# Exhibit 1

```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY

CELGENE CORPORATION,              .
                                  .
        Plaintiff,                .
                                  . Case No. 17-cv-03387
vs.                               .
                                  . Newark, New Jersey
HETERO LABS LIMITED, et al.,      . May 11, 2018
                                  .
        Defendants.               .
                                  .



                    TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE MICHAEL A. HAMMER
               UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

 For the Plaintiff:     WILLIAM C. BATON, ESQ.
                        Saul Ewing Arnstein & Lehr LLP
                        One Riverfront Plaza
                        1037 Raymond Blvd.
                        Suite 1520
                        Newark, NJ 07102
                        (973) 286-6700
                        wbaton@saul.com

                        FRANK CHARLES CALVOSA, ESQ.
                        Quinn Emanuel Urquhart & Sullivan LLP
                        51 Madison Avenue
                        22nd Floor
                        New York, NY 10010
                        (212) 849-7569
                        frankcalvosa@quinnemanuel.com

Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2   For the Plaintiff:      F. DOMINIC CERRITO, ESQ.
                             Quinn Emanuel Urquhart & Sullivan LLP
 3                           51 Madison Avenue
                             22nd Floor
 4                           New York, NY 10010
                             (212) 849-7000
 5                           Nickcerrito@quinnemanuel.com

 6                           MATTHEW J. HERTKO, ESQ.
                             Jones Day
 7                           77 West Wacker
                             Chicago, Illinois  60601-1692
 8                           (312) 269-1581
                             Mhertko@jonesday.com
 9
     For the Defendants      MELISSA E. FLAX, ESQ.
10   Hetero Labs             Carella Byrne Cecchi Olstein Brody &
     Limited, Hetero         Agnello, PC
11   Labs Limited            5 Becker Farm Road
     Unit-V, Hetero          Roseland, NJ 07068
12   Drugs Limited,          (973) 994-1700
     Hetero USA, Inc.:       mflax@carellabyrne.com
13
                             ANDREW M. ALUL, ESQ.
14                           Taft Stettinius & Hollister LLP
                             111 East Wacker
15                           Suite 2800
                             Chicago, IL 60601
16                           (312) 836-4135
                             Aalul@taftlaw.com
17
     For the Defendant       ROBERT JOSEPH FETTWEIS, ESQ.
18   Breckenridge            Fleming Ruvoldt PLLC
     Pharmaceutical,         250 Moonachie Road
19   Inc.:                   Suite 501
                             Moonachie, NJ 07074
20                           (201) 518-7878
                             rfettweis@flemingruvoldt.com
21
                             C. KYLE MUSGROVE, ESQ.
22                           Haynes and Boone
                             800 17th Street NW
23                           Suite 500
                             Washington, D.C. 20006
24                           (202) 654-4502
                             Kyle.musgrove@haynesboone.com
25
```

```
 1  (APPEARANCES continued)

 2  For the Defendant       ARNOLD B. CALMANN, ESQ.
    Mylan                   Saiber LLC
 3  Pharmaceuticals,        One Gateway Center
    Inc.:                   10th Floor
 4                          Newark, NJ 07102-5311
                            (973) 622-3333
 5                          Abc@saiber.com

 6                          ELHAM FIROUZI STEINER, ESQ.
                            Wilson Sonsini Goodrich & Rosati
 7                          12235 El Camino Real
                            San Diego, CA 92130
 8                          (858) 350-2246

 9  For the Defendant       ELEONORE OFOSU-ANTWI, ESQ.
    Teva:                   Walsh Pizzi O'Reilly Falanga LLP
10                          One Riverfront Plaza
                            1037 Raymond Blvd
11                          Suite 600
                            Newark, NJ 07102
12                          (973) 757-1022
                            Eofosuantwi@walsh.law
13
                            CHRISTOPHER T. JAGOE, ESQ.
14                          Kirkland & Ellis LLP
                            601 Lexington Avenue
15                          New York, NY 10022
                            (212) 446-4945
16                          Christopher.jagoe@kirkland.com

17  For the Defendants      GURPREET SINGH WALIA, ESQ.
    Aurobindo Pharma        FisherBroyles, LLP
18  Limited, Aurolife       100 Duffy Ave.
    Pharma LLC, Eugia       Suite 510
19  Pharma Specialties      Hicksville, NY 11801
    Limited:                (929) 429-5721
20                          gurpreet.walia@fisherbroyles.com

21                          JOSEPH SCHRAMM, III
                            FisherBroyles LLP
22                          100 Overlook Center
                            2nd Floor
23                          Princeton, NJ 08540
                            (856) 733-0220
24                          Joseph.Schramm@fisherbroyles.com

25
```

1           (Commencement of proceedings at 10:09 A.M.)

2

3           THE COURT:  All right.  So we are on the record in

4   matter of Celgene Corporation versus Hetero Labs Limited and

5   Celgene Corporation versus Par Pharmaceutical.  The Hetero

6   Labs Limited matter is Civil No. 17-3387.  The Par

7   Pharmaceutical matter is 17-3159.

8           And let me take appearances of counsel, please,

9   beginning with Celgene.

10          MR. BATON:  Good morning, Your Honor, Bill Baton of

11  Saul Ewing Arnstein & Lehr, New Jersey counsel for Celgene.

12          MR. CERRITO:  Good morning, Your Honor.  Nick

13  Cerrito and Frank Calvosa, Quinn Emanuel Urquhart & Sullivan,

14  on behalf of Celgene.

15          MR. HERTKO:  Good morning, Your Honor, Matt Hertko

16  from Jones Day also on behalf of Celgene.

17          THE COURT:  All right.  Did we miss somebody?  No?

18  Okay.

19          Ms. Flax, how are you?

20          MR. FLAX:  Good morning, Your Honor, Melissa Flax

21  from Carella Byrne on behalf of Apotex and Hetero.  And I'll

22  let my cocounsel introduce themselves.

23          MR. ALUL:  Good morning, Your Honor, Andrew Alul

24  from Taft Stettinius & Hollister in Chicago on behalf of the

25  Apotex and Hetero defendants.

 1            THE COURT:  All right.  Good morning.

 2            MR. FETTWEIS:  Good morning, Your Honor.  Robert J.

 3   Fettweis, Fleming Ruvoldt, local counsel for Breckenridge

 4   Pharmaceuticals.  I'm joined by Kyle Musgrove, patent

 5   counsel, Haynes and Boone in Washington.

 6            THE COURT:  All right.  Good to see you,

 7   Mr. Fettweis.

 8            Mr. Calmann.

 9            MR. CALMANN:  Good morning, Your Honor.  Arnold

10   Calmann for Mylan.  And with me is my cocounsel Ellie Steiner

11   from Wilson Sonsini in California.

12            THE COURT:  Ms. Steiner, how are you?

13            MR. CALMANN:   Thank you, Your Honor.

14            MS. OFOSU-ANTWI:  Good morning, Your Honor.

15   Eleonore Ofosu-Antwi from the Walsh firm.  And with me is my

16   cocounsel Chris Jagoe from Kirkland & Ellis for Teva.

17            THE COURT:  Good to see you again, counsel.

18            MR. WALIA:  Good morning, Your Honor.  This is

19   Gurpreet Walia.  And with me is cocounsel Joe Schramm for --

20   from FisherBroyles for Aurobindo --

21            THE COURT:  All right.  Good morning.  All right.

22   So what I'm looking at the most -- I think the most currently

23   substantive correspondence that I have -- and if I'm wrong,

24   please tell me -- is the Docket Entry 164.  This is the

25   Celgene Hetero Labs Limited, April 27th letter.  If I recall,

1  you folks had proposed and I had agreed in both matters to

2  extend the deadline to serve invalidity contentions.

3              MR. CERRITO:  Your Honor, I think they said --

4              THE COURT:  Go ahead.

5              MR. CERRITO:  The April 27th letter dealt with only

6  one particular --

7              THE COURT:  Right.  That was just Hetero.  I'm

8  looking at the March 28th letter and then the April 27th

9  letter.  The March 28th letter was both Par and Hetero.  The

10  April 27th letter, Docket Entry 164, is just Hetero.

11             MR. CERRITO:  Right.  And it dealt -- it only

12  dealt -- it wasn't -- the 164 deals only with a schedule

13  pertaining to Mylan.

14             THE COURT:  Right.

15             MR. CERRITO:  With regard to certain discovery

16  dates there.

17             THE COURT:  Right.  So why don't we do it this way.

18  Why don't I start with Celgene and why don't you bring me up

19  to speed on where we are in both matters where they --

20  because I don't think I've had a conference in this case

21  previously.  Right?  Okay.

22             So why don't you bring me up to speed on where we

23  are with both matters, where they are on the same track,

24  where they diverge, and help me just sort of generally get my

25  bearings.

 1          MR. CERRITO:  To answer that, I guess the last

 2  question first, they're basically on the same track with the

 3  minor exception of the Mylan venue-related discovery.  As

 4  Your Honor knows that's a sort of running -- a separate

 5  isolated issue with Mylan only.

 6          Just to get Your Honor up to speed a little bit,

 7  the case was filed back in 2017.  Initial disclosures in this

 8  case were exchanged in October.  There are --

 9          THE COURT:  I'm sorry.  You say "this case."  We're

10  on -- you're talking about both cases?

11          MR. CERRITO:  Yeah, they were done simultaneously.

12          THE COURT:  That's fine.  Okay.  So -- so go ahead.

13          MR. CERRITO:  Everything runs together, I guess,

14  Your Honor, essentially.

15          THE COURT:  Okay.

16          MR. CERRITO:  There's currently six defendants.

17  There are seven filed, but one defendant decided to go a

18  different route.  But there are six active defendants.  The

19  number of patents asserted here are between four and nine

20  depending on who certified as to what.  So two parties have

21  four.  The remainder of the other four parties have nine

22  patents.

23          The responsive contentions were exchanged back in

24  April 20th -- not an insubstantial endeavor on behalf of,

25  certainly, Celgene.  Nearly a thousand pages were submitted

1   there.

2           As a result, now that, you know, the issues have

3   been framed with contentions, we are now undertaking some

4   discovery.  There has been some letters back and forth

5   between parties concerning certain of the discovery.  We

6   think that there is one issue that is ripe for a decision at

7   this point.  Of course, we'd have to file a motion or ask

8   Your Honor for leave to file a motion.  We're deciding how to

9   approach that, so we may be --

10          THE COURT:  Okay.

11          MR. CERRITO:  -- approaching Your Honor in the near

12  future.  It's a sort of isolated issue.

13          THE COURT:  With respect to both cases or just one

14  or the other?

15          MR. CERRITO:  I -- it'd be both.

16          THE COURT:  Okay.

17          MR. CERRITO:  Yes, Your Honor.  I apologize.  I

18  will -- unless I guess I say --

19          THE COURT:  Unless to the contrary.

20          MR. CERRITO:  I just don't think of them as

21  separate cases, so I apologize.

22          THE COURT:  That's fine.  And I still don't know

23  what I think of them, so....  So let's try and figure all

24  that out.

25          MR. CERRITO:  Fair enough.  Fair enough.  So

1   we're -- again some letters have been exchanged, but it

2   doesn't really be ripe on those issues.

3        We did receive some correspondence late last night

4   concerning defendants' desire to set some dates into the

5   schedule.  We received that last night about 9 o'clock.  We

6   have not, obviously, had a chance to discuss that with our

7   client.

8        We're happy to discuss that with defendants and get

9   back to Your Honor with a recommendation or hopefully an

10  agreement.

11       THE COURT:  Yeah, you actually presage my next

12  question, which is I know that there were -- well, actually I

13  don't know.  Whether we're operating under a viable pretrial

14  scheduling order at this point.

15       MR. CERRITO:  Your Honor, I guess I don't presume

16  to understand what you mean by one --

17       THE COURT:  In other words.  Go ahead.

18       MR. ALUL:  I was just going to say, Your Honor, I

19  don't believe we are.  We're operating on a truncated

20  schedule at best that basically leaves a number of dates open

21  after -- after the claim construction schedule.  And we're

22  almost a year into this case -- I believe we're 10 months

23  into this case.  We're eight months into fact discovery.  I

24  generally agree with what Mr. Cerrito's synopsis of what's

25  happened in this case, except that I believe we've engaged in

```
 1    some very considerable fact discovery.  We served our Rule 34

 2    requests, Rule 33 interrogatories.  We've gotten responses

 3    back from them.  We're working through some deficiencies with

 4    them.  We've served our invalidity contentions, our

 5    noninfringement contentions.  Hundreds of pages.  They served

 6    their response and their infringement contentions.

 7              THE COURT:  Right.

 8              MR. ALUL:  Both sides have exchanged hundreds, if

 9    not thousands, of pages of prior art and other documentary

10    evidence in connection with those contentions.  Really, the

11    only thing we have left to do is take fact deps.  And I

12    believe Celgene has yet to serve Rule 34 requests for

13    documents.  They've already served Rule 34 requests for

14    samples.  We've produced those.

15              So we've had significant fact discovery underway

16    here.  And at least on the defense side, we believe we need a

17    schedule.

18              MR. CERRITO:  Well, Your Honor, I -- had most of

19    it, right up until part where he said --

20              THE COURT:  No, I didn't hear a lot of

21    disagreement.  But, right.

22              MR. CERRITO:  Well -- said we're basically done.  I

23    mean, we basic just started is where we are.

24              Once contentions are served to the parties --

25              THE COURT:  This is going to get interesting.
```

1    Okay.

2              MR. CERRITO:  I mean, that's when you know what

3    your case is.  Right?  They served their contentions.  We

4    responded.  They did hundreds.  We did thousands in response.

5              And now we know where -- that happened April 20th,

6    so couple of weeks ago, basically, we framed the case.

7              Look, we have no problem talking about a schedule.

8    We'll do that offline and present to Your Honor.

9              THE COURT:  Yeah.

10             MR. CERRITO:  Unfortunately, we were sort of

11   sandbagged by their attempt to rush into court with a

12   schedule that never raising it --

13             THE COURT:  I'm sure no sandbagging was intended.

14             But, look, why don't we do it this way, right, and

15   approach it practically.  How about if I give you folks two

16   weeks -- and if this isn't enough time because we have -- we

17   have multiple parties, tell me.  I'll be happy to work with

18   you -- to meet and confer and try to get me a schedule.  And

19   actually, shame on me, I probably should have done that in

20   the run-up to this conference.  But no harm, no foul.

21             So if two weeks is enough time.

22             And then if you folks, as you most certainly will,

23   disagree on this part or that part of the schedule, you'll

24   tell me in that submission what your respective disagreement

25   is, and each of you can please concisely tell me the basis

1  for your position as to that aspect of the schedule on which

2  you disagree.

3          MR. CERRITO:  Yes, Your Honor.

4          MR. ALUL:  Happy to do that, Your Honor.

5          I'd just like to push back on this assertion

6  somehow we sandbagged them.  We asked them on Monday actually

7  for -- then I'll leave it alone.

8          THE COURT:  You're arguing when you're ahead.

9          MR. ALUL:  I'm sorry?

10          THE COURT:  You're arguing while you're ahead.  No,

11  I didn't infer sandbagging.

12          MR. ALUL:  Thank you.  But we have a proposed

13  schedule here with us, but we're happy to meet and confer

14  with them.  Yeah.

15          THE COURT:  Yes, please do that.  Look, if nothing

16  else, I don't expect you folks -- just experience teaches me

17  that you won't agree on the entirety of the schedule,

18  especially if there's at least some disagreement over what's

19  been accomplished, but at least in doing this -- look, here's

20  the truth about being a magistrate judge in complex civil

21  litigation.  Okay?  Unless you're Stanley Chesler, who's

22  obviously no longer a magistrate judge and hasn't been in a

23  while.  But half the time, you're just trying to figure out

24  where the disagreement lies.  Okay?  And you're doing it in,

25  you know, with 10 other conferences going on that day, a

 1    settlement conference that may or may not actually settle.

 2    You don't know because you're only in hour 3, and you still

 3    don't know exactly where the parties are.

 4            So the best thing can you do by meeting and

 5    conferring, if you -- look, in a perfect world, you'll agree

 6    on everything.  But in a less than perfect world, at least

 7    you'll tell me where you disagree and why, and that'll let me

 8    get through it a lot more quickly and get you folks back an

 9    order that reconciles the issues.

10            MR. ALUL:  Thank Your Honor.

11            THE COURT:  All right.  What else you got?

12            MR. CERRITO:  Nothing, Your Honor.

13            THE COURT:  Okay.

14            DEFENSE ATTORNEY:  Your Honor, the only question I

15    have is I know that this is unusual in New Jersey, but given

16    the 30-month stay date, would it be possible to talk to Judge

17    Salas about getting a trial date.  That we had originally

18    proposed that back in front of Judge -- the other magistrate

19    judge in January.

20            THE COURT:  And I'm going to guess, did he say in a

21    sort of skeptical tone, you can ask?

22            DEFENSE ATTORNEY:  I think we actually -- my record

23    of -- is that he said he would talk to her.  In fact,

24    Your Honor, if you look -- my recollection at that time was

25    that he said he would check with Judge Salas, but, obviously,

```
 1   if we had a trial date, then it's much easier to work

 2   backwards.  If that's certainly not something that's done

 3   here, we're fine with that.  But --

 4            THE COURT:  I can -- maybe I'm betraying just sheer

 5   ignorance.  I've not heard of that practice before.

 6            Mr. Cerrito, do you want to --

 7            MR. CERRITO:  I've never heard of that either,

 8   Your Honor.  And just so we're on --

 9            THE COURT:  I'm not saying it doesn't happen.  I'm

10   just saying I haven't heard of that previously.

11            MR. CERRITO:  I've had, as Your Honor knows, many

12   cases before Judge Salas.  I've never heard that.

13            But the 30-month stay in this case is more than two

14   years away.  This was actually a 42-month stay because of the

15   "date certain" filing.  So it's August 2020.  I don't know

16   that we can talk about trial dates two and a half years from

17   now.

18            MR. ALUL:  Just to clarify, Your Honor, in the

19   Rule 16 transcript, Judge Dickson did say that he would check

20   with Judge Salas.

21            THE COURT:  I'm not doubting.

22            MR. ALUL:  Yeah.

23            THE COURT:  Yeah, I don't doubt that.

24            MR. ALUL:  But we're certainly willing to follow

25   whatever the Court's predilection is on this.
```

 1          THE COURT:  Here's what I propose you do.  Hold on.

 2   Let me see if I can find it in the transcript.  I was going

 3   to suggest first submitting a letter, but if it's already in

 4   the transcript, I'm not sure that that's entirely necessary.

 5          MR. ALUL:  Yes, it's -- Your Honor.  We have some

 6   citations.  It's actually in the scheduling order that's in

 7   place.  It's Footnote 2 in the calendar attached to the

 8   schedule.  And you'll see hearing transcript, October 25th,

 9   2017, at 14:24 to 16:5, and then 49 --

10          THE COURT:  I'm sorry.  Wait.  Hold on.  Let me

11   just catch up with you.

12          MR. ALUL:  Sure.

13          THE COURT:  October -- tell me that again.  What's

14   the date?

15          MR. ALUL:  Sure.  It's October 25th, 2017, is the

16   transcript of the Rule 16.

17          THE COURT OFFICER:  What page?

18          MR. ALUL:  Page 14 to 16, and page 49, lines 4

19   through 19.  I actually have it on my phone.  I don't have a

20   hard copy of it here with me.

21          THE COURT:  It's all right.  I've got it here -- or

22   I will.

23          MR. CERRITO:  What may be missing from that written

24   word is the skepticism Judge Dickson showed when that

25   statement was made.

1              But regardless, Your Honor, we're talking about a

2    case --

3              THE COURT:  I'll raise the issue.  I mean --

4              MR. CERRITO:  I would encourage you to talk to

5    Judge Dickson.

6              THE COURT:  J, did you make a note of those page --

7    what are the pages again?  I'm sorry.

8              MR. ALUL:  Sure.  They 14 to 16 and 49.

9              THE COURT:  Okay.  All right.

10             MR. CERRITO:  I think it's, quite frankly, a little

11   unproductive to do this piecemeal and present to Your Honor a

12   full picture.

13             THE COURT:  Here's the other problem -- right? --

14   realistically with predicting a trial schedule or a trial

15   date two years out.  As you folks know, and certainly Judge

16   Salas is eminently sensitive to the 30-month stay issue.  But

17   we also operate -- or she operates as a district judge in a

18   world where criminal cases get priority constitutionally, and

19   trying to predict exactly an open date, you know, in a case

20   for trial purposes is at this point extraordinarily difficult

21   and speculative.

22             But I'll take a look at the transcript, and I'll

23   talk about it.

24             MR. CERRITO:  I guess I would just add, if we're

25   going to go down this road, you know, obviously, this Court's

|Hearing
|17-cv-03387, May 11, 2018

1  well aware of Local Rule 2.4 about Markman scheduling and

2  what expert reports follow therefrom.  We obviously agree

3  with the rule.  We think that you should have Markman ruling

4  before you end up doing expert reports, and maybe more so in

5  this case than in others, since there are so many defendants.

6          THE COURT:  Right.

7          MR. CERRITO:  There's going to be -- and I'm

8  guessing, between all the parties -- remember, I have to show

9  infringement against all of them.  I mean, the different

10  experts against all of them.  There could easily be 15 to 20

11  experts in this case.  To rush with the schedule, to work

12  backwards to set a date when we don't have a Markman may

13  require us to do two sets of expert reports, may require

14  amended contentions, may require all the things that Rule 2.4

15  was set up to avoid.

16          THE COURT:  Right.  I'll say this outset, I'd have

17  some real concerns about locking in a schedule now, just

18  getting sort of up to speed on the case.

19          MR. ALUL:  Understood, Your Honor.  I -- again, we

20  just --

21          THE COURT:  I understand the idea and the purpose

22  behind it.

23          MR. ALUL:  We didn't -- the issue for us is,

24  Your Honor, we're in this case.  We've been in this case now

25  for almost a year or eight months in the fact discovery.

1           THE COURT:  Right.

2           MR. ALUL:  We've hired experts who -- some of whom

3    are physicians, some of whom are university professors who

4    have very busy schedules who are calling me every month

5    saying, when are our services going to be needed?

6           We have corporate clients who for budgetary reasons

7    need to know when big litigation expenditures are going to

8    take place in this case.

9           THE COURT:  Yeah, well, I have to be honest, on

10   that one, your corporate clients are use -- especially in

11   these sort of cases, this is probably something that they've

12   grown accustomed or adapted to by now.

13          MR. ALUL:  Understood.  Okay.  Fair enough,

14   Your Honor.

15          I guess my point is, though, we've been in this

16   case for a year and a half now.  We've hired experts --

17   for -- I'm sorry -- for a year now.  We're eight months into

18   fact discovery.  We know --

19          THE COURT:  He was about to get up and object to

20   year and a half.

21      (Simultaneous conversation)

22          THE COURT:  And you even see him out of the corner

23   of your eyes, so I would think --

24      (Simultaneous conversation)

25          MR. CERRITO:  See, I don't even have to say

```
 1    anything.  I just have to look like I'm going to stand up.

 2              MR. ALUL:  So, you know, again, I find it -- I've

 3    practiced before this Court for years now, and I find it

 4    unusual that we're almost a year into this case, and we don't

 5    have a complete schedule; set aside the trial date issue.

 6    And I think we, on the defense side, would find it very

 7    helpful if we could lock in some days.

 8              THE COURT:  Well, look, at a minimum, here's what I

 9    can promise you.  By the end of -- you folks are going to get

10    me the joint letter by when?  We said in two weeks.  Right?

11              MR. ALUL:  Sure.

12              THE COURT:  So that's the 25th.  By the end of the

13    month, we're going to have a schedule.

14              MR. ALUL:  Great.  Thank you, Your Honor.

15              THE COURT:  It may not have a trial date on it.

16              MR. ALUL:  Sure.

17              THE COURT:  But we're going to have a schedule.

18              MR. ALUL:  Understood.

19              THE COURT:  What else?  Nothing?

20              MR. ALUL:  Your Honor, there was one last issue

21    that we were going to bring up for Apotex and Hetero, and

22    we'd be happy to submit a formal letter application on this

23    particular issue, if Your Honor would like.

24              THE COURT:  Okay.

25              MR. ALUL:  There are, as Mr. Cerrito mentioned,
```

1   nine patents in this case for, I guess, four of the

2   defendant, including both of my clients.  One of the patents

3   is a formulation patent.  It's a very specific formulation

4   patent.  It claims specific capsules of pomalidomide with

5   certain ingredients and certain amounts, weighing certain

6   amounts and having certain sizes.  It's a very, very narrow

7   patent.  And my clients have designed around it.  And we

8   don't infringe.  In fact, a few weeks ago, we got Celgene's

9   infringement contentions, which we're still digesting, but

10  they actually concede no literal infringement.  They only

11  assert infringement under the doctrine of equivalents.  And

12  there, Your Honor, the case law's pretty crystal-clear,

13  Celgene's estopped from asserting infringement of the

14  doctrine of equivalents for two independent reasons: because

15  of how they narrowed their claims during claim construction

16  to avoid the prior art, and because of what they told the

17  Patent Office about their claims to distinguish them from the

18  prior art.  And under Federal Circuit case law, Your Honor,

19  prosecution history estoppel is a legal issue for the Court

20  to decide via pretrial summary judgment motion.  So --

21          THE COURT:  Okay.  So -- I'm sorry -- wait.  So

22  tell me what the request is.

23          MR. ALUL:  So the request is -- the request is for

24  leave to file for summary judgment on this one patent.  And

25  we'd be happy to present it as a letter application to

1    Your Honor.

2            THE COURT:  Yeah, you're probably going to need to,

3    because that's going to be much more Judge Salas's call than

4    mine, but go ahead, Mr. Cerrito.

5            MR. ALUL:  Sure.

6            MR. CERRITO:  I mean, besides disagreeing with

7    everything he just said, and there is a legal issue --

8            THE COURT:  I imagine on the law, you did.  But --

9            MR. CERRITO:  Yeah, and I do -- and also it's an

10   issue underlying --

11           THE COURT:  Do you concede that there's no literal

12   infringement, though?

13           MR. CERRITO:  I believe that is what we said in

14   our -- in the papers.

