**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CELGENE CORPORATION, | |
| Plaintiff, | |
| v. | |
| HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-V, HETERO DRUGS LIMITED, HETERO USA, INC., AUROBINDO PHARMA LIMITED, AUROBINDO PHARMA USA, INC., AUROLIFE PHARMA LLC, EUGIA PHARMA SPECIALTIES LIMITED, APOTEX INC., APOTEX CORP., MYLAN PHARMACEUTICALS, INC., MYLAN INC., MYLAN, N.V., BRECKENRIDGE PHARMACEUTICAL, INC., and TEVA PHARMACEUTICALS USA, INC. | C.A. No. 17-3387 (ES)(MAH) **CONSOLIDATED** |
| Defendants. | |

**DECLARATION OF ROSHAN P. SHRESTHA, PH.D. IN SUPPORT OF DEFENDANTS'
SUPPLEMENTAL RESPONSIVE CLAIM CONSTRUCTION BRIEF**

1

I, Roshan P. Shrestha, Ph.D., declare as follow:

1.      I am an attorney with the law firm of Taft Stettinius & Hollister LLP, counsel for Defendants and Counterclaim Plaintiffs, Apotex Inc. and Apotex Corp. in the above-captioned matter.

2.      I submit this Declaration in support of Defendants' Supplemental Claim Construction Brief.

3.      I have personal knowledge of the following facts and, if called to testify, I could and would testify competently to the matters stated herein.

4.      Attached hereto as Exhibit A is a true and correct copy of the transcript of the August 23, 2019 deposition of Donald E. Macfarlane, M.B., B.S., Ph.D.

I, Roshan P. Shrestha, declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

September 11, 2019                              Respectfully submitted,

Roshan P. Shrestha, Ph.D.

# EXHIBIT A



JANE ROSE REPORTING                                    800-825-3341

74 FIFTH AVENUE NYC 10011
JANE ROSE REPORTING.COM
JANE ROSE @ JANE ROSE REPORTING.COM

## *US District Court - New Jersey*

---

## Celgene Corporation
## v.
## Hetero Labs Limited, et al.

---

## *Video Deposition of:*
## Donald Macfarlane, MD
## August 23, 2019

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

---

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------------
CELGENE CORPORATION,
    Plaintiff,
v.
HETERO LABS LIMITED, et al.,
    Defendants.

C.A. No.: 17-3387 (ES)(MAH) Consolidated
----------------------------------------

VIDEO DEPOSITION OF
Donald E. Macfarlane, MD
August 23, 2019
Chicago, Illinois
Lead: Frank Calvosa, Esquire
Firm: Quinn Emanuel Urquhart & Sullivan

FINAL COPY
JANE ROSE REPORTING 1-800-825-3341

---

Page 2

ATTORNEYS FOR PLAINTIFF
    Frank C. Calvosa, Esquire
    Eric Stops, Esquire
    QUINN EMANUEL URQUHART & SULLIVAN
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    1-212-849-7000

    - and -

    Matthew J. Hertko, Esquire
    JONES DAY
    77 West Wacker
    Chicago, Illinois 60601-1692
    1-312-782-3939

ATTORNEYS FOR APOTEX DEFENDANTS
AND THE WITNESS
    Andrew M. Alul, Esquire
    TAFT STETTINIUS & HOLLISTER LLP
    111 East Wacker Drive, Suite 2800
    Chicago, Illinois 60601
    1-312-527-4000

---

Page 3

ATTORNEYS FOR EUGIA PHARMA AND
THE AUROBINDO DEFENDANTS
    Gupreet Singh Walia, Esquire
    (Telephonic)
    FISHERBROYLES, LLP
    445 Park Avenue, Ninth Floor
    New York, New York 10022
    1-866-211-5914

ATTORNEYS FOR BRECKENREIDGE
PHARMACEUTICAL, INC.
    John W. Bateman, Esquire
    (Telephonic)
    HAYNES AND BOONE, LLP
    800 17th Street NW, Ste 500
    Washington, D.C. 20006
    202-654-4584

ATTORNEYS FOR TEVA PHARMACEUTICALS
    Mark C. McLennan, Esquire
    (Telephonic)
    KIRKLAND & ELLIS LLP
    601 Lexington Avenue
    New York, New York 10022
    1-212-446-4800

---

Page 4

ATTORNEYS FOR THE MYLAN DEFENDANTS:
    T.O. Kong, Esquire
    (Telephonic)
    WILSON SONSINI GOODRICH & ROSATI
    One Market - Spear Tower
    Suite 3300
    San Francisco, California 94105
    415.947.2000

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Cynthia J. Conforti, Court Reporter
    Gabriel Martin, Videographer

---

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 5

TABLE OF CONTENTS

Witness:
Donald Macfarlane, MD

Examination
By Mr. Calvosa.......................Page 6

Reporter Certificate.................Page 143

Notice to Read and Sign..............Page 145

Index of Exhibits....................Page 147

Page 7

1  Jones Day, Chicago.
2      MR. ALUL:  Andrew Alul from Taft
3  Stettinius and Hollister in Chicago on
4  behalf of defendants Apotex, Inc. and
5  Apotex Corp., and also on behalf of the
6  witness.
7      Counsel for -- joint defense
8  counsel, will you please introduce
9  yourselves one at a time, please.
10      (Telephone appearances
11      announced.)
12      MR. WALIA:  Gurpreet Singh Walia
13  from the law firm Fisher Broyles,
14  representing Eugia Pharma and Aurobindo.
15      MR. BATEMAN:  Hi.  This is John
16  Bateman, B-A-T-E-M-A-N, from Haynes and
17  Boone, LLP, for defendant Breckenridge
18  Pharmaceutical, Inc.
19      MR. McLENNAN:  This is Mark McLennan
20  of Kirkland & Ellis, New York, attending by
21  phone for defendant Teva Pharmaceuticals
22  USA, Inc.
23      MR. KONG:  T.O. Kong, Wilson Sonsini
24  Goodrich and Rosati on behalf of the Mylan
25  Defendants.

Page 6

1        *   *   *
2      Chicago, Illinois
3        9:08 a.m.
4        *   *   *
5      THE VIDEOGRAPHER:  We are now on the
6  record.  Here begins Media No. 1, Volume I,
7  in the deposition of Donald Macfarlane, in
8  the matter of Celgene Corporation versus
9  Hetero Labs, Ltd., et al.
10      Today's date is August 23rd,
11  2019, and the time is now 9:08 a.m.  This
12  deposition is taking place at 111 East
13  Wacker Drive, Chicago.
14      My name is Gabriel Martin, and I
15  am the videographer.  The court reporter is
16  Cynthia Conforti, from Jane Rose Reporting,
17  New York.
18      Counsel, for the record, please
19  introduce yourself and who do you
20  represent.
21      MR. CALVOSA:  Frank Calvosa from
22  Quinn Emanuel Urquhart & Sullivan New York
23  office on behalf of plaintiff Celgene
24  Corporation.  With me is Eric Stops, also
25  of Quinn Emanuel, and Matt Hertko from

Page 8

1      MR. ALUL:  Is there anybody on for
2  Hetero?
3      Okay.  I guess not.  We'll
4  proceed then.
5      THE VIDEOGRAPHER:  Now the court --
6  the court reporter is going to swear in the
7  witness.
8  DONALD E. MACFARLANE, M.D.
9   having been duly sworn, was examined and
10  testified as follows:
11  EXAMINATION
12  BY MR. CALVOSA:
13   Q.  Good morning.
14   A.  Good morning.
15   Q.  Would you please state your name for
16  the record.
17   A.  My name is Donald Macfarlane.
18   Q.  And your address?
19   A.  I live at 620 South Summit Street,
20  Iowa City, Iowa.
21   Q.  Do you have a business address
22  that's different than that?
23   A.  I do not.
24      (Macfarlane Exhibits 1 and 2
25      marked for identification.)

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 9

1    BY MR. CALVOSA:
2        Q.   You're being handed two documents.
3    The first is marked Macfarlane 1, and the
4    second is marked Macfarlane 2.
5            Do you recognize Macfarlane 1?
6        A.   I do.
7        Q.   And what is that?
8        A.   It's a declaration signed by me
9    concerning the matter.
10       Q.   Okay.  And if you turn to page 7 of
11   Macfarlane 1, is that your signature there?
12       A.   Yes, it is.
13       Q.   Okay.  And you signed this
14   declaration on the 2nd of July 2019; is that
15   right?
16       A.   Yes, sir.
17       Q.   And if you look at Macfarlane 2, do
18   you recognize that document?
19       A.   Yes, sir, I do.
20       Q.   Okay.  And what is Macfarlane 2?
21       A.   It is a copy of my curriculum vitae.
22       Q.   And this was attached as Exhibit A
23   to your declaration.  Are you aware of that?
24       A.   Yes, sir.
25       Q.   If you look at page 1 of your CV,

Page 10

1    it's dated June 1st, 2008.
2        A.   Yes, sir.
3        Q.   Is that the most current copy of the
4    CV that you have?
5        A.   No, I have a more current copy.
6        Q.   Okay.  Is there a reason why you
7    provided counsel with this copy of the CV?
8        A.   That was timely.
9        Q.   When did you update the CV?
10       A.   Last week.
11       Q.   Okay.
12           MR. CALVOSA:  Counsel, we'll just
13       request production of the more current
14       version of the CV.
15           MR. ALUL:  We'll take it under
16       advisement.
17   BY MR. CALVOSA:
18       Q.   Has anything changed in the CV?
19       A.   Between this copy and the update?
20       Q.   Correct.
21       A.   Yes.  I've added some number of
22   clinical trials that I've been involved in.
23       Q.   Okay.  How many clinical trials?
24       A.   I think I added five or six.
25       Q.   Okay.  And what drugs did those

Page 11

1    concern?
2        A.   They concerned Revlimid,
3    daratumumab, Selinexor, and a drug that I don't
4    think has a name.  It is code number ALT,
5    A-L-T, 801.
6        Q.   Why doesn't the drug have a name,
7    the ALT-801?
8        A.   I don't know, sir.
9        Q.   Okay.  What compound is ALT-801?
10       A.   It was a bifunctional antibody
11   involving I think Interleukin 15.
12       Q.   Okay.  Do you know the structure of
13   that antibody?
14       A.   I don't, sir.
15       Q.   Why don't you know the structure of
16   the antibody?
17       A.   It's a little bit beyond my
18   abilities to understand the structure of an
19   antibody.  I may be able to understand some of
20   the functional attributes of it, but I don't
21   understand its structure.
22       Q.   Okay.  If you look at page 2 of the
23   CV, the professional and academic positions at
24   the top.
25       A.   Yes, sir.

Page 12

1        Q.   Are you still a professor in the
2    Department of Internal Medicine at the
3    University of Iowa?
4        A.   I am.
5        Q.   I guess I'm a little confused.
6    Earlier I asked you if you had a different -- a
7    business address that was different than the
8    one that you gave me, and you said you did not.
9        A.   I have a business which is -- has
10   the same address as my home.
11       Q.   Okay.
12       A.   I work at the University of Iowa.  I
13   think you were asking for a business address.
14   If you intended to ask for my work address,
15   it's at the University of Iowa Hospitals and
16   Clinics.
17       Q.   I see.  Thank you.
18           And do you know the address of the
19   university?
20       A.   It's Hawkins Drive, Iowa City, Iowa,
21   52242.
22           THE REPORTER:  Counsel, may we go
23       off the record for a moment?
24           MR. CALVOSA:  Sure.
25           MR. ALUL:  Yes.

Page 13

1        THE VIDEOGRAPHER:  We are going off
2    the record at 9:15 a.m.
3            (Brief interruption.)
4        THE VIDEOGRAPHER:  We are back on
5    the record at 9:20 a.m.
6            (Discussion off the
7            stenographic record.)
8    BY MR. CALVOSA:
9        Q.   In terms of structures of an
10   antibody that we were talking about, you said
11   it's a bit beyond your abilities to understand
12   the structures of an antibody.  I guess, why is
13   that?
14       A.   Antibodies are elaborated by a
15   complex system.  They're protein molecules
16   consisting of two heavy chains and two light
17   chains.  Substantial proportions, lengths of
18   those chains, are consistent between
19   antibodies, but then there's a so-called
20   variable region on the light chain and the
21   heavy chain, and the combination of those two
22   variable regions gives rise to a highly
23   specific binding region, which confers the
24   functionality of the molecule.
25       It's very hard to understand the

Page 14

1    relationship between the chemical structure and
2    the efficacy of an antibody in its actual work,
3    which is to recognize epitope within the
4    biological system.
5        Q.   Switching tracks a little bit, have
6    you been deposed before?
7        A.   I have.
8        Q.   About how many times?
9        A.   I think about 20.
10       Q.   How many times within the last four
11   years, would you say?
12       A.   I've been deposed twice in the last
13   four years.
14       Q.   And those were both in medical
15   malpractice cases?
16       A.   Yes, sir.
17       Q.   Okay.  And before that, the other 18
18   or so depositions, were those medical
19   malpractice cases as well?
20       A.   I think -- I think they were all
21   medical malpractice cases, yes.
22       Q.   Have you ever been deposed in a
23   patent case?
24       A.   I have not.
25       Q.   Okay.  Have you ever given testimony

Page 15

1    in a patent case?
2        A.   I haven't.
3        Q.   Okay.  Have you ever been involved
4    in a patent case at all?
5        A.   I was involved in a patent case of a
6    patent portfolio that I possessed, yes.
7        Q.   Okay.  And were you enforcing the
8    patents there against a potential infringer?
9        A.   It was a dispute between myself and
10   the university about the disposal of the
11   patents.
12       Q.   What do you mean by "disposal"?
13       A.   The sale.
14       Q.   The sale?
15       A.   Yes.
16       Q.   Okay.  Are you generally familiar
17   with the patent, then, if you have some
18   yourself?
19       MR. ALUL:  Objection to form -- hang
20   on a second.  Objection as to form.
21       Go ahead.
22       THE WITNESS:  I have nine issued
23   patents in my name, and I did assist in the
24   drafting of those patents.  I have very
25   limited understanding of the enforceability

Page 16

1    of patents.
2    BY MR. CALVOSA:
3        Q.   Do you understand in a patent at the
4    end there's things called claims?
5        A.   Yes, sir.
6        MR. ALUL:  Objection as to form.
7        Go ahead.
8        THE WITNESS:  Yes, I do.
9    BY MR. CALVOSA:
10       Q.   Okay.  And what do you understand a
11   claim in a patent to be?
12       A.   I think it is a statement of the
13   novel invention, which is protected under
14   patent law.
15       Q.   Okay.  And do you understand that
16   before the claims comes columns of either
17   written words or examples that's called a
18   specification?
19       MR. ALUL:  Objection as to form.
20       THE WITNESS:  I'm aware of that,
21   yes.
22   BY MR. CALVOSA:
23       Q.   Okay.  And what do you understand
24   the specification to contain?
25       A.   I know what it typically contains,

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 17

1 but I'm really very confused as to why it
2 contains a lot of material.
3          Basically, it's a statement of the
4 new facts that are available that justify the
5 claims.
6     Q.   Do you know what an abbreviated new
7 drug application is?
8     A.   I'm unfamiliar with the term
9 "abbreviated." I do understand the new drug
10 application, yes.
11    Q.   Okay. What do you understand a new
12 drug application to be?
13    A.   It is when an individual files with
14 the FDA for permission to explore a new drug.
15    Q.   Okay. In this declaration that you
16 submitted, Macfarlane 1, do you understand
17 there's a lawsuit between the company, Celgene
18 Corporation, and several generic pharmaceutical
19 companies?
20    A.   I do.
21    Q.   Do you understand why Celgene is
22 suing the generic pharmaceutical companies?
23         MR. ALUL: Objection as to form.
24         THE WITNESS: Celgene is trying to
25 use patent law to restrain the defendants

Page 18

1     from marketing the drug at issue.
2 BY MR. CALVOSA:
3     Q.   And what's that understanding based
4 on?
5     A.   I can't -- I can't recall what that
6 is based on, sir.
7     Q.   Okay.
8     A.   Yes.
9         Can I amend my answer? Yes, I did
10 read the complaint.
11    Q.   Okay.
12    A.   Yes.
13    Q.   And for patents, are you aware of
14 something called a file history for a patent?
15    A.   Not really, sir.
16    Q.   Okay. Are you aware that in
17 attempting to obtain a patent there's usually
18 communications between the Patent Office and
19 the inventor?
20    A.   I am, yes, sir.
21    Q.   And you, yourself, you've been
22 involved in those communications?
23    A.   Yes --
24         MR. ALUL: Objection as to form.
25         Go ahead.

Page 19

1         THE WITNESS: Yes, sir.
2 BY MR. CALVOSA:
3     Q.   Okay. One of the defendants in this
4 case is Apotex, Inc. Do you understand that?
5     A.   Yes, sir.
6     Q.   Were you aware of the company
7 Apotex, Inc., before becoming involved in this
8 matter?
9     A.   I have no specific memory of that,
10 no, sir.
11    Q.   Okay. One of the other defendants
12 is Breckenridge Pharmaceutical, Inc. Were you
13 aware of them before being involved in this
14 case?
15    A.   I have no specific recall of that
16 company.
17    Q.   Okay. We'll just try one more.
18         Mylan Pharmaceuticals, Inc., were
19 you aware of them before becoming involved in
20 this case?
21    A.   I'm sorry. Could you repeat the
22 name?
23    Q.   Sure. Mylan Pharmaceuticals, Inc.
24    A.   I may have heard of it as a generic
25 drug manufacturer, but I have no specific

Page 20

1 recall.
2     Q.   Okay. And what about the plaintiff,
3 Celgene Corporation?
4     A.   I have heard of Celgene Corporation.
5     Q.   And what -- I guess, where did you
6 hear of Celgene Corporation or in what context?
7         MR. ALUL: Objection as to form.
8         THE WITNESS: I think I first became
9 aware of it because it was marketing
10 thalidomide and subsequently Revlimid and
11 pomalidomide.
12 BY MR. CALVOSA:
13    Q.   Okay. When did you become aware
14 that Celgene was marketing thalidomide?
15    A.   About the middle 2000s.
16    Q.   Okay. And when did you become aware
17 that Celgene was marketing Revlimid?
18    A.   Shortly thereafter.
19    Q.   Okay. Shortly after the middle
20 2000s?
21    A.   Right.
22    Q.   Okay. And when did you become --
23 you've heard of pomalidomide?
24    A.   I have.
25    Q.   Okay. Do you understand that

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 21

1   Celgene also markets pomalidomide?
2       A.   Yes, sir.
3       Q.   When did you become aware that
4   Celgene was marketing pomalidomide?
5       A.   I think in 2013.
6       Q.   Have you prescribed thalidomide
7   before?
8       A.   I have.
9       Q.   For what disease stage or states?
10      A.   For the disease --
11          MR. ALUL:  Objection as to form.
12          Go ahead.
13          THE WITNESS:  For the disease
14      multiple myeloma.
15  BY MR. CALVOSA:
16      Q.   Anything else?
17      A.   No, sir.
18      Q.   Have you prescribed Revlimid before?
19      A.   I have.
20      Q.   And for what disease states have you
21  prescribed Revlimid?
22      A.   For multiple myeloma and
23  occasionally for low grade lymphoma.
24      Q.   And do you understand that the trade
25  name for pomalidomide is Pomalyst?

Page 22

1       A.   I do.
2       Q.   Have you prescribed Pomalyst before?
3       A.   I have.
4       Q.   And what disease states have you
5   prescribed Pomalyst for?
6       A.   For multiple myeloma.
7       Q.   When was the first time that you
8   prescribed thalidomide for multiple myeloma?
9       A.   I don't have a specific recall of
10  that.
11      Q.   Would it have been in the mid-2000s?
12      A.   Probably would have been a little
13  earlier.
14      Q.   Do you know how much earlier?
15      A.   Maybe 2002, but, as I say, I don't
16  specifically recall.
17      Q.   Okay.  Do you know when the first
18  time you ever heard of thalidomide was?
19      A.   The late 1950s.
20      Q.   And in what context did you hear of
21  thalidomide?
22      A.   It was a medication that was
23  approved and actually sold over-the-counter in
24  Germany in the late 1950s for -- as a sedative,
25  as a sleep aid, and, more specifically, for the

Page 23

1   nausea of pregnancy and was sold
2   over-the-counter -- counter primarily in
3   Germany.
4       Q.   And prescribing it, for example, for
5   the nausea of pregnancy turned out to be a
6   really bad thing, right?
7           MR. ALUL:  Objection as to form,
8       lack of foundation, outside of the scope.
9           THE WITNESS:  Yes, it was a very bad
10      thing, yes.
11  BY MR. CALVOSA:
12      Q.   And why is that?
13          MR. ALUL:  Same objections.
14          THE WITNESS:  I'm aware of the news
15      accounts that it caused limbal
16      abnormalities in infants born of the
17      pregnant mothers.
18  BY MR. CALVOSA:
19      Q.   And thalidomide is a known
20  teratogen; is that right?
21      A.   That's a bit of a technical term.  I
22  don't have an opinion about that.
23      Q.   You don't know whether thalidomide
24  is a teratogen?
25      A.   As I say, it's a technical term, and

Page 24

1   I don't have an opinion about it.
2       Q.   I'm asking if you know, not whether
3   you have an opinion.
4       A.   Well, I don't know.
5       Q.   Okay.
6       A.   I mean, teratogen has a specific
7   meaning and --
8       Q.   What did you -- sorry.  Go ahead.
9       A.   And I don't know if that's the basis
10  for the limbal abnormalities.
11      Q.   That's fair enough.
12          When was the first time that you
13  prescribed Revlimid?
14      A.   In the late 2000s.
15      Q.   And are you aware that the active
16  ingredient in Revlimid is lenalidomide?
17      A.   I am.
18      Q.   When was the first time you heard of
19  lenalidomide?
20      A.   I don't specifically recall, sir.
21      Q.   Would it have been in the late
22  2000s?
23      A.   Probably.
24      Q.   And when was the first time that you
25  prescribed Pomalyst?

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 25

1       A.    Probably 2013.
2       Q.    And we said this before, but just so
3   we're -- we're clear, you understand the active
4   ingredient in Pomalyst was pomalidomide?
5       A.   I am.
6       Q.    When was the first time you heard of
7   pomalidomide?
8       A.    Probably 2013, but it might have
9   been earlier.
10      Q.    Is it fair to say that you heard of
11  pomalidomide after you heard of lenalidomide?
12      A.    Yes, sir.
13      Q.    Why have you prescribed all three of
14  thalidomide, lenalidomide, and pomalidomide?
15          MR. ALUL:  Objection as to form.
16              Go ahead.
17          THE WITNESS:  Each drug has its
18      advantages and disadvantages, and we try to
19      use the most advantageous drug.
20  BY MR. CALVOSA:
21      Q.    Okay.  What are some of the
22  disadvantages of pomalidomide?
23          MR. ALUL:  Objection as to form,
24      outside of the scope, calls for
25      speculation.

Page 26

1          THE WITNESS:  It has known side
2      effects.  We have to be very careful to
3      make sure that it's -- that pregnant women
4      are not exposed to the drug.  It can cause
5      neutropenia, thrombocytopenia, and it may
6      increase the rate of deep venous
7      thrombosis, and it has a multitude of other
8      side effects.
9   BY MR. CALVOSA:
10      Q.    And does Revlimid have any different
11  side effects than pomalidomide?
12          MR. ALUL:  Hang on a second.
13      Objection as to form, outside of the scope.
14          THE WITNESS:  They're somewhat
15      similar.  Revlimid has a slightly higher
16      rate of side effects.
17  BY MR. CALVOSA:
18      Q.    Are there advantages -- you said
19  that each drug has its own advantages,
20  disadvantages.  Are there advantages to
21  pomalidomide over Revlimid?
22          MR. ALUL:  Objection as to form,
23      calls for speculation, outside the scope
24      of the declaration.
25          THE WITNESS:  I'm not aware of

Page 27

1      head-to-head clinical trials that would
2      reveal that.
3   BY MR. CALVOSA:
4      Q.    Are you aware of any advantages from
5   your personal prescribing of those drugs?
6          MR. ALUL:  Same objections.
7          THE WITNESS:  Patients who have been
8      exposed to Revlimid, and the drug has
9      failed in those patients, may still respond
10      usefully to pomalidomide.
11  BY MR. CALVOSA:
12      Q.    If you could turn to Macfarlane 1,
13  your declaration, page 3, paragraph 8.
14      A.    Yes, sir.
15      Q.    In there you're talking about how
16  you're an attending physician for outpatients
17  and inpatients with diseases of the blood and
18  cancer.
19          Do you see that?
20      A.    Yes, sir.
21      Q.    And then you say:
22          In the last two decades, this
23  typically amounted to several thousand patient
24  contacts per year, and then in parentheses, it
25  says (approximately 5,000 RVUs)?

Page 28

1      A.    Yes, sir.
2      Q.    What is an RVU?
3      A.    It's a term used in Medicare
4   reimbursement for physicians.  The term means
5   relative value units.  Approximately -- when I
6   see a new patient for a complex consultation,
7   that might be worth about three RVUs.  When I
8   see a simple return patient, that might be one
9   RVU.
10      Q.    So one RVU is not equivalent to one
11  patient in every case?
12      A.    No, sir.
13      Q.    Okay.  Understood.
14          And if you turn to paragraph 14 of
15  Macfarlane 1, that's on page 4 --
16      A.    Yes, sir.
17      Q.    -- there you're talking about your
18  experience with patients with multiple myeloma,
19  right?
20      A.    That's right.
21      Q.    And it says:
22          In the last five years, I typically
23  treated simultaneously approximately 50
24  patients with multiple myeloma.
25          I'm trying to understand.  Does that

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 29

1  mean that you have had 50 multiple myeloma
2  patients per year for the past five years or
3  50 multiple myeloma patients over the last five
4  years?
5      A.   I maintained a computer file on the
6  hospital information system of active patients
7  with multiple myeloma, and that list was
8  typically about 50 patients.  So that means
9  active patients who had looked to me or
10  continued to look to me to be their managing
11  physician for the disease multiple myeloma.
12      Q.   Do those active patients include
13  patients with newly diagnosed multiple myeloma?
14      A.   They did.  I no longer see patients
15  in the outpatient clinic.  I've adjusted my
16  clinic hours.  So for the last 18 months, I've
17  only done inpatient work.  I no longer have an
18  active stable of outpatients.
19      Q.   So over the past five years you've
20  had experience with patients with newly
21  diagnosed multiple myeloma?
22      A.   I have, yes.
23      Q.   And over the past five years, have
24  you had experience with patients with relapsed
25  multiple myeloma?

Page 30

1      A.   Yes, sir.
2      Q.   And over the past five years, have
3  you had experience with patients with
4  refractory multiple myeloma?
5      A.   You're going to have to define what
6  you mean by "refractory."
7      Q.   Do you have an understanding of that
8  word without me defining it?
9      A.   Refractory means to a specific
10  treatment.  Because you're refractory to one
11  treatment doesn't mean that you're refractory
12  to all treatments.
13      Q.   Okay.
14      A.   So the term has to be specified.
15      Q.   Let me ask it a different way, and
16  we'll see if we can get an answer.  If not,
17  maybe I could give a definition.
18          Over the past five years, have you
19  had experience with multiple myeloma patients
20  who are refractory to at least one other drug?
21      A.   Yes, sir.
22      Q.   Okay.  And with your multiple
23  myeloma patients over the last five years, have
24  you prescribed multiple myeloma medications to
25  them?

Page 31

1      A.   Yes, sir.
2      Q.   So those patients with multiple
3  myeloma that you've seen over the last five
4  years, they were in need of treatment, right?
5      A.   Yes, sir.
6      Q.   And you agree with me that a patient
7  having multiple myeloma is in need of
8  treatment, right?
9          MR. ALUL:  Objection as to form,
10  outside of the scope.
11          THE WITNESS:  I'm sorry.  Could you
12  repeat the question?
13  BY MR. CALVOSA:
14      Q.   Sure.
15          A patient having multiple myeloma is
16  in need of treatment, right?
17          MR. ALUL:  Same objections.
18          THE WITNESS:  Not every patient
19  needs treatment.
20  BY MR. CALVOSA:
21      Q.   Okay.  What about a patient having a
22  relapsed multiple myeloma, are they in need of
23  treatment?
24          MR. ALUL:  Objection to form,
25  outside of the scope.