15           THE COURT:  Okay.  Okay.

16           MR. CERRITO:  But the underlying question of law

17   there, of course, is based on facts.  And so, again -- I know

18   he's been here a long time, I've been here a long time, we've

19   all been here a long time, and rarely do we see summary

20   judgment motions for all the reasons that judges typically

21   don't allow them, because they waste time.  On the one hand,

22   they want to move forward quickly and do all this stuff, but

23   on the other hand, they want to distract us.

24           THE COURT:  Well, they're not proposing to stay

25   discovery.  I mean, you're not proposing to stay discovery.

 1          MR. ALUL:  Oh, no.

 2          THE COURT:  Right.  That's not happening.

 3          MR. CERRITO:  But when it's six against -- when

 4  it's six against one -- easy for them to do that, because

 5  they can all do the work.  I have to do the work against all

 6  of them.  They can choose which one of them does the work.

 7          So, you know, they can make their application, I

 8  guess, Your Honor, but obviously, we would -- we're going to

 9  oppose.

10          THE COURT:  Well, I assume you're going to want to

11  be heard on that?  So you folks will send me a joint letter?

12  Unless you don't want to be heard.

13          MR. ALUL:  Sure.

14          MR. CERRITO:  I mean, I want to be heard to oppose,

15  yes.

16          THE COURT:  Yeah, to oppose him, leave to make the

17  motion.  I assume that you're -- obviously you want to -- you

18  want to be heard on opposing any motion, if it's allowed.

19          MR. CERRITO:  Whatever -- yes, Your Honor.

20          THE COURT:  All right.  So what I'll do --

21          MR. CERRITO:  Well, if a motion will be allowed.

22          MR. BATON:  Yeah, Your Honor, it's Bill Baton.

23  Just to be clear, I think what you're asking is he -- they

24  want to put in a letter --

25          THE COURT:  Yeah.

|Hearing
|17-cv-03387, May 11, 2018

23

```
1              MR. BATON:  -- requesting leave to file a motion.

2              THE COURT:  And I want to know -- your side why

3      that's a bad idea.

4              MR. BATON:  Yes.  Right.

5              MR. CERRITO:  Yes, Your Honor.

6              MR. BATON:  But he's just not going to file a

7      motion.

8              THE COURT:  No.

9              MR. BATON:  Right.  Correct.

10             THE COURT:  All right.  So why don't you folks get

11     that to me also by the 25th.

12             MR. ALUL:  Thank Your Honor.

13             THE COURT:  Okay.  Okay.  Anything else?  All

14     right.  We're adjourned.

15             (Conclusion of proceedings at 10:29 A.M.)

16

17

18

19

20

21

22

23

24

25
```

|Hearing
|17-cv-03387, May 11, 2018
|Certification

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 24 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                    17th of May, 2018

19   _____    _____
     Signature of Approved Transcriber              Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25

# Exhibit 2





# Exhibit 3

# Exhibit 4

# Exhibit 5

| From: | Frank Calvosa |
|---|---|
| Sent: | Monday, July 09, 2018 4:09 PM |
| To: | Joseph Schramm; Andrew Chalson; Pomalyst; Celgene_JD_Lit@jonesday.com; clizza@saul.com; wbaton@saul.com; Moses, David L. |
| Cc: | Gurpreet Walia; Gary Ji |
| Subject: | RE: Celgene v. Par, Hetero (pomalidomide):  Amendments to Non-infringement Contentions |
| Attachments: | REDLINE - Aurobindo Amended Non-infringement Contentions - 427 patent (QE Response).pdf |

Counsel,

Provided that Aurobindo agrees that Celgene may amend its infringement contentions to address Aurobindo's amendments within 45 days of Aurobindo's amended non-infringement contentions being entered by the Court, Celgene agrees to Aurobindo's proposed amendments with the exception of those highlighted in the attached.  Celgene is willing to meet and confer regarding its position.

Best,

**Frank Calvosa**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Joseph Schramm [mailto:joseph.schramm@FisherBroyles.com]
**Sent:** Friday, June 29, 2018 8:27 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; Pomalyst <pomalyst@quinnemanuel.com>; Celgene_JD_Lit@jonesday.com; clizza@saul.com; wbaton@saul.com; Moses, David L. <David.Moses@saul.com>
**Cc:** Gurpreet Walia <Gurpreet.Walia@fisherbroyles.com>; Gary Ji <Gary.Ji@fisherbroyles.com>
**Subject:** RE: Celgene v. Par, Hetero (pomalidomide): Amendments to Non-infringement Contentions

Frank,

Attached is a redline comparing Aurobindo's proposed amended non-infringement contentions that we circulated yesterday against Aurobindo's original contentions.  We propose that Aurobindo's non-infringement contentions for the other patents would remain unchanged, despite this redline showing edits in those sections because we only provided those pertinent sections of the proposed amended non-infringement contentions that relate to the '427 patent.

Regards,

Joe

**Joseph Schramm, III, Esq.**
**FisherBroyles, LLP**
Direct: 856.733.0220 | joseph.schramm@fisherbroyles.com | fisherbroyles.com

---

**From:** Frank Calvosa [mailto:frankcalvosa@quinnemanuel.com]
**Sent:** Friday, June 29, 2018 11:41 AM
**To:** Joseph Schramm <joseph.schramm@FisherBroyles.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>;
Pomalyst <pomalyst@quinnemanuel.com>; Celgene_JD_Lit@jonesday.com; clizza@saul.com; wbaton@saul.com;
Moses, David L. <David.Moses@saul.com>
**Cc:** Gary Ji <Gary.Ji@fisherbroyles.com>
**Subject:** RE: Celgene v. Par, Hetero (pomalidomide): Amendments to Non-infringement Contentions

Counsel,

Can you please provide a redline against Aurobindo's original contentions so that we may consider.

Thanks,

**Frank Calvosa**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Joseph Schramm [mailto:joseph.schramm@FisherBroyles.com]
**Sent:** Thursday, June 28, 2018 5:57 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>;
Pomalyst <pomalyst@quinnemanuel.com>; Celgene_JD_Lit@jonesday.com; clizza@saul.com; wbaton@saul.com;
Moses, David L. <David.Moses@saul.com>
**Cc:** Gary Ji <Gary.Ji@fisherbroyles.com>
**Subject:** RE: Celgene v. Par, Hetero (pomalidomide): Amendments to Non-infringement Contentions

Counsel,

Attached are Aurobindo's and Eugia's proposed amendments to their non-infringement contentions.  For purposes of
Celgene considering whether to consent to this request, we've included only those portions of the non-infringement
contentions relating to the '427 patent because those are the only sections of the non-infringement contentions to
which Aurobindo and Eugia propose amendments at this time.

Please let us know by July 6, 2018 whether Celgene will consent to this amendment.

2

# Exhibit 6

**From:** Scharn, Nathan [mailto:nscharn@wsgr.com]
**Sent:** Monday, July 23, 2018 4:44 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; Hanson, Tina <thanson@wsgr.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; Pomalyst <pomalyst@quinnemanuel.com>; Moses, David L. <David.Moses@saul.com>; Matthew J Hertko <mhertko@jonesday.com>; Cary Miller <cmiller@jonesday.com>; Clark, Douglas L. <dlclark@jonesday.com>; Anthony Insogna <aminsogna@jonesday.com>; Steven J Corr <sjcorr@JonesDay.com>; Celgene_JD_Lit@jonesday.com; Slavin, Elina <Elina.Slavin@saul.com>; *wbaton@saul.com <wbaton@saul.com>; DuFault, Andrea L. <aldufault@JonesDay.com>; *clizza@saul.com <clizza@saul.com>
**Cc:** Kong, T.O. <TKong@wsgr.com>; Steiner, Ellie <esteiner@wsgr.com>; Siedlak, Sarah <ssiedlak@wsgr.com>; Arnie Calmann <ACalmann@saiber.com>; Jakob B. Halpern <JHalpern@saiber.com>
**Subject:** RE: Celgene v. Par, Hetero Non-infringement Contentions

Counsel,

Thank you for taking the time to meet and confer last week.  As discussed on the call, the parties are at an impasse with respect to the Mylan Defendants' proposed amended non-infringement contentions, and the Mylan Defendants will seek relief with the Court.

Regards,
Nathan

Nathaniel R. Scharn ▪ Wilson Sonsini Goodrich & Rosati, PC
12235 El Camino Real, Suite 200, San Diego, CA 92130-3002
Phone | 858.350.2371 ▪ Fax | 858.350.2399

**From:** Frank Calvosa [mailto:frankcalvosa@quinnemanuel.com]
**Sent:** Thursday, July 19, 2018 7:39 AM
**To:** Scharn, Nathan; Hanson, Tina; Andrew Chalson; Pomalyst; Moses, David L.; Matthew J Hertko; Cary Miller; Clark, Douglas L.; Anthony Insogna; Steven J Corr; Celgene_JD_Lit@jonesday.com; Slavin, Elina; *wbaton@saul.com; DuFault, Andrea L.; *clizza@saul.com
**Cc:** Kong, T.O.; Steiner, Ellie; Siedlak, Sarah
**Subject:** RE: Celgene v. Par, Hetero Non-infringement Contentions

Nathan,

We can be available Friday at 11 am PT/2 pm ET.  Please circulate a dial in.

Thank you,

**Frank Calvosa**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX

frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Scharn, Nathan [mailto:nscharn@wsgr.com]
**Sent:** Wednesday, July 18, 2018 5:53 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; Hanson, Tina <thanson@wsgr.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; Pomalyst <pomalyst@quinnemanuel.com>; Moses, David L. <David.Moses@saul.com>; Matthew J Hertko <mhertko@jonesday.com>; Cary Miller <cmiller@jonesday.com>; Clark, Douglas L. <dlclark@jonesday.com>; Anthony Insogna <aminsogna@jonesday.com>; Steven J Corr <sjcorr@JonesDay.com>; Celgene_JD_Lit@jonesday.com; Slavin, Elina <Elina.Slavin@saul.com>; *wbaton@saul.com <wbaton@saul.com>; DuFault, Andrea L. <aldufault@JonesDay.com>; *clizza@saul.com <clizza@saul.com>
**Cc:** Kong, T.O. <TKong@wsgr.com>; Steiner, Ellie <esteiner@wsgr.com>; Siedlak, Sarah <ssiedlak@wsgr.com>
**Subject:** RE: Celgene v. Par, Hetero Non-infringement Contentions

Frank,

Please provide your availability for Thursday between 3 PM and 5 PM PT and Friday between 9:30 AM and 3 PM PT to meet and confer regarding Celgene's objection.

Regards,
Nathan

Nathaniel R. Scharn ▪ Wilson Sonsini Goodrich & Rosati, PC
12235 El Camino Real, Suite 200, San Diego, CA 92130-3002
Phone | 858.350.2371 ▪ Fax | 858.350.2399

**From:** Frank Calvosa [mailto:frankcalvosa@quinnemanuel.com]
**Sent:** Monday, July 09, 2018 1:09 PM
**To:** Hanson, Tina; Andrew Chalson; Pomalyst; Moses, David L.; Matthew J Hertko; Cary Miller; Clark, Douglas L.; Anthony Insogna; Steven J Corr; Celgene_JD_Lit@jonesday.com; Slavin, Elina; *wbaton@saul.com; DuFault, Andrea L.; *clizza@saul.com
**Cc:** Kong, T.O.; Steiner, Ellie; Scharn, Nathan; Siedlak, Sarah
**Subject:** RE: Celgene v. Par, Hetero Non-infringement Contentions

Counsel,

Celgene objects to Mylan's proposed amended non-infringement contentions.  Celgene is willing to meet and confer regarding its position.

Best,

**Frank Calvosa**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Hanson, Tina [mailto:thanson@wsgr.com]
**Sent:** Monday, June 25, 2018 4:24 PM
**To:** Frank Calvosa <frankcalvosa@quinnemanuel.com>; Andrew Chalson
<andrewchalson@quinnemanuel.com>; Pomalyst <pomalyst@quinnemanuel.com>; Moses, David L.
<David.Moses@saul.com>; Matthew J Hertko <mhertko@jonesday.com>; Cary Miller
<cmiller@jonesday.com>; Clark, Douglas L. <dlclark@jonesday.com>; Anthony Insogna
<aminsogna@jonesday.com>; Steven J Corr <sjcorr@JonesDay.com>; Celgene_JD_Lit@jonesday.com;
Slavin, Elina <Elina.Slavin@saul.com>; *wbaton@saul.com <wbaton@saul.com>; DuFault, Andrea L.
<aldufault@JonesDay.com>; *clizza@saul.com <clizza@saul.com>
**Cc:** Kong, T.O. <TKong@wsgr.com>; Steiner, Ellie <esteiner@wsgr.com>; Scharn, Nathan
<nscharn@wsgr.com>; Siedlak, Sarah <ssiedlak@wsgr.com>
**Subject:** Celgene v. Par, Hetero Non-infringement Contentions

Counsel,

Further to the correspondence between the parties, attached is a draft of the Mylan Defendants'
proposed supplemental non-infringement contentions.  Please let us know if Celgene consents to our
application to serve these contentions.

Regards,
Tina

**Tina Hanson**
**Wilson Sonsini Goodrich & Rosati**
One Market │ Spear Tower │ San Francisco, CA │ 94105-1126
Direct:  (415) 947-2048 │ Email: thanson@wsgr.com

This email and any attachments thereto may contain private, confidential, and privileged material
for the sole use of the intended recipient.  Any review, copying, or distribution of this email (or
any attachments thereto) by others is strictly prohibited.  If you are not the intended recipient,
please contact the sender immediately and permanently delete the original and any copies of this
email and any attachments thereto.

# Exhibit 7

Liza M. Walsh
Christine I. Gannon
Eleonore Ofosu-Antwi
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, N.J. 07102
Tel.: (973) 757-1100

*Of Counsel:*
Jay P. Lefkowitz
Jeanna M. Wacker
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

Kristen P.L. Reichenbach
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel.: (415) 439-1400

*Attorneys for Defendant Teva Pharmaceuticals USA, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CELGENE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-3159 (ES)(JAD) |
| | ) | |
| PAR PHARMACEUTICAL, INC., PAR | ) | |
| PHARMACEUTICAL COMPANIES, INC., | ) | |
| and TEVA PHARMACEUTICALS USA, | ) | **HIGHLY CONFIDENTIAL –** |
| INC., | ) | **OUTSIDE COUNSEL'S EYES** |
| | ) | **ONLY** |
| Defendants. | ) | |

**TEVA PHARMACEUTICALS USA, INC.'S NON-INFRINGEMENT CONTENTIONS WITH RESPECT TO U.S. PATENT NOS. 8,198,262, 8,673,939, 8,735,428, AND 8,828,427**

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Pursuant to Local Patent Rule 3.6, Teva Pharmaceuticals USA, Inc. ("Teva") hereby submits to Plaintiff Celgene Corporation ("Celgene" or "Plaintiff") its non-infringement contentions for the Asserted Claims of U.S. Patent Nos. 8,198,262 ("the '262 patent"), 8,673,939 ("the '939 patent"), 8,735,428 ("the '428 patent"), and 8,828,427 ("the '427 patent") (collectively, "the Patents-in-Suit").

As identified in Celgene's Disclosure of Asserted Claims, dated November 1, 2017, Celgene has stated that it will assert the following claims of the Patents-in-Suit ("the Asserted Claims") under 35 U.S.C. § 271(a), (b), (c), (e)(2)(A):

| Patent | Asserted Claims |
|---|---|
| '262 patent [DEFS_POM_00010468-496] | 1, 2, 4–16, 18–27, 29 |
| '939 patent [DEFS_POM_00010605-634] | 1–14, 16–35 |
| '428 patent [DEFS_POM_00010664-693] | 1–27 |
| '427 patent [DEFS_POM_00013547-563] | 3–10 |

In the event that Celgene attempts to assert additional claims, Teva reserves its right to object and to respond with supplemental contentions if the new assertions are permitted.

Teva reserves the right to supplement and/or amend these contentions in accordance with any Scheduling Order entered by the Court. Teva has prepared these contentions based on information and discovery currently available to it. The Court has yet to construe any claim of the Patents-in-Suit. Fact discovery has just begun, and expert discovery has not yet begun in this case. Teva's investigation into the non-infringement and invalidity of the Patents-in-Suit continues. Accordingly, Teva reserves the right to seek leave to amend, alter, or supplement these non-infringement contentions at any time based on further investigation, discovery, testing and/or expert testimony as the case progresses, any claim construction from the court, the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

contentions of any parties in litigation involving any of the Patents-in-Suit, or as a result of Celgene's Asserted Claims, contentions, and infringement positions.

Teva further reserves the right to supplement and/or amend these contentions when Plaintiff provides its infringement allegations, or to the extent any claim construction ruling by the Court modifies Teva's positions herein and/or provides a basis for additional non-infringement contentions.  Teva otherwise reserves the right to serve additional, supplemental, and/or revised non-infringement contentions as necessary or appropriate and as provided under the Local Patent Rules or any other applicable Rules or order of the Court.  Teva also reserves the right to supplement or amend these non-infringement contentions after the claims of the Patents-in-Suit are construed by the Court.

These contentions should not be taken as an indication of Teva's position with regard to the proper construction of any claim term.  Rather, Teva has made reasonable assumptions, to the extent necessary and appropriate, as to the meaning of the claim terms for the purposes of these contentions only and has used those meanings to prepare these contentions.  To the extent that Teva determines that a different meaning is appropriate for any claim term, it will assert that meaning in connection with the claim construction proceedings, and it reserves the right to amend these contentions as a result of the *Markman* hearing, or any other subsequent clarification or alteration of the meaning of the claim terms.

These contentions are made pursuant to Federal Rule of Evidence 502.  To the extent these contentions contain any information that may be protected from discovery under the attorney-client privilege, the attorney work-product immunity, the common interest doctrine, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.  The information set forth in these contentions is

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other, on the grounds of privilege, relevance, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided below at any time.

In accordance with 21 U.S.C. § 355(j)(2)(B)(ii), Teva provided confidential notice in the form of a "Notice Letter" to Plaintiff that it sought FDA approval to market drug products under its Abbreviated New Drug Application No. 209956 ("Teva's ANDA") before the expiration date of the Patents-in-Suit.  Teva's Notice Letter set forth, among other things, a detailed statement of the factual and legal bases that the claims of the Patents-in-Suit are invalid, not infringed, or both, by Teva's ANDA products.  Teva hereby incorporates by reference its Notice Letter dated March 30, 2017 and its accompanying enclosure as they relate to the non-infringement of the Patents-in-Suit as if fully set forth herein.

These contentions are marked and designated "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" in anticipation of the entry of a discovery confidentiality order pursuant to L. Pat. R. 2.2.  Accordingly, because these contentions contain references to Teva's ANDA, these contentions are subject to the restrictions contained in L. Pat. R. 2.2.

## I.      WRITTEN BASIS UNDER L. PAT. R. 3.6(E)

Celgene bears the burden of proving that Teva's ANDA infringes the Asserted Claims. Celgene has not met that burden.  Teva does not concede that Celgene has proven direct or indirect literal infringement or infringement under the doctrine of equivalents of any element of the Asserted Claims, and Teva reserves the right to challenge the sufficiency of proof of infringement of any and all elements of the Asserted Claims.  All documents within Teva's possession, custody, and control that Teva presently intends to rely on in support of these non-

4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

infringement contentions have already been produced.  Pursuant to L. Pat. R. 3.6(f), Teva expressly reserves the right to produce additional documents should such documents be identified.  Additionally, Teva reserves the right to rely upon documents produced by Celgene pursuant to L. Pat. R. 3.4A(e) and 3.6(h).

As set forth below and in Exhibits A–D, Teva identifies, for each Asserted Claim, which claim limitations are literally absent from the pomalidomide drug products described in Teva's Abbreviated New Drug Application No. 209956 ("Teva's ANDA Products").  Teva sets forth additional contentions below, including on non-infringement under the doctrine of equivalents and indirect non-infringement.

In addition to the individual reasons identified below, Teva does not infringe any of the Asserted Claims because an invalid claim cannot be infringed.  As set forth in detail in Defendants' Joint Initial Invalidity Contentions Pursuant L. Pat. R. 3.6(c), also served on December 15, 2017, each of the Asserted Claims is invalid under, *inter alia*, 35 U.S.C. §§ 102–103, 112.  Because the Asserted Claims are invalid, Teva cannot infringe any of these claims with respect to the products disclosed in its ANDA No. 209956.

To the extent Plaintiff chooses to assert infringement under the doctrine of equivalents, the Plaintiff bears the burden of proof.  *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014); *Interwoven, Inc. v. Vertical Comput. Sys.*, CV 10-04645 RS, 2013 WL 3786633, at *6 (N.D. Cal. July 18, 2013) ("it is not [the alleged infringer's] burden to disprove infringement under the doctrine of equivalents by pointing out differences between its products and the patented product.  Rather [] it is [the patentee] who bears the burden").  As part of that burden, Plaintiff must identify on a limitation-by-limitation basis the missing claimed feature and the equivalent structure in the accused product.  *AquaTex Indus., Inc. v. Techniche Sols.*, 479

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

F.3d 1320, 1328 (Fed. Cir. 2007).  Additionally, the Plaintiff has the burden of establishing that the structure is equivalent under an appropriate legal test.  The Supreme Court has set out two frameworks for evaluating equivalency under the doctrine of equivalents: (1) the function-way-result test, which asks whether an alleged equivalent performs substantially the same function in substantially the same way to obtain the same result; and (2) the insubstantial differences test, which asks whether the substitute element plays a role substantially different from the claimed element.  *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608-9 (1950); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).  The Federal Circuit recently advised that "the substantial differences test may be more suitable than [the function-way-result test] for determining equivalence in the chemical arts."  *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 869 (Fed. Cir. 2017).  As a matter of law, the Plaintiff may be precluded from arguing infringement under the doctrine of equivalents.

Teva's arguments provided herein that there is no evidence that Teva's ANDA Products infringe under the doctrine of equivalents are made without knowledge of Celgene's infringement contentions, which have not yet been served.  Thus, at this time, Celgene has not yet provided any limitation-by-limitation identification of any equivalent structure in the accused product, nor has Celgene provided any argument or analysis as to why such unnamed structure(s) should be considered equivalent to a claimed feature.  Accordingly, Teva reserves the right to amend and/or supplement these non-infringement contentions if Celgene asserts infringement under the doctrine of equivalents, such amendments and/or supplements may include contentions that Celgene's doctrine of equivalents allegations are precluded by law, responses to any arguments that Teva's ANDA Products are not substantially different from claimed features, and/or responses to arguments that Teva's ANDA Products perform the same function in

6

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

substantially the same way to obtain the same result as claimed features.  Additionally, Teva reserves the right to respond with a hypothetical claim where Celgene's doctrine of equivalents arguments impermissibly ensnare the prior art.

> ### A.     '428 Patent
>
> #### 1.     No Direct Infringement of Claims 1–27: A method of treating multiple myeloma, which comprises administering to a patient having multiple myeloma

Each of the Asserted Claims of the '428 patent recites "[a] method of treating multiple myeloma which comprises administering to a patient having multiple myeloma" the specified compound in the specified manner.  Additionally, claim 17 recites "administering a therapeutically effective amount of an additional active agent."  Claim 27 recites "administering a therapeutically effective amount of dexamethasone."  Claim 16 requires the compound be "administered" as recited "until disease progression."  Teva will not "administer" to any patients, and Teva will not treat multiple myeloma.  Additionally, Teva will not "administer" any additional active agent or dexamethasone.  Teva will also not "administer the claimed" compound "until disease progression."  For at least these reasons, Teva does not directly infringe any claim of the '428 patent.

> #### 2.     No Indirect Infringement of Claim 3: Prior therapy with thalidomide, a proteasome inhibitor, or a combination thereof

Claim 3 recites the method of claim 1, "wherein the previous therapy is treatment with thalidomide, a proteasome inhibitor, or a combination thereof."  Teva's proposed prescribing information (TEVA_POM_00000089–115, the "Teva Proposed Label") does not instruct patients or physicians to administer pomalidomide to patients who have had previous therapy with thalidomide, a proteasome inhibitor, or a combination thereof.  The Indications and Usage section of the Teva Proposed Label states that the Teva ANDA Products are "indicated for

7

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

patients with multiple myeloma who have received at least two prior therapies including

<u>lenalidomide and</u> a proteasome inhibitor." *See*, *e.g.* TEVA_POM_00000089 at

TEVA_POM_00000090 (emphasis added).  For example, the Teva Proposed Label makes no

reference to patients having previous treatment with thalidomide, a proteasome inhibitor alone,

or a combination of a proteasome inhibitor and thalidomide, let alone directing physicians to

prescribe to such patients.  Instead, Teva's Proposed Label's indication requires patients to have

had two previous therapies, including both lenalidomide and a proteasome inhibitor.  Teva's

Proposed Label details the mechanism of action by which the Teva ANDA Products perform in

patients who have had prior therapy specifically with lenalidomide (*See*, *e.g.*

TEVA_POM_00000089 at TEVA_POM_00000102  "pomalidomide inhibited the proliferation

of lenalidomide-resistant multiple myeloma cell lines").  Therefore, the Teva Proposed Label

does not "encourage, recommend, or promote infringement" of this claim and there can be no

finding of induced infringement under § 271(b).  *Takeda Pharm. U.S.A., Inc. v. West-Ward*

*Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015).

Additionally, Teva cannot be held liable for contributory infringement of claim 3 under §

271(c) as, *inter alia*, there are substantial non-infringing uses.  On-label use for the sole approved

indication of pomalidomide will result in the treatment of patients who have not received prior

therapy with thalidomide, a proteasome inhibitor, or a combination thereof, which is more than

an "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental" use and is

therefore substantial. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir.

2009); *In re Depomed Patent Litig.*, No. 13-4507 (CCC-MF), 2016 WL 7163647, at *68 (D.N.J.

Sept. 30, 2016) (finding no contributory infringement, and that the on-label use of a drug was

substantial non-infringing use); (*see, e.g.* TEVA_POM_00000089 at TEVA_POM_00000104–

8

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

06, Tables 4 and 6, indicating that for some patients in Trials 1 and 2 "Number of Prior Therapies" was two prior therapies ("min") – Trials 1 and 2 both required prior treatments with lenalidomide and bortezomib, therefore these patients had received no other prior treatment).