Page 32

1          THE WITNESS:  I think that
2  question's a bit too vague for me to
3  tackle.
4          Each patient presents with an
5  individual set of characteristics, wants
6  and needs, and we make an individual
7  decision about every patient that we see.
8  BY MR. CALVOSA:
9      Q.   Okay.  Those medications that you
10  mentioned that you prescribed to patients,
11  multiple myeloma patients over the past five
12  years, what was one of them?
13      A.   I'm sorry.  Could you rephrase that?
14      Q.   Sure.
15          What was one medication that you've
16  used for multiple myeloma within the past five
17  years?
18      A.   You're asking for a list or a single
19  example?
20      Q.   Just a single example.
21      A.   Revlimid.
22      Q.   Okay.  And how many patients did you
23  use Revlimid in within the last five years?
24      A.   Probably the majority.
25      Q.   And how many is that numberwise

US District Court - New Jersey                    FINAL - August 23, 2019
Celgene v. Hetero Labs                            Donald Macfarlane, MD

Page 33

1  about?
2       A.   Maybe 40.
3       Q.   Okay.  Did each one of those 40
4  patients have a response to the Revlimid?
5       A.   No, sir.
6       Q.   Is there any multiple myeloma drug
7  that you've used that has generated a response
8  in every patient that's received it?
9       A.   No, sir.
10      Q.   Okay.  Is there any drug that you're
11 aware of that generates a response in every
12 patient that receives it?
13      MR. ALUL:  Objection as to form,
14 outside of the scope.
15      THE WITNESS:  No, sir.
16 BY MR. CALVOSA:
17      Q.   And I'll ask the question in the
18 context of pomalidomide.  You prescribed that
19 over the last five years, right?
20      A.   Yes, sir.
21      Q.   And approximately how many patients
22 have you prescribed pomalidomide to over the
23 past five years?
24      A.   Probably about 20.
25      Q.   Okay.  And did the pomalidomide

Page 34

1  generate a response in each of those 20
2  patients?
3       MR. ALUL:  Objection as to form,
4  outside of the scope.
5       THE WITNESS:  No, sir.
6  BY MR. CALVOSA:
7       Q.   Okay.  Did the pomalidomide generate
8  a response in any of those patients?
9       A.   Yes, sir.
10      Q.   Okay.  So in your personal
11 experience, you've prescribed pomalidomide to
12 say patient 1, and you treated that patient's
13 multiple myeloma, right?
14      MR. ALUL:  Objection as to form.
15      THE WITNESS:  I'm not sure who
16 "patient 1" is, sir.
17 BY MR. CALVOSA:
18      Q.   Sure.  I'm saying patient 1 is one
19 of the 20 patients.
20      MR. ALUL:  Same objection.
21 BY MR. CALVOSA:
22      Q.   So I'll rephrase it.
23      In your personal experience, you
24 prescribed pomalidomide to one of the 20
25 patients, and it treated that patient's

Page 35

1  multiple myeloma, right?
2       MR. ALUL:  Objection as to form,
3  lack of foundation.
4       THE WITNESS:  I treated about 20
5  patients with Pomalyst.
6  BY MR. CALVOSA:
7       Q.   Okay.  But in those 20 patients that
8  you treated with Pomalyst, how many of them had
9  their multiple myeloma treated?
10      MR. ALUL:  Objection as to form,
11 calls for speculation, outside of the scope
12 of the declaration.
13      THE WITNESS:  I'm unclear what you
14 mean by "treated," sir.
15 BY MR. CALVOSA:
16      Q.   Try it a different way.
17      Let's look at paragraph 10 and some
18 of the other drugs that you've used.
19      A.   Yes, sir.
20      Q.   Paragraph 10 talks about your
21 experience in clinical trials, right?
22      A.   Yes, sir.
23      Q.   And you say:
24      There are currently about 150 active
25 trials in cancer involving adult patients with

Page 36

1  cancer and blood diseases at the University of
2  Iowa?
3       Do you see that?
4       A.   Yes, sir.
5       Q.   And then you continue:
6       Any of whom I might care for at some
7  stage of their disease.
8       A.   Yes, sir.
9       Q.   Are you caring for them in the
10 context of the clinical trial?
11      A.   I'm listed as an investigator on a
12 large number of trials, not all of them, but I
13 may be rendering clinical care to a patient
14 who's currently on a clinical trial, and I have
15 a responsibility to make sure that the
16 documentation and the decision-making is
17 appropriate within the context of the trial.
18      Q.   Okay.  So you're not listed on -- as
19 an investigator in all 150 active trials at the
20 University of Iowa?
21      A.   Not that I'm aware of, no.
22      Q.   Okay.  Are you listed as an
23 investigator on the Revlimid clinical trial
24 that you referenced earlier?
25      A.   I was, yes, sir.

US District Court - New Jersey

Celgene v. Hetero Labs

FINAL - August 23, 2019

Donald Macfarlane, MD

Page 37

1      Q.    You're no longer listed as an
2   investigator?
3      A.    The trial is now closed.
4      Q.    Okay.  In the last sentence there,
5   you make reference to anti-myeloma drugs.
6      A.    Yes, sir.
7      Q.    What do you mean when you say
8   "anti-myeloma"?
9      A.    I think it's a trivial term to mean
10  drugs that are prescribed to patients to
11  attempt to control their multiple myeloma.
12     Q.    How do you control multiple myeloma?
13     A.    You wish to limit the progression of
14  the malignant plasma cells.
15     Q.    And would that refer to the
16  M paraprotein?
17         MR. ALUL:  Objection as to form,
18     lack of foundation, outside of the scope.
19         THE WITNESS:  Measurements of the
20     M protein are one way to assess the
21     progression or regression of the disease.
22  BY MR. CALVOSA:
23     Q.    Okay.  And there's different
24  criteria for assessing M protein; is that
25  right?

Page 38

1         MR. ALUL:  Objection as to form,
2     outside of the scope.
3         THE WITNESS:  Yes, sir.
4   BY MR. CALVOSA:
5      Q.    Are you aware of the SWOG criteria
6   for assessing M protein?
7      A.    I'm -- I'm aware there probably is
8   some.  I can't recall...
9      Q.    And SWOG is S-W-O-G; is that right?
10     A.    That's correct.
11         MR. ALUL:  Objection as to form,
12     lack of foundation, outside of the scope.
13  BY MR. CALVOSA:
14     Q.    And do you know what SWOG stands
15  for?
16     A.    The Southwestern Oncology Group.
17     Q.    And what about ECOG, E-C-O-G?  Are
18  you aware of that?
19         MR. ALUL:  Objection as to form,
20     outside of the scope.
21         THE WITNESS:  That's the Eastern
22     Oncology and Obstetrics of Gynecology.  I'm
23     sorry.  I can't quite recall what it is,
24     but, anyway, it's a cooperative group.
25  BY MR. CALVOSA:

Page 39

1      Q.    Okay.  You believe ECOG includes
2   gynecology?
3      A.    I think it used to at one time, but
4   can I just register I'm a bit confused about
5   it?
6      Q.    Okay.  The Revlimid study that you
7   say you're an investigator on, wasn't that
8   through ECOG?
9      A.    It was, yes.
10     Q.    And are you aware of the
11  International Myeloma Working Group criteria
12  for assessing paraprotein?
13     A.    I'm aware there may be such.
14     Q.    Why do you -- why do you say "may be
15  such"?
16         MR. ALUL:  Objection as to form.
17         THE WITNESS:  There are multiple
18     criteria for multiple diseases promulgated
19     by multiple national/international bodies.
20     Each clinical trial references one of
21     those, and it's beyond my memory to -- to
22     recall them specifically.
23  BY MR. CALVOSA:
24     Q.    Okay.  So, for example, if the
25  clinical trial referenced the SWOG criteria,

Page 40

1   that's the criteria that would be used, right?
2         MR. ALUL:  Objection as to form,
3     outside of the scope.
4         THE WITNESS:  Yes, sir.
5   BY MR. CALVOSA:
6      Q.    And the same is true if the clinical
7   trial referenced the International Myeloma
8   Working Group criteria, that's the criteria
9   that would be used?
10         MR. ALUL:  Same objections.
11         THE WITNESS:  Maybe.
12  BY MR. CALVOSA:
13     Q.    Why "maybe" this time?
14         MR. ALUL:  Same objections.
15         THE WITNESS:  I don't have a
16     specific recall of those criteria, sir.
17  BY MR. CALVOSA:
18     Q.    Okay.  As a doctor prescribing drugs
19  to multiple myeloma patients, you can determine
20  whether the drug you're giving is actually
21  efficacious, right?
22         MR. ALUL:  Objection as to form,
23     outside of the scope.
24         THE WITNESS:  Not with great
25     specificity.

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 41

1  BY MR. CALVOSA:
2      Q.   Well, can't you assess the
3  M protein?
4          MR. ALUL:  Objection as to form,
5      outside of the scope.
6          THE WITNESS:  Yes, but the global
7      assessment as to whether the patient is
8      being advantaged by the drug or not is much
9      more complex than that.
10  BY MR. CALVOSA:
11     Q.   So if your patient says to you:
12  "Dr. Macfarlane, is this drug working for me?"
13  you would tell them, "I can't assess that"?
14         MR. ALUL:  Objection as to form,
15     outside of the scope.
16         THE WITNESS:  I don't recall
17     specifically stating that.
18  BY MR. CALVOSA:
19     Q.   Okay.  You would be able to tell the
20  patient, the multiple myeloma patient, whether
21  the drug you're prescribing for them is
22  actually efficacious, right?
23         MR. ALUL:  Same objections.
24         THE WITNESS:  I think I've answered
25     that question.  The assessment is complex

Page 42

1      and sometimes indecisive.
2  BY MR. CALVOSA:
3      Q.   Why is it complex?
4      A.   Because there are multiple factors
5  that go into patient management other than just
6  assessing an M protein.
7      Q.   If you were prescribing a drug to a
8  patient for several months and the M protein
9  kept increasing, would you tell that patient
10  the drug was working for them?
11         MR. ALUL:  Objection as to form,
12     outside of the scope.
13         THE WITNESS:  Well, it's a bit of a
14     hypothetical.  I could imagine that
15     scenario could arise, yes.
16  BY MR. CALVOSA:
17     Q.   Have you ever done that before?
18     A.   I don't --
19         MR. ALUL:  Same objections.
20         THE WITNESS:  I don't have a
21     specific recall of saying that.
22  BY MR. CALVOSA:
23     Q.   If one of the drugs you were
24  prescribing to your multiple myeloma patient
25  was so toxic that it was materially disabling

Page 43

1  the patient, would you continue with the
2  prescription of that drug?
3          MR. ALUL:  Objection as to form,
4      outside of the scope, calls for
5      speculation.
6          THE WITNESS:  I'm sorry.  Could you
7      repeat the last part of your question?
8  BY MR. CALVOSA:
9      Q.   Sure.  If a drug you were
10  prescribing to one of your multiple myeloma
11  patients was causing such severe side effects
12  that it was materially disabling the patient,
13  would you continue to prescribe the drug?
14         MR. ALUL:  Same objections.
15         THE WITNESS:  I don't recall that
16     scenario, sir.
17  BY MR. CALVOSA:
18     Q.   I'm asking would you continue to
19  prescribe the drug.
20         MR. ALUL:  Same objections.
21         THE WITNESS:  I -- I don't remember
22     being in that situation, sir.
23  BY MR. CALVOSA:
24     Q.   Okay.  What if you were?
25         MR. ALUL:  Same objections.

Page 44

1          THE WITNESS:  I think you're asking
2      me a hypothetical question.
3  BY MR. CALVOSA:
4      Q.   Of course I am.
5      I am asking you what would happen if
6  you were giving a drug to the patient and the
7  side effects were so severe that it was
8  materially disabling the patient, would you
9  continue giving that drug?
10         MR. ALUL:  Objection as to form,
11     outside of the scope of the declaration,
12     calls for speculation.
13         THE WITNESS:  We sometimes do
14     continue lifesaving drugs even though the
15     patient is disadvantaged by taking the
16     drug.
17  BY MR. CALVOSA:
18     Q.   Okay.  What about if the side
19  effects are so severe that it's materially
20  disabling the patient?
21         MR. ALUL:  Objection as to form,
22     calls for speculation, outside of the
23     scope.
24         THE WITNESS:  I'm not sure I can
25     quite resonate with your language, sir.

Page 45

1        The decision whether to continue
2    a lifesaving drug or discontinue it is very
3    complex and depends upon a number of
4    parameters other than the fact that it
5    disadvantages the patient.
6    BY MR. CALVOSA:
7        Q.    Okay.  So you have no opinion one
8    way or the other whether, if you're giving a
9    drug that has such toxic side effects that it
10   materially disables the patients, whether you
11   would continue the drug?
12       MR. ALUL:  Same objections.
13       THE WITNESS:  I really haven't
14   studied that question for the purposes of
15   this trial.
16   BY MR. CALVOSA:
17       Q.    Okay.  In paragraph 13 of
18   Macfarlane 1, your declaration, on page 3, it
19   says:
20       My research has led to several
21   inventions which have led to the issuance of
22   nine United States Patents listing me as an
23   inventor.
24       Do you see that?
25       A.    Yes, sir.

Page 46

1        Q.    Can you tell me what the subject
2    matter is of the patents?
3        A.    My first four patents involved a
4    technique for isolating RNA from blood and
5    other bloody fluids in a simple and intact
6    form.
7        Q.    Okay.  What about the other five?
8        A.    The next four involved a drug
9    portfolio of antirheumatic drugs.
10       Q.    You said antirheumatic?
11       A.    Yes, sir.
12       Q.    And by "antirheumatic," you mean
13   drugs for what?
14       A.    For the treatment of rheumatism.
15       Q.    For the treatment of rheumatism in
16   human patients or...
17       A.    That was what we developed the drug
18   candidates for, yes, sir.
19       Q.    And that's what your patents are
20   for?
21       A.    Yes, sir.
22       Q.    And is rheumatism only used to refer
23   to rheumatoid arthritis or...
24       A.    I mean generically it would include
25   Lupus, erythematosus, and related diseases.

Page 47

1        Q.    Going back to the side-effect
2    questions I was asking about, I know you said
3    it's complicated and requires assessment.  Does
4    that include a risk-benefit assessment by the
5    doctor for the multiple myeloma patient?
6        MR. ALUL:  Objection as to form,
7    outside of the scope.
8        THE WITNESS:  That is one part of
9    the analysis, yes, sir.
10   BY MR. CALVOSA:
11       Q.    And that assessment the doctor makes
12   about whether to continue with a drug for a
13   multiple myeloma, that's part of the doctor's
14   routine practice; is that fair?
15       MR. ALUL:  Objection as to form,
16   outside of the scope, calls for
17   speculation.
18       THE WITNESS:  There are other
19   factors besides the doctor's --  the
20   doctor's view of that.  Patient's opinions
21   are valuable in the assessment of that.
22   BY MR. CALVOSA:
23       Q.    Sure, but that part of a doctor's
24   care for the patient is deciding whether to
25   continue with the drug based on efficacy, side

Page 48

1    effects, and the patient?
2        MR. ALUL:  Same objections.
3        I'm sorry.  Go ahead.
4        MR. CALVOSA:  Sorry.
5        THE WITNESS:  Yeah, it is based on
6    the totality of the case, and those are one
7    factors -- those are two of the factors in
8    the case, the risk and the benefit.
9    BY MR. CALVOSA:
10       Q.    And have you ever had a multiple
11   myeloma patient where you just couldn't tell
12   whether the drug that you prescribed them is
13   working for them?
14       MR. ALUL:  Objection as to form.
15       THE WITNESS:  It depends on the time
16   scale that we are talking about.  The first
17   couple of months it may be very unclear.
18   Subsequently, it may become clearer.  But
19   there's a large amount of uncertainty about
20   the management of every patient with
21   multiple myeloma.
22   BY MR. CALVOSA:
23       Q.    And that's across the board, no
24   matter what the drug being prescribed is?
25       MR. ALUL:  Objection as to form,

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 49

1    outside of the scope.
2         THE WITNESS:  Yes.
3    BY MR. CALVOSA:
4         Q.   Let's go to Macfarlane 2, the CV.
5         A.   Yes, sir.
6         Q.   On page 1, beginning with the higher
7    education, you list 1967 and an MB?
8         A.   The -- the British system for
9    professional degrees is a bachelor's degree of
10   medicine, a bachelor degree of surgery.  That's
11   the educational equivalence of an MD degree in
12   the States.
13        Q.   Okay.  And then you went further
14   than the MD degree.  You got a Ph.D. as well.
15        A.   I did.
16        Q.   Okay.  Is that something typical for
17   a medical doctor, they also have a Ph.D.?
18        A.   No, sir, it's not.
19        Q.   Okay.  Is there a specific area of
20   research that your Ph.D. was focused on?
21        A.   Yes.  It was focused upon the
22   pharmacology of blood platelets.
23        Q.   And when you use the term
24   "pharmacology," what do you mean?
25        A.   The internal workings of how drugs

Page 50

1    influence the performance of the platelets.
2         Q.   And what are platelets?
3         A.   Platelets are small organelles in
4    the blood that assist in blood coagulation.
5         Q.   Are they important for the human
6    physiology?
7         MR. ALUL:  Objection as to form,
8    calls for speculation, outside of the
9    scope.
10        THE WITNESS:  Yes, sir.
11   BY MR. CALVOSA:
12        Q.   Why is that?
13        MR. ALUL:  Same objections.
14        THE WITNESS:  Because if they are
15   overactive, they can be involved in
16   thrombosis, which can be lethal.  If
17   they're underactive, they can be involved
18   in bleeding, which is also lethal.
19   BY MR. CALVOSA:
20        Q.   Is there a medical term for the
21   underactive platelets where it's lethal?
22        MR. ALUL:  Objection as to form,
23   outside the scope.
24        THE WITNESS:  There are several
25   terms, sir.

Page 51

1    BY MR. CALVOSA:
2         Q.   What are those terms?
3         MR. ALUL:  Same objections.
4         THE WITNESS:  Thrombocytopenia would
5    be a shortage in platelets.
6    Thrombocytophy or thrombasthenia, other
7    terms like that, have been used for
8    defective platelet function.
9    BY MR. CALVOSA:
10        Q.   And thrombosis means you have too
11   many platelets in your body?
12        A.   No, sir.
13        Q.   What does "thrombosis" mean?
14        A.   Thrombosis is the blocking of a
15   blood vessel.
16        Q.   So like a blood clot; is that fair?
17        A.   Yes, sir.
18        MR. ALUL:  Objection as to form,
19   calls for speculation, outside the scope.
20        THE WITNESS:  Yes, sir.
21   BY MR. CALVOSA:
22        Q.   Can thrombosis be caused by
23   prescription drugs?
24        MR. ALUL:  Objection as to form,
25   outside of the scope.

Page 52

1         THE WITNESS:  Yes, sir.
2    BY MR. CALVOSA:
3         Q.   Okay.  Can thrombocytopenia be
4    caused by prescription drugs?
5         MR. ALUL:  Objection as to form,
6    outside of the scope.
7         THE WITNESS:  Yes, sir.
8    BY MR. CALVOSA:
9         Q.   And thrombosis is a condition that a
10   doctor would want to avoid in a patient, right?
11        MR. ALUL:  Same objections.
12        THE WITNESS:  In general, yes.
13   BY MR. CALVOSA:
14        Q.   And thrombocytopenia is a condition
15   that a doctor would want to avoid in a patient,
16   correct?
17        MR. ALUL:  Objection as to form,
18   outside of the scope.
19        THE WITNESS:  To a limited extent,
20   yes.
21   BY MR. CALVOSA:
22        Q.   The next question for you on page 1
23   of Macfarlane 2, you have "certification" as
24   one of the bold headings?
25        A.   Yes, sir.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 53

1      Q.    And then you have "board" beneath
2  that, and then you write "none"?
3      A.    Yes, sir.
4      Q.    So you're not board-certified in
5  oncology, for example, right?
6      A.    No, sir.
7      Q.    And you're not board-certified in
8  hematology, right?
9      A.    No, sir.
10     Q.    Do you have to put on your CV that
11 you're not board-certified as a medical doctor
12 in the U.S.?
13     A.    There are institutional requirements
14 at the University of Iowa for the structure of
15 the curriculum vitae.
16     Q.    Okay.  And the university requires
17 you to put on your CV that you're not
18 board-certified, correct?
19     A.    I don't know that, sir.
20     Q.    Oh, I thought that's why you were
21 saying -- let me ask you a different way.
22         Why do you put on your CV that you
23 have no board certifications?
24     A.    This was institutionally generated.
25 It wasn't generated by my pen.

Page 54

1      Q.    Okay.  So the -- sorry.  The
2  University of Iowa generated this CV for you,
3  right?
4      A.    Yes, sir.
5      Q.    And the University of Iowa decided
6  that they would put down that you're not
7  board-certified?
8      A.    I don't know that, sir.
9      Q.    Okay.  Earlier we talked about some
10 side effects for Revlimid and pomalidomide.
11     A.    Yes, sir.
12     Q.    Do you know if thrombocytopenia is a
13 side effect of pomalidomide?
14         MR. ALUL:  Objection as to form,
15     outside of the scope.
16         THE WITNESS:  Yes, sir.
17 BY MR. CALVOSA:
18     Q.    Is it a side effect of pomalidomide?
19     A.    Yes, sir.
20         MR. ALUL:  Same objections.
21 BY MR. CALVOSA:
22     Q.    Is thrombocytopenia a side effect of
23 lenalidomide?
24         MR. ALUL:  Same objections.
25         THE WITNESS:  Yes, sir.

Page 55

1  BY MR. CALVOSA:
2      Q.    Is thrombocytopenia a side effect of
3  thalidomide?
4          MR. ALUL:  Same objections.
5          THE WITNESS:  Yes, sir.
6          MR. CALVOSA:  Is now a good time for
7  a break?
8          MR. ALUL:  Yes.
9          THE VIDEOGRAPHER:  We are going off
10 the record at 10:09 a.m.
11         (Recess taken.)
12         THE VIDEOGRAPHER:  We are back on
13 the record at 10:22 a.m.
14 BY MR. CALVOSA:
15     Q.    Dr. Macfarlane, you mentioned before
16 the break that the focus of your Ph.D. work was
17 on platelets.
18     A.    Yes.
19     Q.    And as I turn to page 5 of
20 Macfarlane 2, the CV --
21     A.    Yes, sir.
22     Q.    -- and correct me if I'm wrong, but
23 for the first 10 to 15 years of your
24 publications, it appears that they were largely
25 focused on platelets as well, right?

Page 56

1      A.    Yes, sir.
2      Q.    Are any of the publications you list
3  in your CV -- do any of the publications that
4  you list in your CV concern multiple myeloma?
5      A.    Not that I can recall.
6      Q.    Okay.  And none of the publications
7  certain pomalidomide, right?
8      A.    Not that I can recall.
9      Q.    And for the book chapters that you
10 list beginning on page 10 of your CV, none of
11 those concern multiple myeloma, right?
12     A.    No, sir.
13     Q.    And none of those concern
14 pomalidomide, right?
15     A.    No, sir.
16     Q.    And beginning on page 11, the
17 abstracts, to page 14, none of those concern
18 multiple myeloma, right?
19     A.    No, sir.
20     Q.    And none of those concern
21 pomalidomide, right?
22     A.    No, sir.
23     Q.    Over on page 14, Areas of Research
24 Interest.
25     A.    Yes, sir.

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 57

1    Q.   And Current Projects, nothing there
2 concerns multiple myeloma, right?
3    A.   Not specifically, sir.
4    Q.   Okay.  And nothing concerns
5 pomalidomide, right?
6    A.   No, sir.
7    Q.   So we talked about the pharmacology
8 of blood platelets.  The next area of interest
9 you have listed on page 14 is Mechanism of Cell
10 Differentiation?
11    A.   Yes, sir.
12    Q.   What is that?
13    A.   Cells are created by division into
14 two of a parent cell.  In order to sustain a
15 parent cell, it's sensible for one cell to
16 remain a parent cell and the other cell to
17 differentiate something that's useful.
18    Q.   Can you explain that a little bit
19 more, specifically what you mean by "something
20 that's useful"?
21    A.   Well, a plasma cell that elaborates
22 an immunoglobulin is useful in the immune
23 system.  If we have one stem cell that divides
24 and generates one stem cell and another cell
25 that evolves into a plasma cell, that would be

Page 58

1 useful.
2    Q.   So this cell differentiation that
3 you're talking about, it occurs inside the
4 body?
5    A.   Yes.
6    MR. ALUL:  Objection to form.
7    THE WITNESS:  Yes, sir.
8    MR. ALUL:  Outside the scope.
9 BY MR. CALVOSA:
10    Q.   And is it fair to say that activity
11 inside the body is referred to as in vivo?
12    A.   Yes, sir.
13    Q.   And there's also another term, in
14 vitro, right?
15    MR. ALUL:  Objection as to form.
16    THE WITNESS:  Yes, sir.
17 BY MR. CALVOSA:
18    Q.   What does "in vitro" mean?
19    A.   It's a generic term which means
20 anything not in vivo.
21    Q.   As I was looking through your
22 publications, it seems like you've also done
23 cell work in vitro; is that fair?
24    A.   Yes, sir.
25    Q.   Does cell differentiation also apply

Page 59

1 to cells studied in vitro?
2    MR. ALUL:  Objection to form,
3    outside of the scope.
4    THE WITNESS:  Yes, sir.
5 BY MR. CALVOSA:
6    Q.   And how does it apply -- how does
7 cell differentiation apply to cells studied in
8 vitro?
9    MR. ALUL:  Same objections.
10    THE WITNESS:  We may have a marker
11    of differentiation so that we can measure
12    whether a cell is going to differentiate or
13    not, and so we can measure whether a
14    particular circumstance alters the degree
15    of differentiation of cells.
16 BY MR. CALVOSA:
17    Q.   If you turn to page 8 of
18 Macfarlane 2, I'd like to look at 38.
19    A.   Yes, sir.
20    Q.   The publication you have listed in
21 there, it talks about HL-promyelocytic leukemia
22 cells.
23    A.   Yes, sir.
24    Q.   And it says that -- and I'm going to
25 butcher this, so you'll have to help me.

Page 60

1 Phorbol Ester induces a ptosis in the
2 HL-promyelocytic leukemia cells but not in the
3 HL-60 PET mutant.
4    A.   Yes, sir.
5    Q.   Are there -- I guess -- what are
6 HL-60 promyelocytic leukemia cells?
7    A.   It's a widely used cell line used in
8 in vitro experiments to derive from a patient
9 who had promyelocytic leukemia.
10    Q.   And based on the title of this
11 article, I take it to mean that there's
12 different variations of HL-60 cell lines; is
13 that right?
14    MR. ALUL:  Objection as to form,
15    outside the scope.
16    THE WITNESS:  Yes, sir.
17 BY MR. CALVOSA:
18    Q.   So a certain drug compound might
19 have an effect in one HL-60 cell line but not
20 an effect in a different HL-60 cell line?
21    MR. ALUL:  Objection as to form,
22    outside the scope.
23    THE WITNESS:  The paper refers to a
24    chain cell that we generated in the lab
25    that was resistant to a particular

Page 61

1    stimulus.
2    BY MR. CALVOSA:
3        Q.   Are you the inventor of the PET
4    mutant HL-60 cell line?
5        A.   Yes, sir.
6        Q.   Okay.  Are there any other HL-60
7    cell lines?
8            MR. ALUL:  Objection as to form,
9        outside of the scope.
10           THE WITNESS:  I suspect there are
11   hundreds.
12   BY MR. CALVOSA:
13       Q.   Okay.  If a drug compound shows
14   activity in an HL-60 promyelocytic -- sorry.
15       A.   Can I help you out with
16   promyelocytic?
17       Q.   Promyelocytic.  Thank you.
18           If a drug compound shows activity in
19   the HL-60 promyelocytic leukemia cell line,
20   does that mean that it will be efficacious for
21   patients with promyelocytic leukemia?
22           MR. ALUL:  Objection as to form,
23       outside of the scope.
24           THE WITNESS:  No, sir.
25           Well, could you please restate the

Page 62

1    question?
2    BY MR. CALVOSA:
3        Q.   We can come back to that.
4        A.   Yeah.
5            MR. ALUL:  He'll ask another
6        question.  Just wait until he asks a
7        question.
8            THE WITNESS:  Okay.
9    BY MR. CALVOSA:
10       Q.   If you go back to page 7 of
11   Macfarlane 2, the publication listed as number
12   31 --
13       A.   Yes, sir.
14       Q.   -- in the second line there, there's
15   a title.  There's something called the Myc
16   protein?
17       A.   Yes, sir.
18       Q.   Is the Myc protein also a cell line?
19       A.   No, sir.
20       Q.   What is -- what is the Myc protein?
21       A.   It is a --
22           MR. ALUL:  Objection to form,
23       outside of the scope.
24           THE WITNESS:  It's a protein
25       elaborated in cells that regulates nuclear

Page 63

1    function, particularly cell division.
2    BY MR. CALVOSA:
3        Q.   Is the Myc protein studied in
4    potential cancer therapies?
5            MR. ALUL:  Objection as to form,
6        outside of the scope.
7            THE WITNESS:  It may be.
8    BY MR. CALVOSA:
9        Q.   Do you know if the Myc protein was
10   studied in potential cancer therapies in the
11   early 2000s?
12       A.   I don't have a specific recall.
13       Q.   Okay.  Jumping back to page 8 of
14   Macfarlane 2 --
15       A.   Yes, sir.
16       Q.   -- Publication No. 40 --
17       A.   Yes, sir.
18       Q.   -- it mentions in there protein
19   kinase C?
20       A.   Yes.
21       Q.   Is protein kinase C a cell line?
22       A.   No, sir.  It's an enzyme.
23       Q.   Okay.  Is protein kinase C studied
24   in potential cancer therapies?
25           MR. ALUL:  Objection as to form,

Page 64

1    outside of the scope.
2            THE WITNESS:  Probably, sir.
3    BY MR. CALVOSA:
4        Q.   Do you know if protein kinase Cs
5    were studied in potential cancer therapies in
6    the early 2000s?
7            MR. ALUL:  Same objections.
8            THE WITNESS:  I don't have specific
9        knowledge.
10   BY MR. CALVOSA:
11       Q.   Were you doing the cell line work
12   because of your Ph.D.?
13       A.   No, sir.
14       Q.   Do you feel that you're qualified to
15   do the cell line work because of your Ph.D.?
16       A.   I feel that I'm qualified to do cell
17   work, yes.
18       Q.   Why -- why do you feel that you're
19   qualified?
20       A.   Because I -- my manuscripts have
21   been approved by international editors, and my
22   grant applications have been approved.  My work
23   has been cited by other people.
24       Q.   Let's move down to Publication
25   No. 48.