Additionally, there is no evidence of infringement under the doctrine of equivalents. Teva's Proposed Label and the claimed method are not insubstantially different, and do not perform substantially the same function, in substantially the same way, with substantially the same result. For example, the "result" of following Teva's Proposed Label is not substantially the same as that achieved by following the steps of claim 3. The importance of the patient's prior therapy is emphasized in the specification of the '262 patent,[1] which alleges there is a "significant need" for methods of treating "diseases that are refractory to standard treatments." ('262 patent at 3:8–14; *see also, e.g.* 17:52–56). Teva's Proposed Label would not necessarily result in the administration of pomalidomide to patients who have received prior therapy with thalidomide, a proteasome inhibitor, or a combination thereof.

Thus, there is no evidence that Teva induces or contributes to the infringement of claim 3 under the doctrine of equivalents. For at least these reasons, Teva does not indirectly infringe claim 3.

### 3.     No Indirect Infringement of Claim 4: Prior therapy with stem cell transplantation

Claim 4 recites the method of claim 1, "wherein the previous therapy is treatment with stem cell transplantation." Teva's Proposed Label does not instruct patients or physicians to administer the Teva ANDA Products to patients who have had prior stem cell transplantation therapy. For example, the Indications and Usage section of the Teva Proposed Label states that

---

[1]     The '428, '939 and '262 patents share a common specification.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

the Teva ANDA Products are "indicated for patients with multiple myeloma who have received at least two prior therapies including lenalidomide and a proteasome inhibitor."  *See*, *e.g.* TEVA_POM_00000089 at TEVA_POM_00000089–90.  The Teva Proposed Label provides no instruction or encouragement to administer pomalidomide to patients having previously being treated with stem cell transplantation.  Instead, Teva's Proposed Label's indication requires patients to have had two previous therapies: lenalidomide and a proteasome inhibitor. Teva's Proposed Label details the mechanism of action by which the Teva ANDA Products perform in patients who have had prior therapy with lenalidomide (*See*, *e.g.* TEVA_POM_00000089 at TEVA_POM_00000102 "pomalidomide inhibited the proliferation of lenalidomide-resistant multiple myeloma cell lines").  Therefore, the Teva Proposed Label does not "encourage, recommend, or promote infringement" of this claim and there can be no finding of induced infringement under § 271(b).  *Takeda Pharm. U.S.A., Inc.*, 785 F.3d at 631.  Additionally, Teva cannot be held liable for contributory infringement of claim 4 under § 271(c) as, *inter alia*, there are substantial non-infringing uses.  On-label use for the sole approved indication of pomalidomide will result in the treatment of a patients who have not received prior therapy with stem cell transplantation, which is more than an "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental" use and is therefore substantial (*see*, *e.g.* TEVA_POM_00000089 at TEVA_POM_00000106, Table 6 "Trial 2", indicating that 29–31% of patients had not received prior stem cell transplant).  *Vita-Mix Corp.*, 581 F.3d at 1327; *In re Depomed Pat. Litig.*, 2016 WL 7163647, at *68 (finding no contributory infringement, and that the on-label use of a drug was substantial non-infringing use).

Additionally, there is no evidence of infringement under the doctrine of equivalents. Teva's Proposed Label and the claimed method are not insubstantially different, and do not

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

perform substantially the same function, in substantially the same way, with substantially the same result.  For example, the "result" of following Teva's Proposed Label is not substantially the same as that achieved by following the steps of claim 4.  The importance of the patient's prior therapy is emphasized in the specification of the '262 patent, which alleges there is a "significant need" for methods of treating "diseases that are refractory to standard treatments." ('262 patent at 3:8–14; *see also, e.g.* 17:52–56.)  Teva's Proposed Label would not necessarily result in the administration of pomalidomide to patients who have received prior therapy with stem cell transplantation.  Thus, there is no evidence that Teva induces or contributes to the infringement of claim 4 under the doctrine of equivalents.

> For at least these reasons, Teva does not indirectly infringe claim 4.

### 4.    No Indirect Infringement of Claims 5 and 23: Prior therapy with a proteasome inhibitor

Claim 5 recites the method of claim 2, "wherein the previous therapy is treatment with a proteasome inhibitor."  Claim 23 recites the method of claim 22, "wherein the previous therapy is treatment with a proteasome inhibitor." The Teva Proposed Label does not instruct patients or physicians to administer the Teva ANDA Product to patients who have had prior therapy solely with a proteasome inhibitor.  The Indications and Usage section of the Teva Proposed Label states that the Teva ANDA Products are "indicated for patients with multiple myeloma who have received at least two prior therapies including lenalidomide <u>and</u> a proteasome inhibitor."  *See*, *e.g.* TEVA_POM_00000089 at TEVA_POM_00000089–90 (emphasis added).  For example, the Teva Proposed Label makes no reference to patients having previously had prior therapy solely with a proteasome inhibitor, let alone directing physicians to prescribe to such patients.  Instead, Teva's Proposed Label's indication requires patients to have had two previous therapies, including lenalidomide and a proteasome inhibitor.  Therefore, the Teva Proposed Label does not

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

"encourage, recommend, or promote infringement" of these claims and there can be no finding of induced infringement under § 271(b). *Takeda Pharm. U.S.A., Inc.,* 785 F.3d at 631. Additionally, Teva cannot be held liable for contributory infringement of claims 5 or 23 under § 271(c) as, *inter alia*, there are substantial non-infringing uses. On-label use for the sole approved indication of pomalidomide will result in the treatment of a patients who have not received prior therapy solely with a proteasome inhibitor, which is more than an "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental" use and is therefore substantial. *Vita-Mix Corp.,* 581 F.3d 1 at 1327; *In re Depomed Pat. Litig.*, 2016 WL 7163647, at *68 (finding no contributory infringement, and that the on-label use of a drug was substantial non-infringing use).

Additionally, there is no evidence of infringement under the doctrine of equivalents. Teva's Proposed Label and the claimed method are not insubstantially different, and do not perform substantially the same function, in substantially the same way, with substantially the same result. For example, the "result" of following Teva's Proposed Label is not substantially the same as that achieved by following the steps of claims 5 and 23. The importance of the patient's prior therapy is emphasized in the specification of the '262 patent, which alleges there is a "significant need" for methods of treating "diseases that are refractory to standard treatments." ('262 patent at 3:8–14; *see also, e.g.* 17:52–56). Teva's Proposed Label would not necessarily result in the administration of pomalidomide to patients who had prior therapy solely with a proteasome inhibitor. Thus, there is no evidence that Teva induces or contributes to the infringement of claims 5 or 23 under the doctrine of equivalents.

For at least these reasons Teva does not indirectly infringe claims 5 or 23.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### 5. No Indirect Infringement of Claims 6 and 7: Patients 65 years or younger/older than 65

Claim 6 recites the method of claim 1, "wherein the patient is older than 65 years." Claim 7 recites the method of claim 1, "wherein the patient is 65 years or younger." Mere knowledge of possible infringing use by others, even if established by Celgene, does not amount to inducement, and instead "specific intent and action to induce infringement must be proven." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003). The Teva Proposed Label does not instruct patients or physicians to infringe this claim requiring administration to a patient of any age, and specifically does not require administration to a patient 65 years or younger, or older than 65 years. *See, e.g.* TEVA_POM_00000089 at TEVA_POM_00000089– 90. For example, the Indications and Usage section of the Teva Proposed Label does not direct usage in patients of any particular age. TEVA_POM_00000089 at TEVA_POM_00000089–90. Section 8 on Use in Specific Populations does not recommend or direct use in patients of any particular age, only noting that "[n]o dosage adjustment is required for pomalidomide based on age." TEVA_POM_00000089 at TEVA_POM_00000101. Although this section of the Teva Proposed Label states that patients over 65 years of age were more likely to experience pneumonia, such "warnings convey little more than the knowledge of possible infringement, not the specific intent and action to induce required for infringement." *Otsuka Pharm. Co. v. Torrent Pharm. Ltd.,* 99 F. Supp. 3d 461, 494 (D.N.J. 2015); *Takeda Pharms. U.S.A., Inc.,* 785 F.3d at 631 ("[m]erely 'describ[ing]' an infringing mode is not the same as 'recommend[ing],' 'encourag[ing],' or 'promot[ing]' an infringing use, or suggesting that an infringing use 'should' be performed.") (internal citations omitted). Therefore the Teva Proposed Label does not "encourage, recommend, or promote" use in patients 65 years or younger, or older than 65 years and does not induce infringement of these claims. Additionally, Teva cannot be held liable for

13

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

contributory infringement of claims 6 and 7 under § 271(c) as, *inter alia*, there are substantial

non-infringing uses.

Additionally, there is no evidence of infringement under the doctrine of equivalents.

Teva's Proposed Label and the claimed method are not insubstantially different, and do not

perform substantially the same function, in substantially the same way, with substantially the

same result.  Thus, there is no evidence that Teva induces or contributes to the infringement of

claims 6 or 7 under the doctrine of equivalents.

For at least these reasons, Teva does not indirectly infringe claims 6 and 7.

### 6. No Indirect Infringement of Claims 17–21 and 27: Administering of dexamethasone or additional active agent

Claim 17 recites the method of claim 1, further comprising "administering a

therapeutically effective amount of an additional active agent."  Claims 18–21 depend from

claim 17, and additionally require the "additional active agent" be dexamethasone.  Claim 19

recites the method of claim 1 "wherein 40 mg dexamethasone is administered."  Claim 27 recites

the method of claim 22, further comprising "administering a therapeutically effective amount of

dexamethasone."  Claim 20 recites the method of claim 1, "wherein the dexamethasone is orally

administered once daily on days 1, 8, 15 and 22 of each 28 day cycle."  Claim 21 recites the

method of claim 1, "wherein the dexamethasone is orally administered once a week of each 28

day cycle."

The Teva Proposed Label does not instruct patients or physicians to administer an

additional active agent or dexamethasone at any specific dosage or using any specific route of

administration, nor does the Teva Proposed Label instruct patients or physicians to administer

dexamethasone on any specific schedule, let alone the schedules recited by claims 20 and 21.

The Indications and Usage section of the Teva Proposed Label states the Teva ANDA Products

14

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

are indicated "in combination with dexamethasone, for patients with multiple myeloma."

TEVA_POM_00000089 at TEVA_POM_00000089–90.  The Dosage and Administration

section of the Teva Proposed Label does not direct any specific dosage, specific schedule, nor

route of administration for any additional active agent or dexamethasone.  *Id.*  The statements in

Teva's Proposed Label do not amount to an instruction to administer dexamethasone once daily

on days 1, 8, 15 and 22 of each 28 day cycle, or once a week of each 28 day cycle.  While the

Clinical Studies section of the label refers to dexamethasone being administered in a trial at 20

mg and 40 mg, this does not amount to an instruction to administer dexamethasone at either of

these dosages.  Further, the Clinical Studies section of the label refers to dexamethasone being

administered in a clinical study either once daily on days 1, 8, 15 and 22 of a 28-day cycle, or

once per day on days 1 through 4, 9 through 12, and 17 through 20 of a 28-day cycle.

TEVA_POM_00000089 at TEVA_POM_000000105–06.  This is not an instruction to

administer dexamethasone according to the claimed schedule.  The possibility that physicians

may look outside the Teva Proposed Label to determine the dosage of an active agent or of

dexamethasone, or the proper schedule for such administration, is insufficient for a finding of

induced infringement.  *Otsuka Pharm. Co., Ltd.*, 99 F. Supp. 3d at 493 (an instruction

"specifically directs that a particular action, or series of actions be taken"); *United Therapeutics

Corp. v. Sandoz, Inc.*, 12-CV-01617, 2014 WL 4259153, at *17 (D.N.J. Aug. 29, 2014) (a

"scholarly scavenger hunt" through the label to identify statements that may inferentially but not

inevitably tie to a physician's acts is insufficient to establish inducement).  Therefore, the Teva

Proposed Label does not "encourage, recommend, or promote infringement" of these claims and

there can be no finding of induced infringement under § 271(b). *Takeda Pharm. U.S.A., Inc.,* 785

F.3d at 631.  Additionally, Teva cannot be held liable for contributory infringement of claims

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

17–21 and 27 under § 271(c) as, *inter alia*, there are substantial non-infringing uses.  On-label use for the sole approved indication of pomalidomide in combination with dexamethasone at dosages other than those required by the claims, e.g. 40 mg, and according schedules other than those required by the claims, is more than an "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental" use and is therefore substantial.  *Vita-Mix Corp.,* 581 F.3d at 1327.

Additionally, there is no evidence of infringement under the doctrine of equivalents.  Teva's Proposed Label and the claimed method are not insubstantially different, and do not perform substantially the same function, in substantially the same way, with substantially the same result.  The specification to the '428 patent states that the amounts of additional active agents to be administered may "depend on the specific agent used, the type of disease being treated or managed, the severity and stage of disease, and the amount(s) of immunomodulatory compounds of the invention and any optional additional active agents concurrently administered to the patient."  '428 patent at 19:12–18.  *See also id.*  at 24:37–42.  Teva's Proposed Label would not necessarily result in an amount of an additional active agent or dexamethasone being administered according to the method of claims 17–21 and 27.  Thus, there is no evidence that Teva induces or contributes to the infringement of claims 17–21 or 27 under the doctrine of equivalents.

For at least these reasons, Teva does not indirectly infringe claims 17–21 and 27.

## B.    '262 Patent

### 1.    No Direct Infringement of 1, 2, 4–16, 18–27, 29: A method of treating multiple myeloma, which comprises administering to a patient having multiple myeloma

Each of the Asserted Claims of the '262 patent recites "[a] method of treating multiple myeloma which comprises administering to a patient having multiple myeloma" the specified

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

compounds in the specified manner. Teva will not "administer" to any patients, and Teva will not treat multiple myeloma.  For at least this reason, Teva does not directly infringe any of the Asserted Claims of the '262 patent.

> **2.     No Indirect Infringement of Claim 9: Prior therapy with thalidomide, 3-(4-amino-1-oxo-1,3-dihydro-isoindol-2-yl)-piperidine-2,6-dione, a proteasome inhibitor, stem cell transplantation, or a combination thereof**

Claim 9 recites the method of claim 1, "wherein the previous therapy is treatment with thalidomide, 3-(4-amino-1-oxo-1,3-dihydro-isoindol-2-yl)-piperidine-2,6-dione, a proteasome inhibitor, stem cell transplantation, or a combination thereof." The specification to the '262 patent describes 3-(4-amino-1-oxo-1,3-dihydro-isoindol-2-yl)-piperidine-2,6-dione as "Revimid™." '262 patent at 4:23-25.

This claim is not infringed for at least the reasons provided in §§I.A.2–4 above, which are incorporated by reference in their entirety.

> **3.     No Indirect Infringement of Claims 1, 2, 4–16, 18–27, 29: Administering dexamethasone**

Each of the Asserted Claims of the '262 patent recites "[a] method of treating multiple myeloma which comprises administering to a patient having multiple myeloma" the specified compound and "40 mg of dexamethasone." Claim 14 depends from claim 1 and recites "wherein the dexamethasone is orally administered in an amount of 40 mg once daily on days 1, 8, 15 and 22 of each 28 day cycle." Claim 15 depends from claim 1 and recites "wherein the dexamethasone is orally administered in an amount of about 40 mg once a week of each 28 day cycle."

These claims are not infringed for at least the reasons provided in §I.A.6 above, which are incorporated by reference in their entirety.

> **C.     '939 Patent**

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

1. **No Direct Infringement of Claims 1–14, 16–35: A method of treating multiple myeloma, which comprises administering to a patient having multiple myeloma**

Each of the Asserted Claims of the '939 patent recites "[a] method of treating multiple myeloma, which comprises administering to a patient having multiple myeloma" the specified compound in the specified manner.  Additionally, claim 20 recites the method of claim 1, "wherein the compound is orally administered [] until disease progression." Claim 21 recites "administering a therapeutically effective amount of an additional active agent."  Claims 22–25 and 33–35 require dexamethasone to be "administered." Teva will not "administer" to any patients, and Teva will not treat multiple myeloma.  Additionally, Teva will not "administer" any additional active agent or dexamethasone.  Teva will also not "administer" the claimed compound "until disease progression."  For at least these reasons, Teva does not directly infringe any Asserted Claim of the '939 patent.

2. **No Indirect Infringement of Claim 3: Prior therapy with thalidomide, a proteasome inhibitor, or a combination thereof**

Claim 3 recites the method of claim 1, "wherein the previous therapy is treatment with thalidomide, a proteasome inhibitor, or a combination thereof."

This claim is not infringed for at least the reasons provided in §I.A.2 above, which are incorporated by reference in their entirety.

3. **No Indirect Infringement of Claim 4: Prior therapy with stem cell transplantation**

Claim 4 recites the method of claim 1, "wherein the previous therapy is treatment with stem cell transplantation."

This claim is not infringed for at least the reasons provided in §I.A.3 above, which are incorporated by reference in their entirety.

18

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

4. **No Indirect Infringement of Claims 5 and 27: Prior therapy with a proteasome inhibitor**

Claim 5 recites the method of claim 2, "wherein the previous therapy is treatment with a proteasome inhibitor." Claim 27 recites the method of claim 26, "wherein the previous therapy is treatment with a proteasome inhibitor."

These claims are not infringed for at least the reasons provided in §I.A.4 above, which is incorporated by reference in its entirety.

5. **No Indirect Infringement of Claims 6 and 7: Patients 65 years or younger/older than 65**

Claim 6 recites the method of claim 1, "wherein the patient is older than 65 years." Claim 7 recites the method of claim 1, "wherein the patient is 65 years or younger."

These claims are not infringed for at least the reasons provided in §I.A.5 above, which is incorporated by reference in its entirety.

6. **No Indirect Infringement of Claims 21–25, 33–35: Administering a therapeutically effective amount of dexamethasone or additional active agent**

Claim 21 recites the method of claim 1, further comprising "administering a therapeutically effective amount of an additional active agent." Claims 22–25 depend from claim 21, and additionally require the "additional active agent" be dexamethasone. Claim 33 recites the method of claim 26, further comprising "administering a therapeutically effective amount of dexamethasone." Claim 34 depends from claim 33 and further recites "wherein 40 mg dexamethasone is administered." Claim 35 depends from claim 33 and further recites "wherein the dexamethasone is orally administered once daily on days 1, 8, 15 and 22 of a 28 day cycle." Claim 24 recites the method of claim 22, "wherein the dexamethasone is orally administered once daily on days 1, 8, 15 and 22 of a 28 day cycle." Claim 25 recites the method of claim 22, "wherein the dexamethasone is orally administered once a week of a 28 day cycle." Claim 35

19

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

depends from claim 33 and further recites "wherein the dexamethasone is orally administered once daily on days 1, 8, 15 and 22 of a 28 day cycle."

These claims are not infringed for at least the reasons provided in §I.A.6 above, which is incorporated by reference in its entirety.

### D.    '427 Patent

#### 1.    No Direct Infringement of Claims 3–10: Dosage forms requiring specified amounts of sodium stearyl fumarate

Each of the Asserted Claims of the '427 patent require sodium stearyl fumarate.  Claims 3, 5, 7, and 9 recite dosage forms comprising specified amounts of sodium stearyl fumarate. Teva's ANDA Products do not contain any sodium stearyl fumarate.  *See*, *e.g.* TEVA_POM_00001174 at TEVA_POM_00001177–80.  For at least these reasons, Teva's ANDA Products do not literally infringe claims 3–10.

Additionally, there is no evidence that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents, applying either the function-way-result test, or the insubstantial differences test.  For example, the claimed amounts of sodium stearyl fumarate differ from the component(s), or combination of components, in Teva's ANDA Products in substantial ways. Some such differences include at least the following:

- No component or components of the Teva ANDA Products is structurally or chemically similar to the sodium stearyl fumarate recited in the claims of the '427 patent.

- Due to both the different excipients and their presence at different amounts, the API-excipient and excipient-excipient interactions in Teva ANDA Products are substantially different than any interactions within the claimed dosage forms (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "it is now realized that the additives present in the capsule formulation, like the compressed tablet, can influence the release of the drug substance from the capsule.")

20

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

- The specification to the '427 patent teaches an additional blending step before encapsulation where the sodium stearyl fumarate is added. For Example 5.2:

  > To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. ('427 patent at 29:21–23)

  And, for example:

  > "When a lubricant, e.g., sodium stearyl fumarate, is used, the lubricant is mixed with the pre-blend at the end of the process to complete the pharmaceutical composition. This additional mixing is from about 1 minute to about 10 minutes, or from about 3 minutes to about 5 minutes." ('427 patent at 21:6–10).

  The Teva ANDA Products do not require this separate blending and screening step, as they do not contain sodium stearyl fumarate (*see, e.g.* TEVA_POM_00000672).

- Because sodium stearyl fumarate has a lubricating function in the claimed dosage form ("the lubricant is mixed with the pre-blend at the end of the process to complete the pharmaceutical composition" '427 patent at 21:6–10), its absence from Teva's ANDA Products leads to capsule fill having different properties.

- Sodium stearyl fumarate performs its lubricating function in a different manner than any component or combination of components in Teva's ANDA Product at least because the chemical structures differ.

- The lubricating properties of a particular capsule fill blend can change the way in which the capsules are prepared, such as by requiring different machinery for blending or encapsulating, change the manner or method of blending, and/or changing the speed or efficiency of the blending or encapsulating (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "Since the flow of material is of great importance in the rapid and accurate filling of the capsule bodies, lubricants such as the stearates also are used frequently.")

Thus, no component, or combination of components, in Teva's ANDA Products performs

substantially the same function, in substantially the same way, to obtain the same result as the

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

specified amounts of sodium stearyl fumarate recited in the claims.  Teva reserves the right to

respond to any arguments made by Celgene that any component or combination of components

of the Teva ANDA Product infringes this claim limitation under the doctrine of equivalents.

Further, Celgene is precluded from claiming that Teva's ANDA Products infringe claims

3–10 under the doctrine of equivalents.  For example, there can be no infringement under the

doctrine of equivalents as a matter of law, if a claim limitation is totally missing from the

accused device, as is the case here where Teva's ANDA Products contain no sodium stearyl

fumarate.  *See Warner–Jenkinson*, 520 U.S. at 33–34; *DeMarini Sports, Inc. v. Worth, Inc.*, 239

F.3d 1314, 1332 (Fed. Cir. 2001); *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d

1528, 1532 (Fed. Cir. 1987) (courts may not "convert a multi-limitation claim to one of [fewer]

limitations to support a finding of equivalency").  Teva's ANDA Products do not contain any

equivalent excipient.

In addition, prosecution history estoppel and argument-based estoppel also preclude any

potential argument by Celgene that Teva's ANDA Products infringe claims 3-10 under the

doctrine of equivalents.  Claim amendments and arguments made during prosecution of a patent

application can create an estoppel, thereby preventing the patent owner from recapturing subject

matter through the doctrine of equivalents that was surrendered during prosecution of the patent.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) ("[A]

narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an

estoppel").

The prosecution history of the '427 patent clearly establishes that the applicant made

amendments and arguments with respect to these claims regarding the limitation "sodium stearyl

fumurate at an amount of [x] mg" in response to the examiner's patentability rejections which

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

preclude the application of the doctrine of equivalents with respect to the "sodium stearyl

fumarate" limitation.  The original independent claims did not recite a dosage form comprising

any sodium stearyl fumarate.  For example, claim 11 (which ultimately became claim 3),

originally was as follows:

> 11. An oral dosage form which weighs about 125 mg and comprises: 1) pomolidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of pomolidomide; and **2) a pharmaceutically acceptable carrier or excipient.**[2]

'427 patent at 32:52-59.  The examiner rejected all claims as unpatentable under 35 U.S.C. §

103.[3]  In response, the applicant narrowed all independent claims to require certain amounts of

sodium stearyl fumarate.  For example, claim 11 (which ultimately issued as claim 3) was

amended to add "sodium stearyl fumarate at an amount of 0.32 mg:"[4]

> 11. (Currently amended) An oral dosage form which weighs about 125 mg and comprises: 1) ~~pomolidomide~~ pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of ~~pomolidomide~~ pomalidomide; ~~and 2) a pharmaceutically acceptable carrier or excipient~~ 2) pregelatinized starch at an amount of 70 mg; **3) sodium stearyl fumarate at an amount of 0.32 mg;** and 4) spray dried mannitol at an amount that brings the total weight of the composition to 125 mg.

'427 patent at 32:12-19.

In the remarks that accompanied these amendments, the applicant admitted that the claim

amendments were made in response to rejections to the claims as unpatentable under §103 and

---

[2]   U.S. Application No. 12/783,390, May 19, 2010 at 44–49 (claims 1, 11, 21, 31, 41, and 51) (emphasis added).

[3]   Office Action mailed April 24, 2012 at 3–11; Amendment and Response dated August 16, 2012 at 3.

[4]   Amendment and Response dated August 16, 2012 at 3–6 (emphasis added).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

argued the added sodium stearyl fumarate limitation was a basis for patentability.[5]  The applicant

argued that:

> The stability shown for the claimed dosage forms would have been unexpected in
> view of the fact that those skilled in the art would have completely lacked any
> expectation, in particular based on [a prior art] disclosure, as to <u>what specific
> excipients, at what amount levels</u>, would bring about any advantageous properties
> in combination with Pomalidomide. For at least the reasons above, Applicants
> respectfully request that the rejection of the claims be withdrawn.[6]

In other words, the applicant argued that the presence of sodium stearyl fumarate, and presence

at specified amounts, made it patentable over the prior art.[7]  The applicant also submitted a

declaration by named inventor Mr. Anthony Tutino in which he stated:

> It is my opinion that [] it would have been impossible for one reading [the cited
> prior art references to] arrive at the currently claimed dosage forms without
> specifically knowing that <u>the particular combination of the particular excipients</u>
> recited by the current claims would provide a formulation having favorable
> compatibility and stability properties.[8]

When the examiner allowed the claims, the notice of allowance stated that the claims:

> were not obvious over the prior art of record because one of ordinary skill in the
> art could not have selected the specific oral dosage formulations as claimed from
> [the prior art] with a reasonable expectation in obtaining formulations that are
> stable under tested conditions because applicant showed in a declaration that
> stability of pomalidomide in formulation comprising various excipients is not
> predictable.[9]

---

[5]   Amendment and Response dated August 16, 2012 at 11 (emphasis added).