US District Court - New Jersey                           FINAL - August 23, 2019
Celgene v. Hetero Labs                                   Donald Macfarlane, MD

Page 65

1      A.   Yes, sir.
2      Q.   There is mention of the WEHI-231 --
3      A.   Yes.
4      Q.   -- B lymphocytes.  Is that a cell
5  line?
6      A.   Yes, sir.
7      Q.   And what type of patient does the
8  WEHI-231 B lymphocyte cell line come from?
9           MR. ALUL:  Objection to form,
10     outside of the scope.
11          THE WITNESS:  I don't recall
12     specifically, sir.
13 BY MR. CALVOSA:
14     Q.   Is the WEHI-231 cell line human
15  derived?
16     A.   Yes.
17     Q.   Can it come from animals as well?
18          MR. ALUL:  Objection as to form,
19     outside of the scope.
20          THE WITNESS:  No, sir.
21 BY MR. CALVOSA:
22     Q.   If you turn to page 9 of the CV,
23  publication 51 --
24     A.   Yes, sir.
25     Q.   -- there it mentions the 7TD1 --

Page 66

1      A.   Yes, sir.
2      Q.   -- murine hybridoma cells?
3      A.   Yes, sir.
4      Q.   Is that a cell line?
5      A.   Yes, sir.
6      Q.   What type of patient does the 7TD1
7  murine hybridoma cell line come from?
8           MR. ALUL:  Objection as to form,
9      outside of the scope.
10          THE WITNESS:  It does not come from
11     a patient, sir.
12 BY MR. CALVOSA:
13     Q.   Does it come from an animal?
14     A.   Yes, sir.
15          MR. ALUL:  Same objections.
16          Hang on a second.
17          Dr. Macfarlane, you've got to
18     let him ask the question.  I've got to
19     object.  If I object -- if I don't object,
20     I won't say anything, and then you answer.
21     Let's slow things down.
22          THE WITNESS:  Okay.
23          MR. ALUL:  Okay.
24 BY MR. CALVOSA:
25     Q.   And what animal does the 7TD1 murine

Page 67

1  hybridoma cell line come from?
2           MR. ALUL:  Same objections.
3           THE WITNESS:  It comes from a mouse.
4  BY MR. CALVOSA:
5      Q.   If you go to page 15 of the -- of
6  Macfarlane 2, your CV --
7      A.   Yes, sir.
8      Q.   -- and continuing to page 18, I
9  believe there you have some grants that you've
10  received; is that right?
11     A.   Yes, sir.
12     Q.   And you mentioned PI for some of
13  those grants.
14     A.   Yes, sir.
15     Q.   By "PI," do you mean principal
16  investigator?
17     A.   I do.
18     Q.   And then when is says "co-PI," that
19  refers to co-principal investor, right?
20     A.   Yes, sir.
21     Q.   So this is grants for clinical
22  studies; is that fair?
23     A.   It includes some of my grants for
24  clinical studies, yes.
25     Q.   None of the grants that are listed

Page 68

1  on pages 15 through 18 concern multiple
2  myeloma, right?
3      A.   Not as listed.
4      Q.   And none of the grants concern
5  pomalidomide, right?
6      A.   Not as listed.
7      Q.   And then if we go to page 19 to
8  page 21 of Macfarlane 2, you have invited
9  lectures?
10     A.   Yes, sir.
11     Q.   None of those invited lectures
12  concern multiple myeloma, right?
13     A.   Some of them may -- may have
14  involved some aspects of multiple myeloma.
15     Q.   Which ones?
16     A.   34, 33, 32, 31, 30, 29, 24.
17     Q.   Any others?
18     A.   39, 35.
19     Q.   How sure are you that those invited
20  lectures that you just listed concern multiple
21  myeloma?
22     A.   I'm not sure, sir.
23     Q.   None of the invited lectures concern
24  pomalidomide, right?
25     A.   No, sir.

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

---

Page 69

1      Q.    And there's no invited lectures
2   listed here after the year 1998, right?
3      A.    That's correct.
4      Q.    Back to page 18 of Macfarlane 2 --
5      A.    Yes, sir.
6      Q.    -- the very last grant listed
7   there --
8      A.    Yes, sir.
9      Q.    -- says "PI," and then in
10  parentheses (Shire trial of lexamy technology)?
11     A.    Yes, sir.
12     Q.    Does that Shire refer to the
13  pharmaceutical company Shire?
14     A.    Yes, sir.
15     Q.    What is lexamy?
16     A.    This is a term that I use in my
17  invention concerning the creation of the
18  medical record.
19     Q.    So lexamy is Dr. Macfarlane's
20  terminology?
21     A.    Yes, sir.
22     Q.    Okay.  And that's also -- Lexamy is
23  also the name of your consulting company; is
24  that right?
25     A.    Yes, sir.

---

Page 70

1      Q.    I just want to go back to the nine
2   patents that you have.
3      A.    Yes, sir.
4      Q.    We talked about eight of them
5   before.
6      A.    Yes, sir.
7      Q.    What was the last one?
8      A.    The last one is my invention of a
9   method for creating medical records.
10     Q.    And is that the Lexamy technology
11  that we just talked about?
12     A.    Yes, sir.
13     Q.    In Macfarlane 1, your declaration --
14     A.    Yes, sir.
15     Q.    -- you're offering certain opinions,
16  right?
17     A.    Yes, sir.
18     Q.    And these are expert opinions.  Is
19  that fair to say?
20     A.    Yes, sir.
21     Q.    What field do you consider yourself
22  an expert in?
23     A.    As relevance of this case -- this
24  case, the clinical management of patients with
25  multiple myeloma.

---

Page 71

1      Q.    And by "the clinical management of
2   patients with multiple myeloma," you're talking
3   about actually seeing the multiple myeloma
4   patients in the clinic, right?
5      A.    It's -- it's larger than that.  It's
6   the -- includes teaching elements, it includes
7   research elements, it includes educational
8   elements, and patient care elements.
9      Q.    What are the teaching elements?
10     A.    As a faculty physician, I'm
11  responsible for teaching particularly fellows
12  in hematology/oncology about the management --
13  modern management of multiple myeloma.
14     Q.    And what are the research elements?
15     A.    The conduct of clinical trials and
16  occasionally commenting to fellows on research
17  programs in multiple myeloma.
18     Q.    And what are the educational
19  elements?
20     A.    The educational elements go all the
21  way from undergraduate teaching about multiple
22  myeloma all the way through to the finer points
23  of management to fellows who are about to
24  launch their private practices.
25     Q.    You said that the clinical

---

Page 72

1   management of patients with multiple myeloma
2   was the relevant expertise for this
3   declaration?
4          MR. ALUL:  Objection as to form.
5          THE WITNESS:  I think I used a
6      generic term to include the teaching and
7      evaluation of research efforts and other
8      aspects besides specifically managing a
9      named patient.
10  BY MR. CALVOSA:
11     Q.    Sure.  I just -- I just want to see
12  if you do or do not have certain other
13  expertise, whether you think it's relevant to
14  this declaration or not.
15     A.    This declaration is specific to the
16  questions addressed in this case.
17     Q.    Yeah.  Do you consider yourself an
18  expert in drug formulation?
19     A.    Not for the purposes of this case,
20  no.
21     Q.    Outside of this case, do you
22  consider yourself an expert in drug
23  formulation?
24     A.    I think not, sir.
25     Q.    Okay.  Do you consider yourself an

---

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

---

Page 73

1    expert in the FDA approval process?
2         A.    No, sir.
3         Q.    Okay.  And I should have asked this
4    earlier, but are all the opinions that you're
5    offering for this case contained within your
6    declaration?
7         A.    Yes, sir.
8         Q.    Okay.  Are there any errors in your
9    declaration that you'd like to correct?
10        A.    The drug dosing for Pomalyst on --
11   in paragraph 14, I don't think I've ever
12   prescribed 1 or 2 milligrams.  I've only
13   prescribed 3 or 4.
14        Q.    Why did you list one or two when you
15   originally wrote this?
16        A.    I think the drafting of this was a
17   joint effort, and it was an oversight on my
18   part.
19        Q.    So the attorneys wrote down 1, 2, 3
20   and 4 milligrams?
21        A.    As it was sent to me, it contained
22   1, 2, 3 and 4, and I did not correct it, yes.
23        Q.    In paragraph 21 --
24        A.    Yes, sir.
25        Q.    -- it says:

---

Page 74

1              I have been asked -- I have also
2    been asked to assume that the chemical name --
3    and then it states the chemical name -- refers
4    to pomalidomide.
5         A.    Yes, sir.
6         Q.    Do you know whether that chemical
7    name actually refers to pomalidomide?
8         A.    Yes, sir.
9         Q.    Okay.  Does it?
10        A.    Yes, sir.
11        Q.    Okay.  Why were you asked to assume
12   that then?
13             MR. ALUL:  Objection as to form.
14             I would caution the witness not
15        to reveal the contents of any confidential
16        communications between counsel for any of
17        the joint defendants, including myself and
18        yourself.
19             THE WITNESS:  Yes, sir.  There are a
20        number of ways to spell the chemical name.
21        This is one acceptable way.
22   BY MR. CALVOSA:
23        Q.    Let's look at page 4 of
24   Macfarlane 1, question 18.  Sorry.
25   Paragraph 18.

---

Page 75

1              You talk about the first question
2    that you've been asked to opine on.
3         A.    Yes, sir.
4         Q.    And you said:
5              I have been asked whether the
6    specification of the MOT patents discloses any
7    clinical data establishing the efficacy of
8    pomalidomide in the treatment of patients with
9    multiple myeloma.
10        A.    Yes, sir.
11        Q.    See that?
12             What do you mean when you say
13   "establishing the efficacy"?
14        A.    That refers to clinical data that
15   demonstrates to the reader the drug makes
16   patients better.
17        Q.    And what do you mean when you say
18   "the drug makes patients better"?
19        A.    That could involve a number of
20   different parameters.  The bottom line is that
21   it makes patients live longer or live better
22   lives.  But there are a lot of factors that go
23   into that analysis.
24        Q.    Right.  That's how I'm confused
25   whether or how you made this assessment,

---

Page 76

1    because you told me earlier that trying to
2    determine whether a drug is efficacious is very
3    complicated.
4         A.    Yes.
5         Q.    And it's not an easy task and it's
6    hard to do?
7         A.    Yes, sir.
8         Q.    So what information would you need
9    to establish the efficacy of pomalidomide?
10        A.    In an ideal world, I'd like to see a
11   phase 3 trial with a large number of patients
12   in each arm, a multicenter trial demonstrating
13   that patients randomized to receive the drug do
14   better than patients who are randomized not to
15   receive the drug.
16        Q.    Do you know if that's what the FDA
17   required for pomalidomide to be approved?
18             MR. ALUL:  Objection as to form,
19        outside of the scope of the declaration.
20             THE WITNESS:  I don't have knowledge
21        of the details of the approval process.
22   BY MR. CALVOSA:
23        Q.    Okay.  The second question that you
24   were asked to opine on, paragraph 19 --
25        A.    Yes, sir.

---

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 77

1    Q.   -- says:
2         I've been asked to review the
3    prescribing information for Pomalyst and to
4    opine as to whether, based on the clinical data
5    summarized therein, pomalidomide is always
6    effective in treating multiple myeloma.
7    A.   Yes, sir.
8    Q.   And I think we said earlier no drug
9    is always effective for multiple myeloma,
10   right?
11   A.   I think we did say that, yes.
12   Q.   Okay.  In paragraph 22, you begin a
13   discussion of clinical studies that you say are
14   done before drugs are approved by the
15   U.S. Food & Drug Administration.
16   A.   Yes, sir.
17   Q.   And the last sentence there, it
18   says:
19        For previously untested drugs,
20   clinical studies are usually divided into three
21   categories.
22   A.   Yes, sir.
23   Q.   And then over the next few
24   paragraphs, you go over those three categories;
25   is that fair?

Page 78

1    A.   Yes, sir.
2    Q.   And it's your understanding that the
3    drug that's the subject of the patent
4    pomalidomide was previously untested in
5    multiple myeloma at the time of the patents?
6         MR. ALUL:  Objection as to form,
7    outside the scope.
8         THE WITNESS:  Could you define by
9    what the "time of the patent" means?
10   BY MR. CALVOSA:
11   Q.   Sure.  2002.
12        MR. ALUL:  Same objections.
13        THE WITNESS:  I have only hazy
14   knowledge of the drug in that era, sir.
15   BY MR. CALVOSA:
16   Q.   Well, you talk about what's done for
17   previously untested drugs.
18   A.   Yes, sir.
19   Q.   I'm just wondering, is this
20   discussion relevant to pomalidomide?
21        MR. ALUL:  Objection as to form,
22   outside of the scope.
23        THE WITNESS:  Yes, sir.
24   BY MR. CALVOSA:
25   Q.   Okay.  In paragraph 23, you

Page 79

1    generally discuss Phase I studies.
2    A.   Yes, sir.
3    Q.   And based on your discussion in
4    paragraph 23, is it fair to say that Phase I
5    studies are defined -- designed as safety
6    trials?
7    A.   I think that's a little overbroad.
8    The intention is to try to define what
9    toxicities occur and to find a dose which can
10   be used without unacceptable toxicity.
11   Q.   Okay.  That's the purpose of a
12   Phase I study?
13   A.   Yes.
14        MR. ALUL:  Objection as to form.
15        THE WITNESS:  Yes, sir.
16   BY MR. CALVOSA:
17   Q.   If a maximum-tolerated dose is
18   defined for a certain drug in monotherapy, do
19   you need to define the maximum-tolerated dose
20   of that same drug if you're going to combine it
21   with another agent?
22        MR. ALUL:  Objection as to form,
23   lack of foundation, outside of the scope.
24        THE WITNESS:  Yes, sir.
25   BY MR. CALVOSA:

Page 80

1    Q.   And just so I understand, you would
2    need to define the maximum-tolerated dose of
3    that same drug again in combination with that
4    second agent?
5         MR. ALUL:  Same objections.
6         THE WITNESS:  I think, in general,
7    your statement is correct, but,
8    specifically, I can't answer that question.
9    BY MR. CALVOSA:
10   Q.   Okay.  In paragraph 20 of
11   Macfarlane 1 --
12   A.   Yes, sir.
13   Q.   -- you talk about the materials that
14   you reviewed in connection with your opinions.
15   A.   Yes, sir.
16   Q.   Okay.  And you say you reviewed the
17   MOT patents, right?
18   A.   Yes, sir.
19   Q.   Did you review the file histories
20   for those patents?
21   A.   Could you define what you mean by
22   "file history"?
23   Q.   My apologies.  I forgot we did this
24   earlier.
25        Did you review the back-and-forth

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Page 81

1   communications between the inventor and the
2   Patent Office regarding the MOT patents?
3           MR. ALUL:  Objection as to form.
4           THE WITNESS:  Not that I'm aware of.
5   BY MR. CALVOSA:
6       Q.   Okay.  And you say that you reviewed
7   the March 2018 prescribing information for
8   Pomalyst attached hereto as Exhibit C.
9       A.   Yes, sir.
10      Q.   And then you also linked to the
11  Pomalyst website and looked at the May 2018
12  prescribing information.
13      A.   2018 or 2019?  2018.  Yes, sir.
14      Q.   Okay.  Why did you not attach the
15  May 2018 Pomalyst prescribing information to
16  your declaration?
17          MR. ALUL:  Objection as to form.
18          Counsel the witness not to
19  reveal the contents of any confidential
20  communications between any joint defense
21  counsel and yourself.
22          THE WITNESS:  I think I determined
23  that the content was almost identical.
24  BY MR. CALVOSA:
25      Q.   Okay.  And then you say -- and you

Page 82

1   had mentioned this earlier -- you also reviewed
2   the complaint filed in this action?
3       A.   Yes, sir.
4       Q.   I looked in your declaration.  I
5   didn't see any reference to the complaint other
6   than in paragraph 20.  Is that right?
7       A.   Not that I can recall, sir.
8       Q.   Okay.  If you don't mention the
9   complaint anywhere else in the declaration, why
10  do you look at it?
11          MR. ALUL:  Objection as to form.
12          I caution the witness not to
13  reveal the contents of any communications
14  with joint defense -- any joint defense
15  counsel and yourself.
16          THE WITNESS:  I just needed to
17  understand the basis of the case.
18  BY MR. CALVOSA:
19      Q.   And what do you understand, based on
20  your review of the complaint, the basis of the
21  case to be?
22          MR. ALUL:  Objection as to form.
23          THE WITNESS:  The defendant are
24  being sued for patent infringement or
25  potential patent infringement under FDA

Page 83

1   rules.
2   BY MR. CALVOSA:
3       Q.   And that is all you used the
4   complaint for?
5       A.   I don't recall it having much more
6   content than that, sir.
7       Q.   Okay.
8           MR. CALVOSA:  Is now a good time for
9   a break?
10          MR. ALUL:  Sure.
11          THE VIDEOGRAPHER:  We are going off
12  the record at 11:03 a.m.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  Back on the
15  record at 11:28 a.m.
16          (Macfarlane 3 marked for
17          identification.)
18  BY MR. CALVOSA:
19      Q.   Dr. Macfarlane, you've been handed
20  what's been marked as Macfarlane 3.
21      A.   Yes, sir.
22      Q.   Do you recognize this document?
23      A.   Yes, sir, I do.
24      Q.   What is Macfarlane 3?
25      A.   It is a publication.

Page 84

1       Q.   Anything else you recognize about
2   Macfarlane 3, other than it's a publication?
3       A.   It has a title, Antagonism of
4   Immunostimulatory CpG-Oligodeoxynucleotides by
5   Quinacrine, Chloroquine, and Structurally
6   Related Compounds by myself and my laboratory
7   technician, Lori Manzel.
8       Q.   So this is a publication that you
9   authored, right?
10      A.   Yes, sir.
11      Q.   And it's published in the Journal of
12  Immunology?
13      A.   Yes, sir.
14      Q.   In 1998, right?
15      A.   Yes.
16      Q.   Do you recall the research that you
17  did that went into this publication?
18      A.   Yes, sir.
19      Q.   And what was the scope of that
20  research?
21          MR. ALUL:  Objection as to form.
22          THE WITNESS:  It's evaluating how
23  oligodeoxynucleotides containing C followed
24  by G, how that immune stimulation is
25  mediated, particularly with respect to

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 85

1    known compounds that we found inhibited
2    this activity that also were valuable in
3    the management of rheumatoid arthritis and
4    Lupus erythematosus.
5    BY MR. CALVOSA:
6        Q.   And these oligo -- is that how
7    you -- oligodeoxy --
8        A.   Oligodeoxy -- oligodeoxynucleotides.
9        Q.   Oligodeoxynucleotides.
10           You said you were studying them for
11   the management of rheumatoid arthritis and
12   Lupus; is that right?
13       A.   That's correct.
14       Q.   Is this also the subject matter that
15   it went into the four patents that we talked
16   about?
17       A.   Yes, sir.
18       Q.   Okay.  So you're familiar with the
19   work that's in this publication, right?
20       A.   Yes, sir.
21       Q.   If you could go to page 1130.
22       A.   Yes, sir.
23       Q.   And feel free to read as much as you
24   need to.  I'd like to ask you about a sentence
25   within the second paragraph that's in the

Page 86

1    remittive action section of this column.
2        A.   Yes, sir.
3        Q.   The term you used, CPG-ODN --
4        A.   Yes, sir.
5        Q.   -- does that refer to the
6    oligodeoxynucleotides?
7        A.   Yes, sir.
8        Q.   Okay.  And here you're talking about
9    the WEHI-231 cells?
10       A.   Yes, sir.
11       Q.   And that's one of the in vitro cell
12   lines that we talk about earlier, right?
13       A.   It is.
14       Q.   So this study of the
15   oligodeoxynucleotides was an in vitro study?
16       A.   It was.
17       Q.   It was not an in vivo study?
18       A.   No, sir.
19       Q.   Okay.  And, as I understand it, the
20   oligodeoxynucleotides were studied for their
21   activity in inhibiting the release of certain
22   cytogenes in this paper?
23           MR. ALUL:  Objection as to form,
24       lack of foundation.
25           THE WITNESS:  Amongst other things,

Page 87

1    yes.
2    BY MR. CALVOSA:
3        Q.   Okay.  At the bottom of the
4    left-hand column of page 1130 to the top of the
5    right-hand column, you say:
6            If the resulting drugs inhibit the
7    release of cytokines, they could be useful in
8    treating septic shock, inflammatory bowel
9    disease, respiratory, and other infections and
10   graft versus host disease amplified by virus or
11   other infection.
12           Do you see that?
13       A.   Yes, sir.
14       Q.   What is graft versus host disease?
15       A.   That is a complication of bone
16   marrow transplantation, when you're engrafting
17   somebody else's immune system into the patient,
18   and the donor's implanted immune system attacks
19   the recipient patient.
20       Q.   So graft versus host disease can
21   only occur in patients who've received bone
22   marrow transplantation?
23           MR. ALUL:  Objection to form,
24       outside of the scope.
25           THE WITNESS:  As a generality, yes.

Page 88

1    BY MR. CALVOSA:
2        Q.   And when you say "respiratory and
3    other infections," what other infections were
4    you thinking of there?
5            MR. ALUL:  Objection as to form.
6            THE WITNESS:  I don't recall any
7        specific.  It's just a generic term.
8    BY MR. CALVOSA:
9        Q.   Okay.  And what do you mean when you
10   say:
11           If the resulting drugs inhibit the
12   release of cytokines, they could be useful in
13   treating septic shock, for example?
14       A.   I think -- I think the statement
15   stands on its own feet.  We were starting a
16   drug development program in the hopes that they
17   could be useful.  One way they could be useful
18   is inhibiting cytokines that injure patients
19   during the inflammatory process.
20       Q.   And you're saying have that if they
21   inhibit the release of cytokines, they could be
22   useful in treating septic shock.
23       A.   That's what the statement says, yes.
24       Q.   And by treating septic shock here,
25   you mean having a positive outcome in a septic

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 89

1  shock patient?
2       MR. ALUL:  Objection as to form,
3  outside of the scope.
4       THE WITNESS:  Yes, sir.
5  BY MR. CALVOSA:
6       Q.   The other author on this
7  publication, Lori Manzel --
8       A.   Yes, sir.
9       Q.   -- I have to ask you again because I
10 don't remember.  You said she was -- what was
11 the relationship there?
12      A.   She was the technician who worked in
13 my lab.
14      Q.   Okay.  Do you know what she does
15 today?
16      A.   No, sir.
17      Q.   Could we go back to your
18 declaration?  You can put that aside.
19      A.   Yes, sir.
20      Q.   In paragraph 5 --
21      A.   Yes, sir.
22      Q.   -- you talk about being an
23 instructor and a research assistant professor
24 at Temple University in Philadelphia.
25           Do you see that?

Page 90

1       A.   Yes, sir.
2       Q.   Were you involved in patient care
3  during your time at Temple?
4       A.   No, sir.
5       MR. ALUL:  Objection as to form.
6            Hang on a second.
7       THE WITNESS:  No, sir.
8  BY MR. CALVOSA:
9       Q.   Why not?
10      MR. ALUL:  Same objection.
11      THE WITNESS:  I was doing full-time
12  bench research.
13 BY MR. CALVOSA:
14      Q.   Okay.  You had already received --
15 or maybe you haven't.  You received your Ph.D.
16 in 1975, according to your CV, right?
17      A.   Yes, sir.
18      Q.   Okay.  Was part of your Ph.D.
19 program conducted at Temple University, because
20 I see here it says you began there in 1974?
21      A.   Yes, I think it did.
22      Q.   And just so we're clear, you know
23 that part of your Ph.D. was done at Temple
24 University?
25      A.   Certainly the final writing of the

Page 91

1  thesis was done when I was at Temple.  I don't
2  recall whether any of the experiments I
3  performed at Temple were included in the Ph.D.
4  thesis.
5       Q.   Understood.  You're not licensed to
6  practice medicine in the state of Pennsylvania,
7  right?
8       A.   No, sir.
9       Q.   Okay.  Is there any particular
10 reason why?
11      A.   I didn't apply for a license in
12 Pennsylvania, sir.
13      Q.   Got it.
14           I want to go back to paragraph 14 of
15 Macfarlane 1.  You had mentioned corrections to
16 the dosage amounts that were listed there.
17      A.   Yes, sir.
18      Q.   And I believe you said you
19 prescribed 3 and 4 milligrams of pomalidomide
20 but not the 1 or 2 milligrams of pomalidomide,
21 right?
22      A.   Yes, sir.
23      Q.   Why have you prescribed 4 milligrams
24 of pomalidomide?
25      MR. ALUL:  Objection as to form.

Page 92

1       THE WITNESS:  That's the standard
2  dose used by the majority of physicians.
3  BY MR. CALVOSA:
4       Q.   Why have you prescribed 3 milligrams
5  of pomalidomide?
6       A.   Sometimes we want to cross
7  toxicities, such as low blood counts, and
8  sometimes we're nervous about the general
9  condition of the patient and renal failure and
10 we think it wise to use a slightly lower dose.
11      Q.   Okay.  And you found the
12 4 milligrams of pomalidomide to be effective in
13 your multiple myeloma patients?
14      MR. ALUL:  Objection as to form,
15  outside of the scope.
16      THE WITNESS:  You need to define
17  what you mean by "effective."
18 BY MR. CALVOSA:
19      Q.   Has 4 milligrams of pomalidomide
20 worked in any of your multiple myeloma
21 patients?
22      MR. ALUL:  Objection as to form.
23      THE WITNESS:  Yes, sir.
24 BY MR. CALVOSA:
25      Q.   Okay.  What do you understand

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 93

1    "effective" to mean?
2        MR. ALUL:  Objection as to form,
3    outside of the scope.
4        THE WITNESS:  It probably has a
5    legal definition that I can't opine on, as
6    used by the FDA.
7        From the point of view of
8    teaching, we can use the term rather
9    sloppily.  In terms of clinical trials, it
10   has to be predefined.  It's a term that has
11   a broad range of meanings.
12   BY MR. CALVOSA:
13      Q.   Okay.  So in day-to-day patient
14   care, you wouldn't use the word "effective."
15   Is that fair?"
16       MR. ALUL:  Objection as to form.
17       THE WITNESS:  I might do in
18   teaching.
19   BY MR. CALVOSA:
20      Q.   Okay.  And when you use it in
21   teaching, what do you mean?
22       MR. ALUL:  Objection as to form.
23   Outside of the scope.
24       THE WITNESS:  I might have a slide
25   of drugs which were effective for the

Page 94

1    treatment of multiple myeloma, for
2    instance.
3    BY MR. CALVOSA:
4       Q.   Okay.  And what do you mean when you
5    say "effective"?
6        MR. ALUL:  Same objections.
7        THE WITNESS:  It confers value to
8    the patient.
9    BY MR. CALVOSA:
10      Q.   And what does "confer value" mean?
11       MR. ALUL:  Objection as to form,
12   calls for speculation, outside of the scope
13   of the declaration.
14       THE WITNESS:  I think I said before
15   it either makes patients live longer or
16   live better.  I think that's a pretty good
17   definition.
18   BY MR. CALVOSA:
19      Q.   Okay.  And you've had experience
20   where the 4 milligrams of pomalidomide has
21   either made patients live longer or live
22   better?
23      A.   Yes, sir.
24      Q.   Okay.  And you've had experiences
25   where the 3 milligrams of pomalidomide has

Page 95

1    either made patients live longer or live
2    better?
3        MR. ALUL:  Objection as to form,
4    outside the scope.
5    BY MR. CALVOSA:
6       Q.   And you've never prescribed 1 or 2
7    milligrams of pomalidomide?
8       A.   Not to my memory, sir.
9       Q.   Okay.  So you have no basis to say
10   one way or another whether the one milligram
11   would either make patients live longer or live
12   better, right?
13       MR. ALUL:  Objection as to form,
14   outside of the scope.
15       THE WITNESS:  I don't have an
16   opinion about that, sir.
17   BY MR. CALVOSA:
18      Q.   Okay.  And you have no opinion on
19   whether the 2 milligrams of pomalidomide would
20   either make patients live longer or live
21   better, right?
22      A.   No, sir.
23       MR. ALUL:  Objection as to form,
24   outside of the scope.
25       THE WITNESS:  No, sir.