[6]   Amendment and Response dated August 16, 2012 at 10 (emphasis added).

[7]   *See also* Amendment and Response dated February 13, 2013 at 8–9; Supplemental
Amendment and Response dated June 17, 2013 at 7–9; Supplemental Amendment dated May
5, 2014 at 7–8 ("there simply is no disclosure in the cited references that would have
prompted one skilled in the art to prepare a composition having pomalidomide at the
specified amounts, along with the particular binders and fillers at the specified amounts
recited by [pending independent claims]").

[8]   Declaration of A. Tutino dated June 14, 2013 at ¶10 (emphasis added).

[9]   Notice of Allowability dated May 5, 2014 at 4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

The above narrowing claim amendments were substantially related to patentability and thus preclude Celgene from arguing any equivalents to the sodium stearyl fumarate limitation. Additionally, statements such as the above made during prosecution that characterize the unexpected properties of the invention, distinguish the prior art, and identify critical attributes of the invention give rise to argument based estoppel and limit the available equivalents. *See, e.g., PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007); *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1314 (Fed. Cir. 2001); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1252 (Fed. Cir. 2000); *Pharmacia & Upjohn Co., v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1378–79 & n. 3 (Fed. Cir. 1999). For at least these reasons, Celgene is estopped from asserting that dosage forms that do not contain sodium stearyl fumarate infringe claims 3–10 under the doctrine of equivalents. Likewise, Celgene is also estopped from asserting that dosage forms that do not contain sodium stearyl fumarate at the recited amounts infringe claims 3–10 under the doctrine of equivalents.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of vitiation. The doctrine of equivalents cannot be used to vitiate meaningful limitations from the claims, as the public is entitled to rely on such limitations to avoid infringement. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002). Here, for example, vitiating the limitations requiring sodium stearyl fumarate at specified amounts would deprive the public of the notice function of the claims, and render an important limitation meaningless. *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) ("an argument that the absence of a feature is equivalent to its presence" negates the doctrine of equivalents).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of public dedication. Celgene is precluded from asserting that any claim of the '427 patent covers the Teva ANDA Products because the specification of the '427 patent discloses the unclaimed subject matter such that it has been dedicated to the public.  *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360, 1(Fed. Cir. 2004) ("The disclosure-dedication rule requires an inventor who discloses specific matter to claim it, and to submit the broader claim for examination.  Otherwise, that matter is dedicated to the public and may not be recaptured under the doctrine of equivalents.").  For example, the specification of the '427 patent discloses the following embodiments, which do not contain any sodium stearyl fumarate:

> In one embodiment where the total weight of the dosage form is about 125 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 70 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.[10]

The specification describes corresponding embodiments for dosage forms having total weights of 250 mg, 180 mg, and 240 mg (at 8:59–67, 9:27–35, 9:62–10:3, respectively).  The presence of any lubricant or sodium stearyl fumarate is excluded by the description of these embodiments (*e.g.* "the remaining weight is filled by starch").  Having disclosed two distinct sets of embodiments, one set which contains a lubricant such as sodium stearyl fumarate as claimed, and one set that does not, Celgene is not entitled to enforce the unclaimed embodiment as an equivalent of the one claimed. *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1107 (Fed. Cir. 2000).

---

[10]   '427 patent at 8:24–32.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents because to do so would ensnare the prior art.  If the claims were to literally cover Teva ANDA Products, which contain no sodium stearyl fumarate, then the claims would encompass the prior art.  *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed. Cir. 1990).  For example, claims reciting the same limitations as claims 3–10, but without the sodium stearyl fumarate, would be obvious in view of the prior art.[11]

Dependent claims 4, 6, 8, and 10 merely recite the size of the capsule for each respective independent claim.  Because there is an absence of direct infringement of the independent claims, there can be no direct infringement of dependent claims.  *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).  As such, Teva's ANDA Product cannot infringe dependent claims 4, 6, 8, and 10.

### 2. No Direct Infringement of Claims 3–10: Dosage forms requiring specified amounts of pregelatinized starch

Each of claims 3, 5, 7, and 9 recite oral dosage forms containing specific amounts of pregelatinized starch (70, 140, 100.8, 134.4 mg, respectively).  Teva's ANDA Products do not contain 70, 100.8, 134.4, or 140 mg of pregelatinized starch. *See* TEVA_POM_00001174 at TEVA_POM_00001177–80.  For at least these reasons, Teva's ANDA Products do not literally infringe claims 3-10.

Additionally, there is no evidence that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents, applying either the function-way-result test, or the insubstantial differences test.  For example, the amounts of pregelatinized starch in Teva's

---

[11]  *See*, *e.g.* Office Action mailed April 24, 2012 at 3–11.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

ANDA Products are substantially less than those recited by the claims.   Some such differences include at least the following:

- The pregelatinized starch in the Teva ANDA Products does not operate in substantially the same "way" as the pregelatinized starch of the claims, as it is present in substantially lower amounts than in the claimed dosage forms.

- The amount of each excipient in a particular capsule fill blend, as well as the change to the total weight of the capsule fill, can change the way in which the capsules are prepared, such as by requiring different machinery for blending or encapsulating, change the manner or method of blending, and/or changing the speed or efficiency of the blending or encapsulating.

- Due to both the different excipients and their presence at different amounts, the API-excipient and excipient-excipient interactions in Teva ANDA Products are substantially different than any interactions within the claimed dosage forms.  (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "However, it is now realized that the additives present in the capsule formulation, like the compressed tablet, can influence the release of the drug substance from the capsule.")

Thus, no component, or combination of components, in Teva's ANDA Products performs substantially the same function, in substantially the same way, to obtain the same result as the specified amounts of spray dried mannitol recited in the claims.  Teva reserves the right to respond to any arguments made by Celgene that any component or combination of components of the Teva ANDA Product infringes this claim limitation under the doctrine of equivalents. Further, Celgene is precluded from claiming that Teva's ANDA Products infringe claims 3-10 under the doctrine of equivalents.  For example, prosecution history estoppel and argument-based estoppel preclude any potential argument by Celgene that Teva's ANDA Products infringe claims 3-10 under the doctrine of equivalents.

28

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

The prosecution history of the '427 patent clearly establishes that the applicant made amendments and arguments with respect to these claims regarding the "pregelatinized starch at an amount of [x] mg" limitation in response to the examiner's patentability rejections, which preclude the application of the doctrine of equivalents with respect to this limitation.

The original independent claims in the application did not recite "pregelatinized starch," nor did they recite "pregelatinized starch" in any specified amount.[12]  For example, claim 11 (which ultimately became claim 3), originally was as follows:

> 11. An oral dosage form which weighs about 125 mg and comprises: 1) pomolidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of pomolidomide; and **2) a pharmaceutically acceptable carrier or excipient.**[13]

The examiner rejected all claims as unpatentable under 35 U.S.C. § 103.[14]  In response, the applicant amended all independent claims to require pregelatinized starch at specified amounts. For example, claim 11 (which ultimately issued as claim 3) was amended to add "pregelatinized starch at an amount of 70 mg:"[15]

> 11. (Currently amended) An oral dosage form which weighs about 125 mg and comprises: 1) ~~pomolidomide~~ pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of ~~pomolidomide~~ pomalidomide; ~~and 2) a pharmaceutically acceptable carrier or excipient~~ **2) pregelatinized starch at an amount of 70 mg**; 3) sodium stearyl fumarate at an amount of 0.32 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 125 mg.

---

[12]   U.S. Application No. 12/783,390 at 44–49 (claims 1, 11, 21, 31, 41, and 51).

[13]   U.S. Application No. 12/783,390, May 19, 2010 at 44–49 (claims 1, 11, 21, 31, 41, and 51) (emphasis added).

[14]   Office Action mailed April 24, 2012 at 3–11; Amendment and Response dated August 16, 2012 at 3.

[15]   Amendment and Response dated August 16, 2012 at 3–6 (emphasis added).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

In the remarks that accompanied these amendments, the applicant admitted that the claim amendments were made in response to rejections to the claims as unpatentable under §103, and argued that added pregelatinized starch limitation was a basis for patentability.[16]  Specifically, the applicant stated that there was no disclosure in the prior art that would have "prompted one skilled in the art to prepare a composition having pomalidomide at the specified amounts, along with the particular binders and fillers at the specified amount, as recited" by the amended independent claims.[17]

As such, the prosecution history of the '427 patent clearly establishes that the applicant made narrowing amendments and arguments regarding the requirement of "pregelatinized starch" in response to the examiner's patentability rejections which preclude Celgene from arguing infringement pursuant to the doctrine of equivalents of the "pregelatinized starch" claim limitation.  For example, Celgene is precluded from arguing the "pregelatinized starch" limitation covers any product containing pregelatinized starch at an amount other than those recited by the claims.  The applicant argued that "those skilled in the art would have completely lacked any expectation, in particular based on [prior art] disclosure, as to what specific excipients, at what amount levels, would bring about any advantageous properties in combination with Pomalidomide."[18]  In other words, the applicant argued that the presence of sodium stearyl fumurate and the specified amounts made the claims patentable over the prior art.[19]

---

[16]   Amendment and Response dated August 16, 2012 at 10.

[17]   Amendment and Response dated August 16, 2012 at 9 (emphasis added).

[18]   Amendment and Response dated August 16, 2012 at 10 (emphasis added).

[19]   *See also* Amendment and Response dated February 13, 2013 at 8–9; Supplemental Amendment and Response dated June 17, 2013 at 7–9. *See also* Declaration of A. Tutino

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

When the examiner allowed the claims, the notice of allowance stated that the claims:

were not obvious over the prior art of record because one of ordinary skill in the art could not have selected the specific oral dosage formulations as claimed from [the prior art] with a reasonable expectation in obtaining formulations that are stable under tested conditions because applicant showed in a declaration that stability of pomalidomide in formulation comprising various excipients is not predictable.[20]

The above narrowing claim amendments were substantially related to patentability and thus preclude Celgene from arguing any equivalents to the sodium stearyl fumarate limitation. Additionally, statements made during prosecution that characterize the unexpected properties of the invention, distinguish the prior art, and identify critical attributes of the invention give rise to argument based estoppel and limit the available equivalents. *Janssen Pharm. N.V. v. Eon Labs Mfg.*, *Inc.*, 374 F. Supp. 2d 263, 274-275 (E.D.N.Y. 2004) ("in light of its emphasis on the importance of the particular core size […], Janssen cannot now claim that the difference in core size between the '015 patent and Eon's ANDA is insubstantial.").  For at least these reasons, Celgene is estopped from asserting that dosage forms that do not contain pregelatinized starch as the claimed amounts infringe claims 3–10 under the doctrine of equivalents.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of vitiation.  Here, for example, vitiating the limitations requiring specific amounts of pregelatinized starch would

---

dated June 14, 2013 at ¶10 (asserting that the claimed dosage forms possessed favorable compatibility and stability properties); Supplemental Amendment dated May 5, 2014 at 7–8 ("there simply is no disclosure in the cited references that would have prompted one skilled in the art to prepare a composition having pomalidomide at the specified amounts, along with the particular binders and fillers at the specified amounts recited by [pending independent claims]).

[20]   Notice of Allowability dated May 5, 2014 at 3–4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

deprive the public of the notice function of the claims, and render an important limitation

meaningless.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe

claims 3–10 under the doctrine of equivalents based on the doctrine of public dedication.

Celgene is precluded from asserting that any claim of the '427 patent covers the Teva ANDA

Products because the specification discloses the unclaimed subject matter such that it has been

dedicated to the public.  For example, the specification of the '427 patent discloses the following

embodiments, which are not limited to any specified amount of pregelatinized starch:

> In one embodiment, provided herein is a dosage form comprising: 1)
> pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt,
> solvate, or clathrate thereof, present at an amount that provides about 1 mg
> potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one
> embodiment, the total weight of the dosage form is about 125 mg. In one
> embodiment, the dosage form is suitable for administration in a size 4 or larger
> capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or
> filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or
> filler and a lubricant.
>
> In one embodiment where the total weight of the dosage form is about 125 mg,
> the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one
> embodiment, the excipient comprises both mannitol and starch. [21]

The specification describes corresponding embodiments for dosage forms having total

weights of 250 mg, 180 mg, and 240 mg (at 8:48–61, 9:16–29, 9:51–64, respectively).  These

embodiments are not limited to dosage forms comprising pregelatinized starch, nor are they

limited to pregelatinized starch at any particular amount.  Having disclosed two distinct sets of

embodiments, one set which contains pregelatinized starch at the amounts claimed, and one set

that does not, Celgene is not entitled to enforce the unclaimed embodiment as an equivalent of

the one claimed.

---

[21]   '427 patent at 8:12–27.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents because to do so would ensnare the prior art. If the claims were to literally cover the Teva ANDA Products with amounts of pregelatinized starch other than those claimed, then the claims would encompass the prior art. *Wilson Sporting Goods Co.,* 904 F.2d at 683. For example, claims reciting the same limitations as claims 3–10, but comprising pregelatinized starch at amounts other than those claimed, would be obvious in view of the prior art.[22]

For the same reasons, as outlined above, Teva's ANDA Product cannot infringe dependent claims 4, 6, 8, and 10.

### 3. No Direct Infringement of Claims 3–10: Dosage forms requiring specified amounts of spray dried mannitol

Each of claims 3, 5, 7, and 9 recite oral dosage forms requiring spray dried mannitol at an amount that brings the total weight of the composition to specified weights. In other words, the claims recite spray dried mannitol in an amount of 53.68, 107.36, 75.75, or 101 mg, respectively. Teva's ANDA Products do not contain 53.68, 107.36, 75.75, or 101 mg of spray dried mannitol. *See, e.g.* TEVA_POM_00001174 at TEVA_POM_00001177–80. For at least these reasons, Teva's ANDA Products do not literally infringe claims 3–10.

Additionally, there is no evidence that Teva's ANDA Products infringe claims 3-10 under the doctrine of equivalents, applying either the function-way-result test, or the insubstantial differences test. For example the specified amounts of spray dried mannitol are substantially higher than the amounts of spray dried mannitol in Teva's ANDA Products. Such substantial differences include at least the following:

---

[22]   *See, e.g.* Office Action mailed April 24, 2012 at 3–11.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

- The spray dried mannitol in the Teva ANDA Products does not operate in substantially the same "way" as the mannitol of the claims, as it is present in substantially lower amounts than in the claimed dosage forms.

- The amount of each excipient in a particular capsule fill blend, as well as the change to the total weight of the capsule fill, can change the way in which the capsules are prepared, such as by requiring different machinery for blending or encapsulating, change the manner or method of blending, and/or changing the speed or efficiency of the blending or encapsulating. (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "it is now realized that the additives present in the capsule formulation, like the compressed tablet, can influence the release of the drug substance from the capsule.")

- Due to both the different excipients and their presence at different amounts, the API-excipient and excipient-excipient interactions in Teva ANDA Products are substantially different than any interactions within the claimed dosage forms. (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "it is now realized that the additives present in the capsule formulation, like the compressed tablet, can influence the release of the drug substance from the capsule.")

Thus, no component, or combination of components, in Teva's ANDA Products performs substantially the same function, in substantially the same way, to obtain the same result as the specified amounts of spray dried mannitol recited in the claims. Teva reserves the right to respond to any arguments made by Celgene that any component or combination or components of the Teva ANDA Product infringes this claim limitation under the doctrine of equivalents.

Further, Celgene is precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents. For example, prosecution history estoppel and argument-based estoppel preclude any potential argument by Celgene that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents.

34

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

The prosecution history of the '427 patent clearly establishes that the applicant made amendments and arguments with respect to these claims regarding the "spray dried mannitol at an amount that brings the total weight of the composition to [x] mg" limitation in response to the examiner's patentability rejections, which preclude the application of the doctrine of equivalents with respect to this limitation.  As outlined in § **Error! Reference source not found.**, the original independent claims recited dosage forms comprising pomalidomide and "a pharmaceutically acceptable carrier or excipient."  These claims were not limited to mannitol in any specified amount.[23]  As with its arguments to overcome the art by including "sodium stearyl fumurate," the applicant argued that the cited references do "not teach or suggest the advantages of the specific oral dosage forms claimed in the current application" and that amendments to include the spray dried mannitol limitation were a basis for patentability.[24]  Specifically, the applicant stated that there was no disclosure in the prior art that would have "prompted one skilled in the art to prepare a composition having pomalidomide at the specified amounts, along with the particular binders and fillers at the specified amount, as recited by the claims."[25]  As such, the prosecution history of the '427 patent clearly establishes that the applicant made narrowing amendments and arguments with respect to the independent claims regarding the requirement of "spray dried mannitol" in response to the examiner's patentability rejections which preclude the application of the doctrine of equivalents with respect to the "spray dried mannitol" limitation.   These narrowing claim amendments were substantially related to patentability and thus preclude Celgene from arguing any equivalents to the spray dried mannitol

---

[23]   U.S. App. No. 12/783,390 at 44–49 (claims 1, 11, 21, 31, 41, and 51).

[24]   Amendment and Response dated August 16, 2012 at 10.

[25]   Amendment and Response dated August 16, 2012 at 9 (emphasis added).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

limitation.  For at least these reasons, Celgene is estopped from asserting that dosage forms that do not contain spray dried mannitol at the amounts recited by claims 3–10 infringe under the doctrine of equivalents.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of vitiation.  Here, for example, vitiating the limitations requiring specified weights of spray dried mannitol would deprive the public of the notice function of the claims, and render an important limitation meaningless.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of public dedication. Celgene is precluded from asserting that any claim of the '427 patent covers the Teva ANDA Products, because the specification of the '427 patent discloses the unclaimed subject matter such that it has been dedicated to the public.  For example, the specification of the '427 patent discloses the following embodiment, in which the weight of mannitol varies from that disclosed in the claims:

> In one embodiment, the dosage forms provided herein comprise both mannitol and starch. In one embodiment, mannitol and starch comprise from about 70 to about 99 weight percent of total weight of the composition.[26]

This embodiment, in which the mannitol and starch together comprise 70–99% weight of the total weight of the composition, are in contrast to other embodiments that require specific weights of spray dried mannitol and starch that comprise over 99% weight of the total weight of the composition (e.g. "In one in embodiment, provided herein is a dosage form comprising …. 2) about 70 mg of pregelatinized starch … 4) <u>spray dried mannitol at an amount that brings the total</u>

---

[26]   '427 patent at 6:51–54.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

<u>weight of the dosage form to 125 mg</u>." 8:39–46).  Having disclosed two distinct sets of embodiments, one set which recite dosage forms comprising the recited amounts of mannitol, and one set that recite more or less than that, Celgene is not entitled to enforce the unclaimed embodiment as an equivalent of the one claimed.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents because to do so would ensnare the prior art.  If the claims were to literally cover the Teva ANDA Products which contain mannitol at amounts other than those claimed, the claims would encompass the prior art.  For example, claims reciting the same limitations as claims 3–10, but without the spray dried mannitol at the amounts claimed, would be obvious in view of the prior art.[27]

For the same reasons, as outlined above, Teva's ANDA Product cannot infringe dependent claims 4, 6, 8, and 10.

### 4.    No Direct Infringement of Claims 3–10: Dosage forms of specified weights

Each of claims 3, 5, 7, and 9 recite an "oral solid dosage form in the form of a capsule which" of specified weights (125, 250, 180, or 240 mg).  Additionally each of claims 3, 5, 7, and 9 recites "spray dried mannitol at an amount that brings the total weight of the composition to" specified weights (125, 250, 180, or 240 mg).  Teva's ANDA Products do not satisfy these limitations.  For example, none of Teva's ANDA Products has a weight of 125, 250, 180, or 240 mg. *See*, *e.g.* TEVA_POM_00000595 at TEVA_POM_00000628; TEVA_POM_00000595 at TEVA_POM_00000652-3. For at least these reasons, Teva's ANDA Products do not literally infringe claims 3-10.

---

[27]    *See*, *e.g.* Office Action mailed April 24, 2012 at 3–11.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Additionally, there is no evidence that Teva's ANDA Products infringe claims 3-10 under the doctrine of equivalents, applying either the function-way-result test, or the insubstantial differences test. For example, the claimed dosage forms of specified weights are substantially different from the weights of the Teva ANDA Products. Additionally, Teva's ANDA Products do not perform substantially the same function, in substantially the same way, to obtain the same result as the claimed dosage forms having the specified weights. For example, the Teva ANDA Products do not operate in substantially the same "way" as the dosage forms of the claims, as they are substantially lighter in weight than the claimed dosage forms (100 mg, 200 mg, 150 mg, and 200 mg for the 1 mg, 2 mg, 3 mg, and 4 mg dosage strengths, respectively, equating to 20% lighter in weight; TEVA_POM_00000595 at TEVA_POM_00000664). Teva reserves the right to respond to any arguments made by Celgene that any component or combination or components of the Teva ANDA Product infringes this claim limitation under the doctrine of equivalents.

Further, Celgene is precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents. For example, prosecution history estoppel and argument-based estoppel preclude any potential argument by Celgene that Teva's ANDA Products infringe this limitation under the doctrine of equivalents.

The prosecution history of the '427 patent clearly establishes that the applicant made amendments and arguments with respect to these claims regarding these limitations in response to the examiner's patentability rejections, which preclude the application of the doctrine of equivalents with respect to these claim limitations. The original independent claims recited

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

dosage forms which weigh "about" a certain weight.[28]  For example, claim 11 (which ultimately became claim 3), originally was as follows:

> 11. An oral dosage form which weighs about 125 mg and comprises: 1) pomolidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of pomolidomide; and 2) a pharmaceutically acceptable carrier or excipient.

The specification of the '427 defines "about" as follows:

> As used herein, and unless otherwise specified, the term "about," when used in connection with doses, amounts, or weight percent of ingredients of a composition or a dosage form, means dose, amount, or weight percent that is recognized by those of ordinary skill in the art to provide a pharmacological effect equivalent to that obtained from the specified dose, amount, or weight percent is encompassed. Specifically, the term "about" contemplates a dose, amount, or weight percent within 30%, 25%, 20%, 15%, 10%, or 5% of the specified dose, amount, or weight percent is encompassed.

'427 Patent at 4:4–14. During prosecution, the examiner issued a Non-Final Rejection of the claims originally containing "about," noting that based on the specification, the claimed amounts reciting "amount" are "viewed as ranges."[29]  In response to the examiner's rejection, the applicant narrowed all the claims by removing the word "about":[30]

> 11. (Currently amended) An oral dosage form in the form of a capsule which weighs about 125 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg potency of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 70 mg; 3) sodium stearyl fumarate at an amount of 0.32 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 125 mg.

---

[28]   U.S. Application No. 12/783,390, May 19, 2010 at 44–49 (claims 1, 11, 21, 31, 41, and 51) (emphasis added).

[29]   Non-Final Rejection mailed April 24, 2012 at 2.

[30]   Supplemental Amendment and Response dated June 17, 2013 at 2–4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

After this amendment, the examiner allowed the claims, stating in the notice that the rejections under §112 ¶2 were "obviated with claim amendments" made on June 17, 2013.[31]

A reasonable competitor reading the specification and file history, finding that the term "about" was removed from the claims, would understand that the patent applicant had surrendered dosage forms of any weights other than the exact doses recited in each claim. *Desper Prods., Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1338 (Fed. Cir. 1998) ("In determining the scope of what, if any, subject matter has been surrendered, the standard is an objective one: what would a reasonable competitor reading the prosecution history conclude has been surrendered"). For example, the patent applicant surrendered at least the ranges of weights in the specification and can no longer claim as equivalents weights that differ from the specified dose by 30%, 25%, 20%, 15%, 10%, or 5%. As such, the prosecution history of the '427 patent clearly establishes that the applicant made amendments and arguments with respect to the independent claims regarding the requirement of "a capsule which weighs" in response to the examiner's patentability rejections which preclude the application of the doctrine of equivalents with respect to these claim limitations.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of vitiation. Here, for example, vitiating the limitations requiring specific weights would deprive the public of the notice function of the claims, and render an important limitation meaningless.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of public dedication. Celgene is precluded from asserting that any claim of the '427 patent covers the Teva ANDA

---

[31]   Notice of Allowability dated May 5, 2014 at 3–4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Products, as it disclosed the unclaimed subject matter in the specification and has therefore dedicated it to the public.  For example, the specification of the '427 patent discloses the following embodiments, in which the "total weight of the dosage form is about 125 mg":

> In one embodiment where the total weight of the dosage form is about 125 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.3 mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.32 mg.[32]

The specification describes corresponding embodiments for dosage forms having "total weights" of "about" 250 mg, 180 mg, and 240 mg ('427 patent at 9:1–6, 9:36–41, 10:4–8, respectively). These embodiments are in contrast to other embodiments that are expressed to be in exact weights (e.g. "In some embodiments, provided herein is a dosage form comprising …. spray dried mannitol at an amount that brings the total weight of the dosage form to 125 mg." *Id.* at 11:23–32).  Having disclosed two distinct sets of embodiments, one set which recite dosage forms of "about" specified weights, and one set that are of precise weights, Celgene is not entitled to enforce the unclaimed embodiment as an equivalent of the one claimed.

Celgene is also precluded from asserting that any claim of the '427 patent covers the Teva ANDA Products with weights other than those claimed, as if the claims were to literally cover such products, the claims would encompass the prior art. For example, claims reciting the same limitations as claims 3-10, but without the weight limitation, would be obvious in view of the prior art.[33]

For the same reasons, as outlined above, Teva's ANDA Product cannot infringe dependent claims 4, 6, 8, and 10.

---

[32]   '427 patent at 8:33–38.