Page 96

1    BY MR. CALVOSA:
2       Q.   When you assess patient outcomes in
3    your clinical practice, what term do you use?
4        MR. ALUL:  Objection as to form,
5    outside of the scope.
6        THE WITNESS:  I'm not sure what
7    context you're -- you're dealing with, sir.
8    BY MR. CALVOSA:
9       Q.   Sure.  So you said that "effective"
10   you would use in a teaching moment, for
11   example, but you said you wouldn't use
12   "effective" in a clinical setting.  And I'm
13   asking what term do you use in assessing
14   patient outcome?
15       MR. ALUL:  Objection as to form,
16   outside of the scope.
17       THE WITNESS:  I might list
18   improvements in well-being, improvements in
19   M spike, improvements in renal function,
20   improvements of blood counts, improvements
21   of bone pain, improvements in mobility.
22   BY MR. CALVOSA:
23      Q.   And those improvements are ways that
24   you would determine whether the drug has a
25   successful outcome, right?

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 97

1         MR. ALUL:  Objection as to form,
2   outside of the scope of the declaration.
3         THE WITNESS:  Yes, sir.
4   BY MR. CALVOSA:
5      Q.   The two medical malpractice cases
6   that you have listed in paragraph 16 of
7   Macfarlane 1 --
8      A.   Yes, sir.
9      Q.   -- were you testifying on behalf of
10  the patient or the doctor?
11     A.   I was testifying for the defense.
12     Q.   For the doctor?
13     A.   Yes, sir.
14     Q.   Were all of your other malpractice
15  cases also on behalf of the defense?
16     A.   All except one, sir.
17     Q.   So one time you testified on behalf
18  of the patient?
19     A.   Yes, sir.
20     Q.   Why was that?
21         MR. ALUL:  Objection as to form.
22         THE WITNESS:  The attorney for the
23  patient was my next-door neighbor in
24  Philadelphia.  The case was a very
25  straightforward and I thought reprehensible

Page 98

1   case of medical malpractice.
2   BY MR. CALVOSA:
3      Q.   Good explanation.
4         The next paragraph, paragraph 17,
5   you mention a fee sheet that you've attached as
6   Exhibit B to your declaration.
7      A.   Yes, sir.
8         (Macfarlane 4 marked for
9         identification.)
10  BY MR. CALVOSA:
11     Q.   And the court reporter is handing
12  you Exhibit B to your declaration, marked as
13  Macfarlane 4.
14     A.   Yes, sir.
15     Q.   Is that the fee schedule that you
16  refer to?
17     A.   Yes, sir.
18     Q.   And that's the current fee schedule
19  that you use today?
20     A.   Yes, sir.
21     Q.   Is that the same fee schedule that
22  you use in your malpractice cases?
23     A.   No, sir.
24     Q.   Are you charging more or less in
25  this case than in your malpractice case?

Page 99

1      A.   The malpractice cases typically
2   don't have a yearly minimum, and my rate I
3   think was typically 375 or 400.
4      Q.   Is this the first case that you've
5   used this fee sheet with?
6      A.   To my knowledge, yes, sir.
7      Q.   The next paragraph, paragraph 18 --
8      A.   Yes, sir.
9      Q.   -- you talk about the MOT patents.
10     A.   Yes, sir.
11         (Macfarlane 5 marked for
12         identification.)
13  BY MR. CALVOSA:
14     Q.   What you're being handed now by the
15  court reporter is Macfarlane 5 through 7.
16         (Macfarlane 6 marked for
17         identification.)
18         (Macfarlane 7 marked for
19         identification.)
20  BY MR. CALVOSA:
21     Q.   Are those the MOT patents?  And by
22  "those," I mean Macfarlane 5 through 7.
23         Are Macfarlane 5 through 7 the MOT
24  patents you refer to in paragraph 18?
25     A.   Yes, sir.

Page 100

1      Q.   Okay.  Did you read those patents in
2   their entirety?
3      A.   No, sir.
4      Q.   Let's look at Macfarlane 5, which
5   I'll refer to as the '262 patent, if that's
6   okay with you.
7      A.   Yes, sir.
8      Q.   Which portions of the '262 patent
9   did you read, if you didn't read it in its
10  entirety?
11     A.   I didn't read the reference lists,
12  which are pages 2, 3, 4, 5, 6, 7, and I did not
13  read the claims starting on, whatever it is,
14  Column 38.
15     Q.   Why did you not read the claims
16  starting in Column 38?
17         MR. ALUL:  Objection as to form.
18         I counsel the witness not to
19  reveal the contents of any confidential
20  communications between any joint defense
21  counsel and the witness.
22         THE WITNESS:  My instructions were
23  to seek clinical data establishing the
24  efficacy of pomalidomide in the treatment
25  of patients with multiple myeloma.  For

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 101

1    that reason, I concentrated almost all of
2    my efforts on the specification.
3    BY MR. CALVOSA:
4        Q.   And you only looked -- so you didn't
5    look at the claims of the '262 patent at all?
6        A.   I don't recall doing so, sir.
7        Q.   And I assume the same is true for
8    Macfarlane 6 and 7?
9        A.   Yes, sir.
10       Q.   Did you look at the '262 patent for
11   anything other than clinical data?
12       A.   That was what I was seeking.
13   Obviously, I -- when you read, you read the
14   whole thing.
15       Q.   Before your analysis, you only took
16   into account the clinical data that's in the
17   '262 patent; is that fair?
18       MR. ALUL:  Objection as to form.
19       THE WITNESS:  No, sir.  I did a
20   comparison of the three specifications to
21   start with.
22   BY MR. CALVOSA:
23       Q.   Okay.  Tell me about that
24   comparison.
25       A.   I found there was no textual

Page 102

1    difference.  There were a number of
2    typographical errors that were corrected.  But
3    all three patents appeared to have essentially
4    identical specifications.
5        Q.   Okay.  So if I asked you questions
6    about the '262 specification, your answer would
7    be the same for the patents that are
8    Macfarlane 6 and 7?
9        A.   I believe so, yes.
10       Q.   Okay.  So when you reviewed the '262
11   specification to determine -- I want to make
12   sure I use your language correctly.
13       So to determine in the '262
14   specification whether there was anything
15   establishing the efficacy of pomalidomide in
16   the treatment of patients with multiple
17   myeloma, you only took into account clinical
18   data, right?
19       A.   I was seeking clinical data
20   establishing the efficacy of pomalidomide in
21   the treatment of multiple myeloma.
22       Q.   Okay.  Did you look for anything
23   other than clinical data to see if anything
24   established a clinical efficacy of multiple
25   myeloma -- let me ask it again.

Page 103

1        Q.   Did you consider whether there was
2    any information in the '262 patent, other than
3    clinical data, that established the efficacy of
4    pomalidomide in the treatment of patients with
5    multiple myeloma?
6        A.   I read the entire specification.
7        Q.   When you read the entire
8    specification, did you consider whether there
9    was other information in there than clinical
10   data that established the efficacy of
11   pomalidomide?
12       A.   I was --
13       MR. ALUL:  Objection.  Hang on a
14   second, guys.
15       MR. CALVOSA:  Let me finish, and
16   then you can go, and he'll go.
17       MR. ALUL:  That's what we are doing.
18   We are going to break it down three ways.
19   So...
20       MR. CALVOSA:  Let me finish my
21   question.
22       MR. ALUL:  Yeah, yeah.  No, I just
23   want to explain for the witness's sake
24   what's going on here.
25       Dr. Macfarlane, he's going to

Page 104

1    answer his question.  This -- this isn't a
2    conversation.  You've got to wait a couple
3    second, I object, then you answer.
4        Okay.  Go ahead.
5    BY MR. CALVOSA:
6        Q.   When you read the entire
7    specification of the '262 patent, did you
8    consider whether there was other information in
9    there, aside from clinical data, that
10   established the efficacy of pomalidomide in the
11   treatment of patients with multiple myeloma?
12       MR. ALUL:  Objection as to form.
13       THE WITNESS:  I was looking for
14   clinical data, sir, and I read the entire
15   specification, trying to understand the
16   meaning of every paragraph.
17   BY MR. CALVOSA:
18       Q.   Did you -- did you consider whether
19   any statements in the '262 patent that were not
20   clinical data established the efficacy of
21   pomalidomide in the treatment of patients with
22   multiple myeloma?
23       MR. ALUL:  Objection as to form.
24       THE WITNESS:  You're going to have
25   to tell me what you mean by less than

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 105

1    clinical data that bears upon efficacy.
2  BY MR. CALVOSA:
3    Q.   Is it your opinion that it has to be
4  clinical data in order to bear on efficacy?
5        MR. ALUL:  Objection as to form.
6        THE WITNESS:  I think broadly, yes.
7    The term "efficacy" means it's valuable for
8    the patient.  So that can only be derived
9    from data concerning a patient.
10 BY MR. CALVOSA:
11   Q.   So, in your opinion, in vitro
12 studies wouldn't support a claim for efficacy
13 in a patient?
14       MR. ALUL:  Objection as to form.
15 BY MR. CALVOSA:
16   Q.   Is that right?
17       MR. ALUL:  Objection as to form,
18   outside of the scope of the declaration.
19       THE WITNESS:  I don't think in vitro
20   data establishes efficacy in the management
21   of multiple myeloma.
22 BY MR. CALVOSA:
23   Q.   What about in the context of some
24 other conditions we talked about earlier, like
25 sepsis?  Does in vitro data establish efficacy

Page 106

1  in the management of sepsis?
2        MR. ALUL:  Objection as to form,
3    outside of the scope of the declaration.
4        THE WITNESS:  That's a bit far
5    afield for me, so I don't really have an
6    opinion concerning that, sir.
7  BY MR. CALVOSA:
8    Q.   You realize you published on
9  in vitro data and its relationship to the
10 treatment of sepsis, right?  We just looked at
11 that publication.
12       MR. ALUL:  Objection as to form,
13   outside of the scope of the declaration.
14       THE WITNESS:  So very early drug
15   development work excites interest, and that
16   interest causes the drug development
17   program to expand in the hopes that
18   clinical data may show efficacy.  It does
19   not establish efficacy.
20 BY MR. CALVOSA:
21   Q.   And that's -- sorry.
22   A.   So my publication was expressing a
23 hope, not an actuality.
24   Q.   And that's true of in vitro data
25 generally, right?

Page 107

1        MR. ALUL:  Objection as to form,
2    outside of the scope of the declaration,
3    calls for speculation.
4        THE WITNESS:  Yes, sir.
5  BY MR. CALVOSA:
6    Q.   So in vitro data would not establish
7  the efficacy of a drug for rheumatoid
8  arthritis, right?
9        MR. ALUL:  Objection as to form,
10   outside the scope of the declaration, calls
11   for speculation.
12       THE WITNESS:  No, sir.
13       (Macfarlane 8 marked for
14       identification.)
15 BY MR. CALVOSA:
16   Q.   The court reporter has just handed
17 you what I've marked as Macfarlane 8, and it is
18 U.S. Patent 6,221,882, issue date of
19 April 24th, 2001, filing date of July 2, 1998,
20 titled: Methods for Inhibiting Immuno
21 Stimulatory DNA Associated Responses.
22       Do you recognize Macfarlane 8?
23   A.   Yes, sir.
24   Q.   And you're listed as the inventor on
25 Macfarlane 8, right?

Page 108

1    A.   Yes, sir.
2    Q.   This is one of those four patents
3  that claims the treatment of humans or --
4  sorry -- the treatment of rheumatoid arthritis
5  in humans, right?
6        MR. ALUL:  Objection as to form.
7        THE WITNESS:  I'm looking rather
8    closely because one of my patents or maybe
9    two of them were new compositions of matter
10   patents, and I'm not sure which one this
11   is.
12 BY MR. CALVOSA:
13   Q.   Will you look at the end?
14   A.   Yes.
15   Q.   And this is one of those four
16 patents that we mentioned earlier that claimed
17 the treatment of rheumatoid arthritis in
18 humans, right?
19       MR. ALUL:  Objection as to form,
20   calls for a legal conclusion.
21       THE WITNESS:  Do you see rheumatoid
22   arthritis in the claims because I'm not
23   seeing it.
24       MR. ALUL:  Objection as to form.
25       Dr. Macfarlane, he has to ask

US District Court - New Jersey                    FINAL - August 23, 2019
Celgene v. Hetero Labs                            Donald Macfarlane, MD

---

Page 109

1  the questions, you have to answer them,
2  so...
3  BY MR. CALVOSA:
4      Q.   Sure, happy to help you.  If you
5  look at Claim 5, that one's specific to
6  rheumatoid arthritis.
7      A.   Yes, thank you.
8      Q.   Sorry about that.  And I know you
9  used rheumatosis earlier, a broader term, and I
10 thought it meant rheumatoid arthritis, and I
11 think that's where the confusion is here.
12     A.   Right, um-hmm.  Yes.
13     Q.   Okay.  Is there any clinical data in
14 this patent that establishes the efficacy of
15 any compounds for rheumatoid arthritis?
16     A.   No, sir.
17     Q.   Yet you still filed a patent
18 application and got it issued?
19     A.   Yes, sir.
20     Q.   You could put that aside.
21         Can you turn back to Macfarlane 1,
22 please?
23         MR. ALUL:  Declaration.
24         THE WITNESS: Yes, sir.
25 BY MR. CALVOSA:

---

Page 110

1      Q.   And you could feel free to shift the
2  other papers to the side.  Maybe that will help
3  you.
4      A.   Got to hang on to my patent.  I have
5  not seen it in years.
6      Q.   Back to the paragraph 18 that we
7  were on --
8      A.   Yes, sir.
9      Q.   -- again, when looking at the
10 specification for any clinical data
11 establishing the efficacy of pomalidomide in
12 the treatment for patients with multiple
13 myeloma, what type of clinical data would you
14 have needed to see to say that there was data
15 in the patent establishing the efficacy of
16 pomalidomide in the treatment of multiple
17 myeloma?
18         MR. ALUL:  Objection as to form.
19         THE WITNESS:  The best data would be
20     a Phase III trial.  Inferior data would be
21     a Phase II trial.  Barely acceptable data
22     might be some results on outcome of
23     patients treated in a Phase I trial.
24 BY MR. CALVOSA:
25     Q.   Anything else?

---

Page 111

1      A.   The terms "Phase I, Phase II and
2  Phase III" can be formally defined, but often
3  we use them sort of somewhat generically, but
4  any sort of data that looks like a Phase I, II
5  or III trial, even if they're not so
6  designated, would be helpful.
7      Q.   But it's your opinion that PK data
8  is not enough?
9         MR. ALUL:  Objection as to form.
10        THE WITNESS:  "PK" mean
11     pharmacokinetics.  That describes how a
12     drug is absorbed, metabolized, and
13     excreted.  It has nothing to do with
14     patient response.
15 BY MR. CALVOSA:
16     Q.   If you look at the '262 patent,
17 Macfarlane 5.
18     A.   Yes, sir.
19     Q.   And if you look at column 37 --
20     A.   Yes, sir.
21     Q.   -- beginning down at line 57 or so,
22 there's an indentation that says 6.5.6.
23     A.   Yes, sir.
24     Q.   Treatment of relapsed or refractory
25 multiple myeloma.

---

Page 112

1      A.   Yes, sir.
2      Q.   Did you consider whether this
3  example provided evidence of the efficacy of
4  pomalidomide in the treatment of patients with
5  multiple myeloma?
6         MR. ALUL:  Objection as to form,
7     outside of the scope of the declaration.
8         THE WITNESS:  Paragraph 6.5.5
9     addresses Revlimid.  It does not, to my
10    memory, address pomalidomide.
11 BY MR. CALVOSA:
12     Q.   Sorry.  I was asking about 6.5.6,
13 below that.
14     A.   6.5.6 does not specifically address
15 any drug.
16     Q.   Is it your opinion that an
17 immunomodulat- -- sorry.
18        Is it your opinion that within
19 example 6.5.6, an immunomodulatory compound of
20 the invention cannot be pomalidomide?
21        MR. ALUL:  Objection as to form,
22    outside of the scope of the declaration.
23        THE WITNESS:  The term
24    "immunomodulatory drug" is rather
25    specifically used and used interchangeably

---

US District Court - New Jersey                          FINAL - August 23, 2019
Celgene v. Hetero Labs                                      Donald Macfarlane, MD

|                                   Page 113 |                                   Page 115 |
|-------------------------------------------|-------------------------------------------|

Page 113

1      by Celgene -- by Celgene and is defined in
2      Column 5.
3              In Column 5 through 10, there
4      are probably thousands of compounds
5      described there.  Embedded in there is
6      Actimid and Revlimid.  Actimid is the
7      trivial name used at the time of the filing
8      of the patent for pomalidomide.
9      BY MR. CALVOSA:
10        Q.    What do you mean by the "trivial
11     name"?
12        A.    I'm not sure.  I think Actimid may
13     have been used in foreign countries.  I'm not
14     sure that Actimid was used in the -- in the
15     States as a licensed name.
16        Q.    So you --
17        A.    At the time this patent was filed,
18     Celgene's name for pomalidomide was Actimid.
19        Q.    And when was that?
20        MR. ALUL:  Objection as to form.
21        THE WITNESS:  Well, the patent was
22     filed in 2002, I believe.
23     BY MR. CALVOSA:
24        Q.    It's an interesting answer.
25              You had said earlier that you had

Page 114

1      never heard of pomalidomide and zolaspir
2      (phonetic) in lenalidomide, and you said you
3      had never heard of lenalidomide until the
4      mid-2000s.
5        MR. ALUL:  Objection as to form.
6        THE WITNESS:  I think your question
7        was whether I knew about Celgene and
8        lenalidomide.
9      BY MR. CALVOSA:
10       Q.    No, but the record will reflect what
11     it reflects.
12       A.    Okay.  I'm not sure how that bears
13     upon this.  I'm reading a document whose
14     origins are in 2002, and I'm making the
15     statement, when I use Actimid, I'm using the
16     term, as used in this patent by Celgene, to
17     designate the compound pomalidomide.
18       Q.    My question -- so let's go back to
19     6.5.6.
20       A.    Yes, sir.
21       Q.    It says an immunomodulatory compound
22     of the invention.
23       A.    Yes, sir.
24       Q.    Do you understand that the invention
25     here is pomalidomide?

Page 115

1        MR. ALUL:  Objection as to form,
2      calls for speculation, outside of the scope
3      of the declaration, and calls for a legal
4      conclusion.
5        THE WITNESS:  No, sir.
6      BY MR. CALVOSA:
7        Q.    And that's because you didn't look
8      at the claims of this patent, right?
9        A.    I read the text, sir, and the text
10     refers to IMIDS and immunomodulatory compounds
11     of which thousands are described in this
12     patent.
13       Q.    6.5.6 specifically says an
14     immunomodulatory compound of the invention.
15             Do you understand -- it's your
16     opinion that the '262 patent has thousands of
17     compounds within the invention?
18       MR. ALUL:  Objection as to form,
19     outside of the scope of the declaration,
20     calls for speculation.
21       THE WITNESS:  The language used is
22     the immunomodulatory drugs of the
23     invention.
24             The invention is listed in the
25     specification that lists thousands of

Page 116

1      drugs.
2      BY MR. CALVOSA:
3        Q.    Okay.  So it's your opinion that the
4      invention in the '262 patent is in the
5      specification?
6        MR. ALUL:  Objection as to form,
7        outside the scope of the declaration, calls
8        for a legal conclusion.
9        THE WITNESS:  Yes.
10     BY MR. CALVOSA:
11       Q.    Okay.  You don't think the claims of
12     the patent being in Column 38 limit the
13     invention in the '262 patent?
14       MR. ALUL:  Objection as to form,
15       outside of the scope of the declaration,
16       calls for a legal conclusion.
17       THE WITNESS:  I haven't read the
18       claims, so I really don't have an opinion
19       about the claims.
20     BY MR. CALVOSA:
21       Q.    Did you read the title of the
22     patent?
23       A.    Yes, sir, I did.
24       Q.    And is that title referring to
25     thousands of compounds, sir?

US District Court - New Jersey

FINAL - August 23, 2019

Celgene v. Hetero Labs

Donald Macfarlane, MD

Page 117

1     A.    No, it's specifically referring to
2 pomalidomide.
3     Q.    You still don't think the invention
4 of the '262 patent is limited to pomalidomide?
5         MR. ALUL:  Objections to form,
6     outside of the scope of the declaration,
7     calls for speculation.
8         THE WITNESS:  I was unaware that the
9     title of a patent was a determinative
10    statement of the content of the patent.
11 BY MR. CALVOSA:
12    Q.    Okay.  If you look at Column 13 in
13 Claim 1.
14    A.    I'm sorry, Column?
15    Q.    Sorry.  38.
16    A.    Column 38.
17    Q.    Column 1 of Macfarlane 5.
18    A.    Of Macfarlane 5?
19    Q.    Yeah, the '262 patent.
20        MR. ALUL:  You've got it.  It's in
21    your hand.
22        THE WITNESS:  Confusing.  All right.
23    Yes, sir.
24 BY MR. CALVOSA:
25    Q.    That structure that's pictured

Page 118

1 there, do you know what that compound is?
2     A.    Yes.
3         MR. ALUL:  Objection as to form.
4     Hang on a second, please.
5         Objection as to form, outside of
6     the scope of the declaration, calls for a
7     legal conclusion.
8         THE WITNESS:  Yes, sir.
9 BY MR. CALVOSA:
10    Q.    What compound is that?
11    A.    Pomalidomide.
12        MR. ALUL:  Same objections.  Hang on
13    a second, please.  Please.  Same
14    objections.
15        THE WITNESS:  Pomalidomide.
16 BY MR. CALVOSA:
17    Q.    Is any other compound pictured
18 there?
19        MR. ALUL:  Objection as to form,
20    outside of the scope of the declaration,
21    calls for a legal conclusion.
22        THE WITNESS:  In Claim 1?
23 BY MR. CALVOSA:
24    Q.    Yes.
25    A.    No, sir.

Page 119

1     Q.    And you still have no opinion about
2 whether the claims are limited to the
3 immunomodulatory compound pomalidomide?
4         MR. ALUL:  Objection as to form,
5     outside of the scope of the declaration,
6     calls for a legal conclusion.
7         THE WITNESS:  I was asked to
8     determine whether there was clinically --
9     clinical data establishing the efficacy of
10    pomalidomide within the specification.
11 BY MR. CALVOSA:
12    Q.    I'm asking you now that we have
13 identified the compound in Claim 1 whether you
14 understand that the claims are limited to the
15 immunomodulatory compound pomalidomide?
16        MR. ALUL:  Objection as to form,
17    outside of the scope of the declaration,
18    calls for a legal conclusion.
19        THE WITNESS:  I really haven't
20    studied the claim, sir.  I don't have an
21    opinion about the claims.
22 BY MR. CALVOSA:
23    Q.    Okay.  In Claim 1, Step A, or after
24 the letter A, in parentheses, it says:  From
25 about 1 milligram to about 5 milligrams per day

Page 120

1 of a compound having a formula -- and we just
2 said that's pomalidomide.
3         And you testified earlier that you
4 prescribed 4 milligrams of pomalidomide to your
5 MM patients, right?
6     A.    Yes, sir.
7     Q.    Okay.  And you said you've seen
8 beneficial outcomes with the 4 milligrams
9 prescribed to those patients, right?
10        MR. ALUL:  Objection as to form.
11        THE WITNESS:  Yes, sir.
12 BY MR. CALVOSA:
13    Q.    If you turn to the page where
14 Column 3 is in the '262 patent --
15    A.    Yes, sir.
16    Q.    -- and I think we said this earlier,
17 but -- so I know what your understanding of
18 what the specification contains, you understand
19 that the specification contains information
20 from the inventor telling about what the
21 invention is, right?
22        MR. ALUL:  Objection as to form,
23    mischaracterizes the witness's testimony.
24        THE WITNESS:  Sounds correct.
25

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 121

1  BY MR. CALVOSA:
2      Q.   Do you see in Column 3 there's a
3  section called Summary of the Invention?
4      A.   Yes, sir.
5      Q.   And right after that, it says:
6          The invention encompasses methods of
7  treating and preventing certain types of
8  cancers, including primary and metastatic
9  cancer, as well as cancers that are refractory
10 or resistant to conventional therapy --
11 chemotherapy.
12         MR. ALUL:  I'm sorry.  Where are
13     you?
14         MR. CALVOSA:  Right below summary of
15     the invention, line 40, column 3.
16         MR. ALUL:  Okay.  I got you.
17 BY MR. CALVOSA:
18     Q.   Let me know when you're there,
19 Dr. Macfarlane.
20     A.   Yes, sir.
21     Q.   And you see that first sentence
22 there?
23     A.   Yes, sir.
24     Q.   What does it mean to prevent a type
25 of cancer?

Page 122

1          MR. ALUL:  Objection as to form,
2      outside of the scope of the declaration.
3          THE WITNESS:  Within the context of
4      this patent application, I have no idea.
5  BY MR. CALVOSA:
6      Q.   What about outside of the context of
7  this patent?  Do you know what it means to
8  prevent cancer?
9          MR. ALUL:  Objection as to form,
10     outside of the scope of this -- this
11     declaration.
12         THE WITNESS:  One example might be
13     giving a vaccine against papilloma virus in
14     young people to prevent future cancers.
15 BY MR. CALVOSA:
16     Q.   So it's a basically stop it before
17 it starts; is that fair?
18         MR. ALUL:  Objection as to form,
19     outside of the scope of the declaration.
20         THE WITNESS:  Well, those are your
21     words.  Yes, that's fine.
22 BY MR. CALVOSA:
23     Q.   And then you see the next sentence.
24 It says:
25         The methods comprise administering

Page 123

1  to a patient in need of such treatment or
2  prevention therapeutically or prophylactically
3  effective amounts of an immunomodulatory
4  compound.
5          Do you see that?
6      A.   Yes, sir.
7      Q.   And the patent gives in the claims
8  as patients who are in need of the treatment,
9  the multiple myeloma patients, right?
10         MR. ALUL:  Objection as to form,
11     outside of the scope of the declaration.
12         THE WITNESS:  I don't have an
13     opinion about the claims, sir.
14 BY MR. CALVOSA:
15     Q.   Can you look at the claims and tell
16 me if the patients who are in need of treatment
17 there are patients having multiple myeloma?
18         MR. ALUL:  Objection as to form,
19     outside the scope of the declaration,
20     calling for a legal conclusion.
21         THE WITNESS:  Claim 1 does mention
22     multiple myeloma.
23 BY MR. CALVOSA:
24     Q.   So for Claim 1, the patient in need
25 of treatment is a patient having multiple

Page 124

1  myeloma, right?
2          MR. ALUL:  Objection as to form,
3      outside of the scope of the declaration,
4      calls for a legal conclusion?
5          THE WITNESS:  No, sir.  I think
6      within the specification, there's a very
7      long list of cancers.  Goes on for
8      paragraphs.  The specification is by no
9      means limited to multiple myeloma.
10 BY MR. CALVOSA:
11     Q.   Sure, but I'm asking for Claim 1.
12 The only patient identified in need of
13 treatment is a patient having multiple myeloma,
14 right?
15         MR. ALUL:  Objection as to form.
16     Hang on a second, please.  Objection as to
17     form, outside of the scope of the
18     declaration, calls for a legal conclusion.
19         THE WITNESS:  I don't have opinions
20     about the claims.
21 BY MR. CALVOSA:
22     Q.   Sitting here today, do you know
23 whether there was any patient identified in
24 Claim 1, other than a patient having multiple
25 myeloma, who would be in need of treatment?