[33]   *See, e.g.* Office Action mailed April 24, 2012 at 3–11.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

### 5.  No Direct Infringement of Claims 3–10: Dosage forms requiring specified weight of 100% pure pomalidomide

Each of claims 3, 5, 7, and 9 recite oral solid dosage forms that contain pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1, 2, 3, or 4 mg of 100% pure pomalidomide.  Teva's ANDA Products do not contain pomalidomide at an amount that provides 1, 2, 3, or 4 mg of 100% pure pomalidomide. *See* TEVA_POM_00000686-89; TEVA_POM_00001177.  For at least these reasons, Teva's ANDA Products do not literally infringe claims 3–10.

Additionally, there is no evidence that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents, applying either the function-way-result test, or the insubstantial differences test.  For example, the specified amounts of "100% pure pomalidomide" are substantially different from the amounts present in the Teva ANDA Products.  Some such differences include at least the following:

- Due to both the different excipients, their presence at different amounts, and the differing amount of API, the API-excipient and excipient-excipient interactions in Teva ANDA Products are substantially different than any interactions within the claimed dosage forms. (*See, e.g.* Remington's Pharmaceutical Sciences, 18th ed. at 1660 "it is now realized that the additives present in the capsule formulation, like the compressed tablet, can influence the release of the drug substance from the capsule.")

- The amount of each excipient in a particular capsule fill blend, as well as the change to the total weight of the capsule fill, can change the way in which the capsules are prepared, such as by requiring different machinery for blending or encapsulating, change the manner or method of blending, and/or changing the speed or efficiency of the blending or encapsulating.

Thus, the amount and purity of the pomalidomide in Teva's ANDA Products does not perform substantially the same function, in substantially the same way, to obtain the same result

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

as the specified amounts of "100% pure pomalidomide" recited in the claims.  Teva reserves the right to respond to any arguments made by Celgene that any component or combination or components of the Teva ANDA Product infringes this claim limitation under the doctrine of equivalents.

Additionally, the inherent narrowness of the claim language and specification precludes the application of the doctrine of equivalents.  For example, the specification of the '427 patent states:

> In some embodiments, because it is typical to obtain pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, at a purity of less than 100%, the formulations and dosage forms provided herein may be defined as compositions, formulations, or dosage forms that comprise pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, at an amount that provides the potency of a specified amount of 100% pure pomalidomide.

'427 patent at 7:26–34.  From these statements in the specification, a person of ordinary skill in the art would understand that the claims exclude any dosage form containing any amount of pomalidomide less than the specified amount of "100% pure pomalidomide."  *See Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n,* 109 F.3d 726, 732 (Fed. Cir. 1997) (narrow language in the claims and specification can preclude use of doctrine of equivalents to reach beyond what is literally claimed).

Further, Celgene is precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents.  For example, prosecution history estoppel and argument-based estoppel preclude any potential argument by Celgene that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents.

The prosecution history of the '427 patent clearly establishes that the applicant made amendments and arguments with respect to these claims regarding the "at an amount that provides [x] mg of 100% pure pomalidomide" limitation in response to the examiner's

43

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

patentability rejections, which preclude the application of the doctrine of equivalents with respect to this limitation.

The original independent claims in the application did not recite "at an amount that provides [x] mg of 100% pure pomolidomide" nor did they recite "100% pure pomolidomide" in any specified amount.[34]  For example, claim 11 (which ultimately became claim 3), originally was as follows:

> 11. An oral dosage form which weighs about 125 mg and comprises: 1) pomolidomide, or a pharmaceutically acceptable salt or solvate thereof, **at an amount that provides 1 mg potency of pomolidomide**; and 2) a pharmaceutically acceptable carrier or excipient.[35]

The examiner rejected all pending claims as unpatentable under §112 ¶2.[36]  The examiner stated that the pending independent claims were indefinite "because they recite potency of pomalidomide in miligrams [sic]."[37]  In response, the applicant traversed the rejection and stated that "the potency of pomalidomide, as recited by the pending claims, is unambiguously explained in the specification," referring to the statements at 9:20–25, reproduced above.[38]

The examiner maintained the rejection and stated that:

> Based on the specification (from page 9 line 30 to page 10 line 5) it appears that the applicant intended to say that since pomalidomide is obtained at a purity of less than 100%, the amount of impure pamolidomide that is utilized in the dosage forms should provide a specified amount of pure pamolidomide such as 0.5 mg.[39]

---

[34]   U.S. Application. No. 12/783,390, at 44–49 (claims 1, 11, 21, 31, 41, and 51).

[35]   U.S. Application No. 12/783,390, at 44–49 (claims 1, 11, 21, 31, 41, and 51) (emphasis added).

[36]   Office Action mailed April 24, 2012 at 2–3.

[37]   *Id*.

[38]   Amendment and Response dated August 16, 2012 at 8.

[39]   Office Action mailed November 15, 2012 at 4–5.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

The applicant traversed the rejection again, stating that "the "mg" unit recited by the claims does

not refer to the actual potency of the active ingredient, but instead refers to the amount of

pomalidomide free base that would provide the required potency."[40]  The examiner issued an

Advisory Action restating the §112 ¶2 rejection and the applicant then amended the claims,

admitting that the claim amendments were made in response in to rejections to the claims as

unpatentable under §112 ¶2.[41]  For example, claim 11 (which ultimately issued as claim 3) was

amended to add "100% pure:"[42]

> 11. (Currently amended) An oral dosage form <u>in the form of a capsule</u> which weighs ~~about~~ 125 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, **at an amount that provides 1 mg** ~~potency~~ **of 100% pure** pomalidomide; 2) pregelatinized starch at an amount of 70 mg; 3) sodium stearyl fumarate at an amount of 0.32 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 125 mg.

After this amendment, the examiner allowed the claims, stating in the notice of allowance that

the rejections under §112 ¶2 were "obviated with claim amendments" made on June 17, 2013.[43]

A reasonable competitor reading the specification and file history, finding that the term "100%

pure" was added to the claims, would understand that the patent applicant had surrendered

dosage forms comprising any amount of pomalidomide less than the claimed amounts of "100%

pure pomalidomide." *Desper Prods., Inc.,* 157 F.3d at 1338.  As such, the prosecution history of

the '427 patent clearly establishes that the applicant made amendments and arguments with

respect to the independent claims regarding the requirement of "100% pure pomalidomide" in

---

[40]   Response After Final Action dated February 13, 2013 at 7–8.

[41]   Advisory Action mailed March 25, 2013.

[42]   Supplemental Amendment and Response dated June 17, 2013 at 2–4 (emphasis added).

[43]   Notice of Allowability dated May 5, 2014 at 3–4.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

response to the examiner's patentability rejections which preclude the application of the doctrine of equivalents with respect to this limitation.

For example, as with its arguments to overcome the art by including "sodium stearyl fumarate" limitation, in remarks that accompanied these amendments, the applicant argued that the cited references do "not teach or suggest the advantages of the specific oral dosage forms claimed in the current application."[44]  Specifically, the applicant stated that there was no disclosure in the prior art that would have "prompted one skilled in the art to prepare a composition having pomalidomide at the specified amounts, along with the particular binders and fillers at the specified amount, as recited" by the amended independent claims.[45]

The above narrowing claim amendments were substantially related to patentability and thus preclude Celgene from arguing any equivalents to the sodium stearyl fumarate limitation. Additionally, statements such as the above made during prosecution that characterize the unexpected properties of the invention, distinguish the prior art, and identify critical attributes of the invention give rise to argument based estoppel and limit the available equivalents.  For at least these reasons, Celgene is estopped from asserting that the Teva ANDA Products infringe claims 3–10 under the doctrine of equivalents.

Celgene is further legally precluded from claiming that Teva's ANDA Products infringe claims 3–10 under the doctrine of equivalents based on the doctrine of vitiation.  Here, for example, vitiating the limitations requiring pomalidomide at an amount that provides specific amounts of "100% pure pomalidomide," to anything less than 100% purity, would deprive the public of the notice function of the claims, and render an important limitation meaningless.

---

[44]   Amendment and Response dated August 16, 2012 at 10.

[45]   Amendment and Response dated August 16, 2012 at 9 (emphasis added).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Celgene is also precluded from asserting that any claim of the '427 patent covers the Teva ANDA Products with less than the recited amounts of "100% pure pomalidomide," as if the claims were to literally cover such products, the claims would encompass the prior art.  For example, claims reciting the same limitations as claims 3–10, but without the 100% purity limitation, would be obvious in view of the prior art.[46]

For the same reasons, as outlined above, Teva's ANDA Product cannot infringe dependent claims 4, 6, 8, and 10.

6.     **No Indirect Infringement of Claims 3–10: No indirect infringement**

Liability under each of §§ 271(b) and (c) requires a finding of direct infringement. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) (contributory infringement); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) (induced infringement).  As outlined above, the Teva ANDA Products do not, and will not, directly infringe claims 3–10.  For at least these reasons, there can be no finding of indirect infringement of those claims.

Dated: December 15, 2017           WALSH PIZZI O'REILLY FALANGA LLP

                                                      */s/  Liza M. Walsh*

                                                      Liza M. Walsh
                                                      Christine I. Gannon
                                                      Eleonore Ofosu-Antwi
                                                      One Riverfront Plaza
                                                      1037 Raymond Boulevard, Suite 600
                                                      Newark, NJ 07102
                                                      Tel.: (973) 757-1100

                                                      OF COUNSEL:

                                                      Jay P. Lefkowitz
                                                      Jeanna M. Wacker

---

[46]  *See, e.g.* Office Action mailed April 24, 2012 at 3–11.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
lefkowitz@kirkland.com
jeanna.wacker@kirkland.com

Kristen P.L. Reichenbach
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel.: (415) 439-1400
kristen.reichenbach@kirkland.com

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

# Exhibit 8

US008828427B2

(12) **United States Patent**     (10) **Patent No.:**     **US 8,828,427 B2**
Tutino et al.                     (45) **Date of Patent:**     **Sep. 9, 2014**

(54) **FORMULATIONS OF 4-AMINO-2-(2,6-DIOXOPIPERIDINE-3-YL)ISOINDOLINE-1,3-DIONE**

(75) Inventors: **Anthony Tutino**, New Providence, NJ (US); **Michael T. Kelly**, Lake Hopatcong, OH (US)

(73) Assignee: **Celgene Corporation**, Summit, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 398 days.

(21) Appl. No.: **12/783,390**

(22) Filed: **May 19, 2010**

(65) **Prior Publication Data**

US 2011/0045064 A1      Feb. 24, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/179,678, filed on May 19, 2009.

(51) **Int. Cl.**
*A61K 31/454*      (2006.01)
*A61K 9/48*      (2006.01)

(52) **U.S. Cl.**
USPC ........................................... **424/452**; 514/323

(58) **Field of Classification Search**
CPC ..... A61K 31/454; A61K 47/26; A61K 47/36; A61K 9/4858; A61K 9/4866

USPC ........................................... 424/452; 514/323
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,593,696 | A | * | 1/1997 | McNally et al. ............... 424/472 |
| 2007/0155791 | A1 | * | 7/2007 | Zeldis et al. .................. 514/323 |

FOREIGN PATENT DOCUMENTS

WO      WO 2006/058008 A1      6/2006

OTHER PUBLICATIONS

Remington's Pharmaceutical Sciences 17th Edition, Published 1985, pp. 1613-1615 and 1625-1626.*
Crane and List, "Immunomodulatory Drugs," Cancer Investigation 23(7): 625-634 (2005).

* cited by examiner

*Primary Examiner* — Richard Schnizer
*Assistant Examiner* — Alma Pipic
(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

Pharmaceutical compositions and single unit dosage forms of 4-amino-2-(2,6-dioxopiperidine-3-yl)isoindoline-1,3-dione, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, hydrate, or clathrate, are provided herein. Also provided are methods of treating, managing, or preventing various disorders, such as cancer or an inflammatory disease.

**12 Claims, No Drawings**

US 8,828,427 B2

**1**

# FORMULATIONS OF 4-AMINO-2-(2,6-DIOXOPIPERIDINE-3-YL)ISOINDOLINE-1,3-DIONE

This application claims priority to U.S. Provisional Application No. 61/179,678, filed May 19, 2009, the entirety of which is incorporated herein by reference.

## 1. FIELD

Provided herein are formulations and dosage forms of pomalidomide, i.e., 4-amino-2-(2,6-dioxopiperidine-3-yl) isoindoline-1,3-dione or CC-4047. Methods of using the formulations and dosage forms are also provided herein.

## 2. BACKGROUND

Drug substances are usually administered as part of a formulation in combination with one or more other agents that serve varied and specialized pharmaceutical functions. Dosage forms of various types may be made through selective use of pharmaceutical excipients. As pharmaceutical excipients have various functions and contribute to the pharmaceutical formulations in many different ways, e.g., solubilization, dilution, thickening, stabilization, preservation, coloring, flavoring, etc. The properties that are commonly considered when formulating an active drug substance include bioavailability, ease of manufacture, ease of administration, and stability of the dosage form. Due to the varying properties of the active drug substance to be formulated, dosage forms typically require pharmaceutical excipients that are uniquely tailored to the active drug substance in order to achieve advantageous physical and pharmaceutical properties.

Pomalidomide, which is also known as CC-4047, is chemically named 4-amino-2-(2,6-dioxopiperidine-3-yl)isoindoline-1,3-dione. Pomalidomide is an immunomodulatory compound that inhibits, for example, LPS induced monocyte TNFα, IL-1β, IL-12, IL-6, MIP-1, MCP-1, GM-CSF, G-CSF, and COX-2 production. The compound is also known to co-stimulate the activation of T-cells. Pomalidomide and method of synthesizing the compound are described, e.g., in U.S. Pat. No. 5,635,517, the entirety of which is incorporated herein by reference.

Due to its diversified pharmacological properties, pomalidomide is useful in treating, preventing, and/or managing various diseases or disorders. Thus, a need exists as to dosage forms of pomalidomide having advantageous physical and pharmaceutical properties.

## 3. SUMMARY

Provided herein are pharmaceutical dosage forms of pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, hydrate, or clathrate thereof. Also provided herein are methods of treating, managing, or preventing diseases and conditions such as, but not limited to, cancer, pain, Macular Degeneration, a skin disease, a pulmonary disorder, an asbestos-related disorder, a parasitic disease, an immunodeficiency disorder, a CNS disorder, CNS injury, atherosclerosis, a sleep disorder, hemoglobinopathy, anemia, an inflammatory disease, an autoimmune disease, a viral disease, a genetic disease, an allergic disease, a bacterial disease, an ocular neovascular disease, a choroidal neovascular disease, a retina neovascular disease, and rubeosis, using pomalidomide, or a pharmaceutically acceptable stereoisomer,

**2**

prodrug, salt, solvate, hydrate, or clathrate thereof, in the dosage forms described herein.

### 3.1. Definitions

As used herein and unless otherwise indicated, a composition that is "substantially free" of a compound means that the composition contains less than about 20 percent by weight, more preferably less than about 10 percent by weight, even more preferably less than about 5 percent by weight, and most preferably less than about 3 percent by weight of the compound.

As used herein and unless otherwise indicated, the term "stereomerically pure" means a composition that comprises one stereoisomer of a compound and is substantially free of other stereoisomers of that compound. For example, a stereomerically pure composition of a compound having one chiral center will be substantially free of the opposite enantiomer of the compound. A stereomerically pure composition of a compound having two chiral centers will be substantially free of other diastereomers of the compound. A typical stereomerically pure compound comprises greater than about 80 percent by weight of one stereoisomer of the compound and less than about 20 percent by weight of other stereoisomers of the compound, more preferably greater than about 90 percent by weight of one stereoisomer of the compound and less than about 10 percent by weight of the other stereoisomers of the compound, even more preferably greater than about 95 percent by weight of one stereoisomer of the compound and less than about 5 percent by weight of the other stereoisomers of the compound, and most preferably greater than about 97 percent by weight of one stereoisomer of the compound and less than about 3 percent by weight of the other stereoisomers of the compound.

As used herein and unless otherwise indicated, the term "enantiomerically pure" means a stereomerically pure composition of a compound having one chiral center.

As used herein, unless otherwise specified, the term "pharmaceutically acceptable salt(s)," as used herein includes, but is not limited to, salts of acidic or basic moieties of thalidomide. Basic moieties are capable of forming a wide variety of salts with various inorganic and organic acids. The acids that can be used to prepare pharmaceutically acceptable acid addition salts of such basic compounds are those that form nontoxic acid addition salts, i.e., salts containing pharmacologically acceptable anions. Suitable organic acids include, but are not limited to, maleic, fumaric, benzoic, ascorbic, succinic, acetic, formic, oxalic, propionic, tartaric, salicylic, citric, gluconic, lactic, mandelic, cinnamic, oleic, tannic, aspartic, stearic, palmitic, glycolic, glutamic, gluconic, glucaronic, saccharic, isonicotinic, methanesulfonic, ethanesulfonic, p-toluenesulfonic, benzenesulfonic acids, or pamoic (i.e., 1,1'-methylene-bis-(2-hydroxy-3-naphthoate) acids. Suitable inorganic acids include, but are not limited to, hydrochloric, hydrobromic, hydroiodic, sulfuric, phosphoric, or nitric acids. Compounds that include an amine moiety can form pharmaceutically acceptable salts with various amino acids, in addition to the acids mentioned above. Chemical moieties that are acidic in nature are capable of forming base salts with various pharmacologically acceptable cations. Examples of such salts are alkali metal or alkaline earth metal salts and, particularly, calcium, magnesium, sodium, lithium, zinc, potassium, or iron salts.

As used herein, and unless otherwise specified, the term "solvate" means a compound provided herein or a salt thereof, that further includes a stoichiometric or non-sto-

**3**

ichiometric amount of solvent bound by non-covalent intermolecular forces. Where the solvent is water, the solvate is a hydrate.

As used herein and unless otherwise indicated, the teen "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide the compound. Examples of prodrugs include, but are not limited to, derivatives of thalidomide that include biohydrolyzable moieties such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues. Other examples of prodrugs include derivatives of thalidomide that include —NO, —NO$_2$, —ONO, or —ONO$_2$ moieties.

As used herein and unless otherwise indicated, the terms "biohydrolyzable carbamate," "biohydrolyzable carbonate," "biohydrolyzable ureide," "biohydrolyzable phosphate" mean a carbamate, carbonate, ureide, or phosphate, respectively, of a compound that either: 1) does not interfere with the biological activity of the compound but can confer upon that compound advantageous properties in vivo, such as uptake, duration of action, or onset of action; or 2) is biologically inactive but is converted in vivo to the biologically active compound. Examples of biohydrolyzable carbamates include, but are not limited to, lower alkylamines, substituted ethylenediamines, aminoacids, hydroxyalkylamines, heterocyclic and heteroaromatic amines, and polyether amines.

As used herein and unless otherwise indicated, the term "biohydrolyzable ester" means an ester of a compound that either: 1) does not interfere with the biological activity of the compound but can confer upon that compound advantageous properties in vivo, such as uptake, duration of action, or onset of action; or 2) is biologically inactive but is converted in vivo to the biologically active compound. Examples of biohydrolyzable esters include, but are not limited to, lower alkyl esters, alkoxyacyloxy esters, alkyl acylamino alkyl esters, and choline esters.

As used herein and unless otherwise indicated, the term "biohydrolyzable amide" means an amide of a compound that either: 1) does not interfere with the biological activity of the compound but can confer upon that compound advantageous properties in vivo, such as uptake, duration of action, or onset of action; or 2) is biologically inactive but is converted in vivo to the biologically active compound. Examples of biohydrolyzable amides include, but are not limited to, lower alkyl amides, α-amino acid amides, alkoxyacyl amides, and alkylaminoalkylcarbonyl amides.

As used herein, and unless otherwise specified, the terms "treat," "treating" and "treatment" contemplate an action that occurs while a patient is suffering from the specified disease or disorder, which reduces the severity of the disease or disorder, or retards or slows the progression of the disease or disorder.

As used herein, and unless otherwise specified, the terms "prevent," "preventing" and "prevention" refer to the prevention of the onset, recurrence or spread of a disease or disorder, or of one or more symptoms thereof. The terms "prevent," "preventing" and "prevention" contemplate an action that occurs before a patient begins to suffer from the specified disease or disorder, which inhibits or reduces the severity of the disease or disorder.

As used herein, and unless otherwise indicated, the terms "manage," "managing" and "management" encompass preventing the recurrence of the specified disease or disorder in a patient who has already suffered from the disease or disorder, and/or lengthening the time that a patient who has suffered from the disease or disorder remains in remission. The

**4**

terms encompass modulating the threshold, development and/or duration of the disease or disorder, or changing the way that a patient responds to the disease or disorder.

As used herein, and unless otherwise specified, the term "about," when used in connection with doses, amounts, or weight percent of ingredients of a composition or a dosage form, means dose, amount, or weight percent that is recognized by those of ordinary skill in the art to provide a pharmacological effect equivalent to that obtained from the specified dose, amount, or weight percent is encompassed. Specifically, the term "about" contemplates a dose, amount, or weight percent within 30%, 25%, 20%, 15%, 10%, or 5% of the specified dose, amount, or weight percent is encompassed.

As used herein, and unless otherwise specified, the term "stable," when used in connection with a formulation or a dosage form, means that the active ingredient of the formulation or dosage form remains solubilized for a specified amount of time and does not significantly degrade or aggregate or become otherwise modified (e.g., as determined, for example, by HPLC). In some embodiments, about 70 percent or greater, about 80 percent or greater or about 90 percent or greater of the compound remains solubilized after the specified period.

## 4. DETAILED DESCRIPTION

Provided herein are pharmaceutical dosage forms of pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, hydrate, or clathrate thereof. In some embodiments, the dosage forms are suitable for oral administration to a patient. In other embodiments, the dosage forms provided herein exhibit advantageous physical and/or pharmacological properties. Such properties include, but are not limited to, ease of assay, content uniformity, flow properties for manufacture, dissolution and bioavailability, and stability. In certain embodiments, the dosage forms provided herein have a shelf life of at least about 12 months, at least about 24 months, or at least about 36 months without refrigeration.

Also provided herein are kits comprising pharmaceutical compositions and dosage forms provided herein. Also provided herein are methods of treating, managing, and/or preventing a disease or condition, which comprises administering to a patient in need thereof a pharmaceutical composition or a dosage form provided herein.

### 4.1 Compositions and Dosage Forms

In one embodiment, provided herein is a single unit dosage form suitable for oral administration to a human comprising: an amount equal to or greater than about 1, 5, 10, 15, 20, 25, 30, 50, 75, 100, 150, or 200 mg of an active ingredient; and a pharmaceutically acceptable excipient; wherein the active ingredient is pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof. In some embodiments, the amount of active ingredient is from about 0.1 to about 100 mg, from about 0.5 to about 50 mg, from, about 0.5 to about 25 mg, from about 1 mg to about 10 mg, from about 0.5 to about 5 mg, or from about 1 mg to about 5 mg. In one embodiment, the amount of the active ingredient is about 0.5 mg. In another embodiment, the amount of the active ingredient is about 1 mg. In another embodiment, the amount of the active ingredient is about 2 mg. In another embodiment, the amount of the active ingredient is about 5 mg.

Pharmaceutical compositions and formulations provided herein can be presented as discrete dosage forms, such as

US 8,828,427 B2

5

capsules (e.g., gelcaps), caplets, tablets, troches, lozenges, dispersions, and suppositories each containing a predetermined amount of an active ingredient as a powder or in granules, a solution, or a suspension in an aqueous or non-aqueous liquid, an oil-in-water emulsion, or a water-in-oil liquid emulsion. Because of their ease of administration, tablets, caplets, and capsules represent a preferred oral dosage unit forms.

Tablets, caplets, and capsules typically contain from about 50 mg to about 500 mg of the pharmaceutical composition (i.e., active ingredient and excipient(s)). Capsules can be of any size. Examples of standard sizes include #000, #00, #0, #1, #2, #3, #4, and #5. See, e.g., *Remington's Pharmaceutical Sciences*, page 1658-1659 (Alfonso Gennaro ed., Mack Publishing Company, Easton Pa., 18th ed., 1990), which is incorporated by reference. In some embodiments, capsules provided herein are of size #1 or larger, #2 or larger, or #4 or larger.

Also provided herein are anhydrous pharmaceutical compositions and dosage forms including an active ingredient, since water can facilitate the degradation of some compounds. For example, the addition of water (e.g., 5 percent) is widely accepted in the pharmaceutical arts as a means of simulating shelf-life, i.e., long-term storage in order to determine characteristics such as shelf-life or the stability of formulations over time. See, e.g., Jens T. Carstensen, *Drug Stability: Principles & Practice,* 2d. Ed., Marcel Dekker, NY, N.Y., 1995, pp. 379-80. In effect, water and heat accelerate decomposition. Thus, the effect of water on a formulation can be of great significance since moisture and/or humidity are commonly encountered during manufacture, handling, packaging, storage, shipment, and use of formulations.

An anhydrous pharmaceutical compositions should be prepared and stored such that the anhydrous nature is maintained. Accordingly, in some embodiments, anhydrous compositions are packaged using materials known to prevent exposure to water such that they can be included in suitable formulary kits. Examples of suitable packaging include, but are not limited to, hermetically sealed foils, plastic or the like, unit dose containers, blister packs, and strip packs.

In this regard, also provided herein is a method of preparing a solid pharmaceutical formulation including an active ingredient through admixing the active ingredient and an excipient under anhydrous or low moisture/humidity conditions, wherein the ingredients are substantially free of water. The method can further include packaging the anhydrous or non-hygroscopic solid formulation under low moisture conditions. By using such conditions, the risk of contact with water is reduced and the degradation of the active ingredient can be prevented or substantially reduced.

Also provided herein are lactose-free pharmaceutical compositions and dosage forms. Compositions and dosage forms that comprise an active ingredient that is a primary or secondary amine are preferably lactose-free. As used herein, the term "lactose-free" means that the amount of lactose present, if any, is insufficient to substantially increase the degradation rate of an active ingredient that is a primary or secondary amine. Lactose-free compositions provided herein can comprise excipients which are well known in the art and are listed in the USP (XXI)/NF (XVI), which is incorporated herein by reference.

In one embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises from about 0.1 to about 10 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises

6

from about 0.1 to about 5 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises from about 0.1 to about 3 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises from about 0.5 to about 3 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises from about 0.5 to about 2 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises about 1 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises about 0.8 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises about 2 weight percent of total weight of the composition. In another embodiment, pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, comprises about 1.7 weight percent of total weight of the composition.