US District Court - New Jersey                          FINAL - August 23, 2019
Celgene v. Hetero Labs                                  Donald Macfarlane, MD

| Page 125 | Page 127 |
|---|---|

**Page 125**

1      MR. ALUL:  Objection as to form,
2    outside of the scope of the declaration,
3    calls for a legal conclusion.
4      THE WITNESS:  I'm sorry.  I lost the
5    middle part of your question.
6  BY MR. CALVOSA:
7    Q.   Sure.  Sitting here today, do you
8  see anything other than a patient having
9  multiple myeloma in Claim 1 of the '262 patent
10 as the patient who is in need of treatment?
11     MR. ALUL:  Same objections.
12     THE WITNESS:  Just reading Claim 1
13   now, it does mention multiple myeloma.
14 BY MR. CALVOSA:
15   Q.   And no other disease state is
16 mentioned as a patient in need of treatment,
17 right?
18     MR. ALUL:  Objection as to form,
19   outside of the scope of the declaration,
20   calls for a legal conclusion.
21     THE WITNESS:  Claim 1 would appear
22   to be limited to multiple myeloma.  I don't
23   have opinions about the other claims.
24 BY MR. CALVOSA:
25   Q.   Okay.  So now that we have agreed

**Page 126**

1    that Claim 1 appears limited to multiple
2  myeloma, within the context of Claim 1 only,
3  the only patient identified as being in need of
4  treatment is a patient having multiple myeloma,
5  right?
6      MR. ALUL:  Objection as to form,
7    outside of the scope of the declaration,
8    calls for a legal conclusion.
9      THE WITNESS:  My analysis was of the
10   specification, and the specification is
11   generalized to almost any form of cancer.
12 BY MR. CALVOSA:
13   Q.   Respectfully, that's not answering
14 my question.
15     My question is limited to Claim 1.
16 We have just agreed that only multiple myeloma
17 is in Claim 1.
18   A.   Yes.
19     MR. ALUL:  Hang on a second, please,
20   hang on.
21 BY MR. CALVOSA:
22   Q.   So limited to Claim 1 only, the only
23 patient identified as being in need of
24 treatment is a patient having multiple myeloma?
25     MR. ALUL:  Objection as to form,

**Page 127**

1    outside of the scope of the declaration,
2    mischaracterizes the claim, calls for a
3    legal conclusion.
4      THE WITNESS:  As I sit here, in
5    Claim 1, I read multiple myeloma.  I don't
6    have an opinion beyond that.
7  BY MR. CALVOSA:
8    Q.   Do you have an opinion about whether
9  the amounts identified for pomalidomide, 1
10 milligram to 5 milligrams, are a
11 therapeutically effective amount of
12 pomalidomide?
13     MR. ALUL:  Objection as to form
14   outside of the scope of the declaration.
15     THE WITNESS:  As I've testified,
16   I've used 3 and 4 milligrams of
17   pomalidomide.  Been happy with the results
18   sometimes.
19 BY MR. CALVOSA:
20   Q.   And that would fall within about 1
21 milligram to about 5 milligrams, right?
22     MR. ALUL:  Objection as to form.
23     THE WITNESS:  It would, sir.
24 BY MR. CALVOSA:
25   Q.   So, for example, within the context

**Page 128**

1  of Claim 1, 3 milligrams is an effective amount
2  of pomalidomide, right?
3      MR. ALUL:  Objection.  Hang on,
4    please.  Objection as to form, outside of
5    the scope of the declaration, calls for a
6    legal conclusion.
7      THE WITNESS:  I have successfully
8    treated patients with 3 milligrams of
9    pomalidomide.
10 BY MR. CALVOSA:
11   Q.   Okay.  And within the context of
12 Claim 1, 4 milligrams would be a
13 therapeutically effective amount of
14 pomalidomide, right?
15     MR. ALUL:  Objection as to form,
16   outside the scope of the declaration,
17   mischaracterizes Claim 1 and calls for a
18   legal conclusion.
19     THE WITNESS:  I have successfully
20   used 4 milligrams in my practice.
21 BY MR. CALVOSA:
22   Q.   In paragraph -- sorry.
23     Back to Macfarlane 1, the
24 declaration.
25     MR. ALUL:  Which paragraph?

US District Court - New Jersey                      FINAL - August 23, 2019
Celgene v. Hetero Labs                               Donald Macfarlane, MD

Page 129

1       MR. CALVOSA:  Paragraph 19.
2       THE WITNESS:  Yes, sir.
3  BY MR. CALVOSA:
4       Q.   When you say that you were asked to
5  assess, based on the Pomalyst package insert or
6  the prescribing information, whether
7  pomalidomide is always effective in treating
8  multiple myeloma, what did you mean or what did
9  you understand was your assignment?
10      A.   I think it was to address the yes/no
11 question:  Is pomalidomide always effective in
12 treating multiple myeloma?
13      Q.   And how did you determine that?
14      A.   No, pomalidomide is not always
15 effective in treating multiple myeloma.
16      Q.   How -- how did you determine that
17 it's not always?
18      A.   Well, if we can refer to the package
19 insert, I believe there's a Table 7, which
20 lists the efficacy, and three-quarters of the
21 patients did not respond to pomalidomide,
22 according to the criteria they used.  One
23 quarter of the patients responded; three
24 quarters did not.
25      Q.   Okay.  So you determined whether

Page 130

1  pomalidomide treats multiple myeloma by looking
2  at the response rates in the Pomalyst package
3  insert?
4       MR. ALUL:  Objection as to form.
5       THE WITNESS:  I was specifically
6  asked to address that question, and I think
7  I've answered it.
8  BY MR. CALVOSA:
9       Q.   And the answer was that it does in a
10 certain percent of patients but does not in a
11 certain other percent of patients, right?
12      MR. ALUL:  Objection as to form.
13      THE WITNESS:  Yes, sir.
14      MR. CALVOSA:  You want to take a
15 break and see where we are at and give you
16 an idea?
17      MR. ALUL:  That's fine.
18      THE VIDEOGRAPHER:  We are going off
19 the record at 12:35 p.m.
20      (Recess taken.)
21      THE VIDEOGRAPHER:  We are back on
22 the record at 12:50 p.m.
23      (Macfarlane 9 marked for
24      identification.)
25 BY MR. CALVOSA:

Page 131

1       Q.   The court reporter has handed you
2  what I've marked Macfarlane 9.
3       MR. ALUL:  9 or 10?
4       MR. CALVOSA:  9.
5       MR. ALUL:  Okay.  Okay.
6  BY MR. CALVOSA:
7       Q.   Do you recognize Macfarlane 9?
8       A.   Yes, sir, I do.
9       Q.   And what is it?
10      A.   It's the March 2018 package insert
11 for the drug Pomalyst.
12      Q.   And this was attached as Exhibit C
13 to your declaration in this case, right?
14      A.   Yes, sir.
15      Q.   And correct me if I'm wrong, but all
16 I see about Macfarlane 9 in your declaration is
17 paragraphs 27 and 28 talking about Section 14.1
18 of the Pomalyst label.
19      A.   You're referring to my declaration?
20      Q.   Yes.
21      A.   Yes.
22      Q.   And specifically paragraphs 27 and
23 28 are the only times I see the Pomalyst label
24 Macfarlane 10 being cited?
25      A.   Yes, sir.

Page 132

1       Q.   So is it fair to say that all you're
2  relying on for your opinions in this
3  declaration is Section 14.1 of the Pomalyst
4  label?
5       A.   I'm relying on my extensive
6  experience in my professional life, sir.
7       Q.   Sure.
8       A.   Did I misunderstand the question?
9       Q.   I asked a poor question.
10      In terms of -- from the Pomalyst
11 label itself, the only section that you talk
12 about in your declaration is Section 14.1?
13      A.   Yes, sir.
14      Q.   Are any of your opinions in the
15 declaration based on any other sections of the
16 Pomalyst label?
17      A.   No, sir.  The general information in
18 the package label is something that I
19 know -- some of my opinions may be informed by
20 the information in the package label.
21      Q.   Any specific information that you
22 can point to today?
23      A.   Not specifically.
24      Q.   And you say your knowledge about
25 pomalidomide is informed by the package label.

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 133

```
1    Is that because the labeling provides
2    instructions on use of Pomalyst?
3        A.   Yes.  It's one of the sources of
4    knowledge that we have when we're preparing to
5    prescribe a drug.
6        Q.   Okay.  In paragraph 10 of your
7    declaration, the antimyeloma drugs you mention
8    there, the first one, lenalidomide, we talked
9    about.
10       A.   Yes.
11       Q.   The second one, daratumumab?
12       A.   Daratumumab.
13       Q.   Daratumumab, is that FDA-approved
14   for use in multiple myeloma?
15       A.   Yes, sir.
16       Q.   Okay.  And what's the trade name for
17   that?
18       A.   It might be Darzalex.  I rarely use
19   the trade name for it.
20       Q.   Okay.  Is that compound available in
21   generic form today, do you know?
22       A.   Not that I'm aware of.
23       Q.   Okay.  Why do you not use the trade
24   name?
25       A.   It's an interesting question about
```

Page 134

```
1    when physicians use trade names and when they
2    don't, but I don't have specific knowledge
3    about it.
4        Q.   Why is it an interesting question
5    when physicians use trade names and when they
6    don't?
7        A.   Well, if you're a philosopher, I
8    think -- or a linguist, I think it would be an
9    interesting study to do.
10       Q.   Okay.
11       A.   Not interesting with respect to this
12   patent dispute.
13       Q.   Do you generally not use trade names
14   in your practice?
15       A.   About half the time I do, and about
16   half the time I don't.
17       Q.   The next compound there, Selinexor?
18       A.   Yes, sir.
19       Q.   Is Selinexor FDA-approved for use in
20   multiple myeloma?
21       A.   Yes.
22       Q.   And is Selinexor the trade name or
23   the active ingredient name?
24       A.   That's the trade name.
25       Q.   Okay.  What's the active ingredient
```

Page 135

```
1    for Selinexor?
2        A.   I know I hate to reveal my ignorance
3    on camera.
4            MR. ALUL:  This is not a memory
5        test, so...
6            THE WITNESS:  This is not a memory
7        test.  I don't recall.  "Implicity,"
8        "Implicitor," something like that.
9    BY MR. CALVOSA:
10       Q.   Okay.  Do you know how many drugs
11   are FDA-approved for use in multiple myeloma
12   today?
13           MR. ALUL:  Objection as to form,
14       outside of the scope.
15           THE WITNESS:  The quick answer is
16       no.
17   BY MR. CALVOSA:
18       Q.   Okay.  Do you know if it's a lot or
19   a little?
20           MR. ALUL:  Same objections.
21           THE WITNESS:  The specific approvals
22       in the last five years or ten years has
23       been probably been about eight.
24   BY MR. CALVOSA:
25       Q.   Okay.
```

Page 136

```
1        A.   But the general approvals, that is,
2    drugs that could be used in multiple myeloma or
3    lots of other drugs, may be another ten.
4        Q.   In paragraphs 22 through 25 of your
5    declaration, you talk about the process of
6    trying to obtain FDA approval through Phase I,
7    II, and III studies.
8        A.   Yes, sir.
9        Q.   And I believe you yourself have been
10   involved in Phase I, II, and III studies,
11   right?
12       A.   Yes, sir.
13       Q.   Is that process what you would
14   characterize as quick?
15           MR. ALUL:  Objection as to form.
16           THE WITNESS:  It's a lot quicker
17       than it used to be.
18   BY MR. CALVOSA:
19       Q.   Okay.  How quick is it today?
20           MR. ALUL:  Same objection.
21           THE WITNESS:  There's an accelerated
22       approval process, and I think if the expert
23       committee is really excited about a drug,
24       the FDA now moves very effectively.
25   BY MR. CALVOSA:
```

US District Court - New Jersey                          FINAL - August 23, 2019
Celgene v. Hetero Labs                                    Donald Macfarlane, MD

---

Page 137

1        Q.   And when you say "now," what time
2    period are you using as a cutoff?
3        A.   The last two or three years.
4        Q.   Okay.  Before that, how long did the
5    process take?
6            MR. ALUL:  Objection as to form,
7    outside of the scope.
8            THE WITNESS:  I really don't know,
9    so.  The initial interaction of a drug
10   company with the FDA through final approval
11   is a long time.
12   BY MR. CALVOSA:
13       Q.   Could be like a decade?
14           MR. ALUL:  Objection to form,
15   outside of the scope, calls for
16   speculation.
17           THE WITNESS:  I doubt it, but it's
18   of that time frame.
19   BY MR. CALVOSA:
20       Q.   Okay.  Is running Phase I, II, and
21   III studies a costly process?
22           MR. ALUL:  Objection as to form,
23   outside of the scope, calls for
24   speculation.
25           THE WITNESS:  Yes, sir.

---

Page 138

1    BY MR. CALVOSA:
2        Q.   There's a lot of thought that goes
3    into the design of a clinical study, right?
4            MR. ALUL:  Objection as to form,
5    outside of the scope of the declaration,
6    calls for speculation.
7            THE WITNESS:  Yes, sir.
8    BY MR. CALVOSA:
9        Q.   There's no such things as a routine
10   clinical study.  Would you agree with that?
11           MR. ALUL:  Same -- objection as to
12   form, outside of the scope, calls for
13   speculation.
14           THE WITNESS:  No, sir.
15   BY MR. CALVOSA:
16       Q.   You wouldn't agree with that?
17       A.   No, sir.
18       Q.   You think they are all routine
19   clinical studies?
20           MR. ALUL:  Same objections.
21           THE WITNESS:  The question was
22   whether there are routine studies?
23   BY MR. CALVOSA:
24       Q.   Routine clinical studies.
25       A.   Yes, sir, there are routine clinical

---

Page 139

1    studies.
2        Q.   And what type of clinical study
3    would be a routine clinical study?
4        A.   Trying to find a new use for an
5    established drug, trying to settle an
6    unresolved question about the safety and
7    efficacy of a drug that's been approved
8    already.
9        Q.   Okay.  So routine studies apply to
10   already approved drug products?
11           MR. ALUL:  Objection as to form,
12   outside the scope of the declaration,
13   mischaracterizes the witness's testimony.
14           THE WITNESS:  I don't have an
15   opinion about the term "routine," sir.
16   BY MR. CALVOSA:
17       Q.   Okay.  In the Pomalyst label?
18       A.   Yes, sir.
19           MR. CALVOSA:  And that's
20   Macfarlane 10.
21   BY MR. CALVOSA:
22       Q.   There's -- there's Bates numbers on
23   the bottom of the pages.  Are you familiar with
24   those?
25       A.   Yes, sir.

---

Page 140

1        Q.   Okay.  I'm looking at the one that
2    ends in 1927, the very beginning of the package
3    insert.
4        A.   Yes, sir.
5        Q.   And specifically the dosage and
6    administration section.
7        A.   Yes, sir.
8        Q.   It says:  For pomalidomide, for
9    multiple myeloma, 4 milligrams per day taken
10   orally on days 1 through 21 of repeated 28-day
11   cycles?
12       A.   Yes, sir.
13       Q.   Are you aware of any other multiple
14   myeloma drugs today that are dosed days 1
15   through 21 of repeated 28-day cycles?
16           MR. ALUL:  Objection as to form,
17   outside the scope of the declaration.
18           THE WITNESS:  Yes, sir.
19   BY MR. CALVOSA:
20       Q.   What other drugs?
21       A.   Revlimid.
22       Q.   Are you aware of any other drugs
23   today that are dosed days 1 through 21 at
24   repeated 28-day cycles other than Pomalyst and
25   Revlimid?

---

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

| | |
|---|---|
| Page 141 | Page 143 |

**Page 141**

1    MR. ALUL:  Objections to form,
2  outside the scope of the declaration.
3    THE WITNESS:  I'm not aware of a
4  drug, no, sir.
5  BY MR. CALVOSA:
6    Q.  Okay.  And, just generally, are you
7  aware of any drug for multiple myeloma, other
8  than Pomalyst or Revlimid, being dosed days
9  1 through 21 of repeated 28-day cycles?
10    MR. ALUL:  Objection to form,
11  outside the scope of the declaration,
12  calls for speculation.
13    THE WITNESS:  None comes to mind
14  immediately.
15    MR. CALVOSA:  Barring any questions
16  from counsel, I have nothing further.
17    MR. ALUL:  No questions from Apotex.
18  The witness reserves the right to review,
19  read and sign the transcript.
20    Anything from joint defense
21  counsel?
22    MR. KONG:  No questions for Mylan.
23    MR. BATEMAN:  Nothing from
24  Breckenridge.
25    MR. ALUL:  I have nothing.

**Page 142**

1    Hearing nothing further, nothing
2  else from joint defense counsel, this
3  deposition is closed.
4    Dr. Macfarlane, thank you for your
5  time today.
6    MR. CALVOSA:  Yes.  Thank you very
7  much, Doctor.
8    THE WITNESS:  My pleasure.  Thank
9  you very much.
10    THE VIDEOGRAPHER:  Going off the
11  record at 1:06 p.m. with the end of the
12  deposition of Donald Macfarlane.
13    (Ending time noted 1:06 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

**Page 143**

1    R E P O R T E R   C E R T I F I C A T E
2
3  STATE OF ILLINOIS
4  COUNTY OF COOK
5
6    I, Cynthia J. Conforti, a Certified
7  Realtime Reporter and Notary Public within
8  and for the State of Illinois, do hereby certify:
9    That DONALD E. MACFARLANE, M.D., the
10  witness whose deposition is hereinbefore set
11  forth, was duly previously sworn by me and that
12  such deposition is a true record of the testimony
13  given by the witness.
14    I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18
19    IN WITNESS WHEREOF, I have hereunto set
20  my hand this ___ day of _____, 2019.
21
22
23    _____
24
25

**Page 144**

1    INSTRUCTIONS FOR ERRATA
2
3  NOTARY PUBLIC SIGNATURE
4  Not required unless agreed upon by counsel that
5  notary public signature is required.
6
7  Please return a copy of the signed errata within
8  30 days of receipt, unless otherwise agreed upon
9  by counsel.  Once we receive the signed errata, we
10  will distribute an electronic copy to all parties.
11
12  RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
13    FAX:    1-800-825-9055
14    EMAIL:  janerose@janerosereporting.com
15
16    Jane Rose Reporting
17    Administrative Offices
18    309 South Main Street
19    PO Box 542
20    Luck, Wisconsin  54853
21
22
23
24
25

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

---

Page 145

1      NOTICE TO READ AND SIGN
2
3    This transcript was electronically distributed to
4    TAFT STETTINIUS & HOLLISTER LLP to forward to
5    witness.
6
7         ACKNOWLEDGEMENT OF DEPONENT
8
9
10      I, DONALD E. MACFARLANE, MD, do hereby
11   certify that I have read the foregoing pages and
12   that the same is a correct transcription of the
13   answers given by me to the questions therein
14   propounded, except for the corrections or changes
15   in form or substance, if any, noted in the
16   attached Errata Sheet.
17
18   _____  _____
19   Date          DONALD E. MACFARLANE, MD
20
21   Signed and subscribed to before me this
22   _____ day of _____, 2019.
23
24   _____
25      Notary Public

---

Page 146

1   PAGE LINE    CHANGE    REASON
2   _____/_____/_____/_____
3   _____/_____/_____/_____
4   _____/_____/_____/_____
5   _____/_____/_____/_____
6   _____/_____/_____/_____
7   _____/_____/_____/_____
8   _____/_____/_____/_____
9   _____/_____/_____/_____
10  _____/_____/_____/_____
11  _____/_____/_____/_____
12  _____/_____/_____/_____
13  _____/_____/_____/_____
14  _____/_____/_____/_____
15  _____/_____/_____/_____
16  _____/_____/_____/_____
17  _____/_____/_____/_____
18  _____/_____/_____/_____
19  _____/_____/_____/_____
20  _____/_____/_____/_____
21  _____/_____/_____/_____
22  _____/_____/_____/_____
23  _____/_____/_____/_____
24  _____/_____/_____/_____
25  _____/_____/_____/_____

---

Page 147

1        I N D E X   E X H I B I T S
2
3   EXHIBIT      DESCRIPTION              PAGE
4   Macfarlane 1  07-02-19 Declaration of Donald    1
5           E. Macfarlane, No Bates
6
7   Macfarlane 2  06-01-19 Document titled Exhibit  1
8           A, Curriculum Vitae of Donald E.
9           Macfarlane, No Bates
10
11  Macfarlane 3  Article "Antagonism of         83
12           Immunostimulatory CpG-
13           Oligodeoxynucleotides of
14           Quinacrine, Chloroquine,
15           and Structurally Related
16           Compounds", No Bates
17
18  Macfarlane 4  Exhibit B, Donald Macfarlane    98
19           Fee Sheet, No Bates
20
21  Macfarlane 5  07-12-12 US Patent 8,198,262 B2  99
22           No Bates
23
24  Macfarlane 6  03-18-14 US Patent 8,673,939 B2  99
25           No Bates

---

Page 148

1        I N D E X   E X H I B I T S
2
3   EXHIBIT      DESCRIPTION              PAGE
4   Macfarlane 7  05-27-14 US Patent 8,735,428 B2  99
5           No Bates
6
7   Macfarlane 8  04-24-01 US Patent 6,221,882 B1  107
8           No Bates
9
10  Macfarlane 9  Exhibit C, Highlights of        130
11           Prescribing Information,
12           Pomalyst, No Bates
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Case 2:17-cv-03387-ES-MAH   Document 457-1   Filed 09/11/19   Page 42 of 57 PageID: 16135

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 149

**A**
abbreviated 17:6,9
abilities 11:18 13:11
able 11:19 41:19
abnormalities 23:16
  24:10
absorbed 111:12
abstracts 56:17
academic 11:23
accelerated 136:21
acceptable 74:21
  110:21
account 101:16
  102:17
accounts 23:15
ACKNOWLEDGEM...
  145:8
Actimid 113:6,6,12,14
  113:18 114:15
action 82:2 86:1
  143:15
active 24:15 25:3 29:6
  29:9,12,18 35:24
  36:19 134:23,25
activity 58:10 61:14,18
  85:2 86:21
actual 14:2
actuality 106:23
added 10:21,24
address 8:18,21 12:7
  12:10,13,14,18
  112:10,14 129:10
  130:6
addressed 72:16
addresses 112:9
adjusted 29:15
administering 122:25
administration 77:15
  140:6
Administrative 144:17
adult 35:25
advantaged 41:8
advantageous 25:19
advantages 25:18
  26:18,19,20 27:4
advisement 10:16
afield 106:5
agent 79:21 80:4
agree 31:6 138:10,16
agreed 125:25 126:16
  144:4,8
ahead 15:21 16:7
  18:25 21:12 24:8
  25:16 48:3 104:4
aid 22:25
al 1:7 6:9
ALT 11:4

alters 59:14
ALT-801 11:7,9
Alul 2:20 7:2,2 8:1
  10:15 12:25 15:19
  16:6,19 17:23 18:24
  20:7 21:11 23:7,13
  25:15,23 26:12,22
  27:6 31:9,17,24
  33:13 34:3,14,20
  35:2,10 37:17 38:1
  38:11,19 39:16 40:2
  40:10,14,22 41:4,14
  41:23 42:11,19 43:5
  43:14,20,25 44:10
  44:21 45:12 47:6,15
  48:2,14,25 50:7,13
  50:22 51:3,18,24
  52:5,11,17 54:14,20
  54:24 55:4,8 58:6,8
  58:15 59:2,9 60:14
  60:21 61:8,22 62:5
  62:22 63:5,25 64:7
  65:9,18 66:8,15,23
  67:2 72:4 74:13
  76:18 78:6,12,21
  79:14,22 80:5 81:3
  81:17 82:11,22
  83:10 84:21 86:23
  87:23 88:5 89:2 90:5
  90:10 91:25 92:14
  92:22 93:2,16,22
  94:6,11 95:3,13,23
  96:4,15 97:1,21
  100:17 101:18
  103:13,17,22 104:12
  104:23 105:5,14,17
  106:2,12 107:1,9
  108:6,19,24 109:23
  110:18 111:9 112:6
  112:21 113:20 114:5
  115:1,18 116:6,14
  117:5,20 118:3,12
  118:19 119:4,16
  120:10,22 121:12,16
  122:1,9,18 123:10
  123:18 124:2,15
  125:1,11,18 126:6
  126:19,25 127:13,22
  128:3,15,25 130:4
  130:12,17 131:3,5
  135:4,13,20 136:15
  136:20 137:6,14,22
  138:4,11,20 139:11
  140:16 141:1,10,17
  141:25
amend 18:9
amount 48:19 127:11

128:1,13
amounted 27:23
amounts 91:16 123:3
  127:9
amplified 87:10
analysis 47:9 75:23
  101:15 126:9
Andrew 2:20 7:2
animal 66:13,25
animals 65:17
announced 7:11
answer 18:9 30:16
  66:20 80:8 102:6
  104:1,3 109:1
  113:24 130:9 135:15
answered 41:24 130:7
answering 126:13
answers 145:13
Antagonism 84:3
  147:11
antibodies 13:14,19
antibody 11:10,13,16
  11:19 13:10,12 14:2
antimyeloma 133:7
antirheumatic 46:9,10
  46:12
anti-myeloma 37:5,8
anybody 8:1
anyway 38:24
apologies 80:23
Apotex 2:18 7:4,5 19:4
  19:7 141:17
appear 125:21
appearances 7:10
appeared 102:3
appears 55:24 126:1
application 17:7,10,12
  109:18 122:4
applications 64:22
apply 58:25 59:6,7
  91:11 139:9
appropriate 36:17
approval 73:1 76:21
  136:6,22 137:10
approvals 135:21
  136:1
approved 22:23 64:21
  64:22 76:17 77:14
  139:7,10
approximately 27:25
  28:5,23 33:21
April 107:19
area 49:19 57:8
Areas 56:23
arm 76:12
arthritis 46:23 85:3,11
  107:8 108:4,17,22

109:6,10,15
article 60:11 147:11
aside 89:18 104:9
  109:20
asked 12:6 73:3 74:1
  74:2,11 75:2,5 76:24
  77:2 102:5 119:7
  129:4 130:6 132:9
asking 12:13 24:2
  32:18 43:18 44:1,5
  47:2 96:13 112:12
  119:12 124:11
asks 62:6
aspects 68:14 72:8
assess 37:20 41:2,13
  96:2 129:5
assessing 37:24 38:6
  39:12 42:6 96:13
assessment 41:7,25
  47:3,4,11,21 75:25
assignment 129:9
assist 15:23 50:4
assistant 89:23
Associated 107:21
assume 74:2,11 101:7
attach 81:14
attached 9:22 81:8
  98:5 131:12 145:16
attacks 87:18
attempt 37:11
attempting 18:17
attending 7:20 27:16
attorney 97:22
attorneys 2:1,18 3:1
  3:10,19 4:1 73:19
attributes 11:20
August 1:15 6:10
Aurobindo 3:2 7:14
author 89:6
authored 84:9
available 17:4 133:20
Avenue 2:5 3:6,23
  4:12
avoid 52:10,15
aware 9:23 16:20
  18:13,16 19:6,13,19
  20:9,13,16 21:3
  23:14 24:15 26:25
  27:4 33:11 36:21
  38:5,7,18 39:10,13
  81:4 133:22 140:13
  140:22 141:3,7
A-L-T 11:5
a.m 6:3,11 13:2,5
  55:10,13 83:12,15

**B**

B 65:4,8 98:6,12 147:1
  147:18 148:1
bachelor 49:10
bachelor's 49:9
back 13:4 47:1 55:12
  62:3,10 63:13 69:4
  70:1 83:14 89:17
  91:14 109:21 110:6
  114:18 128:23
  130:21
back-and-forth 80:25
bad 23:6,9
Barely 110:21
Barring 141:15
based 18:3,6 47:25
  48:5 60:10 77:4 79:3
  82:19 129:5 132:15
basically 17:3 122:16
basis 24:9 82:17,20
  95:9
Bateman 3:12 7:15,16
  141:23
Bates 139:22 147:5,9
  147:16,19,22,25
  148:5,8,12
bear 105:4
bears 105:1 114:12
becoming 19:7,19
began 90:20
beginning 49:6 56:10
  56:16 111:21 140:2
begins 6:6
behalf 6:23 7:4,5,24
  97:9,15,17
believe 39:1 67:9
  91:18 102:9 113:22
  129:19 136:9
bench 90:12
beneath 53:1
beneficial 120:8
benefit 48:8
best 110:19
better 75:16,18,21
  76:14 94:16,22 95:2
  95:12,21
beyond 11:17 13:11
  39:21 127:6
bifunctional 11:10
binding 13:23
biological 14:4
bit 11:17 13:11 14:5
  23:21 32:2 39:4
  42:13 57:18 106:4
bleeding 50:18
blocking 51:14
blood 27:17 36:1 46:4
  49:22 50:4,4 51:15

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

51:16 57:8 92:7
96:20 143:16
**bloody** 46:5
**board** 48:23 53:1,23
**board-certified** 53:4,7
53:11,18 54:17
**bodies** 39:19
**body** 51:11 58:4,11
**bold** 52:24
**bone** 87:15,21 96:21
**book** 56:9
**Boone** 3:14 7:17
**born** 23:16
**bottom** 75:20 87:3
139:23
**bowel** 87:8
**Box** 144:19
**break** 55:7,16 83:9
103:18 130:15
**BRECKENRIDGE**
3:10
**Breckenridge** 7:17
19:12 141:24
**Brief** 13:3
**British** 49:8
**broad** 93:11
**broader** 109:9
**broadly** 105:6
**Broyles** 7:13
**business** 8:21 12:7,9
12:13
**butcher** 59:25
**B-A-T-E-M-A-N** 7:16
**B1** 148:7
**B2** 147:21,24 148:4

**C**

**C** 2:2 3:20 63:19,21,23
81:8 84:23 131:12
143:1,1 148:10
**California** 4:7
**called** 16:4,17 18:14
62:15 121:3
**calling** 123:20
**calls** 25:24 26:23
35:11 43:4 44:12,22
47:16 50:8 51:19
94:12 107:3,10
108:20 115:2,3,20
116:7,16 117:7
118:6,21 119:6,18
124:4,18 125:3,20
126:8 127:2 128:5
128:17 137:15,23
138:6,12 141:12
**Calvosa** 1:17 2:2 5:8
6:21,21 8:12 9:1