In one embodiment, the active ingredient and carrier, diluent, binder, or filler are directly blended as described herein elsewhere. In another embodiment, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment, the carrier, diluent, binder, or filler comprises from about 70 to about 99 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises from about 80 to about 99 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises from about 85 to about 99 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises from about 90 to about 99 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises from about 95 to about 99 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises about 98 weight percent of total weight of the composition. In another embodiment, the carrier, diluent, binder, or filler comprises about 99 weight percent of total weight of the composition.

In one embodiment, the dosage forms provided herein comprise both mannitol and starch. In one embodiment, mannitol and starch comprise from about 70 to about 99 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise from about 80 to about 99 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise from about 85 to about 99 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise from about 90 to about 99 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise from about 95 to about 99 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise about 98 weight percent of total weight of the composition. In another embodiment, mannitol and starch comprise about 99 weight percent of total weight of the composition.

US 8,828,427 B2

7

In one embodiment, the ratio of mannitol:starch in the dosage form is from about 1:1 to about 1:1.5. In one embodiment, the ratio of mannitol:starch in the dosage form is about 1:1.3.

In another embodiment, the dosage form comprises a lubricant. In one embodiment, the dosage form comprises about 0.2, 0.3, 0.5, 0.6, or 0.8 mg of lubricant. In another embodiment, the dosage form comprises about 0.16, 0.32, 0.64, or 0.75 mg of lubricant. In one embodiment, the lubricant is sodium stearyl fumarate (PRUV).

In one embodiment, the lubricant, e.g., PRUV, comprises from about 0.01 to about 5 weight percent of total weight of the composition. In another embodiment, the lubricant, e.g., PRUV, comprises from about 0.01 to about 1 weight percent of total weight of the composition. In another embodiment, the lubricant, e.g., PRUV, comprises from about 0.1 to about 1 weight percent of total weight of the composition. In another embodiment, the lubricant, e.g., PRUV, comprises from about 0.1 to about 0.5 weight percent of total weight of the composition. In another embodiment, the lubricant, e.g., PRUV, comprises from about 0.2 to about 0.3 weight percent of total weight of the composition. In another embodiment, the lubricant, e.g., PRUV, comprises about 0.25 weight percent of total weight of the composition.

In some embodiments, because it is typical to obtain pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, at a purity of less than 100%, the formulations and dosage forms provided herein may be defined as compositions, formulations, or dosage forms that comprise pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, at an amount that provides the potency of a specified amount of 100% pure pomalidomide.

For example, in one embodiment, provided herein is a single unit dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 0.5, 1, 2, 3, 4, or 5 mg potency of pomalidomide; and 2) about 60, 120, 250, 180, 240, or 300 mg of a carrier, diluent, binder, or filler, respectively. In one embodiment, the amount of a carrier, diluent, binder, or filler is about 62, 124, 248, 177, 236, or 295 mg, respectively.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof present at an amount that provides about 0.5 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 62.5 mg. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 62.5 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 35 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment where the total weight of the dosage form is about 62.5 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.2

8

mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.16 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 0.5 mg potency of pomalidomide; 2) about 35 mg of pregelatinized starch; 3) about 0.16 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 62.5 mg. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 1 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 125 mg. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 125 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 70 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment where the total weight of the dosage form is about 125 mg and a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.3 mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.32 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 1 mg potency of pomalidomide; 2) about 70 mg of pregelatinized starch; 3) about 0.32 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 125 mg. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 2 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 250 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 250 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 140 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

US 8,828,427 B2

9

In one embodiment where the total weight of the dosage form is about 250 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.6 mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.64 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 2 mg potency of pomalidomide; 2) about 140 mg of pregelatinized starch; 3) about 0.64 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 250 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 3 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 180 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 180 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 100 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment where the total weight of the dosage form is about 180 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.5 mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.45 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 3 mg potency of pomalidomide; 2) about 100.8 mg of pregelatinized starch; 3) about 0.45 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 180 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 4 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 240 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 240 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 135 mg of

10

starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment where the total weight of the dosage form is about 240 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.6 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 4 mg potency of pomalidomide; 2) about 134.4 mg of pregelatinized starch; 3) about 0.6 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 240 mg. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 5 mg potency of pomalidomide; and 2) a pharmaceutically acceptable excipient. In one embodiment, the total weight of the dosage form is about 300 mg. In one embodiment, the dosage form is suitable for administration in a size 1 or larger capsule. In one embodiment, the excipient comprises a carrier, diluent, binder, or filler. In one embodiment, the excipients comprise a carrier, diluent, binder, or filler and a lubricant.

In one embodiment where the total weight of the dosage form is about 300 mg, the carrier, diluent, binder, or filler comprises mannitol and/or starch. In one embodiment, the excipient comprises both mannitol and starch. In one embodiment, where both mannitol and starch are present in the dosage form, the dosage form comprises about 168 mg of starch, and the remaining weight is filled by starch. In one embodiment, the mannitol is spray dried mannitol. In another embodiment, the starch is pregelatinized starch.

In one embodiment where the total weight of the dosage form is about 300 mg and where a lubricant is present, the lubricant is sodium stearyl fumarate. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.8 mg. In one embodiment, the sodium stearyl fumarate is present at an amount of about 0.75 mg.

In one embodiment, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 5 mg potency of pomalidomide; 2) about 168 mg of pregelatinized starch; 3) about 0.75 mg of sodium stearyl fumarate; and 4) spray dried mannitol at an amount that brings the total weight of the dosage form to 300 mg. In one embodiment, the dosage form is suitable for administration in a size 1 or larger capsule.

In another embodiment, provided herein is a dosage form comprising pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 0.5 mg potency of pomalidomide, which is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In some embodiments, the dosage form comprises mannitol and/or starch. In one embodiment where both starch and mannitol are present in the dosage form, starch is present at an amount of about 35 mg, and mannitol is present at an amount that brings the total weight of composition to about 62.5 mg. In some embodiments, the dosage form further comprises sodium stearyl fumarate at an amount of about 0.2 mg or about 0.16 mg. In some embodiments, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceu-

**11**

tically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 0.5 mg potency of pomalidomide; about 35 mg pregelatinized starch; about 0.16 mg sodium stearyl fumarate; and spray dried mannitol at an amount that brings the total weight of the dosage form to 62.5 mg; wherein the dosage form is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule.

In another embodiment, provided herein is a dosage form comprising pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 1 mg potency of pomalidomide, which is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In some embodiments, the dosage form comprises mannitol and/or starch. In one embodiment where both starch and mannitol are present in the dosage form, starch is present at an amount of about 70 mg, and mannitol is present at an amount that brings the total weight of composition to about 125 mg. In some embodiments, the dosage farm further comprises sodium stearyl fumarate at an amount of about 0.3 mg or about 0.32 mg. In some embodiments, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 1 mg potency of pomalidomide; about 70 mg pregelatinized starch; about 0.32 mg sodium stearyl fumarate; and spray dried mannitol at an amount that brings the total weight of the dosage form to 125 mg; wherein the dosage form is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In one embodiment, the dosage form is suitable for administration in a size 4 or larger capsule.

In another embodiment, provided herein is a dosage form comprising pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 2 mg potency of pomalidomide, which is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In some embodiments, the dosage form comprises mannitol and/or starch. In one embodiment where both starch and mannitol are present in the dosage form, starch is present at an amount of about 140 mg, and mannitol is present at an amount that brings the total weight of composition to about 250 mg. In some embodiments, the dosage form further comprises sodium stearyl fumarate at an amount of about 0.6 mg or about 0.64 mg. In some embodiments, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 2 mg potency of pomalidomide; about 140 mg pregelatinized starch; about 0.64 mg sodium stearyl fumarate; and spray dried mannitol at an amount that brings the total weight of the dosage form to 250 mg; wherein the dosage form is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In one embodiment, the dosage form is suitable for administration in a size 2 or larger capsule.

In another embodiment, provided herein is a dosage form comprising pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 5 mg potency of pomalidomide, which is stable for a period of at least about 12, about 24, or about 36 months without refrigeration. In some embodiments, the dosage form comprises mannitol and/or starch. In one embodiment where both starch and mannitol are present in the dosage form, starch is present at an amount of about 168 mg, and mannitol is present at an amount

**12**

that brings the total weight of composition to about 300 mg. In some embodiments, the dosage form further comprises sodium stearyl fumarate at an amount of about 0.8 mg or about 0.75 mg. In some embodiments, provided herein is a dosage form comprising: 1) pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, present at an amount that provides about 5 mg potency of pomalidomide; about 168 mg pregelatinized starch; about 0.75 mg sodium stearyl fumarate; and spray dried mannitol at an amount that brings the total weight of the dosage form to 300 mg; wherein the dosage form is stable for a period of at least 12, about 24, or about 36 months without refrigeration. In one embodiment, the dosage form is suitable for administration in a size 1 or larger capsule.

4.1.1 Second Active Agents

In certain embodiments, provided herein are compositions and dosage form of pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, which may further comprise one or more secondary active ingredients. Certain combinations may work synergistically in the treatment of particular types diseases or disorders, and conditions and symptoms associated with such diseases or disorders. Pomalidomide, or a pharmaceutically acceptable stereoisomer, prodrug, salt, solvate, or clathrate thereof, can also work to alleviate adverse effects associated with certain second active agents, and vice versa.

Specific second active compounds that can be contained in the formulations and dosage forms provided herein vary depending on the specific indication to be treated, prevented or managed.

For instance, for the treatment, prevention or management of cancer, second active agents include, but are not limited to: semaxanib; cyclosporin; etanercept; doxycycline; bortezomib; acivicin; aclarubicin; acodazole hydrochloride; acronine; adozelesin; aldesleukin; altretamine; ambomycin; ametantrone acetate; amsacrine; anastrozole; anthramycin; asparaginase; asperlin; azacitidine; azetepa; azotomycin; batimastat; benzodepa; bicalutamide; bisantrene hydrochloride; bisnafide dimesylate; bizelesin; bleomycin sulfate; brequinar sodium; bropirimine; busulfan; cactinomycin; calusterone; caracemide; carbetimer; carboplatin; carmustine; carubicin hydrochloride; carzelesin; cedefingol; celecoxib; chlorambucil; cirolemycin; cisplatin; cladribine; crisnatol mesylate; cyclophosphamide; cytarabine; dacarbazine; dactinomycin; daunorubicin hydrochloride; decitabine; dexormaplatin; dezaguanine; dezaguanine mesylate; diaziquone; docetaxel; doxorubicin; doxorubicin hydrochloride; droloxifene; droloxifene citrate; dromostanolone propionate; duazomycin; edatrexate; eflornithine hydrochloride; elsamitrucin; enloplatin; enpromate; epipropidine; epirubicin hydrochloride; erbulozole; esorubicin hydrochloride; estramustine; estramustine phosphate sodium; etanidazole; etoposide; etoposide phosphate; etoprine; fadrozole hydrochloride; fazarabine; fenretinide; floxuridine; fludarabine phosphate; fluorouracil; fluorocitabine; fosquidone; fostriecin sodium; gemcitabine; gemcitabine hydrochloride; hydroxyurea; idarubicin hydrochloride; ifosfamide; ilmofosine; iproplatin; irinotecan; irinotecan hydrochloride; lanreotide acetate; letrozole; leuprolide acetate; liarozole hydrochloride; lometrexol sodium; lomustine; losoxantrone hydrochloride; masoprocol; maytansine; mechlorethamine hydrochloride; megestrol acetate; melengestrol acetate; melphalan; menogaril; mercaptopurine; methotrexate; methotrexate sodium; metoprine; meturedepa; mitindomide; mitocarcin; mitocromin; mitogillin; mitomalcin; mitomycin; mitosper; mitotane; mitoxantrone hydrochloride; mycophenolic acid; nocodazole; nogalamycin; ormaplatin; oxisuran;

US 8,828,427 B2

13

paclitaxel; pegaspargase; peliomycin; pentamustine; peplomycin sulfate; perfosfamide; pipobroman; piposulfan; piroxantrone hydrochloride; plicamycin; plomestane; porfimer sodium; porfiromycin; prednimustine; procarbazine hydrochloride; puromycin; puromycin hydrochloride; pyrazofurin; riboprine; safingol; safingol hydrochloride; semustine; simtrazene; sparfosate sodium; sparsomycin; spirogermanium hydrochloride; spiromustine; spiroplatin; streptonigrin; streptozocin; sulofenur; talisomycin; tecogalan sodium; taxotere; tegafur; teloxantrone hydrochloride; temoporfin; teniposide; teroxirone; testolactone; thiamiprine; thioguanine; thiotepa; tiazofurin; tirapazamine; toremifene citrate; trestolone acetate; triciribine phosphate; trimetrexate; trimetrexate glucuronate; triptorelin; tubulozole hydrochloride; uracil mustard; uredepa; vapreotide; verteporfin; vinblastine sulfate; vincristine sulfate; vindesine; vindesine sulfate; vinepidine sulfate; vinglycinate sulfate; vinleurosine sulfate; vinorelbine tartrate; vinzolidine sulfate; vinzolidine sulfate; vorozole; zeniplatin; zinostatin; and zorubicin hydrochloride.

Other second agents include, but are not limited to: 20-epi-1,25 dihydroxyvitamin D3; 5-ethynyluracil; abiraterone; aclarubicin; acylfulvene; adecypenol; adozelesin; aldesleukin; ALL-TK antagonists; altretamine; ambamustine; amidox; amifostine; aminolevulinic acid; amrubicin; amsacrine; anagrelide; anastrozole; andrographolide; angiogenesis inhibitors; antagonist D; antagonist G; antarelix; anti-dorsalizing morphogenetic protein-1; antiandrogen, prostatic carcinoma; antiestrogen; antineoplaston; antisense oligonucleotides; aphidicolin glycinate; apoptosis gene modulators; apoptosis regulators; apurinic acid; ara-CDP-DL-PTBA; arginine deaminase; amsacrine; atamestane; atrimustine; axinastatin 1; axinastatin 2; axinastatin 3; azasetron; azatoxin; azatyrosine; baccatin III derivatives; balanol; batimastat; BCR/ABL antagonists; benzochlorins; benzoylstaurosporine; beta lactam derivatives; beta-alethine; betaclamycin B; betulinic acid; bFGF inhibitor; bicalutamide; bisantrene; bisaziridinylspermine; bisnafide; bistratene A; bizelesin; breflate; bropirimine; budotitane; buthionine sulfoximine; calcipotriol; calphostin C; camptothecin derivatives; capecitabine; carboxamide-amino-triazole; carboxyamidotriazole; CaRest M3; CARN 700; cartilage derived inhibitor; carzelesin; casein kinase inhibitors (ICOS); castanospermine; cecropin B; cetrorelix; chlorins; chloroquinoxaline sulfonamide; cicaprost; cis-porphyrin; cladribine; clomifene analogues; clotrimazole; collismycin A; collismycin B; combretastatin A4; combretastatin analogue; conagenin; crambescidin 816; crisnatol; cryptophycin 8; cryptophycin A derivatives; curacin A; cyclopentanthraquinones; cycloplatam; cypemycin; cytarabine ocfosfate; cytolytic factor; cytostatin; dacliximab; decitabine; dehydrodidemnin B; deslorelin; dexamethasone; dexifosfamide; dexrazoxane; dexverapamil; diaziquone; didemnin B; didox; diethylnorspermine; dihydro-5-azacytidine; dihydrotaxol, 9-; dioxamycin; diphenyl spiromustine; docetaxel; docosanol; dolasetron; doxifluridine; doxorubicin; droloxifene; dronabinol; duocarmycin SA; ebselen; ecomustine; edelfosine; edrecolomab; eflornithine; elemene; emitefur; epirubicin; epristeride; estramustine analogue; estrogen agonists; estrogen antagonists; etanidazole; etoposide phosphate; exemestane; fadrozole; fazarabine; fenretinide; filgrastim; finasteride; flavopiridol; flezelastine; fluasterone; fludarabine; fluorodaunorunicin hydrochloride; forfenimex; formestane; fostriecin; fotemustine; gadolinium texaphyrin; gallium nitrate; galocitabine; ganirelix; gelatinase inhibitors; gemcitabine; glutathione inhibitors; hepsulfam; heregulin; hexamethylene bisacetamide; hypericin; ibandronic acid; idarubicin; idoxifene; idramantone; ilmofosine; ilomastat; imatinib

14

(Gleevec®), imiquimod; immunostimulant peptides; insulin-like growth factor-1 receptor inhibitor; interferon agonists; interferons; interleukins; iobenguane; iododoxorubicin; ipomeanol, 4-; iroplact; irsogladine; isobengazole; isohomohalicondrin B; itasetron; jasplakinolide; kahalalide F; lamellarin-N triacetate; lanreotide; leinamycin; lenograstim; lentinan sulfate; leptolstatin; letrozole; leukemia inhibiting factor; leukocyte alpha interferon; leuprolide+estrogen+progesterone; leuprorelin; levamisole; liarozole; linear polyamine analogue; lipophilic disaccharide peptide; lipophilic platinum compounds; lissoclinamide 7; lobaplatin; lombricine; lometrexol; lonidamine; losoxantrone; loxoribine; lurtotecan; lutetium texaphyrin; lysofylline; lytic peptides; maitansine; mannostatin A; marimastat; masoprocol; maspin; matrilysin inhibitors; matrix metalloproteinase inhibitors; menogaril; merbarone; meterelin; methioninase; metoclopramide; MIF inhibitor; mifepristone; miltefosine; mirimostim; mitoguazone; mitolactol; mitomycin analogues; mitonafide; mitotoxin fibroblast growth factor-saporin; mitoxantrone; mofarotene; molgramostim; Erbitux, human chorionic gonadotrophin; monophosphoryl lipid A+myobacterium cell wall sk; mopidamol; mustard anticancer agent; mycaperoxide B; mycobacterial cell wall extract; myriaporone; N-acetyldinaline; N-substituted benzamides; nafarelin; nagrestip; naloxone+pentazocine; napavin; naphterpin; nartograstim; nedaplatin; nemorubicin; neridronic acid; nilutamide; nisamycin; nitric oxide modulators; nitroxide antioxidant; nitrullyn; oblimersen (Genasense®); O6-benzylguanine; octreotide; okicenone; oligonucleotides; onapristone; ondansetron; ondansetron; oracin; oral cytokine inducer; ormaplatin; osaterone; oxaliplatin; oxaunomycin; paclitaxel; paclitaxel analogues; paclitaxel derivatives; palauamine; palmitoylrhizoxin; pamidronic acid; panaxytriol; panomifene; parabactin; pazelliptine; pegaspargase; peldesine; pentosan polysulfate sodium; pentostatin; pentrozole; perflubron; perfosfamide; perillyl alcohol; phenazinomycin; phenylacetate; phosphatase inhibitors; picibanil; pilocarpine hydrochloride; pirarubicin; piritrexim; placetin A; placetin B; plasminogen activator inhibitor; platinum complex; platinum compounds; platinum-triamine complex; porfimer sodium; porfiromycin; prednisone; propyl bis-acridone; prostaglandin J2; proteasome inhibitors; protein A-based immune modulator; protein kinase C inhibitor; protein kinase C inhibitors, microalgal; protein tyrosine phosphatase inhibitors; purine nucleoside phosphorylase inhibitors; purpurins; pyrazoloacridine; pyridoxylated hemoglobin polyoxyethylene conjugate; raf antagonists; raltitrexed; ramosetron; ras farnesyl protein transferase inhibitors; ras inhibitors; ras-GAP inhibitor; retelliptine demethylated; rhenium Re 186 etidronate; rhizoxin; ribozymes; RII retinamide; rohitukine; romurtide; roquinimex; rubiginone B1; ruboxyl; safingol; saintopin; SarCNU; sarcophytol A; sargramostim; Sdi 1 mimetics; semustine; senescence derived inhibitor 1; sense oligonucleotides; signal transduction inhibitors; sizofiran; sobuzoxane; sodium borocaptate; sodium phenylacetate; solverol; somatomedin binding protein; sonermin; sparfosic acid; spicamycin D; spiromustine; splenopentin; spongistatin 1; squalamine; stipiamide; stromelysin inhibitors; sulfinosine; superactive vasoactive intestinal peptide antagonist; suradista; suramin; swainsonine; tallimustine; tamoxifen methiodide; tauromustine; tazarotene; tecogalan sodium; tegafur; tellurapyrylium; telomerase inhibitors; temoporfin; teniposide; tetrachlorodecaoxide; tetrazomine; thaliblastine; thiocoraline; thrombopoietin; thrombopoietin mimetic; thymalfasin; thymopoietin receptor agonist; thymotrinan; thyroid stimulating hormone; tin ethyl etiopurpurin; tirapazamine; titanocene bichloride; topsentin; toremifene;

US 8,828,427 B2

15

translation inhibitors; tretinoin; triacetyluridine; triciribine; trimetrexate; triptorelin; tropisetron; turosteride; tyrosine kinase inhibitors; tyrphostins; UBC inhibitors; ubenimex; urogenital sinus-derived growth inhibitory factor; urokinase receptor antagonists; vapreotide; variolin B; velaresol; veramine; verdins; verteporfin; vinorelbine; vinxaltine; vitaxin; vorozole; zanoterone; zeniplatin; zilascorb; and zinostatin stimalamer.

Yet other second active agents include, but are not limited to, 2-methoxyestradiol, telomestatin, inducers of apoptosis in multiple myeloma cells (such as, for example, TRAIL), statins, semaxanib, cyclosporin, etanercept, doxycycline, bortezomib, oblimersen (Genasense®), remicade, docetaxel, celecoxib, melphalan, dexamethasone (Decadron®), steroids, gemcitabine, cisplatinum, temozolomide, etoposide, cyclophosphamide, temodar, carboplatin, procarbazine, gliadel, tamoxifen, topotecan, methotrexate, Arisa®, taxol, taxotere, fluorouracil, leucovorin, irinotecan, xeloda, CPT-11, interferon alpha, pegylated interferon alpha (e.g., PEG INTRON-A), capecitabine, cisplatin, thiotepa, fludarabine, carboplatin, liposomal daunorubicin, cytarabine, doxetaxol, paclitaxel, vinblastine, IL-2, GM-CSF, dacarbazine, vinorelbine, zoledronic acid, palmitronate, biaxin, busulphan, prednisone, bisphosphonate, arsenic trioxide, vincristine, doxorubicin (Doxil®), paclitaxel, ganciclovir, adriamycin, estramustine sodium phosphate (Emcyt®), sulindac, and etoposide.

In another embodiment, examples of specific second agents according to the indications to be treated, prevented, or managed can be found in the following references, all of which are incorporated herein in their entireties: U.S. Pat. Nos. 6,281,230 and 5,635,517; U.S. publication nos. 2004/0220144, 2004/0190609, 2004/0087546, 2005/0203142, 2004/0091455, 2005/0100529, 2005/0214328, 2005/0239842, 2006/0154880, 2006/0122228, and 2005/0143344; and U.S. provisional application No. 60/631,870.

Examples of second active agents that may be used for the treatment, prevention and/or management of pain include, but are not limited to, conventional therapeutics used to treat or prevent pain such as antidepressants, anticonvulsants, antihypertensives, anxiolytics, calcium channel blockers, muscle relaxants, non-narcotic analgesics, opioid analgesics, anti-inflammatories, cox-2 inhibitors, immunomodulatory agents, alpha-adrenergic receptor agonists or antagonists, immunosuppressive agents, corticosteroids, hyperbaric oxygen, ketamine, other anesthetic agents, NMDA antagonists, and other therapeutics found, for example, in the *Physician's Desk Reference* 2003. Specific examples include, but are not limited to, salicylic acid acetate (Aspirin®), celecoxib (Celebrex®), Enbrel®, ketamine, gabapentin (Neurontin®), phenyloin (Dilantin®), carbamazepine (Tegretol®), oxcarbazepine (Trileptal®), valproic acid (Depakene®), morphine sulfate, hydromorphone, prednisone, griseofulvin, penthonium, alendronate, dyphenhydramide, guanethidine, ketorolac (Acular®), thyrocalcitonin, dimethylsulfoxide (DMSO), clonidine (Catapress®), bretylium, ketanserin, reserpine, droperidol, atropine, phentolamine, bupivacaine, lidocaine, acetaminophen, nortriptyline (Pamelor®), amitriptyline (Elavil®), imipramine (Tofranil®), doxepin (Sinequan®), clomipramine (Anafranil®), fluoxetine (Prozac®), sertraline (Zoloft®), naproxen, nefazodone (Serzone®), venlafaxine (Effexor®), trazodone (Desyrel®), bupropion (Wellbutrin®), mexiletine, nifedipine, propranolol, tramadol, lamotrigine, vioxx, ziconotide, ketamine, dextromethorphan, benzodiazepines, baclofen, tizanidine and phenoxybenzamine.

16

Examples of second active agents that may be used for the treatment, prevention and/or management of macular degeneration and related syndromes include, but are not limited to, a steroid, a light sensitizer, an integrin, an antioxidant, an interferon, a xanthine derivative, a growth hormone, a neutrotrophic factor, a regulator of neovascularization, an anti-VEGF antibody, a prostaglandin, an antibiotic, a phytoestrogen, an anti-inflammatory compound or an antiangiogenesis compound, or a combination thereof. Specific examples include, but are not limited to, verteporfin, purlytin, an angiostatic steroid, rhuFab, interferon-2α, pentoxifylline, tin etiopurpurin, motexafin, lucentis, lutetium, 9-fluoro-11,21-dihydroxy-16,17-1-methylethylidinebis(oxy)pregna-1,4-diene-3,20-dione, latanoprost (see U.S. Pat. No. 6,225,348), tetracycline and its derivatives, rifamycin and its derivatives, macrolides, metronidazole (U.S. Pat. Nos. 6,218,369 and 6,015,803), genistein, genistin, 6'-O-Mal genistin, 6'-O-Ac genistin, daidzein, daidzin, 6'-O-Mal daidzin, daidzin, glycitein, glycitin, 6'-O-Mal glycitin, biochanin A, formononetin (U.S. Pat. No. 6,001,368), triamcinolone acetomide, dexamethasone (U.S. Pat. No. 5,770,589), thalidomide, glutathione (U.S. Pat. No. 5,632,984), basic fibroblast growth factor (bFGF), transforming growth factor b (TGF-b), brain-derived neurotrophic factor (BDNF), plasminogen activator factor type 2 (PAI-2), EYE101 (Eyetech Pharmaceuticals), LY333531 (Eli Lilly), Miravant, and RETISERT implant (Bausch & Lomb). All of the references cited herein are incorporated in their entireties by reference.