10:12,17 12:24 13:8
16:2,9,22 18:2 19:2
20:12 21:15 23:11
23:18 25:20 26:9,17
27:3,11 31:13,20
32:8 33:16 34:6,17
34:21 35:6,15 37:22
38:4,13,25 39:23
40:5,12,17 41:1,10
41:18 42:2,16,22
43:8,17,23 44:3,17
45:6,16 47:10,22
48:4,9,22 49:3 50:11
50:19 51:1,9,21 52:2
52:8,13,21 54:17,21
55:1,6,14 58:9,17
59:5,16 60:17 61:2
61:12 62:2,9 63:2,8
64:3,10 65:13,21
66:12,24 67:4 72:10
74:22 76:22 78:10
78:15,24 79:16,25
80:9 81:5,24 82:18
83:2,8,18 85:5 87:2
88:1,8 89:5 90:8,13
92:3,18,24 93:12,19
94:3,9,18 95:5,17
96:1,8,22 97:4 98:2
98:10 99:13,20
101:3,22 103:15,20
104:5,17 105:2,10
105:15,22 106:7,20
107:5,15 108:12
109:3,25 110:24
111:15 112:11 113:9
113:23 114:9 115:6
116:2,10,20 117:11
117:24 118:9,16,23
119:11,22 120:12
121:1,14,17 122:5
122:15,22 123:14,23
124:10,21 125:6,14
125:24 126:12,21
127:7,19,24 128:10
128:21 129:1,3
130:8,14,25 131:4,6
135:9,17,24 136:18
136:25 137:12,19
138:1,8,15,23
139:16,19,21 140:19
141:5,15 142:6
**camera** 135:3
**cancer** 27:18 35:25
36:1 63:4,10,24 64:5
121:9,25 122:8
126:11
**cancers** 121:8,9

122:14 124:7
**candidates** 46:18
**care** 36:6,13 47:24
71:8 90:2 93:14
**careful** 26:2
**caring** 36:9
**case** 14:23 15:1,4,5
19:4,14,20 28:11
48:6,8 70:23,24
72:16,19,21 73:5
82:17,21 97:24 98:1
98:25,25 99:4
131:13
**cases** 14:15,19,21
97:5,15 98:22 99:1
**categories** 77:21,24
**cause** 26:4
**caused** 23:15 51:22
52:4
**causes** 106:16
**causing** 43:11
**caution** 74:14 82:12
**Celgene** 1:4 6:8,23
17:17,21,24 20:3,4,6
20:14,17 21:1,4
113:1,1 114:7,16
**Celgene's** 113:18
**cell** 57:9,14,15,15,16
57:16,21,23,24,24
57:25 58:2,23,25
59:7,12 60:7,12,19
60:20,24 61:4,7,19
62:18 63:1,21 64:11
64:15,16 65:4,8,14
66:4,7 67:1 86:11
**cells** 37:14 57:13 59:1
59:7,15,22 60:2,6
62:25 66:2 86:9
**certain** 56:7 60:18
70:15 72:12 79:18
86:21 121:7 130:10
130:11
**Certainly** 90:25
**Certificate** 5:12
**certification** 52:23
**certifications** 53:23
**Certified** 143:6
**certify** 143:8,14
145:11
**chain** 13:20,21 60:24
**chains** 13:16,17,18
**CHANGE** 146:1
**changed** 10:18
**changes** 145:14
**chapters** 56:9
**characteristics** 32:5
**characterize** 136:14

**charging** 98:24
**chemical** 14:1 74:2,3
74:6,20
**chemotherapy** 121:11
**Chicago** 1:16 2:14,23
6:2,13 7:1,3
**Chloroquine** 84:5
147:14
**circumstance** 59:14
**cited** 64:23 131:24
**City** 8:20 12:20
**claim** 16:11 105:12
109:5 117:13 118:22
119:13,20,23 123:21
123:24 124:11,24
125:9,12,21 126:1,2
126:15,17,22 127:2
127:5 128:1,12,17
**claimed** 108:16
**claims** 16:4,16 17:5
100:13,15 101:5
108:3,22 115:8
116:11,18,19 119:2
119:14,21 123:7,13
123:15 124:20
125:23
**clear** 25:3 90:22
**clearer** 48:18
**clinic** 29:15,16 71:4
**clinical** 10:22,23 27:1
35:21 36:10,13,14
36:23 39:20,25 40:6
67:21,24 70:24 71:1
71:15,25 75:7,14
77:4,13,20 93:9 96:3
96:12 100:23 101:11
101:16 102:17,19,23
102:24 103:3,9
104:9,14,20 105:1,4
106:18 109:13
110:10,13 119:9
138:3,10,19,24,25
139:2,3
**clinically** 119:8
**Clinics** 12:16
**closed** 37:3 142:3
**closely** 108:8
**clot** 51:16
**coagulation** 50:4
**code** 11:4
**column** 86:1 87:4,5
100:14,16 111:19
113:2,3 116:12
117:12,14,16,17
120:14 121:2,15
**columns** 16:16
**combination** 13:21

80:3
**combine** 79:20
**come** 62:3 65:8,17
66:7,10,13 67:1
**comes** 16:16 67:3
141:13
**commenting** 71:16
**committee** 136:23
**communications**
18:18,22 74:16 81:1
81:20 82:13 100:20
**companies** 17:19,22
**company** 17:17 19:6
19:16 69:13,23
137:10
**comparison** 101:20
101:24
**complaint** 18:10 82:2
82:5,9,20 83:4
**complex** 13:15 28:6
41:9,25 42:3 45:3
**complicated** 47:3 76:3
**complication** 87:15
**compositions** 108:9
**compound** 11:9 60:18
61:13,18 112:19
114:17,21 115:14
118:1,10,17 119:3
119:13,15 120:1
123:4 133:20 134:17
**compounds** 84:6 85:1
109:15 113:4 115:10
115:17 116:25
147:16
**comprise** 122:25
**computer** 29:5
**concentrated** 101:1
**concern** 11:1 56:4,11
56:13,17,20 68:1,4
68:12,20,23
**concerned** 11:2
**concerning** 9:9 69:17
105:9 106:6
**concerns** 57:2,4
**conclusion** 108:20
115:4 116:8,16
118:7,21 119:6,18
123:20 124:4,18
125:3,20 126:8
127:3 128:6,18
**condition** 52:9,14 92:9
**conditions** 105:24
**conduct** 71:15
**conducted** 90:19
**confer** 94:10
**confers** 13:23 94:7
**confidential** 74:15

Case 2:17-cv-03387-ES-MAH   Document 457-1   Filed 09/11/19   Page 44 of 57 PageID: 16137

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 151

81:19 100:19
**Conforti** 4:15 6:16
  143:6
**confused** 12:5 17:1
  39:4 75:24
**Confusing** 117:22
**confusion** 109:11
**connection** 80:14
**consider** 70:21 72:17
  72:22,25 103:1,8
  104:8,18 112:2
**consistent** 13:18
**consisting** 13:16
**Consolidated** 1:10
**consultation** 28:6
**consulting** 69:23
**contacts** 27:24
**contain** 16:24
**contained** 73:5,21
**containing** 84:23
**contains** 16:25 17:2
  120:18,19
**content** 81:23 83:6
  117:10
**contents** 5:1 74:15
  81:19 82:13 100:19
**context** 20:6 22:20
  33:18 36:10,17 96:7
  105:23 122:3,6
  126:2 127:25 128:11
**continue** 36:5 43:1,13
  43:18 44:9,14 45:1
  45:11 47:12,25
**continued** 29:10
**continuing** 67:8
**control** 37:11,12
**conventional** 121:10
**conversation** 104:2
**COOK** 143:4
**cooperative** 38:24
**copy** 1:24 9:21 10:3,5
  10:7,19 144:7,10,12
**Corp** 7:5
**Corporation** 1:4 6:8
  6:24 17:18 20:3,4,6
**correct** 10:20 38:10
  52:16 53:18 55:22
  69:3 73:9,22 80:7
  85:13 120:24 131:15
  145:12
**corrected** 102:2
**corrections** 91:15
  145:14
**correctly** 102:12
**costly** 137:21
**counsel** 6:18 7:7,8
  10:7,12 12:22 74:16

81:18,21 82:15
  100:18,21 141:16,21
  142:2 144:4,9
**counter** 23:2
**countries** 113:13
**counts** 92:7 96:20
**COUNTY** 143:4
**couple** 48:17 104:2
**course** 44:4
**court** 1:1 4:15 6:15 8:5
  8:6 98:11 99:15
  107:16 131:1
**co-PI** 67:18
**co-principal** 67:19
**CpG** 147:12
**CPG-ODN** 86:3
**CpG-Oligodeoxynu...**
  84:4
**created** 57:13
**creating** 70:9
**creation** 69:17
**criteria** 37:24 38:5
  39:11,18,25 40:1,8,8
  40:16 129:22
**cross** 92:6
**Cs** 64:4
**current** 10:3,5,13 57:1
  98:18
**currently** 35:24 36:14
**curriculum** 9:21 53:15
  147:8
**cutoff** 137:2
**CV** 9:25 10:4,7,9,14,18
  11:23 49:4 53:10,17
  53:22 54:2 55:20
  56:3,4,10 65:22 67:6
  90:16
**cycles** 140:11,15,24
  141:9
**Cynthia** 4:15 6:16
  143:6
**cytogenes** 86:22
**cytokines** 87:7 88:12
  88:18,21
**C.A** 1:10

---

**D**

**D** 147:1 148:1
**daratumumab** 11:3
  133:11,12,13
**Darzalex** 133:18
**data** 75:7,14 77:4
  100:23 101:11,16
  102:18,19,23 103:3
  103:10 104:9,14,20
  105:1,4,9,20,25
  106:9,18,24 107:6

109:13 110:10,13,14
  110:19,20,21 111:4
  111:7 119:9
**date** 6:10 107:18,19
  145:19
**dated** 10:1
**day** 2:12 7:1 119:25
  140:9 143:20 145:22
**days** 140:10,14,23
  141:8 144:8
**day-to-day** 93:13
**dealing** 96:7
**decade** 137:13
**decades** 27:22
**decided** 54:5
**deciding** 47:24
**decision** 32:7 45:1
**decision-making**
  36:16
**declaration** 9:8,14,23
  17:15 26:24 27:13
  35:12 44:11 45:18
  70:13 72:3,14,15
  73:6,9 76:19 81:16
  82:4,9 89:18 94:13
  97:2 98:6,12 105:18
  106:3,13 107:2,10
  109:23 112:7,22
  115:3,19 116:7,15
  117:6 118:6,20
  119:5,17 122:2,11
  122:19 123:11,19
  124:3,18 125:2,19
  126:7 127:1,14
  128:5,16,24 131:13
  131:16,19 132:3,12
  132:15 133:7 136:5
  138:5 139:12 140:17
  141:2,11 147:4
**deep** 26:6
**defective** 51:8
**defendant** 7:17,21
  82:23
**defendants** 1:8 2:18
  3:2 4:1 7:4,25 17:25
  19:3,11 74:17
**defense** 7:7 81:20
  82:14,14 97:11,15
  100:20 141:20 142:2
**define** 30:5 78:8 79:8
  79:19 80:2,21 92:16
**defined** 79:5,18 111:2
  113:1
**defining** 30:8
**definition** 30:17 93:5
  94:17
**degree** 49:9,10,11,14

59:14
**degrees** 49:9
**demonstrates** 75:15
**demonstrating** 76:12
**Department** 12:2
**depends** 45:3 48:15
**DEPONENT** 145:8
**deposed** 14:6,12,22
**deposition** 1:13 6:7,12
  142:3,12 143:10,12
**depositions** 14:18
**derive** 60:8
**derived** 65:15 105:8
**described** 113:5
  115:11
**describes** 111:11
**DESCRIPTION** 147:3
  148:3
**design** 138:3
**designate** 114:17
**designated** 111:6
**designed** 79:5
**details** 76:21
**determinative** 117:9
**determine** 40:19 76:2
  96:24 102:11,13
  119:8 129:13,16
**determined** 81:22
  129:25
**developed** 46:17
**development** 88:16
  106:15,16
**diagnosed** 29:13,21
**difference** 102:1
**different** 8:22 12:6,7
  26:10 30:15 35:16
  37:23 53:21 60:12
  60:20 75:20
**differentiate** 57:17
  59:12
**differentiation** 57:10
  58:2,25 59:7,11,15
**disables** 45:10
**disabling** 42:25 43:12
  44:8,20
**disadvantaged** 44:15
**disadvantages** 25:18
  25:22 26:20 45:5
**discloses** 75:6
**discontinue** 45:2
**discuss** 79:1
**discussion** 13:6 77:13
  78:20 79:3
**disease** 21:9,10,13,20
  22:4 29:11 36:7
  37:21 87:9,10,14,20
  125:15

**diseases** 27:17 36:1
  39:18 46:25
**disposal** 15:10,12
**dispute** 15:9 134:12
**distribute** 144:10
**distributed** 145:3
**DISTRICT** 1:1,2
**divided** 77:20
**divides** 57:23
**division** 57:13 63:1
**DNA** 107:21
**doctor** 40:18 47:5,11
  49:17 52:10,15
  53:11 97:10,12
  142:7
**doctor's** 47:13,19,20
  47:23
**document** 9:18 83:22
  114:13 147:7
**documentation** 36:16
**documents** 9:2
**doing** 64:11 90:11
  101:6 103:17
**Donald** 1:14 5:4 6:7
  8:8,17 142:12 143:9
  145:10,19 147:4,8
  147:18
**donor's** 87:18
**dosage** 91:16 140:5
**dose** 79:9,17,19 80:2
  92:2,10
**dosed** 140:14,23
  141:8
**dosing** 73:10
**doubt** 137:17
**Dr** 41:12 55:15 66:17
  69:19 83:19 103:25
  108:25 121:19 142:4
**drafting** 15:24 73:16
**Drive** 2:22 6:13 12:20
**drug** 11:3,6 17:7,9,12
  17:14 18:1 19:25
  25:17,19 26:4,19
  27:8 30:20 33:6,10
  40:20 41:8,12,21
  42:7,10 43:2,9,13,19
  44:6,9,16 45:2,9,11
  46:8,17 47:12,25
  48:12,24 60:18
  61:13,18 72:18,22
  73:10 75:15,18 76:2
  76:13,15 77:8,15
  78:3,14 79:18,20
  80:3 88:16 96:24
  106:14,16 107:7
  111:12 112:15,24
  131:11 133:5 136:23

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 152

137:9 139:5,7,10
141:4,7
**drugs** 10:25 27:5
35:18 37:5,10 40:18
42:23 44:14 46:9,13
49:25 51:23 52:4
77:14,19 78:17 87:6
88:11 93:25 115:22
116:1 133:7 135:10
136:2,3 140:14,20
140:22
**duly** 8:9 143:11
**D.C** 3:16

**E**

**E** 1:14 8:8 143:1,1,1
143:9 145:10,19
147:1,1,5,8 148:1,1
**earlier** 12:6 22:13,14
25:9 36:24 54:9 73:4
76:1 77:8 80:24 82:1
86:12 105:24 108:16
109:9 113:25 120:3
120:16
**early** 63:11 64:6
106:14
**East** 2:22 6:12
**Eastern** 38:21
**easy** 76:5
**ECOG** 38:17 39:1,8
**editors** 64:21
**education** 49:7
**educational** 49:11
71:7,18,20
**effect** 54:13,18,22
55:2 60:19,20
**effective** 77:6,9 92:12
92:17 93:1,14,25
94:5 96:9,12 123:3
127:11 128:1,13
129:7,11,15
**effectively** 136:24
**effects** 26:2,8,11,16
43:11 44:7,19 45:9
48:1 54:10
**efficacious** 40:21
41:22 61:20 76:2
**efficacy** 14:2 47:25
75:7,13 76:9 100:24
102:15,20,24 103:3
103:10 104:10,20
105:1,4,7,12,20,25
106:18,19 107:7
109:14 110:11,15
112:3 119:9 129:20
139:7
**effort** 73:17

**efforts** 72:7 101:2
**eight** 70:4 135:23
**either** 16:16 94:15,21
95:1,11,20
**elaborated** 13:14
62:25
**elaborates** 57:21
**electronic** 144:10
**electronically** 145:3
**elements** 71:6,7,8,8,9
71:14,19,20
**Ellis** 3:22 7:20
**else's** 87:17
**EMAIL** 144:12,14
**Emanuel** 1:18 2:4 6:22
6:25
**Embedded** 113:5
**encompasses** 121:6
**ends** 140:2
**enforceability** 15:25
**enforcing** 15:7
**engrafting** 87:16
**entire** 103:6,7 104:6
104:14
**entirety** 100:2,10
**enzyme** 63:22
**epitope** 14:3
**equivalence** 49:11
**equivalent** 28:10
**era** 78:14
**Eric** 2:3 6:24
**errata** 144:1,7,9
145:16
**errors** 73:8 102:2
**erythematosus** 46:25
85:4
**ES** 1:10
**Esquire** 1:17 2:2,3,11
2:20 3:3,12,20 4:2
**essentially** 102:3
**establish** 76:9 105:25
106:19 107:6
**established** 102:24
103:3,10 104:10,20
139:5
**establishes** 105:20
109:14
**establishing** 75:7,13
100:23 102:15,20
110:11,15 119:9
**Ester** 60:1
**et** 1:7 6:9
**Eugia** 3:1 7:14
**evaluating** 84:22
**evaluation** 72:7
**evidence** 112:3
**evolves** 57:25

**Examination** 5:7 8:11
**examined** 8:9
**example** 23:4 32:19
32:20 39:24 53:5
88:13 96:11 112:3
112:19 122:12
127:25
**examples** 16:17
**excited** 136:23
**excites** 106:15
**excreted** 111:13
**Exhibit** 9:22 81:8 98:6
98:12 131:12 147:3
147:7,18 148:3,10
**Exhibits** 5:16 8:24
**expand** 106:17
**experience** 28:18
29:20,24 30:3,19
34:11,23 35:21
94:19 132:6
**experiences** 94:24
**experiments** 60:8 91:2
**expert** 70:18,22 72:18
72:22 73:1 136:22
**expertise** 72:2,13
**explain** 57:18 103:23
**explanation** 98:3
**explore** 17:14
**exposed** 26:4 27:8
**expressing** 106:22
**extensive** 132:5
**extent** 52:19
**E-C-O-G** 38:17

**F**

**F** 143:1
**fact** 45:4
**factors** 42:4 47:19
48:7,7 75:22
**facts** 17:4
**faculty** 71:10
**failed** 27:9
**failure** 92:9
**fair** 24:11 25:10 47:14
51:16 58:10,23
67:22 70:19 77:25
79:4 93:15 101:17
122:17 132:1
**fall** 127:20
**familiar** 15:16 85:18
139:23
**far** 106:4
**FAX** 144:12,13
**FDA** 17:14 73:1 76:16
82:25 93:6 136:6,24
137:10
**FDA-approved** 133:13

134:19 135:11
**fee** 98:5,15,18,21 99:5
147:19
**feel** 64:14,16,18 85:23
110:1
**feet** 88:15
**fellows** 71:11,16,23
**field** 70:21
**Fifth** 4:12
**file** 18:14 29:5 80:19
80:22
**filed** 82:2 109:17
113:17,22
**files** 17:13
**filing** 107:19 113:7
137:10
**final** 1:24 90:25
137:10
**find** 79:9 139:4
**fine** 122:21 130:17
**finer** 71:24
**finish** 103:15,20
**firm** 1:18 7:13
**first** 9:3 20:8 22:7,17
24:12,18,24 25:6
46:3 48:16 55:23
75:1 99:4 121:21
133:8
**Fisher** 7:13
**FISHERBROYLES** 3:5
**five** 10:24 28:22 29:2,3
29:19,23 30:2,18,23
31:3 32:11,16,23
33:19,23 46:7
135:22
**Floor** 2:5 3:6
**fluids** 46:5
**focus** 55:16
**focused** 49:20,21
55:25
**followed** 84:23
**follows** 8:10
**Food** 77:15
**foregoing** 145:11
**foreign** 113:13
**forgot** 80:23
**form** 15:19,20 16:6,19
17:23 18:24 20:7
21:11 23:7 25:15,23
26:13,22 31:9,24
33:13 34:3,14 35:2
35:10 37:17 38:1,11
38:19 39:16 40:2,22
41:4,14 42:11 43:3
44:10,21 46:6 47:6
47:15 48:14,25 50:7
50:22 51:18,24 52:5
52:17 54:14 58:6,15

59:2 60:14,21 61:8
61:22 62:22 63:5,25
65:9,18 66:8 72:4
74:13 76:18 78:6,21
79:14,22 81:3,17
82:11,22 84:21
86:23 87:23 88:5
89:2 90:5 91:25
92:14,22 93:2,16,22
94:11 95:3,13,23
96:4,15 97:1,21
100:17 101:18
104:12,23 105:5,14
105:17 106:2,12
107:1,9 108:6,19,24
110:18 111:9 112:6
112:21 113:20 114:5
115:1,18 116:6,14
117:5 118:3,5,19
119:4,16 120:10,22
122:1,9,18 123:10
123:18 124:2,15,17
125:1,18 126:6,11
126:25 127:13,22
128:4,15 130:4,12
133:21 135:13
136:15 137:16,14,22
138:4,12 139:11
140:16 141:1,10
145:15
**formally** 111:2
**formula** 120:1
**formulation** 72:18,23
**forth** 143:11
**forward** 145:4
**found** 85:1 92:11
101:25
**foundation** 23:8 35:3
37:18 38:12 79:23
86:24
**four** 14:10,13 46:3,8
85:15 108:2,15
**frame** 137:18
**Francisco** 4:7
**Frank** 1:17 2:2 6:21
**free** 85:23 110:1
**full-time** 90:11
**function** 51:8 63:1
96:19
**functional** 11:20
**functionality** 13:24
**further** 49:13 141:16
142:1 143:14
**future** 122:14

**G**

**G** 84:24

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

**Gabriel** 4:16 6:14
**general** 52:12 80:6
  92:8 132:17 136:1
**generality** 87:25
**generalized** 126:11
**generally** 15:16 79:1
  106:25 134:13 141:6
**generate** 34:1,7
**generated** 33:7 53:24
  53:25 54:2 60:24
**generates** 33:11 57:24
**generic** 17:18,22
  19:24 58:19 72:6
  88:7 133:21
**generically** 46:24
  111:3
**Germany** 22:24 23:3
**give** 30:17 130:15
**given** 14:25 143:13
  145:13
**gives** 13:22 123:7
**giving** 40:20 44:6,9
  45:8 122:13
**global** 41:6
**go** 12:22 15:21 16:7
  18:25 21:12 24:8
  25:16 42:5 48:3 49:4
  62:10 67:5 68:7 70:1
  71:20 75:22 77:24
  85:21 89:17 91:14
  103:16,16 104:4
  114:18
**goes** 124:7 138:2
**going** 8:6 13:1 30:5
  47:1 55:9 59:12,24
  79:20 83:11 103:18
  103:24,25 104:24
  130:18 142:10
**good** 8:13,14 55:6
  83:8 94:16 98:3
**Goodrich** 4:4 7:24
**grade** 21:23
**graft** 87:10,14,20
**grant** 64:22 69:6
**grants** 67:9,13,21,23
  67:25 68:4
**great** 40:24
**group** 38:16,24 39:11
  40:8
**guess** 8:3 12:5 13:12
  20:5 60:5
**Gupreet** 3:3
**Gurpreet** 7:12
**guys** 103:14
**gynecology** 38:22
  39:2

**H**

**H** 147:1 148:1
**half** 134:15,16
**hand** 117:21 143:20
**handed** 9:2 83:19
  99:14 107:16 131:1
**handing** 98:11
**hang** 15:19 26:12
  66:16 90:6 103:13
  110:4 118:4,12
  124:16 126:19,20
  128:3
**happen** 44:5
**happy** 109:4 127:17
**hard** 13:25 76:6
**hate** 135:2
**Hawkins** 12:20
**Haynes** 3:14 7:16
**hazy** 78:13
**headings** 52:24
**head-to-head** 27:1
**hear** 20:6 22:20
**heard** 19:24 20:4,23
  22:18 24:18 25:6,10
  25:11 114:1,3
**Hearing** 142:1
**heavy** 13:16,21
**help** 59:25 61:15
  109:4 110:2
**helpful** 111:6
**hematology** 53:8
**hematology/oncology**
  71:12
**hereinbefore** 143:10
**hereto** 81:8
**hereunto** 143:19
**Hertko** 2:11 6:25
**Hetero** 1:7 6:9 8:2
**he'll** 62:5 103:16
**Hi** 7:15
**higher** 26:15 49:6
**Highlights** 148:10
**highly** 13:22
**histories** 80:19
**history** 18:14 80:22
**HL-promyelocytic**
  59:21 60:2
**HL-60** 60:3,6,12,19,20
  61:4,6,14,19
**Hollister** 2:21 7:3
  145:4
**home** 12:10
**hope** 106:23
**hopes** 88:16 106:17
**hospital** 29:6
**Hospitals** 12:15
**host** 87:10,14,20

**hours** 29:16
**human** 46:16 50:5
  65:14
**humans** 108:3,5,18
**hundreds** 61:11
**hybridoma** 66:2,7 67:1
**hypothetical** 42:14
  44:2

**I**

**idea** 122:4 130:16
**ideal** 76:10
**identical** 81:23 102:4
**identification** 8:25
  83:17 98:9 99:12,17
  99:19 107:14 130:24
**identified** 119:13
  124:12,23 126:3,23
  127:9
**ignorance** 135:2
**II** 110:21 111:1,4 136:7
  136:10 137:20
**III** 110:20 111:2,5
  136:7,10 137:21
**Illinois** 1:16 2:14,23
  6:2 143:3,8
**imagine** 42:14
**IMIDS** 115:10
**immediately** 141:14
**immune** 57:22 84:24
  87:17,18
**Immuno** 107:20
**immunoglobulin**
  57:22
**Immunology** 84:12
**immunomodulat**
  112:17
**immunomodulatory**
  112:19,24 114:21
  115:10,14,22 119:3
  119:15 123:3
**Immunostimulatory**
  84:4 147:12
**implanted** 87:18
**Implicitor** 135:8
**Implicity** 135:7
**important** 50:5
**improvements** 96:18
  96:18,19,20,20,21
  96:23
**include** 29:12 46:24
  47:4 72:6
**included** 91:3
**includes** 39:1 67:23
  71:6,6,7
**including** 74:17 121:8
**increase** 26:6

**increasing** 42:9
**indecisive** 42:1
**indentation** 111:22
**Index** 5:16
**individual** 17:13 32:5
  32:6
**induces** 60:1
**infants** 23:16
**infection** 87:11
**infections** 87:9 88:3,3
**Inferior** 110:20
**inflammatory** 87:8
  88:19
**influence** 50:1
**information** 29:6 76:8
  77:3 81:7,12,15
  103:2,9 104:8
  120:19 129:6 132:17
  132:20,21 148:11
**informed** 15:20 34:24
**infringement** 82:24,25
**infringer** 15:8
**ingredient** 24:16 25:4
  134:23,25
**inhibit** 87:6 88:11,21
**inhibited** 85:1
**inhibiting** 86:21 88:18
  107:20
**initial** 137:9
**injure** 88:18
**inpatient** 29:17
**inpatients** 27:17
**insert** 129:5,19 130:3
  131:10 140:3
**inside** 58:3,11
**instance** 94:2
**institutional** 53:13
**institutionally** 53:24
**instructions** 100:22
  133:2 144:1
**instructor** 89:23
**intact** 46:5
**intended** 12:14
**intention** 79:8
**interaction** 137:9
**interchangeably**
  112:25
**interest** 56:24 57:8
  106:15,16
**interested** 143:17
**interesting** 113:24
  133:25 134:4,9,11
**Interleukin** 11:11
**internal** 12:2 49:25
**international** 39:11
  40:7 64:21
**interruption** 13:3

**introduce** 6:19 7:8
**invention** 16:13 69:17
  70:8 112:20 114:22
  114:24 115:14,17,23
  115:24 116:4,13
  117:3 120:21 121:3
  121:6,15
**inventions** 45:21
**inventor** 18:19 45:23
  61:3 81:1 107:24
  120:20
**investigator** 36:11,19
  36:23 37:2 39:7
  67:16
**investor** 67:19
**invited** 68:8,11,19,23
  69:1
**involve** 75:19
**involved** 10:22 15:3,5
  18:22 19:7,13,19
  46:3,8 50:15,17
  68:14 90:2 136:10
**involving** 11:11 35:25
**Iowa** 8:20,20 12:3,12
  12:15,20,20 36:2,20
  53:14 54:2,5
**isolating** 46:4
**issuance** 45:21
**issue** 18:1 107:18
**issued** 15:22 109:18