Examples of second active agents that may be used for the treatment, prevention and/or management of skin diseases include, but are not limited to, keratolytics, retinoids, α-hydroxy acids, antibiotics, collagen, botulinum toxin, interferon, steroids, and immunomodulatory agents. Specific examples include, but are not limited to, 5-fluorouracil, masoprocol, trichloroacetic acid, salicylic acid, lactic acid, ammonium lactate, urea, tretinoin, isotretinoin, antibiotics, collagen, botulinum toxin, interferon, corticosteroid, transretinoic acid and collagens such as human placental collagen, animal placental collagen, Dermalogen, AlloDerm, Fascia, Cymetra, Autologen, Zyderm, Zyplast, Resoplast, and Isolagen.

Examples of second active agents that may be used for the treatment, prevention and/or management of pulmonary hepertension and related disorders include, but are not limited to, anticoagulants, diuretics, cardiac glycosides, calcium channel blockers, vasodilators, prostacyclin analogues, endothelin antagonists, phosphodiesterase inhibitors (e.g., PDE V inhibitors), endopeptidase inhibitors, lipid lowering agents, thromboxane inhibitors, and other therapeutics known to reduce pulmonary artery pressure. Specific examples include, but are not limited to, warfarin (Coumadin®), a diuretic, a cardiac glycoside, digoxin-oxygen, diltiazem, nifedipine, a vasodilator such as prostacyclin (e.g., prostaglandin I2 (PGI2), epoprostenol (EPO, Floran®), treprostinil (Remodulin®), nitric oxide (NO), bosentan (Tracleer®), amlodipine, epoprostenol (Floran®), treprostinil (Remodulin®), prostacyclin, tadalafil (Cialis®), simvastatin (Zocor®), omapatrilat (Vanlev®), irbesartan (Avapro®), pravastatin (Pravachol®), digoxin, L-arginine, iloprost, betaprost, and sildenafil (Viagra®).

Examples of second active agents that may be used for the treatment, prevention and/or management of asbestos-related disorders include, but are not limited to, anthracycline, platinum, alkylating agent, oblimersen (Genasense®), cisplatinum, cyclophosphamide, temodar, carboplatin, procarbazine, gliadel, tamoxifen, topotecan, methotrexate, taxotere, irinotecan, capecitabine, cisplatin, thiotepa, fludarabine, car-

US 8,828,427 B2

17

boplatin, liposomal daunorubicin, cytarabine, doxetaxol, paclitaxel, vinblastine, IL-2, GM-CSF, dacarbazine, vinorelbine, zoledronic acid, palmitronate, Biaxin, busulphan, prednisone, bisphosphonate, arsenic trioxide, vincristine, doxorubicin (Doxil®), paclitaxel, ganciclovir, adriamycin, bleomycin, hyaluronidase, mitomycin C, mepacrine, thiotepa, tetracycline and gemcitabine.

Examples of second active agents that may be used for the treatment, prevention and/or management of parasitic diseases include, but are not limited to, chloroquine, quinine, quinidine, pyrimethamine, sulfadiazine, doxycycline, clindamycin, mefloquine, halofantrine, primaquine, hydroxychloroquine, proguanil, atovaquone, azithromycin, suramin, pentamidine, melarsoprol, nifurtimox, benznidazole, amphotericin B, pentavalent antimony compounds (e.g., sodium stibogluceuronate), interferon gamma, itraconazole, a combination of dead promastigotes and BCG, leucovorin, corticosteroids, sulfonamide, spiramycin, IgG (serology), trimethoprim, and sulfamethoxazole.

Examples of second active agents that may be used for the treatment, prevention and/or management of immunodeficiency disorders include, but are not limited to: antibiotics (therapeutic or prophylactic) such as, but not limited to, ampicillin, tetracycline, penicillin, cephalosporins, streptomycin, kanamycin, and erythromycin; antivirals such as, but not limited to, amantadine, rimantadine, acyclovir, and ribavirin; immunoglobulin; plasma; immunologic enhancing drugs such as, but not limited to, levami sole and isoprinosine; biologics such as, but not limited to, gammaglobulin, transfer factor, interleukins, and interferons; hormones such as, but not limited to, thymic; and other immunologic agents such as, but not limited to, B cell stimulators (e.g., BAFF/BlyS), cytokines (e.g., IL-2, IL-4, and IL-5); growth factors (e.g., TGF-α), antibodies (e.g., anti-CD40 and IgM), oligonucleotides containing unmethylated CpG motifs, and vaccines (e.g., viral and tumor peptide vaccines).

Examples of second active agents that may be used for the treatment, prevention and/or management of CNS disorders include, but are not limited to: opioids; a dopamine agonist or antagonist, such as, but not limited to, Levodopa, L-DOPA, cocaine, α-methyl-tyrosine, reserpine, tetrabenazine, benzotropine, pargyline, fenodolpam mesylate, cabergoline, pramipexole dihydrochloride, ropinorole, amantadine hydrochloride, selegiline hydrochloride, carbidopa, pergolide mesylate, Sinemet CR, and Symmetrel; a MAO inhibitor, such as, but not limited to, iproniazid, clorgyline, phenelzine and isocarboxazid; a COMT inhibitor, such as, but not limited to, tolcapone and entacapone; a cholinesterase inhibitor, such as, but not limited to, physostigmine saliclate, physostigmine sulfate, physostigmine bromide, meostigmine bromide, neostigmine methylsulfate, ambenonim chloride, edrophonium chloride, tacrine, pralidoxime chloride, obidoxime chloride, trimedoxime bromide, diacetyl monoxim, endrophonium, pyridostigmine, and demecarium; an anti-inflammatory agent, such as, but not limited to, naproxen sodium, diclofenac sodium, diclofenac potassium, celecoxib, sulindac, oxaprozin, diflunisal, etodolac, meloxicam, ibuprofen, ketoprofen, nabumetone, refecoxib, methotrexate, leflunomide, sulfasalazine, gold salts, Rho-D Immune Globulin, mycophenylate mofetil, cyclosporine, azathioprine, tacrolimus, basiliximab, daclizumab, salicylic acid, acetylsalicylic acid, methyl salicylate, diflunisal, salsalate, olsalazine, sulfasalazine, acetaminophen, indomethacin, sulindac, mefenamic acid, meclofenamate sodium, tolmetin, ketorolac, dichlofenac, flurbinprofen, oxaprozin, piroxicam, meloxicam, ampiroxicam, droxicam, pivoxicam, tenoxicam, phenylbutazone, oxyphenbutazone, antipyrine, aminopyrine,

18

apazone, zileuton, aurothioglucose, gold sodium thiomalate, auranofin, methotrexate, colchicine, allopurinol, probenecid, sulfinpyrazone and benzbromarone or betamethasone and other glucocorticoids; and an antiemetic agent, such as, but not limited to, metoclopromide, domperidone, prochlorperazine, promethazine, chlorpromazine, trimethobenzamide, ondansetron, granisetron, hydroxyzine, acetylleucine monoethanolamine, alizapride, azasetron, benzquinamide, bietanautine, bromopride, buclizine, clebopride, cyclizine, dimenhydrinate, diphenidol, dolasetron, meclizine, methallatal, metopimazine, nabilone, oxyperndyl, pipamazine, scopolamine, sulpiride, tetrahydrocannabinol, thiethylperazine, thioproperazine, tropisetron, and a mixture thereof.

Examples of second active agents that may be used for the treatment, prevention and/or management of CNS injuries and related syndromes include, but are not limited to, immunomodulatory agents, immunosuppressive agents, antihypertensives, anticonvulsants, fibrinolytic agents, antiplatelet agents, antipsychotics, antidepressants, benzodiazepines, buspirone, amantadine, and other known or conventional agents used in patients with CNS injury/damage and related syndromes. Specific examples include, but are not limited to: steroids (e.g., glucocorticoids, such as, but not limited to, methylprednisolone, dexamethasone and betamethasone); an anti-inflammatory agent, including, but not limited to, naproxen sodium, diclofenac sodium, diclofenac potassium, celecoxib, sulindac, oxaprozin, diflunisal, etodolac, meloxicam, ibuprofen, ketoprofen, nabumetone, refecoxib, methotrexate, leflunomide, sulfasalazine, gold salts, RHo-D Immune Globulin, mycophenylate mofetil, cyclosporine, azathioprine, tacrolimus, basiliximab, daclizumab, salicylic acid, acetylsalicylic acid, methyl salicylate, diflunisal, salsalate, olsalazine, sulfasalazine, acetaminophen, indomethacin, sulindac, mefenamic acid, meclofenamate sodium, tolmetin, ketorolac, dichlofenac, flurbinprofen, oxaprozin, piroxicam, meloxicam, ampiroxicam, droxicam, pivoxicam, tenoxicam, phenylbutazone, oxyphenbutazone, antipyrine, aminopyrine, apazone, zileuton, aurothioglucose, gold sodium thiomalate, auranofin, methotrexate, colchicine, allopurinol, probenecid, sulfinpyrazone and benzbromarone; a cAMP analog including, but not limited to, db-cAMP; an agent comprising a methylphenidate drug, which comprises 1-threo-methylphenidate, d-threo-methylphenidate, dl-threo-methylphenidate, 1-erythro-methylphenidate, d-erythro-methylphenidate, dl-erythro-methylphenidate, and a mixture thereof; and a diuretic agent such as, but not limited to, mannitol, furosemide, glycerol, and urea.

Examples of second active agent that may be used for the treatment, prevention and/or management of dysfunctional sleep and related syndromes include, but are not limited to, a tricyclic antidepressant agent, a selective serotonin reuptake inhibitor, an antiepileptic agent (gabapentin, pregabalin, carbamazepine, oxcarbazepine, levitiracetam, topiramate), an antiarythmic agent, a sodium channel blocking agent, a selective inflammatory mediator inhibitor, an opioid agent, a second immunomodulatory compound, a combination agent, and other known or conventional agents used in sleep therapy. Specific examples include, but are not limited to, Neurontin, oxycontin, morphine, topiramate, amitryptiline, nortryptiline, carbamazepine, Levodopa, L-DOPA, cocaine, α-methyl-tyrosine, reserpine, tetrabenazine, benzotropine, pargyline, fenodolpam mesylate, cabergoline, pramipexole dihydrochloride, ropinorole, amantadine hydrochloride, selegiline hydrochloride, carbidopa, pergolide mesylate, Sinemet CR, Symmetrel, iproniazid, clorgyline, phenelzine, isocarboxazid, tolcapone, entacapone, physostigmine saliclate, physostigmine sulfate, physostigmine bromide, meo-

US 8,828,427 B2

19

stigmine bromide, neostigmine methylsulfate, ambenonium chloride, edrophonium chloride, tacrine, pralidoxime chloride, obidoxime chloride, trimedoxime bromide, diacetyl monoxim, endrophonium, pyridostigmine, demecarium, naproxen sodium, diclofenac sodium, diclofenac potassium, celecoxib, sulindac, oxaprozin, diflunisal, etodolac, meloxicam, ibuprofen, ketoprofen, nabumetone, refecoxib, methotrexate, leflunomide, sulfasalazine, gold salts, RHo-D Immune Globulin, mycophenylate mofetil, cyclosporine, azathioprine, tacrolimus, basiliximab, daclizumab, salicylic acid, acetylsalicylic acid, methyl salicylate, diflunisal, salsalate, olsalazine, sulfasalazine, acetaminophen, indomethacin, sulindac, mefenamic acid, meclofenamate sodium, tolmetin, ketorolac, dichlofenac, flurbinprofen, oxaprozin, piroxicam, meloxicam, ampiroxicam, droxicam, pivoxicam, tenoxicam, phenylbutazone, oxyphenbutazone, antipyrine, aminopyrine, apazone, zileuton, aurothioglucose, gold sodium thiomalate, auranofin, methotrexate, colchicine, allopurinol, probenecid, sulfinpyrazone, benzbromarone, betamethasone and other glucocorticoids, metoclopromide, domperidone, prochlorperazine, promethazine, chlorpromazine, trimethobenzamide, ondansetron, granisetron, hydroxyzine, acetylleucine monoethanolamine, alizapride, azasetron, benzquinamide, bietanautine, bromopride, buclizine, clebopride, cyclizine, dimenhydrinate, diphenidol, dolasetron, meclizine, methallatal, metopimazine, nabilone, oxyperndyl, pipamazine, scopolamine, sulpiride, tetrahydrocannabinol, thiethylperazine, thioproperazine, tropisetron, and a mixture thereof.

Examples of second active agents that may be used for the treatment, prevention and/or management of hemoglobinopathy and related disorders include, but are not limited to: interleukins, such as IL-2 (including recombinant IL-II ("rIL2") and canarypox IL-2), IL-10, IL-12, and IL-18; interferons, such as interferon alfa-2a, interferon alfa-2b, interferon alfa-n1, interferon alfa-n3, interferon beta-I a, and interferon gamma-I b; and G-CSF; hydroxyurea; butyrates or butyrate derivatives; nitrous oxide; hydroxy urea; HEMOXIN™ (NIPRISAN™; see U.S. Pat. No. 5,800,819); Gardos channel antagonists such as clotrimazole and triaryl methane derivatives; Deferoxamine; protein C; and transfusions of blood, or of a blood substitute such as Hemospan™ or Hemospan™ PS (Sangart).

### 4.2. Process for Making Dosage Forms

Dosage forms provided herein can be prepared by any of the methods of pharmacy, but all methods include the step of bringing the active ingredient into association with the excipient, which constitutes one or more necessary ingredients. In general, the compositions are prepared by uniformly admixing (e.g., direct blend) the active ingredient with liquid excipients or finely divided solid excipients or both, and then, if necessary, shaping the product into the desired presentation (e.g., compaction such as roller-compaction). If desired, tablets can be coated by standard aqueous or non-aqueous techniques.

A dosage form provided herein can be prepared by compression or molding, optionally with one or more accessory ingredients. Compressed tablets can be prepared by compressing in a suitable machine the active ingredient in a free-flowing form such as powder or granules, optionally mixed with an excipient as above and/or a surface active or dispersing agent. Molded tablets can be made by molding in a suitable machine a mixture of the powdered compound moistened with an inert liquid diluent. Encapsulation of the dosage forms provided herein can be done using capsules of methylcellulose, calcium alginate, or gelatin.

20

In some embodiments, the active ingredients and excipients are directly blended and loaded into, for example, a capsule, or compressed directly into tablets. A direct-blended dosage form may be more advantageous than a compacted (e.g., roller-compacted) dosage form in certain instances, since direct-blending can reduce or eliminate the harmful health effects that may be caused by airborne particles of ingredients during the manufacture using compaction process.

Direct blend formulations may be advantageous in certain instances because they require only one blending step, that of the active and excipients, before being processed into the final dosage form, e.g., tablet or capsule. This can reduce the production of airborne particle or dust to a minimum, while roller-compaction processes may be prone to produce dust. In roller-compaction process, the compacted material is often milled into smaller particles for further processing. The milling operation can produce significant amounts of airborne particles, since the purpose for this step in manufacturing is to reduce the materials particle size. The milled material is then blended with other ingredients prior to manufacturing the final dosage form.

For certain active ingredients, in particular for a compound with a low solubility, the active ingredient's particle size is reduced to a fine powder in order to help increase the active ingredient's rate of solubilization. The increase in the rate of solubilization is often necessary for the active ingredient to be effectively absorbed in the gastrointestinal tract. However for fine powders to be directly-blended and loaded onto capsules, the excipients should preferably provide certain characteristics which render the ingredients suitable for the direct-blend process. Examples of such characteristics include, but are not limited to, acceptable flow characteristics. In one embodiment, therefore, provided herein is the use of, and compositions comprising, excipients which may provide characteristics, which render the resulting mixture suitable for direct-blend process, e.g., good flow characteristics.

#### 4.2.1. Screening

The process for making the pharmaceutical compositions of the invention preferably includes the screening of the active ingredient and the excipient(s). In one embodiment, the active ingredient is passed through a screen having openings of about 200 microns to about 750 microns. In another embodiment, the active ingredient is passed through a screen with openings of about 200 microns to about 400 microns. In one embodiment, the active ingredient is passed through a screen having openings of about 300 to about 400 microns. Depending on the excipient(s) used, the screen openings vary. For example, disintegrants and binders are passed through openings of about 430 microns to about 750 microns, from about 600 microns to about 720 microns, or about 710 microns. Lubricants are typically passed through smaller openings, e.g., about 150 microns to about 250 microns screen. In one embodiment, the lubricant is passed through a screen opening of about 210 microns.

#### 4.2.2. Pre-Blending

After the ingredients are screened, the excipient and active ingredient are mixed in a diffusion mixer. In one embodiment, the mixing time is from about 1 minute to about 50 minutes, from about 5 minutes to about 45 minutes, from about 10 minutes to about 40 minutes, or from about 10 minutes to about 25 minutes. In another embodiment, the mixing time is about 15 minutes.

When more than one excipients are used, the excipients may be admixed in a tumble blender for about 1 minute to about 20 minutes, or for about 5 minutes to about 10 minutes, prior to mixing with the active ingredient.

US 8,828,427 B2

21

4.2.3. Roller Compaction

In one embodiment, the pre-blend may optionally be passed through a roller compactor with a hammer mill attached at the discharge of the compactor.

4.2.4. Final Blend

When a lubricant, e.g., sodium stearyl fumarate, is used, the lubricant is mixed with the pre-blend at the end of the process to complete the pharmaceutical composition. This additional mixing is from about 1 minute to about 10 minutes, or from about 3 minutes to about 5 minutes.

4.2.5. Encapsulation

The formulation mixture is then encapsulated into the desired size capsule shell using, for example, a capsule filling machine or a rotary tablet press.

4.3. Kits

Pharmaceutical packs or kits which comprise pharmaceutical compositions or dosage forms provided herein are also provided. An example of a kit comprises notice in the form prescribed by a governmental agency regulating the manufacture, use or sale of pharmaceuticals or biological products, which notice reflects approval by the agency of manufacture, use or sale for human administration.

4.4. Methods of Treatment, Prevention, and Management

Provided herein are methods of treating, preventing, and/or managing certain diseases or disorders using the formulations, compositions, or dosage forms provided herein.

Examples of diseases or disorders include, but are not limited to, cancer, disorders associated with angiogenesis, pain including, but not limited to, Complex Regional Pain Syndrome ("CRPS"), Macular Degeneration "MD") and related syndromes, skin diseases, pulmonary disorders, asbestos-related disorders, parasitic diseases, immunodeficiency disorders, CNS disorders, CNS injury, atherosclerosis and related disorders, dysfunctional sleep and related disorders, hemoglobinopathy and related disorders (e.g., anemia), INFα related disorders, and other various diseases and disorders.

Examples of cancer and precancerous conditions include, but are not limited to, those described in U.S. Pat. Nos. 6,281, 230 and 5,635,517 to Muller et al., in various U.S. patent publications to Zeldis, including publication nos. 2004/0220144A1, published Nov. 4, 2004 (Treatment of Myelodysplastic Syndrome); 2004/0029832A1, published Feb. 12, 2004 (Treatment of Various Types of Cancer); and 2004/0087546, published May 6, 2004 (Treatment of Myeloproliferative Diseases). Examples also include those described in WO 2004/103274, published Dec. 2, 2004. All of these references are incorporated herein in their entireties by reference.

Certain examples of cancer include, but are not limited to, cancers of the skin, such as melanoma; lymph node; breast; cervix; uterus; gastrointestinal tract; lung; ovary; prostate; colon; rectum; mouth; brain; head and neck; throat; testes; kidney; pancreas; bone; spleen; liver; bladder; larynx; nasal passages; and AIDS-related cancers. The compounds are also useful for treating cancers of the blood and bone marrow, such as multiple myeloma and acute and chronic leukemias, for example, lymphoblastic, myelogenous, lymphocytic, and myelocytic leukemias. The compounds provided herein can be used for treating, preventing or managing either primary or metastatic tumors.

22

Other cancers include, but are not limited to, advanced malignancy, amyloidosis, neuroblastoma, meningioma, hemangiopericytoma, multiple brain metastase, glioblastoma multiforms, glioblastoma, brain stem glioma, poor prognosis malignant brain tumor, malignant glioma, recurrent malignant glioma, anaplastic astrocytoma, anaplastic oligodendroglioma, neuroendocrine tumor, rectal adenocarcinoma, Dukes C & D colorectal cancer, unresectable colorectal carcinoma, metastatic hepatocellular carcinoma, Kaposi's sarcoma, karotype acute myeloblastic leukemia, chronic lymphocytic leukemia (CLL), Hodgkin's lymphoma, non-Hodgkin's lymphoma, cutaneous T-Cell lymphoma, cutaneous B-Cell lymphoma, diffuse large B-Cell lymphoma, low grade follicular lymphoma, metastatic melanoma (localized melanoma, including, but not limited to, ocular melanoma), malignant mesothelioma, malignant pleural effusion mesothelioma syndrome, peritoneal carcinoma, papillary serous carcinoma, gynecologic sarcoma, soft tissue sarcoma, scleroderma, cutaneous vasculitis, Langerhans cell histiocytosis, leiomyosarcoma, fibrodysplasia ossificans progressive, hormone refractory prostate cancer, resected high-risk soft tissue sarcoma, unresectable hepatocellular carcinoma, Waldenstrom's macroglobulinemia, smoldering myeloma, indolent myeloma, fallopian tube cancer, androgen independent prostate cancer, androgen dependent stage IV non-metastatic prostate cancer, hormone-insensitive prostate cancer, chemotherapy-insensitive prostate cancer, papillary thyroid carcinoma, follicular thyroid carcinoma, medullary thyroid carcinoma, and leiomyoma. In a specific embodiment, the cancer is metastatic. In another embodiment, the cancer is refractory or resistance to chemotherapy or radiation.

In one embodiment, the diseases or disorders are various forms of leukemias such as chronic lymphocytic leukemia, chronic myelocytic leukemia, acute lymphoblastic leukemia, acute myelogenous leukemia and acute myeloblastic leukemia, including leukemias that are relapsed, refractory or resistant, as disclosed in U.S. publication no. 2006/0030594, published Feb. 9, 2006, which is incorporated in its entirety by reference.

The term "leukemia" refers malignant neoplasms of the blood-forming tissues. The leukemia includes, but is not limited to, chronic lymphocytic leukemia, chronic myelocytic leukemia, acute lymphoblastic leukemia, acute myelogenous leukemia and acute myeloblastic leukemia. The leukemia can be relapsed, refractory or resistant to conventional therapy. The term "relapsed" refers to a situation where patients who have had a remission of leukemia after therapy have a return of leukemia cells in the marrow and a decrease in normal blood cells. The term "refractory or resistant" refers to a circumstance where patients, even after intensive treatment, have residual leukemia cells in their marrow.

In another embodiment, the diseases or disorders are various types of lymphomas, including Non-Hodgkin's lymphoma (NHL). The term "lymphoma" refers a heterogenous group of neoplasms arising in the reticuloendothelial and lymphatic systems. "NHL" refers to malignant monoclonal proliferation of lymphoid cells in sites of the immune system, including lymph nodes, bone marrow, spleen, liver and gastrointestinal tract. Examples of NHL include, but are not limited to, mantle cell lymphoma (MCL), lymphocytic lymphoma of intermediate differentiation, intermediate lymphocytic lymphoma (ILL), diffuse poorly differentiated lymphocytic lymphoma (PDL), centrocytic lymphoma, diffuse small-cleaved cell lymphoma (DSCCL), follicular lym-

US 8,828,427 B2

23

phoma, and any type of the mantle cell lymphomas that can be seen under the microscope (nodular, diffuse, blastic and mentle zone lymphoma).

Examples of diseases and disorders associated with, or characterized by, undesired angiogenesis include, but are not limited to, inflammatory diseases, autoimmune diseases, viral diseases, genetic diseases, allergic diseases, bacterial diseases, ocular neovascular diseases, choroidal neovascular diseases, retina neovascular diseases, and rubeosis (neovascularization of the angle). Specific examples of the diseases and disorders associated with, or characterized by, undesired angiogenesis include, but are not limited to, arthritis, endometriosis. Crohn's disease, heart failure, advanced heart failure, renal impairment, endotoxemia, toxic shock syndrome, osteoarthritis, retrovirus replication, wasting, meningitis, silica-induced fibrosis, asbestos-induced fibrosis, veterinary disorder, malignancy-associated hypercalcemia, stroke, circulatory shock, periodontitis, gingivitis, macrocytic anemia, refractory anemia, and 5q-deletion syndrome.

Examples of pain include, but are not limited to those described in U.S. patent publication no. 2005/0203142, published Sep. 15, 2005, which is incorporated herein by reference. Specific types of pain include, but are not limited to, nociceptive pain, neuropathic pain, mixed pain of nociceptive and neuropathic pain, visceral pain, migraine, headache and post-operative pain.

Examples of nociceptive pain include, but are not limited to, pain associated with chemical or thermal burns, cuts of the skin, contusions of the skin, osteoarthritis, rheumatoid arthritis, tendonitis, and myofascial pain.

Examples of neuropathic pain include, but are not limited to, CRPS type I, CRPS type II, reflex sympathetic dystrophy (RSD), reflex neurovascular dystrophy, reflex dystrophy, sympathetically maintained pain syndrome, causalgia, Sudeck atrophy of bone, algoneurodystrophy, shoulder hand syndrome, post-traumatic dystrophy, trigeminal neuralgia, post herpetic neuralgia, cancer related pain, phantom limb pain, fibromyalgia, chronic fatigue syndrome, spinal cord injury pain, central post-stroke pain, radiculopathy, diabetic neuropathy, post-stroke pain, luetic neuropathy, and other painful neuropathic conditions such as those induced by drugs such as vincristine and velcade.