**J**

**J** 2:11 4:15 143:6
**Jane** 1:25 4:11 6:16
  144:16
**janerose@janerose...**
  144:14
**JERSEY** 1:2
**John** 3:12 7:15
**joint** 7:7 73:17 74:17
  81:20 82:14,14
  100:20 141:20 142:2
**Jones** 2:12 7:1
**Journal** 84:11
**July** 9:14 107:19
**Jumping** 63:13
**June** 10:1
**justify** 17:4

**K**

**kept** 42:9
**kinase** 63:19,21,23
  64:4
**Kirkland** 3:22 7:20
**knew** 114:7
**know** 11:8,12,15
  12:18 16:25 17:6

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 154

22:14,17 23:23 24:2
24:4,9 38:14 47:2
53:19 54:8,12 63:9
64:4 74:6 76:16
89:14 90:22 109:8
118:1 120:17 121:18
122:7 124:22 132:19
133:21 135:2,10,18
137:8
**knowledge** 64:9 76:20
78:14 99:6 132:24
133:4 134:2
**known** 23:19 26:1
85:1
**Kong** 4:2 7:23,23
141:22

---

**L**

**lab** 60:24 89:13
**label** 131:18,23 132:4
132:11,16,18,20,25
139:17
**labeling** 133:1
**laboratory** 84:6
**Labs** 1:7 6:9
**lack** 23:8 35:3 37:18
38:12 79:23 86:24
**language** 44:25
102:12 115:21
**large** 36:12 48:19
76:11
**largely** 55:24
**larger** 71:5
**late** 22:19,24 24:14,21
**launch** 71:24
**law** 7:13 16:14 17:25
**lawsuit** 17:17
**Lead** 1:17
**lectures** 68:9,11,20,23
69:1
**led** 45:20,21
**left-hand** 87:4
**legal** 93:5 108:20
115:3 116:8,16
118:7,21 119:6,18
123:20 124:4,18
125:3,20 126:8
127:3 128:6,18
**lenalidomide** 24:16,19
25:11,14 54:23
114:2,3,8 133:8
**lengths** 13:17
**lethal** 50:16,18,21
**letter** 119:24
**let's** 35:17 49:4 64:24
66:21 74:23 100:4
114:18

**leukemia** 59:21 60:2,6
60:9 61:19,21
**lexamy** 69:10,15,19,22
70:10
**Lexington** 3:23
**license** 91:11
**licensed** 91:5 113:15
**life** 132:6
**lifesaving** 44:14 45:2
**light** 13:16,20
**limbal** 23:15 24:10
**limit** 37:13 116:12
**limited** 1:7 15:25
52:19 117:4 119:2
119:14 124:9 125:22
126:1,15,22
**line** 60:7,19,20 61:4
61:19 62:14,18
63:21 64:11,15 65:5
65:8,14 66:4,7 67:1
75:20 111:21 121:15
146:1
**lines** 60:12 61:7 86:12
**linguist** 134:8
**linked** 81:10
**list** 29:7 32:18 49:7
56:2,4,10 73:14
96:17 124:7
**listed** 36:11,18,22
37:1 57:9 59:20
62:11 67:25 68:3,6
68:20 69:2,6 91:16
97:6 107:24 115:24
**listing** 45:22
**lists** 100:11 115:25
129:20
**little** 11:17 12:5 14:5
22:12 57:18 79:7
135:19
**live** 8:19 75:21,21
94:15,16,21,21 95:1
95:1,11,11,20,20
**lives** 75:22
**LLP** 2:21 3:5,14,22
7:17 145:4
**long** 124:7 137:4,11
**longer** 29:14,17 37:1
75:21 94:15,21 95:1
95:11,20
**look** 9:17,25 11:22
29:10 35:17 59:18
74:23 82:10 100:4
101:5,10 102:22
108:13 109:5 111:16
111:19 115:7 117:12
123:15
**looked** 29:9 81:11

82:4 101:4 106:10
**looking** 58:21 104:13
108:7 110:9 130:1
140:1
**looks** 111:4
**Lori** 84:7 89:7
**lost** 125:4
**lot** 17:2 75:22 135:18
136:16 138:2
**lots** 136:3
**low** 21:23 92:7
**lower** 92:10
**Luck** 144:20
**Lupus** 46:25 85:4,12
**lymphocyte** 65:8
**lymphocytes** 65:4
**lymphoma** 21:23

---

**M**

**M** 2:20 37:16,20,24
38:6 41:3 42:6,8
96:19
**Macfarlane** 1:14 5:4
6:7 8:8,17,24 9:3,4,5
9:11,17,20 17:16
27:12 28:15 41:12
45:18 49:4 52:23
55:15,20 59:18
62:11 63:14 66:17
67:6 68:8 69:4 70:13
74:24 80:11 83:16
83:19,20,24 84:2
91:15 97:7 98:8,13
99:11,15,16,18,22
99:23 100:4 101:8
102:8 103:25 107:13
107:17,22,25 108:25
109:21 111:17
117:17,18 121:19
128:23 130:23 131:2
131:7,16,24 139:20
142:4,12 143:9
145:10,19 147:4,5,7
147:9,11,18,18,21
147:24 148:4,7,10
**Macfarlane's** 69:19
**Madison** 2:5
**MAH** 1:10
**MAIL** 144:12
**Main** 144:18
**maintained** 29:5
**majority** 32:24 92:2
**making** 114:14
**malignant** 37:14
**malpractice** 14:15,19
14:21 97:5,14 98:1
98:22,25 99:1

**management** 42:5
48:20 70:24 71:1,12
71:13,23 72:1 85:3
85:11 105:20 106:1
**managing** 29:10 72:8
**manufacturer** 19:25
**manuscripts** 64:20
**Manzel** 84:7 89:7
**March** 81:7 131:10
**Mark** 3:20 7:19
**marked** 8:25 9:3,4
83:16,20 98:8,12
99:11,16,18 107:13
107:17 130:23 131:2
**marker** 59:10
**Market** 4:5
**marketing** 18:1 20:9
20:14,17 21:4
**markets** 21:1
**marriage** 143:16
**marrow** 87:16,22
**Martin** 4:16 6:14
**material** 17:2
**materially** 42:25 43:12
44:8,19 45:10
**materials** 80:13
**Matt** 6:25
**matter** 6:8 9:9 19:8
46:2 48:24 85:14
108:9 143:17
**Matthew** 2:11
**maximum-tolerated**
79:17,19 80:2
**MB** 49:7
**McLennan** 3:20 7:19
7:19
**MD** 1:14 5:4 49:11,14
145:10,19
**mean** 15:12 24:6 29:1
30:6,11 35:14 37:7,9
46:12,24 49:24
51:13 57:19 58:18
60:11 61:20 67:15
75:12,17 80:21 88:9
88:25 92:17 93:1,21
94:4,10 99:22
104:25 111:10
113:10 121:24 129:8
**meaning** 24:7 104:16
**meanings** 93:11
**means** 28:4 29:8 30:9
51:10 58:19 78:9
105:7 122:7 124:9
**meant** 109:10
**measure** 59:11,13
**Measurements** 37:19
**Mechanism** 57:9

**Media** 6:6
**mediated** 84:25
**medical** 14:14,18,21
49:17 50:20 53:11
69:18 70:9 97:5 98:1
**Medicare** 28:3
**medication** 22:22
32:15
**medications** 30:24
32:9
**medicine** 12:2 49:10
91:6
**memory** 19:9 39:21
95:8 112:10 135:4,6
**mention** 65:2 82:8
98:5 123:21 125:13
133:7
**mentioned** 32:10
55:15 67:12 82:1
91:15 108:16 125:16
**mentions** 63:18 65:25
**metabolized** 111:12
**metastatic** 121:8
**method** 70:9
**methods** 107:20 121:6
122:25
**middle** 20:15,19 125:5
**mid-2000s** 22:11
114:4
**milligram** 95:10
119:25 127:10,21
**milligrams** 73:12,20
91:19,20,23 92:4,12
92:19 94:20,25 95:7
95:19 119:25 120:4
120:8 127:10,16,21
128:1,8,12,20 140:9
**mind** 141:13
**minimum** 99:2
**mischaracterizes**
120:23 127:2 128:17
139:13
**misunderstand** 132:8
**MM** 120:5
**mobility** 96:21
**modern** 71:13
**molecule** 13:24
**molecules** 13:15
**moment** 12:23 96:10
**monotherapy** 79:18
**months** 29:16 42:8
48:17
**morning** 8:13,14
**MOT** 75:6 80:17 81:2
99:9,21,23
**mothers** 23:17
**mouse** 67:3

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

move 64:24
moves 136:24
multicenter 76:12
multiple 21:14,22 22:6
  22:8 28:18,24 29:1,3
  29:7,11,13,21,25
  30:4,19,22,24 31:2,7
  31:15,22 32:11,16
  33:6 34:13 35:1,9
  37:11,12 39:17,18
  39:19 40:19 41:20
  42:4,24 43:10 47:5
  47:13 48:10,21 56:4
  56:11,18 57:2 68:1
  68:12,14,20 70:25
  71:2,3,13,17,21 72:1
  75:9 77:6,9 78:5
  92:13,20 94:1
  100:25 102:16,21,24
  103:5 104:11,22
  105:21 110:12,16
  111:25 112:5 123:9
  123:17,22,25 124:9
  124:13,24 125:9,13
  125:22 126:1,4,16
  126:24 127:5 129:8
  129:12,15 130:1
  133:14 134:20
  135:11 136:2 140:9
  140:13 141:7
multitude 26:7
murine 66:2,7,25
mutant 60:3 61:4
Myc 62:15,18,20 63:3
  63:9
myeloma 21:14,22
  22:6,8 28:18,24 29:1
  29:3,7,11,13,21,25
  30:4,19,23,24 31:3,7
  31:15,22 32:11,16
  33:6 34:13 35:1,9
  37:11,12 39:11 40:7
  40:19 41:20 42:24
  43:10 47:5,13 48:11
  48:21 56:4,11,18
  57:2 68:2,12,14,21
  70:25 71:2,3,13,17
  71:22 72:1 75:9 77:6
  77:9 78:5 92:13,20
  94:1 100:25 102:17
  102:21,25 103:5
  104:11,22 105:21
  110:13,17 111:25
  112:5 123:9,17,22
  124:1,9,13,25 125:9
  125:13,22 126:2,4
  126:16,24 127:5

129:8,12,15 130:1
133:14 134:20
135:11 136:2 140:9
140:14 141:7
Mylan 4:1 7:24 19:18
  19:23 141:22
M.D 8:8 143:9

**N**

N 147:1 148:1
name 6:14 8:15,17
  11:4,6 15:23 19:22
  21:25 69:23 74:2,3,7
  74:20 113:7,11,15
  113:18 133:16,19,24
  134:22,23,24
named 72:9
names 134:1,5,13
national/international
  39:19
nausea 23:1,5
need 31:4,7,16,22
  76:8 79:19 80:2
  85:24 92:16 123:1,8
  123:16,24 124:12,25
  125:10,16 126:3,23
needed 82:16 110:14
needs 31:19 32:6
neighbor 97:23
nervous 92:8
neutropenia 26:5
never 95:6 114:1,3
new 1:2 2:6,6 3:7,7,24
  3:24 4:13,13 6:17,22
  7:20 17:4,6,9,11,14
  28:6 108:9 139:4
newly 29:13,20
news 23:14
next-door 97:23
nine 15:22 45:22 70:1
Ninth 3:6
notary 143:7 144:3,5
  145:25
noted 142:13 145:15
Notice 5:14 145:1
novel 16:13
nuclear 62:25
number 10:21 11:4
  36:12 45:3 51:5
  62:11 74:20 75:19
  76:11 102:1
numbers 139:22
numberwise 32:25
NW 3:15

**O**

O 143:1

object 66:19,19,19
  104:3
objection 15:19,20
  16:6,19 17:23 18:24
  20:7 21:11 23:7
  25:15,23 26:13,22
  31:9,24 33:13 34:3
  34:14,20 35:2,10
  37:17 38:1,11,19
  39:16 40:2,22 41:4
  41:14 42:11 43:3
  44:10,21 47:6,15
  48:14,25 50:7,22
  51:18,24 52:5,17
  54:14 58:6,15 59:2
  60:14,21 61:8,22
  62:22 63:5,25 65:9
  65:18 66:8 72:4
  74:13 76:18 78:6,21
  79:14,22 81:3,17
  82:11,22 84:21
  86:23 87:23 88:5
  89:2 90:5,10 91:25
  92:14,22 93:2,16,22
  94:11 95:3,13,23
  96:4,15 97:1,21
  100:17 101:18
  103:13 104:12,23
  105:5,14,17 106:2
  106:12 107:1,9
  108:6,19,24 110:18
  111:9 112:6,21
  113:20 114:5 115:1
  115:18 116:6,14
  118:3,5,19 119:4,16
  120:10,22 122:1,9
  122:18 123:10,18
  124:2,15,16 125:1
  125:18 126:6,25
  127:13,22 128:3,4
  128:15 130:4,12
  135:13 136:15,20
  137:6,14,22 138:4
  138:11 139:11
  140:16 141:10
objections 23:13 27:6
  31:17 40:10,14
  41:23 42:19 43:14
  43:20,25 45:12 48:2
  50:13 51:3 52:11
  54:20,24 55:4 59:9
  64:7 66:15 67:2
  78:12 80:5 94:6
  117:5 118:12,14
  125:11 135:20
  138:20 141:1
Obstetrics 38:22

obtain 18:17 136:6
Obviously 101:13
occasionally 21:23
  71:16
occur 79:9 87:21
occurs 58:3
offering 70:15 73:5
office 6:23 18:18 81:2
Offices 144:17
Oh 53:20
okay 8:3 9:10,13,20
  10:6,11,23,25 11:9
  11:12,22 12:11
  14:17,25 15:3,7,16
  16:10,15,23 17:11
  17:15 18:7,11,16
  19:3,11,17 20:2,13
  20:16,19,22,25
  22:17 24:5 25:21
  28:13 30:13,22
  31:21 32:9,22 33:3
  33:10,25 34:7,10
  35:7 36:18,22 37:4
  37:23 39:1,6,24
  40:18 41:19 43:24
  44:18 45:7,17 46:7
  49:13,16,19 52:3
  53:16 54:1,9 56:6
  57:4 61:6,13 62:8
  63:13,23 66:22,23
  69:22 72:25 73:3,8
  74:9,11 76:23 77:12
  78:25 79:11 80:10
  80:16 81:6,14,25
  82:8 83:7 85:18 86:8
  86:19 87:3 88:9
  89:14 90:14,18 91:9
  92:11,25 93:13,20
  94:4,19,24 95:9,18
  100:1,6 101:23
  102:5,10,22 104:4
  109:13 114:12 116:3
  116:11 117:12
  119:23 120:7 121:16
  125:25 128:11
  129:25 131:5,5
  133:6,16,20,23
  134:10,25 135:10,18
  135:25 136:19 137:4
  137:20 139:9,17
  140:1 141:6
oligo 85:6
oligodeoxy 85:7,8
oligodeoxynucleoti...
  84:23 85:8,9 86:6,15
  86:20 147:13
Once 144:9

oncology 38:16,22
  53:5
ones 68:15
one's 109:5
opine 75:2 76:24 77:4
  93:5
opinion 23:22 24:1,3
  45:7 95:16,18 105:3
  105:11 106:6 111:7
  112:16,18 115:16
  116:3,18 119:1,21
  123:13 127:6,8
  139:15
opinions 47:20 70:15
  70:18 73:4 80:14
  124:19 125:23 132:2
  132:14,19
orally 140:10
order 57:14 105:4
organelles 50:3
originally 73:15
origins 114:14
outcome 88:25 96:14
  96:25 110:22 143:17
outcomes 96:2 120:8
outpatient 29:15
outpatients 27:16
  29:18
outside 23:8 25:24
  26:13,23 31:10,25
  33:14 34:4 35:11
  37:18 38:2,12,20
  40:3,23 41:5,15
  42:12 43:4 44:11,22
  47:7,16 49:1 50:8,23
  51:19,25 52:6,18
  54:15 58:8 59:3
  60:15,22 61:9,23
  62:23 63:6 64:1
  65:10,19 66:9 72:21
  76:19 78:7,22 79:23
  87:24 89:3 92:15
  93:3,23 94:12 95:4
  95:14,24 96:5,16
  97:2 105:18 106:3
  106:13 107:2,10
  112:7,22 115:2,19
  116:7,15 117:6
  118:5,20 119:5,17
  122:2,6,10,19
  123:11,19 124:3,17
  125:2,19 126:7
  127:1,14 128:4,16
  135:14 137:7,15,23
  138:5,12 139:12
  140:17 141:2,11
overactive 50:15

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

**overbroad** 79:7
**oversight** 73:17
**over-the-counter**
  22:23 23:2

**P**

**P** 143:1
**package** 129:5,18
  130:2 131:10 132:18
  132:20,25 140:2
**page** 5:8,12,14,16
  9:10,25 11:22 27:13
  28:15 45:18 49:6
  52:22 55:19 56:10
  56:16,17,23 57:9
  59:17 62:10 63:13
  65:22 67:5,8 68:7,8
  69:4 74:23 85:21
  87:4 120:13 146:1
  147:3 148:3
**pages** 68:1 100:12
  139:23 145:11
**pain** 96:21
**paper** 60:23 86:22
**papers** 110:2
**papilloma** 122:13
**paragraph** 27:13
  28:14 35:17,20
  45:17 73:11,23
  74:25 76:24 77:12
  78:25 79:4 80:10
  82:6 85:25 89:20
  91:14 97:6 98:4,4
  99:7,7,24 104:16
  110:6 112:8 128:22
  128:25 129:1 133:6
**paragraphs** 77:24
  124:8 131:17,22
  136:4
**parameters** 45:4
  75:20
**paraprotein** 37:16
  39:12
**parent** 57:14,15,16
**parentheses** 27:24
  69:10 119:24
**Park** 3:6
**part** 43:7 47:8,13,23
  73:18 90:18,23
  125:5
**particular** 59:14 60:25
  91:9
**particularly** 63:1 71:11
  84:25
**parties** 143:15 144:10
**patent** 14:23 15:1,4,5
  15:6,17 16:3,11,14

17:25 18:14,17,18
  78:3,9 81:2 82:24,25
  100:5,8 101:5,10,17
  103:2 104:7,19
  107:18 109:14,17
  110:4,15 111:16
  113:8,17,21 114:16
  115:8,12,16 116:4
  116:12,13,22 117:4
  117:9,10,19 120:14
  122:4,7 123:7 125:9
  134:12 147:21,24
  148:4,7
**patents** 15:8,11,23,24
  16:1 18:13 45:22
  46:2,3,19 70:2 75:6
  78:5 80:17,20 81:2
  85:15 99:9,21,24
  100:1 102:3,7 108:2
  108:8,10,16
**patient** 27:23 28:6,8
  28:11 31:6,15,18,21
  32:4,7 33:8,12 34:12
  34:16,18 36:13 41:7
  41:11,20,20 42:5,8,9
  42:24 43:1,12 44:6,8
  44:15,20 45:5 47:5
  47:24 48:1,11,20
  52:10,15 60:8 65:7
  66:6,11 71:8 72:9
  87:17,19 89:1 92:2
  92:9 93:13 94:8 96:2
  96:14 97:10,18,23
  105:8,9,13 111:14
  123:1,24,25 124:12
  124:13,23,24 125:8
  125:10,16 126:3,4
  126:23,24
**patients** 27:7,9 28:18
  28:24 29:2,3,6,8,9
  29:12,13,14,20,24
  30:3,19,23 31:2
  32:10,11,22 33:4,21
  34:2,8,19,25 35:5,7
  35:25 37:10 40:19
  43:11 45:10 46:16
  61:21 70:24 71:2,4
  72:1 75:8,16,18,21
  76:11,13,14 87:21
  88:18 92:13,21
  94:15,21 95:1,11,20
  100:25 102:16 103:4
  104:11,21 110:12,23
  112:4 120:5,9 123:8
  123:9,16,17 128:8
  129:21,23 130:10,11
**patient's** 34:12,25

47:20
**pen** 53:25
**Pennsylvania** 91:6,12
**people** 64:23 122:14
**percent** 130:10,11
**performance** 50:1
**performed** 91:3
**period** 137:2
**permission** 17:14
**personal** 27:5 34:10
  34:23
**PET** 60:3 61:3
**Pharma** 3:1 7:14
**pharmaceutical** 3:11
  7:18 17:18,22 19:12
  69:13
**Pharmaceuticals** 3:19
  7:21 19:18,23
**pharmacokinetics**
  111:11
**pharmacology** 49:22
  49:24 57:7
**phase** 76:11 79:1,4,12
  110:20,21,23 111:1
  111:1,2,4 136:6,10
  137:20
**Philadelphia** 89:24
  97:24
**philosopher** 134:7
**phone** 7:21
**phonetic** 114:2
**Phorbol** 60:1
**physician** 27:16 29:11
  71:10
**physicians** 28:4 92:2
  134:1,5
**physiology** 50:6
**Ph.D** 49:14,17,20
  55:16 64:12,15
  90:15,18,23 91:3
**PI** 67:12,15 69:9
**pictured** 117:25
  118:17
**PK** 111:7,10
**place** 6:12
**plaintiff** 1:5 2:1 6:23
  20:2
**plasma** 37:14 57:21
  57:25
**platelet** 51:8
**platelets** 49:22 50:1,2
  50:3,21 51:5,11
  55:17,25 57:8
**please** 6:18 7:8,9 8:15
  61:25 109:22 118:4
  118:13,13 124:16
  126:19 128:4 144:7

**pleasure** 142:8
**PO** 144:19
**point** 93:7 132:22
**points** 71:22
**pomalidomide** 20:11
  20:23 21:1,4,25 25:4
  25:7,11,14,22 26:11
  26:21 27:10 33:18
  33:22,25 34:7,11,24
  54:10,13,18 56:7,14
  56:21 57:5 68:5,24
  74:4,7 75:8 76:9,17
  77:5 78:4,20 91:9
  91:20,24 92:5,12,19
  94:20,25 95:7,19
  100:24 102:15,20
  103:4,11 104:10,21
  110:11,16 112:4,10
  112:20 113:8,18
  114:1,17,25 117:2,4
  118:11,15 119:3,10
  119:15 120:2,4
  127:9,12,17 128:2,9
  128:14 129:7,11,14
  129:21 130:1 132:25
  140:8
**Pomalyst** 21:25 22:2,5
  24:25 25:4 35:5,8
  73:10 77:3 81:8,11
  81:15 129:5 130:2
  131:11,18,23 132:3
  132:10,16 133:2
  139:17 140:24 141:8
  148:12
**poor** 132:9
**portfolio** 15:6 46:9
**portions** 100:8
**positions** 11:23
**positive** 88:25
**possessed** 15:6
**potential** 15:8 63:4,10
  63:24 64:5 82:25
**practice** 47:14 91:6
  96:3 128:20 134:14
**practices** 71:24
**predefined** 93:10
**pregnancy** 23:1,5
**pregnant** 23:17 26:3
**preparing** 133:4
**prescribe** 43:13,19
  133:5
**prescribed** 21:6,18,21
  22:2,5,8 24:13,25
  25:13 30:24 32:10
  33:18,22 34:11,24
  37:10 48:12,24
  73:12,13 91:19,23

92:4 95:6 120:4,9
**prescribing** 23:4 27:5
  40:18 41:21 42:7,24
  43:10 77:3 81:7,12
  81:15 129:6 148:11
**prescription** 43:2
  51:23 52:4
**presents** 32:4
**pretty** 94:16
**prevent** 121:24 122:8
  122:14
**preventing** 121:7
**prevention** 123:2
**previously** 77:19 78:4
  78:17 143:11
**primarily** 23:2
**primary** 121:8
**principal** 67:15
**private** 71:24
**probably** 22:12 24:23
  25:1,8 32:24 33:24
  38:7 64:2 93:4 113:4
  135:23
**proceed** 8:4
**process** 73:1 76:21
  88:19 136:5,13,22
  137:5,21
**production** 10:13
**products** 139:10
**professional** 11:23
  49:9 132:6
**professor** 12:1 89:23
**program** 88:16 90:19
  106:17
**programs** 71:17
**progression** 37:13,21
**Projects** 57:1
**promulgated** 39:18
**promyelocytic** 60:6,9
  61:14,16,17,19,21
**prophylactically** 123:2
**proportions** 13:17
**propounded** 145:14
**protected** 16:13
**protein** 13:15 37:20,24
  38:6 41:3 42:6,8
  62:16,18,20,24 63:3
  63:9,18,21,23 64:4
**provided** 10:7 112:3
**provides** 133:1
**ptosis** 60:1
**public** 143:7 144:3,5
  145:25
**publication** 59:20
  62:11 63:16 64:24
  65:23 83:25 84:2,8
  84:17 85:19 89:7

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

106:11,22
**publications** 55:24
56:2,3,6 58:22
**published** 84:11 106:8
**purpose** 79:11
**purposes** 45:14 72:19
**put** 53:10,17,22 54:6
89:18 109:20
**p.m** 130:19,22 142:11
142:13

**Q**

**qualified** 64:14,16,19
**quarter** 129:23
**quarters** 129:24
**question** 31:12 33:17
41:25 43:7 44:2
45:14 52:22 62:1,6,7
66:18 74:24 75:1
76:23 80:8 103:21
104:1 114:6,18
125:5 126:14,15
129:11 130:6 132:8
132:9 133:25 134:4
138:21 139:6
**questions** 47:2 72:16
102:5 109:1 141:15
141:17,22 145:13
**question's** 32:2
**quick** 135:15 136:14
136:19
**quicker** 136:16
**Quinacrine** 84:5
147:14
**Quinn** 1:18 2:4 6:22
6:25
**quite** 38:23 44:25

**R**

**R** 143:1,1,1,1
**randomized** 76:13,14
**range** 93:11
**rarely** 133:18
**rate** 26:6,16 99:2
**rates** 130:2
**read** 5:14 18:10 85:23
100:1,9,9,11,13,15
101:13,13 103:6,7
104:6,14 115:9
116:17,21 127:5
141:19 145:1,11
**reader** 75:15
**reading** 114:13 125:12
**realize** 106:8
**really** 17:1 18:15 23:6
45:13 106:5 116:18
119:19 136:23 137:8

**Realtime** 143:7
**reason** 10:6 91:10
101:1 146:1
**recall** 18:5 19:15 20:1
22:9,16 24:20 38:8
38:23 39:22 40:16
41:16 42:21 43:15
56:5,8 63:12 65:11
82:7 83:5 84:16 88:6
91:2 101:6 135:7
**receipt** 144:8
**receive** 76:13,15
144:9
**received** 33:8 67:10
87:21 90:14,15
**receives** 33:12
**Recess** 55:11 83:13
130:20
**recipient** 87:19
**recognize** 9:5,18 14:3
83:22 84:1 107:22
131:7
**record** 6:6,18 8:16
12:23 13:2,5,7 55:10
55:13 69:18 83:12
83:15 114:10 130:19
130:22 142:11
143:12
**records** 70:9
**refer** 37:15 46:22
69:12 86:5 98:16
99:24 100:5 129:18
**reference** 37:5 82:5
100:11
**referenced** 36:24
39:25 40:7
**references** 39:20
**referred** 58:11
**referring** 116:24 117:1
131:19
**refers** 60:23 67:19
74:3,7 75:14 115:10
**reflect** 114:10
**reflects** 114:11
**refractory** 30:4,6,9,10
30:11,20 111:24
121:9
**regarding** 81:2
**region** 13:20,23
**regions** 13:22
**register** 39:4
**regression** 37:21
**regulates** 62:25
**reimbursement** 28:4
**relapsed** 29:24 31:22
111:24
**related** 46:25 84:6

143:15 147:15
**relationship** 14:1
89:11 106:9
**relative** 28:5
**release** 86:21 87:7
88:12,21
**relevance** 70:23
**relevant** 72:2,13 78:20
**relying** 132:2,5
**remain** 57:16
**remember** 43:21
89:10
**remittive** 86:1
**renal** 92:9 96:19
**rendering** 36:13
**repeat** 19:21 31:12
43:7
**repeated** 140:10,15,24
141:9
**rephrase** 32:13 34:22
**reporter** 4:15 5:12
6:15 8:6 12:22 98:11
99:15 107:16 131:1
143:7
**Reporting** 1:25 4:11
6:16 144:16
**reprehensible** 97:25
**represent** 6:20
**representing** 7:14
**request** 10:13
**required** 76:17 144:4
144:5
**requirements** 53:13
**requires** 47:3 53:16
**research** 45:20 49:20
56:23 71:7,14,16
72:7 84:16,20 89:23
90:12
**reserves** 141:18
**resistant** 60:25 121:10
**resonate** 44:25
**respect** 84:25 134:11
**Respectfully** 126:13
**respiratory** 87:9 88:2
**respond** 27:9 129:21
**responded** 129:23
**response** 33:4,7,11
34:1,8 111:14 130:2
**Responses** 107:21
**responsibility** 36:15
**responsible** 71:11
**restate** 61:25
**restrain** 17:25
**resulting** 87:6 88:11
**results** 110:22 127:17
**return** 28:8 144:7,12
**reveal** 27:2 74:15