As used herein, the terms "complex regional pain syndrome," "CRPS" and "CRPS and related syndromes" mean a chronic pain disorder characterized by one or more of the following: pain, whether spontaneous or evoked, including allodynia (painful response to a stimulus that is not usually painful) and hyperalgesia (exaggerated response to a stimulus that is usually only mildly painful); pain that is disproportionate to the inciting event (e.g., years of severe pain after an ankle sprain); regional pain that is not limited to a single peripheral nerve distribution; and autonomic dysregulation (e.g., edema, alteration in blood flow and hyperhidrosis) associated with trophic skin changes (hair and nail growth abnormalities and cutaneous ulceration).

Examples of MD and related syndromes include, but are not limited to, those described in U.S. patent publication no. 2004/0091455, published May 13, 2004, which is incorporated herein by reference. Specific examples include, but are not limited to, atrophic (dry) MD, exudative (wet) MD, age-related maculopathy (ARM), choroidal neovascularisation (CNVM), retinal pigment epithelium detachment (PED), and atrophy of retinal pigment epithelium (RPE).

Examples of skin diseases include, but are not limited to, those described in U.S. publication no. 2005/0214328A1, published Sep. 29, 2005, which is incorporated herein by reference. Specific examples include, but are not limited to

24

keratoses and related symptoms, skin diseases or disorders characterized with overgrowths of the epidermis, acne, and wrinkles.

As used herein, the term "keratosis" refers to any lesion on the epidermis marked by the presence of circumscribed overgrowths of the horny layer, including but not limited to actinic keratosis, seborrheic keratosis, keratoacanthoma, keratosis follicularis (Darier disease), inverted follicular keratosis, palmoplantar keratoderma (PPK, keratosis palmaris et plantaris), keratosis pilaris, and stucco keratosis. The term "actinic keratosis" also refers to senile keratosis, keratosis senilis, verruca senilis, plana senilis, solar keratosis, keratoderma or keratoma. The term "seborrheic keratosis" also refers to seborrheic wart, senile wart, or basal cell papilloma. Keratosis is characterized by one or more of the following symptoms: rough appearing, scaly, erythematous papules, plaques, spicules or nodules on exposed surfaces (e.g., face, hands, ears, neck, legs and thorax), excrescences of keratin referred to as cutaneous horns, hyperkeratosis, telangiectasias, elastosis, pigmented lentigines, acanthosis, parakeratosis, dyskeratoses, papillomatosis, hyperpigmentation of the basal cells, cellular atypia, mitotic figures, abnormal cell-cell adhesion, dense inflammatory infiltrates and small prevalence of squamous cell carcinomas.

Examples of skin diseases or disorders characterized with overgrowths of the epidermis include, but are not limited to, any conditions, diseases or disorders marked by the presence of overgrowths of the epidermis, including but not limited to, infections associated with papilloma virus, arsenical keratoses, sign of Leser-Trélat, warty dyskeratoma (WD), trichostasis spinulosa (TS), erythrokeratodermia variabilis (EKV), ichthyosis fetalis (harlequin ichthyosis), knuckle pads, cutaneous melanoacanthoma, porokeratosis, psoriasis, squamous cell carcinoma, confluent and reticulated papillomatosis (CRP), acrochordons, cutaneous horn, cowden disease (multiple hamartoma syndrome), dermatosis papulosa nigra (DPN), epidermal nevus syndrome (ENS), ichthyosis vulgaris, molluscum contagiosum, prurigo nodularis, and acanthosis nigricans (AN).

Examples of pulmonary disorders include, but are not limited to, those described in U.S. publication no. 2005/0239842A1, published Oct. 27, 2005, which is incorporated herein by reference. Specific examples include pulmonary hypertension and related disorders. Examples of pulmonary hypertension and related disorders include, but are not limited to: primary pulmonary hypertension (PPH); secondary pulmonary hypertension (SPH); familial PPH; sporadic PPH; precapillary pulmonary hypertension; pulmonary arterial hypertension (PAH); pulmonary artery hypertension; idiopathic pulmonary hypertension; thrombotic pulmonary arteriopathy (TPA); plexogenic pulmonary arteriopathy; functional classes I to IV pulmonary hypertension; and pulmonary hypertension associated with, related to, or secondary to, left ventricular dysfunction, mitral valvular disease, constrictive pericarditis, aortic stenosis, cardiomyopathy, mediastinal fibrosis, anomalous pulmonary venous drainage, pulmonary venoocclusive disease, collagen vascular disease, congenital heart disease, HIV virus infection, drugs and toxins such as fenfluramines, congenital heart disease, pulmonary venous hypertension, chronic obstructive pulmonary disease, interstitial lung disease, sleep-disordered breathing, alveolar hypoventilation disorder, chronic exposure to high altitude, neonatal lung disease, alveolar-capillary dysplasia, sickle cell disease, other coagulation disorder, chronic thromboemboli, connective tissue disease, lupus including systemic and cutaneous lupus, schistosomiasis, sarcoidosis or pulmonary capillary hemangiomatosis.

US 8,828,427 B2

25

Examples of asbestos-related disorders include, but not limited to, those described in U.S. publication no. 2005/0100529, published May 12, 2005, which is incorporated herein by reference. Specific examples include, but are not limited to, mesothelioma, asbestosis, malignant pleural effusion, benign exudative effusion, pleural plaques, pleural calcification, diffuse pleural thickening, rounded atelectasis, fibrotic masses, and lung cancer.

Examples of parasitic diseases include, but are not limited to, those described in U.S. publication no. 2006/0154880, published Jul. 13, 2006, which is incorporated herein by reference. Parasitic diseases include diseases and disorders caused by human intracellular parasites such as, but not limited to, *P. falcifarium, P. ovale, P. vivax, P. malariae, L. donovari, L. infantum, L. aethiopica, L. major, L. tropica, L. mexicana, L. braziliensis, T. Gondii, B. microti, B. divergens, B. coli, C. parvum, C. cayetanensis, E. histolytica, Z belli, S. mansonii, S. haematobium, Trypanosoma* ssp., *Toxoplasma* ssp., and *O. volvulus*. Other diseases and disorders caused by non-human intracellular parasites such as, but not limited to, *Babesia bovis, Babesia canis, Banesia Gibsoni, Besnoitia darlingi, Cytauxzoon felis, Eimeria* ssp., *Hammondia* ssp., and *Theileria* ssp., are also encompassed. Specific examples include, but are not limited to, malaria, babesiosis, trypanosomiasis, leishmaniasis, toxoplasmosis, meningoencephalitis, keratitis, amebiasis, giardiasis, cryptosporidiosis, isosporiasis, cyclosporiasis, microsporidiosis, *ascariasis*, trichuriasis, ancylostomiasis, strongyloidiasis, toxocariasis, trichinosis, lymphatic filariasis, onchocerciasis, filariasis, schistosomiasis, and dermatitis caused by animal schistosomes.

Examples of immunodeficiency disorders include, but are not limited to, those described in U.S. application Ser. No. 11/289,723, filed Nov. 30, 2005. Specific examples include, but not limited to, adenosine deaminase deficiency, antibody deficiency with normal or elevated Igs, ataxia-tenlangiectasia, bare lymphocyte syndrome, common variable immunodeficiency, Ig deficiency with hyper-IgM, Ig heavy chain deletions, IgA deficiency, immunodeficiency with thymoma, reticular dysgenesis, Nezelof syndrome, selective IgG subclass deficiency, transient hypogammaglobulinemia of infancy, Wistcott-Aldrich syndrome, X-linked agammaglobulinemia, X-linked severe combined immunodeficiency.

Examples of CNS disorders include, but are not limited to, those described in U.S. publication no. 2005/0143344, published Jun. 30, 2005, which is incorporated herein by reference. Specific examples include, but are not limited to, include, but are not limited to, Amyotrophic Lateral Sclerosis, Alzheimer Disease, Parkinson Disease, Huntington's Disease, Multiple Sclerosis other neuroimmunological disorders such as Tourette Syndrome, delerium, or disturbances in consciousness that occur over a short period of time, and amnestic disorder, or discreet memory impairments that occur in the absence of other central nervous system impairments.

Examples of CNS injuries and related syndromes include, but are not limited to, those described in U.S. publication no. 2006/0122228, published Jun. 8, 2006, which is incorporated herein by reference. Specific examples include, but are not limited to, CNS injury/damage and related syndromes, include, but are not limited to, primary brain injury, secondary brain injury, traumatic brain injury, focal brain injury, diffuse axonal injury, head injury, concussion, post-concussion syndrome, cerebral contusion and laceration, subdural hematoma, epidermal hematoma, post-traumatic epilepsy, chronic vegetative state, complete SCI, incomplete SCI, acute SCI, subacute SCI, chronic SCI, central cord syndrome, Brown-Sequard syndrome, anterior cord syndrome, conus

26

medullaris syndrome, cauda equina syndrome, neurogenic shock, spinal shock, altered level of consciousness, headache, nausea, emesis, memory loss, dizziness, diplopia, blurred vision, emotional lability, sleep disturbances, irritability, inability to concentrate, nervousness, behavioral impairment, cognitive deficit, and seizure.

Other disease or disorders include, but not limited to, viral, genetic, allergic, and autoimmune diseases. Specific examples include, but not limited to, HIV, hepatitis, adult respiratory distress syndrome, bone resorption diseases, chronic pulmonary inflammatory diseases, dermatitis, cystic fibrosis, septic shock, sepsis, endotoxic shock, hemodynamic shock, sepsis syndrome, post ischemic reperfusion injury, meningitis, psoriasis, fibrotic disease, cachexia, graft versus host disease, graft rejection, auto-immune disease, rheumatoid spondylitis, Crohn's disease, ulcerative colitis, inflammatory-bowel disease, multiple sclerosis, systemic lupus erythematosus, ENL in leprosy, radiation damage, cancer, asthma, or hyperoxic alveolar injury.

Examples of atherosclerosis and related conditions include, but are not limited to, those disclosed in U.S. publication no. 2002/0054899, published May 9, 2002, which is incorporated herein by reference. Specific examples include, but are not limited to, all forms of conditions involving atherosclerosis, including restenosis after vascular intervention such as angioplasty, stenting, atherectomy and grafting. All forms of vascular intervention are contemplated herein, including diseases of the cardiovascular and renal system, such as, but not limited to, renal angioplasty, percutaneous coronary intervention (PCI), percutaneous transluminal coronary angioplasty (PTCA), carotid percutaneous transluminal angioplasty (PTA), coronary by-pass grafting, angioplasty with stent implantation, peripheral percutaneous transluminal intervention of the iliac, femoral or popliteal arteries, and surgical intervention using impregnated artificial grafts. The following chart provides a listing of the major systemic arteries that may be in need of treatment, all of which are contemplated herein:

| Artery | Body Areas Supplied |
|---|---|
| Axillary | Shoulder and axilla |
| Brachial | Upper arm |
| Brachiocephalic | Head, neck, and arm |
| Celiac | Divides into left gastric, splenic, and hepatic arteries |
| Common carotid | Neck |
| Common iliac | Divides into external and internal iliac arteries |
| Coronary | Heart |
| Deep femoral | Thigh |
| Digital | Fingers |
| Dorsalis pedis | Foot |
| External carotid | Neck and external head regions |
| External iliac | Femoral artery |
| Femoral | Thigh |
| Gastric | Stomach |
| Hepatic | Liver, gallbladder, pancreas, and duodenum |
| Inferior mesenteric | Descending colon, rectum, and pelvic wall |
| Internal carotid | Neck and internal head regions |
| Internal iliac | Rectum, urinary bladder, external genitalia, buttocks muscles, uterus and vagina |
| Left gastric | Esophagus and stomach |
| Middle sacral | Sacrum |
| Ovarian | Ovaries |
| Palmar arch | Hand |
| Peroneal | Calf |
| Popliteal | Knee |
| Posterior tibial | Calf |
| Pulmonary | Lungs |
| Radial | Forearm |
| Renal | Kidney |
| Splenic | Stomach, pancreas, and spleen |

US 8,828,427 B2

**27**

-continued

| Artery | Body Areas Supplied |
|---|---|
| Subclavian | Shoulder |
| Superior mesenteric | Pancreas, small intestine, ascending and transverse colon |
| Testicular | Testes |
| Ulnar | Forearm |

Examples of dysfunctional sleep and related syndromes include, but are not limited to, those disclosed in U.S. publication no. 2005/0222209A1, published Oct. 6, 2005, which is incorporated herein by reference. Specific examples include, but are not limited to, snoring, sleep apnea, insomnia, narcolepsy, restless leg syndrome, sleep terrors, sleep walking sleep eating, and dysfunctional sleep associated with chronic neurological or inflammatory conditions. Chronic neurological or inflammatory conditions, include, but are not limited to, Complex Regional Pain Syndrome, chronic low back pain, musculoskeletal pain, arthritis, radiculopathy, pain associated with cancer, fibromyalgia, chronic fatigue syndrome, visceral pain, bladder pain, chronic pancreatitis, neuropathies (diabetic, post-herpetic, traumatic or inflammatory), and neurodegenerative disorders such as Parkinson's Disease, Alzheimer's Disease, amyotrophic lateral sclerosis, multiple sclerosis, Huntington's Disease, bradykinesia; muscle rigidity; parkinsonian tremor; parkinsonian gait; motion freezing; depression; defective long-term memory, Rubinstein-Taybi syndrome (RTS); dementia; postural instability; hypokinetic disorders; synuclein disorders; multiple system atrophies; striatonigral degeneration; olivopontocerebellar atrophy; Shy-Drager syndrome; motor neuron disease with parkinsonian features; Lewy body dementia; Tau pathology disorders; progressive supranuclear palsy; corticobasal degeneration; frontotemporal dementia; amyloid pathology disorders; mild cognitive impairment; Alzheimer disease with parkinsonism; Wilson disease; Hallervorden-Spatz disease; Chediak-Hagashi disease; SCA-3 spinocerebellar ataxia; X-linked dystonia parkinsonism; prion disease; hyperkinetic disorders; chorea; ballismus; dystonia tremors; Amyotrophic Lateral Sclerosis (ALS); CNS trauma and myoclonus.

Examples of hemoglobinopathy and related disorders include, but are not limited to, those described in U.S. publication no. 2005/0143420A1, published Jun. 30, 2005, which is incorporated herein by reference. Specific examples include, but are not limited to, hemoglobinopathy, sickle cell anemia, and any other disorders related to the differentiation of CD34+ cells.

Examples of TNFα related disorders include, but are not limited to, those described in WO 98/03502 and WO 98/54170, both of which are incorporated herein in their entireties by reference. Specific examples include, but are not limited to: endotoxemia or toxic shock syndrome; cachexia; adult respiratory distress syndrome; bone resorption diseases such as arthritis; hypercalcemia; Graft versus Host Reaction; cerebral malaria; inflammation; tumor growth; chronic pulmonary inflammatory diseases; reperfusion injury; myocardial infarction; stroke; circulatory shock; rheumatoid arthritis; Crohn's disease; HIV infection and AIDS; other disorders such as rheumatoid arthritis, rheumatoid spondylitis, osteoarthritis, psoriatic arthritis and other arthritic conditions, septic shock, septis, endotoxic shock, graft versus host disease, wasting, Crohn's disease, ulcerative colitis, multiple sclerosis, systemic lupus erythromatosis, ENL in leprosy, HIV, AIDS, and opportunistic infections in AIDS; disorders such as septic shock, sepsis, endotoxic shock, hemodynamic shock

**28**

and sepsis syndrome, post ischemic reperfusion injury, malaria, mycobacterial infection, meningitis, psoriasis, congestive heart failure, fibrotic disease, cachexia, graft rejection, oncogenic or cancerous conditions, asthma, autoimmune disease, radiation damages, and hyperoxic alveolar injury; viral infections, such as those caused by the herpes viruses; viral conjunctivitis; or atopic dermatitis.

In other embodiments, the use of formulations, compositions or dosage forms provided herein in various immunological applications, in particular, as vaccine adjuvants, particularly anticancer vaccine adjuvants, as disclosed in U.S. Publication No. 2007/0048327, published Mar. 1, 2007, which is incorporated herein in its entirety by reference, is also encompassed. These embodiments also relate to the uses of the compositions, formulations, or dosage forms provided herein in combination with vaccines to treat or prevent cancer or infectious diseases, and other various uses such as reduction or desensitization of allergic reactions.

### 5. EXAMPLES

Embodiments provided herein may be more fully understood by reference to the following examples. These examples are meant to be illustrative of pharmaceutical compositions and dosage forms provided herein, but are not in any way limiting.

#### 5.1 Example 1

0.5 mg Strength Pomalidomide Dosage Capsule

Table 1 illustrates a batch formulation and single dosage formulation for a 0.5 mg strength pomalidomide single dose unit in a size #4 capsule.

TABLE 1

| Formulation for 0.5 mg strength pomolidomide capsule | | |
|---|---|---|
| Material | Percent By Weight | Quantity (mg/capsule) |
| Pomolidomide | ~1% | 0.5* |
| Starch 1500 | 56% | 35 |
| Sodium Stearyl Fumarate (PRUV) | ~0.3% | 0.16 |
| Spray Dried Mannitol (Mannogem EZ) | remainder | remainder |
| Total | 100.0% | 62.5 |

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 0.5 mg of pomolidomide.

Pomalidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomalidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #4 capsule.

#### 5.2 Example 2

1 mg Strength Pomalidomide Dosage Capsule

Table 2 illustrates a batch formulation and single dosage formulation for a 1 mg strength pomalidomide single dose unit in a size #4 capsule.

US 8,828,427 B2

<table>
<tr><td colspan="3">29</td></tr>
<tr><td colspan="3">TABLE 2</td></tr>
<tr><td colspan="3">Formulation for 1 mg strength pomolidomide capsule</td></tr>
<tr><td>Material</td><td>Percent By Weight</td><td>Quantity (mg/capsule)</td></tr>
<tr><td>Pomalidomide</td><td>~1%</td><td>1*</td></tr>
<tr><td>Starch 1500</td><td>56%</td><td>70</td></tr>
<tr><td>Sodium Stearyl Fumarate (PRUV)</td><td>~0.3%</td><td>0.32</td></tr>
<tr><td>Spray Dried Mannitol (Mannogem EZ)</td><td>remainder</td><td>remainder</td></tr>
<tr><td>Total</td><td>100.0%</td><td>125</td></tr>
</table>

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 1 mg of pomolidomide.

Pomalidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomalidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #4 capsule.

### 5.3 Example 3

2 mg Strength Pomalidomide Dosage Capsule

Table 3 illustrates a batch formulation and single dosage formulation for a 2 mg pomalidomide single dose unit in a size #2 capsule.

<table>
<tr><td colspan="3">TABLE 3</td></tr>
<tr><td colspan="3">Formulation for 2 mg strength pomolidomide capsule</td></tr>
<tr><td>Material</td><td>Percent By Weight</td><td>Quantity (mg/capsule)</td></tr>
<tr><td>Pomalidomide</td><td>~1%</td><td>2*</td></tr>
<tr><td>Starch 1500</td><td>56%</td><td>140</td></tr>
<tr><td>Sodium Stearyl Fumarate (PRUV)</td><td>~0.3%</td><td>0.64</td></tr>
<tr><td>Spray Dried Mannitol (Mannogem EZ)</td><td>remainder</td><td>remainder</td></tr>
<tr><td>Total</td><td>100.0%</td><td>250</td></tr>
</table>

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 2 mg of pomolidomide.

Pomalidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomalidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #2 capsule.

### 5.4 Example 4

3 mg Strength Pomalidomide Dosage Capsule

Table 4 illustrates a batch formulation and single dosage formulation for a 0.5 mg strength pomalidomide single dose unit in a size #2 capsule.

30

<table>
<tr><td colspan="3">TABLE 4</td></tr>
<tr><td colspan="3">Formulation for 3 mg strength pomolidomide capsule</td></tr>
<tr><td>Material</td><td>Percent By Weight</td><td>Quantity (mg/capsule)</td></tr>
<tr><td>Pomalidomide</td><td>~1.6%</td><td>3*</td></tr>
<tr><td>Starch 1500</td><td>56%</td><td>100.8</td></tr>
<tr><td>Sodium Stearyl Fumarate (PRUV)</td><td>~0.3%</td><td>0.45</td></tr>
<tr><td>Spray Dried Mannitol (Mannogem EZ)</td><td>remainder</td><td>remainder</td></tr>
<tr><td>Total</td><td>100.0%</td><td>180</td></tr>
</table>

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 3 mg of pomolidomide.

Pomalidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomalidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #2 capsule.

### 5.5 Example 5

4 mg Strength Pomalidomide Dosage Capsule

Table 5 illustrates a batch formulation and single dosage formulation for a 0.5 mg strength pomalidomide single dose unit in a size #2 capsule.

<table>
<tr><td colspan="3">TABLE 5</td></tr>
<tr><td colspan="3">Formulation for 4 mg strength pomolidomide capsule</td></tr>
<tr><td>Material</td><td>Percent By Weight</td><td>Quantity (mg/capsule)</td></tr>
<tr><td>Pomalidomide</td><td>~1.6%</td><td>4*</td></tr>
<tr><td>Starch 1500</td><td>56%</td><td>134.4</td></tr>
<tr><td>Sodium Stearyl Fumarate (PRUV)</td><td>~0.3%</td><td>0.6</td></tr>
<tr><td>Spray Dried Mannitol (Mannogem EZ)</td><td>remainder</td><td>remainder</td></tr>
<tr><td>Total</td><td>100.0%</td><td>240</td></tr>
</table>

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 4 mg of pomolidomide.

Pomalidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomalidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #2 capsule.

### 5.6 Example 6

5 mg Strength Pomalidomide Dosage Capsule

Table 6 illustrates a batch formulation and single dosage formulation for a 5 mg pomalidomide single dose unit in a size #1 capsule.

US 8,828,427 B2

31

TABLE 4

| Formulation for 5 mg strength pomolidomide capsule | | |
|---|---|---|
| Material | Percent By Weight | Quantity (mg/capsule) |
| Pomolidomide | ~2% | 5* |
| Starch 1500 | 56% | 168 |
| Sodium Stearyl Fumarate (PRUV) | ~0.3% | 0.75 |
| Spray Dried Mannitol (Mannogem EZ) | remainder | remainder |
| Total | 100.0% | 300 |

*Denotes amount of pomolidomide that corresponds to the amount that provides the potency of 5 mg of pomolidomide.

Pomolidomide was passed through a 35-mesh screen. Mannitol and starch were each separately passed through a 25-mesh screen. Pomolidomide was pre-blended with a portion of mannitol and starch. The pre-blend was milled through a 0.039 inch screen. The remainder of the mannitol and starch was also milled through a 0.039 inch screen. The pre-blend was blended with the reminder of mannitol and starch. To this blend, sodium fumarate, which was passed through a 60 mesh screen, was further blended. The final blend was encapsulated into a size #1 capsule.

### 5.7 Example 7

### Stability of Formulation

Accelerated stability was assessed under 40° C./75% RH, and levels of impurities over the time period of initial, 1 month, 3 months, and 6 months were determined. Long term stability under 25° C./60% RH is also assessed during 0-24 months. For determination of the level of Impurities, an HPLC gradient method was employed using the following conditions:

| | | | |
|---|---|---|---|
| Column: | Zorbax SB-CN, 150 mm × 4.6 mm id, 5 μm particle size | | |
| Temperature: | Ambient | | |
| Mobile Phase: | A: 10/90 methanol/0.1% trifluoroacetic acid | | |
| | B: 80/20 methanol/0.1% trifluoroacetic acid | | |
| Gradient Profile: | Time (min) | % A | % B |
| | 0 | 90 | 10 |
| | 5 | 90 | 10 |
| | 50 | 20 | 80 |
| | 51 | 90 | 10 |
| | 60 | 90 | 10 |
| Flow Rate: | 1.0 mL/min | | |
| Injection Volume: | 25 μL | | |
| Detection: | UV, 240 nm | | |
| Run Time: | 60 minutes. | | |

From the experiments, it was observed that the impurities in the formulation provided herein stayed negligent throughout the time period investigated. The performance characteristics of the dosage also maintained throughout the time period investigated. These results show that the formulations provided herein have adequate stability for clinical and other uses.

While examples of certain particular embodiments are provided herein, it will be apparent to those skilled in the art that various changes and modifications may be made. Such modifications are also intended to fall within the scope of the appended claims.

32

What is claimed is:

**1**. An oral dosage form in the form of a capsule which weighs 62.5 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 0.5 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 35 mg; 3) sodium stearyl fumarate at an amount of 0.16 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 62.5 mg.

**2**. The dosage form of claim **1**, which is to be administered in the form of a size 4 or larger capsule.

**3**. An oral dosage form in the form of a capsule which weighs 125 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 1 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 70 mg; 3) sodium stearyl fumarate at an amount of 0.32 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 125 mg.

**4**. The dosage form of claim **3**, which is to be administered in the form of a size 4 or larger capsule.

**5**. An oral dosage form in the form of a capsule which weighs 250 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 2 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 140 mg; 3) sodium stearyl fumarate at an amount of 0.64 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 250 mg.

**6**. The dosage form of claim **5**, which is to be administered in the form of a size 2 or larger capsule.

**7**. An oral dosage form in the form of a capsule which weighs 180 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 3 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 100.8 mg; 3) sodium stearyl fumarate at an amount of 0.45 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 180 mg.

**8**. The dosage form of claim **7**, which is to be administered in the form of a size 2 or larger capsule.

**9**. An oral dosage form in the form of a capsule which weighs 240 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 4 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 134.4 mg; 3) sodium stearyl fumarate at an amount of 0.6 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 240 mg.

**10**. The dosage form of claim **9**, which is to be administered in the form of a size 2 or larger capsule.

**11**. An oral dosage form in the form of a capsule which weighs 300 mg and comprises: 1) pomalidomide, or a pharmaceutically acceptable salt or solvate thereof, at an amount that provides 5 mg of 100% pure pomalidomide; 2) pregelatinized starch at an amount of 168 mg; 3) sodium stearyl fumarate at an amount of 0.75 mg; and 4) spray dried mannitol at an amount that brings the total weight of the composition to 300 mg.

**12**. The dosage form of claim **11**, which is to be administered in the form of a size 1 or larger capsule.

* * * * *

# Exhibit 9

# Exhibit 10