81:19 82:13 100:19
135:2
**review** 77:2 80:19,25
82:20 141:18
**reviewed** 80:14,16
81:6 82:1 102:10
**Revlimid** 11:2 20:10
20:17 21:18,21
24:13,16 26:10,15
26:21 27:8 32:21,23
33:4 36:23 39:6
54:10 112:9 113:6
140:21,25 141:8
**rheumatism** 46:14,15
46:22
**rheumatoid** 46:23
85:3,11 107:7 108:4
108:17,21 109:6,10
109:15
**rheumatosis** 109:9
**right** 9:15 20:21 23:6
23:20 28:19,20 31:4
31:8,16 33:19 34:13
35:1,21 37:25 38:9
40:1,21 41:22 52:10
53:5,8 54:3 55:25
56:7,11,14,18,21
57:2,5 58:14 60:13
67:10,19 68:2,5,12
68:24 69:2,24 70:16
71:4 75:24 77:10
80:17 82:6 84:9,14
85:12,19 86:12
90:16 91:7,21 95:12
95:21 96:25 102:18
105:16 106:10,25
107:8,25 108:5,18
109:12 115:8 117:22
120:5,9,21 121:5,14
123:9 124:1,14
125:17 126:5 127:21
128:2,14 130:11
131:13 136:11 138:3
141:18
**right-hand** 87:5
**rise** 13:22
**risk** 48:8
**risk-benefit** 47:4
**RNA** 46:4
**Rosati** 4:4 7:24
**Rose** 1:25 4:11 6:16
144:16
**routine** 47:14 138:9,18
138:22,24,25 139:3
139:9,15
**rules** 83:1
**running** 137:20

**RVU** 28:2,9,10
**RVUs** 27:25 28:7

**S**

**S** 147:1 148:1
**safety** 79:5 139:6
**sake** 103:23
**sale** 15:13,14
**San** 4:7
**saying** 34:18 42:21
53:21 88:20
**says** 27:25 28:21
41:11 45:19 59:24
67:18 69:9 73:25
77:1,18 88:23 90:20
111:22 114:21
115:13 119:24 121:5
122:24 140:8
**scale** 48:16
**scenario** 42:15 43:16
**schedule** 98:15,18,21
**scope** 23:8 25:24
26:13,23 31:10,25
33:14 34:4 35:11
37:18 38:2,12,20
40:3,23 41:5,15
42:12 43:4 44:11,23
47:7,16 49:1 50:9,23
51:19,25 52:6,18
54:15 58:8 59:3
60:15,22 61:9,23
62:23 63:6 64:1
65:10,19 66:9 76:19
78:7,22 79:23 84:19
87:24 89:3 92:15
93:3,23 94:12 95:4
95:14,24 96:5,16
97:2 105:18 106:3
106:13 107:2,10
112:7,22 115:2,19
116:7,15 117:6
118:6,20 119:5,17
122:2,10,19 123:11
123:19 124:3,17
125:2,19 126:7
127:1,14 128:5,16
135:14 137:7,15,23
138:5,12 139:12
140:17 141:2,11
**second** 9:4 15:20
26:12 62:14 66:16
76:23 80:4 85:25
90:6 103:14 104:3
118:4,13 124:16
126:19 133:11
**section** 86:1 121:3
131:17 132:3,11,12

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

140:6
sections 132:15
sedative 22:24
see 12:17 27:19 28:6,8
  29:14 30:16 32:7
  36:3 45:24 72:11
  75:11 76:10 82:5
  87:12 89:25 90:20
  102:23 108:21
  110:14 121:2,21
  122:23 123:5 125:8
  130:15 131:16,23
seeing 71:3 108:23
seek 100:23
seeking 101:12
  102:19
seen 31:3 110:5 120:7
Selinexor 1:3 134:17
  134:19,22 135:1
sensible 57:15
sent 73:21
sentence 37:4 77:17
  85:24 121:21 122:23
sepsis 105:25 106:1
  106:10
septic 87:8 88:13,22
  88:24,25
set 32:5 143:10,19
setting 96:12
settle 139:5
severe 43:11 44:7,19
sheet 98:5 99:5
  145:16 147:19
shift 110:1
Shire 69:10,12,13
shock 87:8 88:13,22
  88:24 89:1
shortage 51:5
Shortly 20:18,19
show 106:18
shows 61:13,18
side 26:1,8,11,16
  43:11 44:7,18 45:9
  47:25 54:10,13,18
  54:22 55:2 110:2
side-effect 47:1
sign 5:14 141:19
  145:1
signature 9:11 144:3,5
signed 9:8,13 144:7,9
  144:12 145:21
similar 26:15
simple 28:8 46:5
simultaneously 28:23
Singh 3:3 7:12
single 32:18,20
sir 9:16,19,24 10:2

11:8,14,25 14:16
  16:5 18:6,15,20 19:1
  19:5,10 21:2,17
  24:20 25:12 27:14
  27:20 28:1,12,16
  30:1,21 31:1,5 33:5
  33:9,15,20 34:5,9,16
  35:14,19,22 36:4,8
  36:25 37:6 38:3 40:4
  40:16 43:16,22
  44:25 45:25 46:11
  46:18,21 47:9 49:5
  49:18 50:10,25
  51:12,17,20 52:1,7
  52:25 53:3,6,9,19
  54:4,8,11,16,19,25
  55:5,21 56:1,12,15
  56:19,22,25 57:3,6
  57:11 58:7,12,16,24
  59:4,19,23 60:4,16
  61:5,24 62:13,17,19
  63:15,17,22 64:2,13
  65:1,6,12,20,24 66:1
  66:3,5,11,14 67:7,11
  67:14,20 68:10,22
  68:25 69:5,8,11,14
  69:21,25 70:3,6,12
  70:14,17,20 72:24
  73:2,7,24 74:5,8,10
  74:19 75:3,10 76:7
  76:25 77:7,16,22
  78:1,14,18,23 79:2
  79:15,24 80:12,15
  80:18 81:9,13 82:3,7
  83:6,21,23 84:10,13
  84:18 85:17,20,22
  86:2,4,7,10,18 87:13
  89:4,8,16,19,21 90:1
  90:4,7,17 91:8,12,17
  91:22 92:23 94:23
  95:8,16,22,25 96:7
  97:3,8,13,16,19 98:7
  98:14,17,20,23 99:6
  99:8,10,25 100:3,7
  101:6,9,19 104:14
  106:6 107:4,12,23
  108:1 109:16,19,24
  110:8 111:18,20,23
  112:1 114:20,23
  115:5,9 116:23,25
  117:23 118:8,25
  119:20 120:6,11,15
  121:4,20,23 123:6
  123:13 124:5 127:23
  129:2 130:13 131:8
  131:14,25 132:6,13
  132:17 133:15

134:18 136:8,12
  137:25 138:7,14,17
  138:25 139:15,18,25
  140:4,7,12,18 141:4
sit 127:4
Sitting 124:22 125:7
situation 43:22
six 10:24
sleep 22:25
slide 93:24
slightly 26:15 92:10
sloppily 93:9
slow 66:21
small 50:3
sold 22:23 23:1
somebody 87:17
somewhat 26:14
  111:3
Sonsini 4:4 7:23
sorry 19:21 24:8 31:11
  32:13 38:23 43:6
  48:3,4 54:1 61:14
  74:24 106:21 108:4
  109:8 112:12,17
  117:14,15 121:12
  125:4 128:22
sort 111:3,4
Sounds 120:24
sources 133:3
South 8:19 144:18
Southwestern 38:16
so-called 13:19
Spear 4:5
specific 13:23 19:9,15
  19:25 22:9 24:6 30:9
  40:16 42:21 49:19
  63:12 64:8 72:15
  88:7 109:5 132:21
  134:2 135:21
specifically 22:16,25
  24:20 39:22 41:17
  57:3,19 65:12 72:8
  80:8 112:14,25
  115:13 117:1 130:5
  131:22 132:23 140:5
specification 16:18,24
  75:6 101:2 102:6,11
  102:14 103:6,8
  104:7,15 110:10
  115:25 116:5 119:10
  120:18,19 124:6,8
  126:10,10
specifications 101:20
  102:4
specificity 40:25
specified 30:14
speculation 25:25

26:23 35:11 43:5
  44:12,22 47:17 50:8
  51:19 94:12 107:3
  107:11 115:2,20
  117:7 137:16,24
  138:6,13 141:12
spell 74:20
spike 96:19
stable 29:18
stage 21:9 36:7
standard 92:1
stands 38:14 88:15
start 101:21
starting 88:15 100:13
  100:16
starts 122:17
state 8:15 91:6 125:15
  143:3,8
statement 16:12 17:3
  80:7 88:14,23
  114:15 117:10
statements 104:19
states 1:1 21:9,20
  22:4 45:22 49:12
  74:3 113:15
stating 41:17
Ste 3:15
stem 57:23,24
stenographic 13:7
Step 119:23
Stettinius 2:21 7:3
  145:4
stimulation 84:24
Stimulatory 107:21
stimulus 61:1
stop 122:16
Stops 2:3 6:24
straightforward 97:25
Street 3:15 8:19
  144:18
Structurally 84:5
  147:15
structure 11:12,15,18
  11:21 14:1 53:14
  117:25
structures 13:9,12
studied 45:14 59:1,7
  63:3,10,23 64:5
  86:20 119:20
studies 67:22,24
  77:13,20 79:1,5
  105:12 136:7,10
  137:21 138:19,22,24
  139:1,9
study 39:6 79:12
  86:14,15,17 134:9
  138:3,10 139:2,3

studying 85:10
subject 46:1 78:3
  85:14
submitted 17:16
subscribed 145:21
subsequently 20:10
  48:18
substance 145:15
Substantial 13:17
successful 96:25
successfully 128:7,19
sued 82:24
suing 17:22
Suite 2:22 4:6
Sullivan 1:18 2:4 6:22
summarized 77:5
summary 121:3,14
Summit 8:19
support 105:12
sure 12:24 19:23 26:3
  31:14 32:14 34:15
  34:18 36:15 43:9
  44:24 47:23 68:19
  68:22 72:11 78:11
  83:10 96:6,9 102:12
  108:10 109:4 113:12
  113:14 114:12
  124:11 125:7 132:7
surgery 49:10
suspect 61:10
sustain 57:14
swear 8:6
Switching 14:5
SWOG 38:5,9,14
  39:25
sworn 8:9 143:11
system 13:15 14:4
  29:6 49:8 57:23
  87:17,18
S-W-O-G 38:9

| T |
|---|
T 143:1,1,1 147:1
  148:1
Table 5:1 129:19
tackle 32:3
Taft 2:21 7:2 145:4
take 10:15 60:11
  130:14 137:5
taken 55:11 83:13
  130:20 140:9
talk 75:1 78:16 80:13
  86:12 89:22 99:9
  132:11 136:5
talked 54:9 57:7 70:4
  70:11 85:15 105:24
  133:8

**talking** 13:10 27:15
28:17 48:16 58:3
71:2 86:8 131:17
**talks** 55:20 59:21
**task** 76:5
**teaching** 71:6,9,11,21
72:6 93:8,18,21
96:10
**technical** 23:21,25
**technician** 84:7 89:12
**technique** 46:4
**technology** 69:10
70:10
**Telephone** 7:10
**Telephonic** 3:4,13,21
4:3
**tell** 41:13,19 42:9 46:1
48:11 101:23 104:25
123:15
**telling** 120:20
**Temple** 89:24 90:3,19
90:23 91:1,3
**ten** 135:22 136:3
**teratogen** 23:20,24
24:6
**term** 17:8 23:21,25
28:3,4 30:14 37:9
49:23 50:20 58:13
58:19 69:16 72:6
86:3 88:7 93:8,10
96:3,13 105:17 109:9
112:23 114:16
139:15
**terminology** 69:20
**terms** 13:9 50:25 51:2
51:7 93:9 111:1
132:10
**test** 135:5,7
**testified** 8:10 97:17
120:3 127:15
**testifying** 97:9,11
**testimony** 14:25
120:23 139:13
143:12
**Teva** 3:19 7:21
**text** 115:9,9
**textual** 101:25
**thalidomide** 20:10,14
21:6 22:8,18,21
23:19,23 25:14 55:3
**thank** 12:17 61:17
109:7 142:4,6,8
**therapeutically** 123:2
127:11 128:13
**therapies** 63:4,10,24
64:5
**therapy** 121:10

**thesis** 91:1,4
**thing** 23:6,10 101:14
**things** 16:4 66:21
86:25 138:9
**think** 10:24 11:4,11
12:13 14:9,20,20
16:12 20:8 21:5 32:1
37:9 39:3 41:24 44:1
72:5,13,24 73:11,16
77:8,11 79:7 80:6
81:22 88:14,14
90:21 92:10 94:14
94:16 99:3 105:6,19
109:11 113:12 114:6
116:11 117:3 120:16
124:5 129:10 130:6
134:8,8 136:22
138:18
**thinking** 88:4
**thought** 53:20 97:25
109:10 138:2
**thousand** 27:23
**thousands** 113:4
115:11,16,25 116:25
**three** 25:13 28:7 77:20
77:24 101:20 102:3
103:18 129:23 137:3
**three-quarters** 129:20
**thrombasthenia** 51:6
**thrombocytopenia**
26:5 51:4 52:3,14
54:12,22 55:2
**Thrombocytophy** 51:6
**thrombosis** 26:7
50:16 51:10,13,14
51:22 52:9
**time** 6:11 7:9 22:7,18
24:12,18,24 25:6
39:3 40:13 48:15
55:6 78:5,9 83:8
90:3 97:17 113:7,17
134:15,16 137:1,11
137:18 142:5,13
**timely** 10:8
**times** 14:8,10 131:23
**title** 60:10 62:15 84:3
116:21,24 117:9
**titled** 107:20 147:7
**today** 89:15 98:19
124:22 125:7 132:22
133:21 135:12
136:19 140:14,23
142:5
**Today's** 6:10
**told** 76:1
**top** 11:24 87:4
**totality** 48:6

**Tower** 4:5
**toxic** 42:25 45:9
**toxicities** 79:9 92:7
**toxicity** 79:10
**tracks** 14:5
**trade** 21:24 133:16,19
133:23 134:1,5,13
134:22,24
**transcript** 141:19
145:3
**transcription** 145:12
**transplantation** 87:16
87:22
**treated** 28:23 34:12,25
35:4,8,9,14 110:23
128:8
**treating** 77:6 87:8
88:13,22,24 121:7
129:7,12,15
**treatment** 30:10,11
31:4,8,16,19,23
46:14,15 75:8 94:1
100:24 102:16,21
103:4 104:11,21
106:10 108:3,4,17
110:12,16 111:24
112:4 123:1,8,16,25
124:13,25 125:10,16
126:4,24
**treatments** 30:12
**treats** 130:1
**trial** 36:10,14,17,23
37:3 39:20,25 40:7
45:15 69:10 76:11
76:12 110:20,21,23
111:5
**trials** 10:22,23 27:1
35:21,25 36:12,19
71:15 79:6 93:9
**trivial** 37:9 113:7,11
**true** 40:6 101:7 106:24
143:12
**try** 19:17 25:18 35:16
79:8
**trying** 17:24 28:25
76:1 104:15 136:6
131:4,5
**turn** 9:10 27:12 28:14
55:19 59:17 65:22
109:21 120:13
**turned** 23:5
**twice** 14:12
**two** 9:2 13:16,16,21
27:22 48:7 57:14
73:14 97:5 108:9
137:3
**type** 65:7 66:6 110:13

121:24 139:2
**types** 121:7
**typical** 49:16
**typically** 16:25 27:23
28:22 29:8 99:1,3
**typographical** 102:2
**T.O** 4:2 7:23

**U**

**um-hmm** 109:12
**unacceptable** 79:10
**unaware** 117:8
**uncertainty** 48:19
**unclear** 35:13 48:17
**underactive** 50:17,21
**undergraduate** 71:21
**understand** 11:18,19
11:21 13:11,25 16:3
16:10,15,23 17:9,11
17:16,21 19:4 20:25
21:24 25:3 28:25
80:1 82:17,19 86:19
92:25 104:15 114:24
115:15 119:14
120:18 129:9
**understanding** 15:25
18:3 30:7 78:2
120:17
**Understood** 28:13
91:5
**unfamiliar** 17:8
**United** 1:1 45:22
**units** 28:5
**university** 12:3,12,15
12:19 15:10 36:1,20
53:14,16 54:2,5
89:24 90:19,24
**unresolved** 139:6
**untested** 77:19 78:4
78:17
**update** 10:9,19
**Urquhart** 1:18 2:4 6:22
**USA** 7:22
**use** 17:25 25:19 32:23
49:23 69:16 92:10
93:8,14,20 96:3,10
96:11,13 98:19,22
102:12 111:3 114:15
133:2,14,18,23
134:1,5,13,19
135:11 139:4
**useful** 57:17,20,22
58:1 87:7 88:12,17
88:17,22
**usefully** 27:10
**usually** 18:17 77:20
**U.S** 53:12 77:15

107:18

**V**

**v** 1:6
**vaccine** 122:13
**vague** 32:2
**valuable** 47:21 85:2
105:7
**value** 28:5 94:7,10
**variable** 13:20,22
**variations** 60:12
**venous** 26:6
**version** 10:14
**versus** 6:8 87:10,14
87:20
**vessel** 51:15
**VIDEO** 1:13
**videographer** 4:16 6:5
6:15 8:5 13:1,4 55:9
55:12 83:11,14
130:18,21 142:10
**view** 47:20 93:7
**virus** 87:10 122:13
**vitae** 9:21 53:15 147:8
**vitro** 58:14,18,23 59:1
59:8 60:8 86:11,15
105:11,19,25 106:9
106:24 107:6
**vivo** 58:11,20 86:17
**Volume** 6:6

**W**

**W** 3:12
**Wacker** 2:13,22 6:13
**wait** 62:6 104:2
**Walia** 3:7 12:12
**want** 52:10,15 70:1
72:11 91:14 92:6
102:11 103:23
130:14
**wants** 32:5
**Washington** 3:16
**wasn't** 39:7 53:25
**way** 30:15 35:16 37:20
45:8 53:21 71:21,22
74:21 88:17 95:10
143:16
**ways** 74:20 96:23
103:18
**website** 81:11
**week** 10:10
**WEHI-231** 65:2,8,14
86:9
**well-being** 96:18
**went** 49:13 84:17
85:15
**West** 2:13

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

**we'll** 8:3 10:12,15
19:17 30:16
**we're** 25:3,3 90:22
92:8 133:4
**WHEREOF** 143:19
**who've** 87:21
**widely** 60:7
**Wilson** 4:4 7:23
**Wisconsin** 144:20
**wise** 92:10
**wish** 37:13
**witness** 2:19 5:3 7:6
8:7 15:22 16:8,20
17:24 19:1 20:8
21:13 23:9,14 25:17
26:1,14,25 27:7
31:11,18 32:1 33:15
34:5,15 35:4,13
37:19 38:3,21 39:17
40:4,11,15,24 41:6
41:16,24 42:13,20
43:6,15,21 44:1,13
44:24 45:13 47:8,18
48:5,15 49:2 50:10
50:14,24 51:4,20
52:1,7,12,19 54:16
54:25 55:5 58:7,16
59:4,10 60:16,23
61:10,24 62:8,24
63:7 64:2,8 65:11,20
66:10,22 67:3 72:5
74:14,19 76:20 78:8
78:13,23 79:15,24
80:6 81:4,18,22
82:12,16,23 84:22
86:25 87:25 88:6
89:4 90:7,11 92:1,16
92:23 93:4,17,24
94:7,14 95:15,25
96:6,17 97:3,22
100:18,21,22 101:19
104:13,24 105:6,19
106:4,14 107:4,12
108:7,21 109:24
110:19 111:10 112:8
112:23 113:21 114:6
115:5,21 116:9,17
117:8,22 118:8,15
118:22 119:7,19
120:11,24 122:3,12
122:20 123:12,21
124:5,19 125:4,12
125:21 126:9 127:4
127:15,23 128:7,19
129:2 130:5,13
135:6,15,21 136:16
136:21 137:8,17,25

138:7,14,21 139:14
140:18 141:3,13,18
142:8 143:10,13,19
145:5
**witness's** 103:23
120:23 139:13
**women** 26:3
**wondering** 78:19
**word** 30:8 93:14
**words** 16:17 122:21
**work** 12:12,14 14:2
29:17 55:16 58:23
64:11,15,17,22
85:19 106:15
**worked** 89:12 92:20
**working** 39:11 40:8
41:12 42:10 48:13
**workings** 49:25
**world** 76:10
**worth** 28:7
**wouldn't** 93:14 96:11
105:12 138:16
**write** 53:2
**writing** 90:25
**written** 16:17
**wrong** 55:22 131:15
**wrote** 73:15,19

**X**

**X** 147:1,1 148:1,1

**Y**

**yeah** 48:5 62:4 72:17
103:22,22 117:19
**year** 27:24 29:2 69:2
**yearly** 99:2
**years** 14:11,13 28:22
29:2,4,19,23 30:2,18
30:23 31:4 32:12,17
32:23 33:19,23
55:23 110:5 135:22
135:22 137:3
**yes/no** 129:10
**York** 2:6,6 3:7,7,24,24
4:13,13 6:17,22 7:20
**young** 122:14

**Z**

**zolaspir** 114:1

**0**

**03-18-14** 147:24
**04-24-01** 148:7
**05-27-14** 148:4
**06-01-19** 147:7
**07-02-19** 147:4
**07-12-12** 147:21

**1**

**1** 6:6 8:24 9:3,5,11,25
17:16 27:12 28:15
34:12,16,18 45:18
49:6 52:22 70:13
73:12,19,22 74:24
80:11 91:15,20 95:6
97:7 109:21 117:13
117:17 118:22
119:13,23,25 123:21
123:24 124:11,24
125:9,12,21 126:1,2
126:15,17,22 127:5
127:9,20 128:1,12
128:17,23 140:10,14
140:23 141:9 147:4
147:4,7
**1st** 10:1
**1-212-446-4800** 3:25
**1-212-849-7000** 2:7
**1-312-527-4000** 2:24
**1-312-782-3939** 2:15
**1-800-825-3341** 1:25
4:14
**1-800-825-9055**
144:13
**1-866-211-5914** 3:8
**1:06** 142:11,13
**10** 35:17,20 55:23
56:10 113:3 131:3
131:24 133:6 139:20
**10:09** 55:10
**10:22** 55:13
**10010** 2:6
**10011** 4:13
**10022** 3:7,24
**107** 148:7
**11** 56:16
**11:03** 83:12
**11:28** 83:15
**111** 2:22 6:12
**1130** 85:21 87:4
**12:35** 130:19
**12:50** 130:22
**13** 45:17 117:12
**130** 148:10
**14** 28:14 56:17,23 57:9
73:11 91:14
**14.1** 131:17 132:3,12
**143** 5:12
**145** 5:14
**147** 5:16
**15** 11:11 55:23 67:5
68:1
**150** 35:24 36:19
**16** 97:6
**17** 98:4

**17th** 3:15
**17-3387** 1:10
**18** 14:17 29:16 67:8
68:1 69:4 74:24,25
99:7,24 110:6
**19** 68:7 76:24 129:1
**1927** 140:2
**1950s** 22:19,24
**1967** 49:7
**1974** 90:20
**1975** 90:16
**1998** 69:2 84:14
107:19

**2**

**2** 8:24 9:4,17,20 11:22
49:4 52:23 55:20
59:18 62:11 63:14
67:6 68:8 69:4 73:12
73:19,22 91:20 95:6
95:19 100:12 107:19
147:7
**2nd** 9:14
**20** 14:9 33:24 34:1,19
34:24 35:4,7 80:10
82:6
**2000s** 20:15,20 24:14
24:22 63:11 64:6
**20006** 3:16
**2001** 107:19
**2002** 22:15 78:11
113:22 114:14
**2008** 10:1
**2013** 21:5 25:1,8
**2018** 81:7,11,13,13,15
131:10
**2019** 1:15 6:11 9:14
81:13 143:20 145:22
**202-654-4584** 3:17
**21** 68:8 73:23 140:10
140:15,23 141:9
**22** 77:12 136:4
**22nd** 2:5
**23** 1:15 78:25 79:4
**23rd** 6:10
**24** 68:16
**24th** 107:19
**25** 136:4
**262** 100:5,8 101:5,10
101:17 102:6,10,13
103:2 104:7,19
111:16 115:16 116:4
116:13 117:4,19
120:14 125:9
**27** 131:17,22
**28** 131:17,23
**28-day** 140:10,15,24

141:9
**2800** 2:22
**29** 68:16

**3**

**3** 27:13 45:18 73:13,19
73:22 76:11 83:16
83:20,24 84:2 91:19
92:4 94:25 100:12
120:14 121:2,15
127:16 128:1,8
147:11
**30** 68:16 144:8
**309** 144:18
**31** 62:12 68:16
**32** 68:16
**33** 68:16
**3300** 4:6
**34** 68:16
**35** 68:18
**37** 111:19
**375** 99:3
**38** 59:18 100:14,16
116:12 117:15,16
**39** 68:18

**4**

**4** 28:15 73:13,20,22
74:23 91:19,23
92:12,19 94:20 98:8
98:13 100:12 120:4
120:8 127:16 128:12
128:20 140:9 147:18
**40** 33:2,3 63:16 121:15
**400** 99:3
**415.947.2000** 4:8
**445** 3:6
**48** 64:25

**5**

**5** 55:19 89:20 99:11,15
99:22,23 100:4,12
109:5 111:17 113:2
113:3 117:17,18
119:25 127:10,21
147:21
**5,000** 27:25
**50** 28:23 29:1,3,8
**500** 3:15
**51** 2:5 65:23
**52242** 12:21
**542** 144:19
**54853** 144:20
**57** 111:21

**6**

**6** 5:8 99:16 100:12

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

101:8 102:8 147:24
**6,221,882** 107:18
148:7
**6.5.5** 112:8
**6.5.6** 111:22 112:12,14
112:19 114:19
115:13
**601** 3:23
**60601** 2:23
**60601-1692** 2:14
**620** 8:19

**7**

**7** 9:10 62:10 99:15,18
99:22,23 100:12
101:8 102:8 129:19
148:4
**7TD1** 65:25 66:6,25
**74** 4:12
**77** 2:13

**8**

**8** 27:13 59:17 63:13
107:13,17,22,25
148:7
**8,198,262** 147:21
**8,673,939** 147:24
**8,735,428** 148:4
**800** 3:15
**801** 11:5
**83** 147:11

**9**

**9** 65:22 130:23 131:2,3
131:4,7,16 148:10
**9:08** 6:3,11
**9:15** 13:2
**9:20** 13:5
**94105** 4:7
**98** 147:18
**99** 147:21,24 148:4

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

```
                                                   Page 144
                    INSTRUCTIONS FOR ERRATA

     NOTARY PUBLIC SIGNATURE
     Not required unless agreed upon by counsel that
     notary public signature is required.

     Please return a copy of the signed errata within
     30 days of receipt, unless otherwise agreed upon
     by counsel.  Once we receive the signed errata, we
     will distribute an electronic copy to all parties.

     RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
          FAX:     1-800-825-9055
          EMAIL:   janerose@janerosereporting.com

          Jane Rose Reporting
          Administrative Offices
          309 South Main Street
          PO Box 542
          Luck, Wisconsin  54853
```



US District Court - New Jersey          FINAL - August 23, 2019
Celgene v. Hetero Labs                  Donald Macfarlane, MD

Page 145

NOTICE TO READ AND SIGN

This transcript was electronically distributed to
TAFT STETTINIUS & HOLLISTER LLP to forward to
witness.

ACKNOWLEDGEMENT OF DEPONENT

        I, DONALD E. MACFARLANE, MD, do hereby
certify that I have read the foregoing pages and
that the same is a correct transcription of the
answers given by me to the questions therein
propounded, except for the corrections or changes
in form or substance, if any, noted in the
attached Errata Sheet.

Sept-5 2019          _____

Date                 DONALD E. MACFARLANE, MD

Signed and subscribed to before me this
_5_ day of September , 2019.

_____
Notary Public

STACY PRUTER
Commission Number 785571
My Commission Expires
August 15, 2020
IOWA

JANE ROSE REPORTING          National Court-Reporting Coverage
1-800-825-3341               janerose@janerosereporting.com

US District Court - New Jersey
Celgene v. Hetero Labs

FINAL - August 23, 2019
Donald Macfarlane, MD

Page 146

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 23 | 15 | "Limb bud" | Nor "limbol" |
| 24 | 10 | " | " |
| 40 | 5 | "body fluids" | Nor "bloddy..." |
| 60 | 1 | "apoptosis" | not "a peptosis" |
| 60 | 8 | "derived from" | not "to derive" |
| 60 | 24 | "changed" | not "chain" |
| 69 | 10 | "le xe mo" | |
| . | 15 | " | |
| " | 19 | " | |
| " | 22 | " | |
| 70 | 10 | " | |